**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEBT BUYERS' ASSOCIATION, )-<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JOHN W. SNOW, Secretary )<br>of the Treasury, *et al.,* )<br>)<br>Defendants. )<br>) | Civil Action No. _____ |

**PLAINTIFF DEBT BUYERS' ASSOCIATION'S MEMORANDUM OF POINTS**
**AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY**
**RETRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Plaintiff Debt Buyers' Association ("Plaintiff" or "DBA"), by its undersigned counsel and

pursuant to Rules 7 and 65 of the Federal Rules of Civil Procedure and Local Civil Rules 7(a)

and 65.1, submits this Memorandum of Points and Authorities in Support of its Motion for

Temporary Restraining Order and/or Preliminary Injunction.

**INTRODUCTION**

The power of Congress to lay and collect taxes is without question. The means of doing

so, however, are not without limit. When Executive Branch officials exceed the bounds of

authority Congress has dictated for the assessment and collection of taxes, they are acting in

violation of the Constitution – both because they are no longer acting under color of

Congressional right, and because their conduct may be significantly encroaching upon other,

unquestionable rights and protections afforded by the Constitution, federal statute and by state

laws. These are the circumstances at issue in DBA's present action.

The purpose of this lawsuit is to secure relief for DBA's debt-buying members,[1] from the Defendants' promulgation and enforcement of Treas. Reg. § 1.6050P-2(e).  Defendants have issued an interpretive regulation that (1) surpasses the statutory authority under which it was enacted; (2) invades an independent federal statutory scheme expressly created by Congress to be the primary regulatory force governing the debt buying industry; (3) effectively displaces the independent common and statutory laws of the sovereign states that have traditionally bestowed certain entitlements upon the members of the debt buying industry; and (4) results in the forcible deprivation of Debt Buyers' legal and economic rights in desecration of the Fifth Amendment Due Process Clause.

The irreparable harm that DBA seeks to prevent includes the certainty that an entire industry of Debt Buyers will be compelled to violate federal law.  Forced to now file Form 1099-C informational reports because of the unconstitutional reach of Treas. Reg. § 1.6050P-2(e), Debt Buyers will fail to fully comply because often they simply do not receive and cannot otherwise ascertain the requisite information sought.  Further, any attempt to satisfy their Form 1099-C filing requirements places Debt Buyers in direct contravention of the purposes and specific prohibitions of the Fair Debt Collections Practices Act ("FDCPA"), thereby subjecting Debt Buyers to the very real, indeed, the "promised" threat of class action litigation under the FDCPA for each Form 1099-C.  Still further, Defendants' enforcement of Treas. Reg. § 6050P-2(e) effectuates a federally-mandated, three-year statute of limitations over the entire debt buying industry for collections activities on the consumer debts they have purchased.  Such a limitations

---

[1]    For purposes of DBA's Motion and this Memorandum in Support thereof, all references to DBA and DBA's members specifically regard those members of the DBA who are in the business of purchasing, collecting, and/or reselling delinquent consumer loans and receivables; *i.e.*, "Debt Buyers."

period conflicts with the statutes of limitation that have been enacted by the sovereign states, and may effectively preempt their enforcement. Not only therefore, does Treas. Reg. § 1.6050P-2(e) strip Debt Buyers of certain legal and economic rights, it threatens the very existence of an entire industry – an industry that has provided substantial benefits to our economy. The instant suit seeks to restrain the Defendants from their pursuit of such unlawful conduct and protect this industry from the irreparable injury that will certainly result.

## STATEMENT OF FACTS

In support of this Motion, DBA submits the following as its statement of pertinent facts, which are attested, for the record, by the accompanying Declaration of Roger A. Knauf ("Knauf Decl."), attached hereto as Exhibit 1:

1.      Debt Buyers are in the business of purchasing and collecting delinquent consumer loans and receivables. Debt Buyers do not originate loans; rather, they specialize in purchasing at a discount from lending institutions (*e.g.*, banks, finance companies, and credit card companies), portfolios of consumer loans and receivables that have been in default for a significant period of time ("Consumer Loans"). Examples of Consumer Loans that Debt Buyers routinely purchase include mortgage loans, home equity lines of credit, student loans, automobile loans, and credit card receivables. Consumer Loans are usually originated by large, institutional lenders like banks, finance companies and credit card companies ("Originating Lenders"). *See* Knauf Decl. ¶¶ 2-4.

2.      DBA, a tax-exempt trade association, has approximately 550 members; almost all of whom are Debt Buyers or associated with the debt buying industry. Chief among DBA's missions is to build and maintain a reliable and credible market for the delinquent receivables market. To that end, DBA tracks state and federal legislation affecting the debt buying industry

and educates its members about significant changes in the law.  DBA, on behalf of its members, also lobbies state and federal agencies regulating and/or monitoring the delinquent receivables market and debt collection activities, including those of Debt Buyers. *Id.* ¶¶ 5-6.

        3.       The debt buying and collection industry comprises more than 10,000 companies and employs roughly 200,000 individuals engaged in the purchasing and collecting of consumer debt.  The industry provides a valuable service and a substantial benefit to the United States financial markets and American consumers.  Lending institutions, such as banks, savings and loan associations, and credit card companies, each year charge-off bad or delinquent consumer debt in excess of $100 billion, representing tens of millions of individual consumer loans.  By purchasing Consumer Loans in default, Debt Buyers enable lending institutions to recoup a portion of their losses which, in turn, helps keep interest rates low and the prices of homes and consumer products and services more stable.  Without an efficient market for the disposition of defaulted consumer debt provided by the debt buying industry, consumer interest rates and prices would be higher. *Id.* ¶¶ 6-7.

        4.       Before making a Consumer Loan, an Originating Lender typically (i) evaluates the creditworthiness of the consumer borrower, (ii) analyzes the collateral, if any, pledged as security for the Consumer Loan, (iii) establishes payment and other terms for the Consumer Loan, and most importantly, (iv) provides the underlying documentation for the consumer lending or credit arrangement.  If a Consumer Loan becomes delinquent, the underlying documentation usually allows the Originating Lender to charge default interest, late charges, attorneys' fees and other costs and expenses of enforcing and collecting the loan. *Id.* ¶ 8.

        5.       It is customary in the consumer lending industry that once a Consumer Loan has been delinquent for more than 180 days, the Originating Lender charges off on its books the

aggregate amount of the unpaid principal, accrued and unpaid interest, late charges, attorneys' fees and other related costs and expenses (a "Charge-Off"). *Id.* ¶ 9.

6.     Once a Charge-Off has been taken, the Originating Lender ordinarily transfers the Consumer Loan to a book account that records the aggregate amount of the Charge-Off, but does not memorialize the debt components at the time of the Charge-Off. *Id.* ¶ 10.

7.     Often, an Originating Lender will seek to recoup a portion of its lost investment in a Consumer Loan that has been charged-off by selling it, usually as part of a portfolio of delinquent Consumer Loans, to a member of the DBA or a similarly situated Debt Buyer. *Id.* ¶ 11.

8.     Unlike an Originating Lender, a Debt Buyer does not engage in any of the underwriting or collateral analysis associated with originating a Consumer Loan. Rather, a Debt Buyer will offer a purchase price for a portfolio of delinquent Consumer Loans based primarily on (i) the size of the portfolio, (ii) the type of consumer debt involved, and (iii) sometimes a computer analysis that provides data on the likelihood of repayment based on statistical models of the account data. Very often, this equation translates into a Debt Buyer purchasing a portfolio of delinquent Consumer Loans for a fraction of the total amount owed to the Originating Lender. *Id.* ¶ 12.

9.     Not only are there striking differences in the activities performed by Originating Lenders, on the one hand, and Debt Buyers, on the other, the risks and rewards of their respective businesses diverge greatly. Originating Lenders are financial intermediaries who borrow money at one rate of interest (either from the Federal Reserve Bank or other institutional lenders, or through deposits made by customers), loan out that money at a higher rate of interest, and realize a profit based upon the "spread" between the two interest rates. Debt Buyers, in contrast, are not

financial intermediaries, but rather investors who purchase assets (defaulted consumer debt) at a discount and attempt to earn a return on that investment through the debt collection process. The realization of profit by originating lenders is more certain while the potential for realization of significant profits, at the risk of substantial losses, by Debt Buyers is greater. *Id.* ¶ 13.

10.    When a Debt Buyer acquires a portfolio of defaulted consumer loans, the Debt Buyer generally receives from the Originating Lender only the account balance with respect to each Charge-Off taken by the lender. In other words, the Debt Buyer often does not know the component amounts of stated principal, unpaid accrued interest, late fees and other charges that comprise the total amount due from the consumer borrower. *Id.* ¶ 14.

11.    Once a Debt Buyer has purchased a portfolio of defaulted Consumer Loans, it may engage in collection efforts (or hire a third-party collection agency to engage in such efforts), which may include locating the borrowers, determining whether the borrowers are in bankruptcy, commencing legal proceedings, or otherwise encouraging payment of all or a portion of the delinquency. *See* Knauf Decl. ¶ 15.

12.    When a Debt Buyer forgives or discharges all or a portion of a defaulted Consumer Loan that it has purchased (or is otherwise required by the regulations under Section 6050P of the Internal Revenue Code of 1986, 26 U.S.C. § 6050P (the "Code") to issue a Form 1099-C because some other "identifiable event" has occurred), that Debt Buyer usually will not be in a position to accurately reflect on the Form 1099-C the amounts to be filled in Box 2 or Box 3 of the Form. The Debt Buyer generally does not have the debt components from the Originating Lender, representing the stated principal of the Consumer Loan nor the unpaid accrued interest on the loan. Nor can the Debt Buyer calculate or reverse engineer the debt components on its own. The Debt Buyer typically receives from the Originating Lender only the

aggregate amount owed by the consumer borrower that includes the total of principal, interest and other sums. As a result, the Debt Buyer is usually unable to accurately report (i) in Box 2 only the amount of stated principal discharged and (ii) in Box 3 the amount of interest included in Box 2. *Id.* ¶ 16.

13.    Because Debt Buyers are customarily provided with only an account balance for each Consumer Loan they purchase, they usually lack a detailed breakdown of the principal, interest and other components of those loans. As a result, they risk violating (and incurring liability under) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1629 *et seq.*, by making "false representations" of the "character, amount, or legal status" of such loans through the issuance of Forms 1099-C that contain incorrect information. In particular, because Debt Buyers are generally not furnished with the information to accurately complete Boxes 2 and 3 of Form 1099-C, they may, for example, overstate the amount of stated principal and understate the amount of unpaid interest "cancelled." *Id.* ¶ 17.

14.    The threat of FDCPA litigation is a very real concern to DBA's members and similarly situated Debt Buyers. Upon information and belief, the plaintiff's bar involved in FDCPA litigation has "promised" to institute class action lawsuits based upon inaccurate Forms 1099-C constituting false or misleading communications to consumer debtors. *Id.* ¶ 18.

15.    The filing of Forms 1099-C may impact Debt Buyers' ability to collect debt and/or enforce debt judgments beyond three years due to the 36 month "non-payment" rule in Section 6050P's regulations. This is because case law suggests that courts are willing to find debt, including judgment debts, unenforceable if the creditor (here, a Debt Buyer), has issued to the debtor a Form 1099-C reporting discharge of indebtedness income. *See e.g.*, *In re Crosby*, 261 B.R. 470 (Bankr. Ct. D. Ka. 2001) (finding creditor's claim "unenforceable" in light of

creditor's issuance and filing of a Form 1099-C). This issue is of major concern to Debt Buyers who engage in collection activities beyond three years as permitted under applicable state statutes of limitations. *Id.* ¶ 19.

16.    In December 2005, DBA engaged the law firm of Womble Carlyle Sandridge & Rice PLLC to petition the Internal Revenue Service for a one-year postponement of the applicability of the information reporting requirements of Section 6050P to Debt Buyers. The purpose of the requested postponement was to give (i) the debt buying industry time to work with the United States Congress so that it could consider whether it intended to extend the application of Section 6050P to the industry, and (ii) the IRS time to consider how, if at all, the information reporting requirements of Section 6050P can practically be applicable to purchasers of consumer indebtedness. The IRS denied DBA's request for a one-year postponement on or about Jan. 12, 2006. After a meeting with IRS representatives and two written submissions to the IRS, the IRS denied DBA's request for a one-year postponement on or about January 12, 2006. *Id.* ¶ 20.

17.    The industry practice regarding information obtained and maintained related to defaulted Consumer Loan debt has been driven by the fact that Originating Lenders have not been required to maintain on their books the stated principal, accrued interest and other components of the debt beyond the total amount owed once a Charge-Off has been taken. Thus, Originating Lenders have been unable to and have not provided this information to Debt Buyers for decades. Treasury Regulation § 1.6050P-2(e) effectively reaches backwards to impose requirements that cannot be complied with. *Id.* ¶ 21.

## STATUTORY BACKGROUND

### A.    Section 6050P Of The Internal Revenue Code

Section 6050P of the Internal Revenue Code, 26 U.S.C. § 6050P(a)-(d) ("Code"), requires federal agencies and any "applicable financial entity" that discharges the indebtedness of any person to (i) file an information return with the Internal Revenue Service ("IRS") setting forth, among other things, "the amount of the indebtedness discharged" and (ii) issue to the person whose debt was discharged a similar information statement.

Initially, the term "applicable financial entity" under Section 6050P included only regulated banks, savings and loan institutions, credit unions, and their respective affiliates, and certain federal agencies. *See* 26 U.S.C. §§ 6050P(c)(1), (c)(2)(A)-(C). Congress, however, amended Section 6050P in 1999 by expanding the definition of "applicable financial entity" to include "any organization a significant trade or business of which is the *lending* of money." *See* Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 107-204, § 533(a), 113 Stat. 1860 (emphasis added). The legislative history accompanying the amendment makes clear that Congress believed it was "appropriate to treat discharges of indebtedness that are made by similar entities in a similar manner," and "to extend the scope of [Section 6050P] to include the indebtedness discharged by any organization a significant trade or business of which is the lending of money (such as *finance companies and credit card companies whether or not affiliated with financial institutions*.). *See* H.R. REP. NO. 106-478 (1999) (Conf. Rep.), 106 H. Rpt. 478, at *110 (Lexis) (emphasis added). In other words, Congress intended Section 6050P to apply to regulated (as originally enacted) and unregulated (as amended) originators of loans, and to certain federal agencies.

**B.     Treasury Regulation § 1.6050P-2(e)**

Notwithstanding Congress' express intent, Defendants have extended the information and reporting requirements (of Section 6050P) beyond the language of the statute to a new class of entities – Debt Buyers – pursuant to Treas. Reg. § 1.6050P-2(e).  The IRS proposed Treas. Reg. § 1.6050P-2(e) in an attempt to provide guidance on the definition of an "organization a significant trade or business of which is the lending of money" for purposes of Section 6050P.  *See* Guidance Under Section 6050P Regarding Cancellation of Indebtedness, 67 Fed. Reg. 40629 (proposed June 13, 2002), attached hereto as Exhibit 2.  Under this regulation, "lending money" is deemed to include "acquiring an indebtedness not only from the debtor at origination but also from a prior holder of the indebtedness."  *See* Treas. Reg. § 1.6050P-2(e).  It is by virtue of this language that Defendants reach out and grab hold of Debt Buyers for purposes of Section 6050P, despite the fact that the literal terms of Section 6050P and its legislative history refer only to lenders of money.

As enforced presently by Defendants, Treas. Reg. § 1.6050P-2(e) is effective for discharges of indebtedness occurring on or after January 1, 2005.  *See* Treas. Reg. § 1.6050P-2(i).  Under Section 6050P(d), information statements with respect to debts discharged in 2005 must be delivered to the borrowers not later than January 31, 2006.  *See* 26 U.S.C. § 6050P(d).  Copies of such information returns must be filed with the IRS no later than February 28, 2006.  *See* Treas. Reg. § 1.6050P-1(a)(4).  The regulations under Section 6050P contemplate that IRS Form 1099-C will be used as the required information statement and information return, and that a lender issuing and filing such Forms will state on the Form the information required by it and its accompanying instructions.  *See* Treas. Reg. § 1.6050P-1(a)(1).

Form 1099-C requires the creditor to state in Box 2 of that form the amount of debt cancelled. A true and complete copy of the 2005 version of Form 1099-C and its instructions is incorporated herein and attached hereto as Exhibit 3. Box 3 of the form requires the creditor to state how much interest was included in the amount reflected in Box 2. The instructions to Form 1099-C state on page AC-3 that for a *lending* transaction, the creditor is required to report only the stated principal in Box 2. *See* Ex. 3. Those instructions also state that if a creditor reports interest as part of the cancelled debt in Box 2, it must show the interest separately in Box 3. *Id.* The purpose of Form 1099-C is, according to Defendants, to "verify that the debtor has included the proper amount of cancelled debt in income on his or her income tax return." *See* Notice and Request for Comments regarding Form 1099-C, attached hereto as Exhibit 4.

Defendants are fully aware that (1) it is customary in the debt buying industry for the Originating Lender to *not* provide to a Debt Buyer a breakdown of the aggregate amount due from the defaulting consumer borrower among stated principal, unpaid accrued interest, late charges and other costs and expenses; and (2) federal law does not require regulated lenders to even maintain such a breakdown once a defaulted loan has been "charged off." As a result, when a Debt Buyer subsequently forgives or discharges all or a portion of a defaulted Consumer Loan that it has purchased (or is otherwise required by the regulations under Section 6050P to issue a Form 1099-C because of the occurrence of some other "identifiable event"), that Debt Buyer usually will not be in a position to accurately reflect on the Form 1099-C the amounts to be filled in Box 2 or Box 3 of the form. *See* Knauf Decl. ¶ 16. In particular, because Originating Lenders typically furnish Debt Buyers only with the total account balance for each defaulted consumer loan sold, the Debt Buyer may overstate the amount of principal in Box 2 and understate the amount of unpaid interest in Box 3. *Id.* ¶¶ 16-17. Because unpaid interest that is discharged

often does not result in discharge of indebtedness income for federal tax purposes, consumer borrowers may feel particularly aggrieved by a Debt Buyers' inability to provide accurate information on Form 1099-C. *See* 26 U.S.C. § 108(e)(2).

## C.    The Fair Debt Collection Practices Act

In light of the foregoing limitations on a Debt Buyer's ability to issue accurate Forms 1099-C, by attempting to comply with Treas. Reg. § 1.6050P-2(e), DBA members will violate critical provisions of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692a-1692o (the "FDCPA"), and may be liable under similar state consumer protection laws as well.

The FDCPA regulates the activities of "debt collectors" who collect "debts" from "consumers," as those terms are defined in 15 U.S.C. § 1692a(6)(F).    Unlike Originating Lenders, who are exempt from the definition of "debt collector" as a "creditor" under Section 1692a(6), Debt Buyers who purchase portfolios of delinquent Consumer Loans and subsequently attempt to collect those loans have to comply with the FDCPA.  The FDCPA, which is enforced by the Federal Trade Commission ("FTC"), but which also authorizes private enforcement actions (which the plaintiffs' bar has not often been shy to institute), prohibits a debt collector from making any "false representation" of the "character, amount, or legal status of any debt." *Id.* § 1692e(2)(A).  Additionally, under the FDCPA, it is a deceptive practice to (i) threaten to take any action that cannot legally be taken or that is not intended to be taken, (ii) communicate to any person credit information which is known to be false or which should be known to be false or (iii) use any false representation or deceptive means to collect or attempt to collect any debt. *Id.* § 1692e(5), (8) and (10).

The FDCPA is a strict liability statute and even a single violation of Section 1692e is sufficient to establish civil liability under the FDCPA. *See* 15 U.S.C. § 1692k; *Russell v. Equifax*

*A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996); *see also Teng v. Metropolitan Retail Recovery, Inc.*, 851 F. Supp. 61, 64 (E.D.N.Y. 1994). Even in the absence of any actual damages whatsoever, a debt collector can be liable to an individual consumer for statutory damages of up to $1,000, plus legal fees and costs. 15 U.S.C. § 1692k(a). Further, if an FDCPA claim is brought as a class action, the debt collector can also be liable for statutory class damages of up to $500,000 or one percent of the debt collector's net worth, whichever is less. *Id.* § 1692k(a)(3).

Because Debt Buyers are customarily provided only with an account balance for each Consumer Loan they purchase, they lack a detailed breakdown of amounts due on the Consumer Loans they purchase (*i.e.*, principal, interest, and other components of those loans), and thus, they risk making "false representations" under the FDCPA by issuing and filing Forms 1099-C that contain inaccurate or incomplete information. As discussed above, Debt Buyers are likely to be unable to accurately complete Box 2 or Box 3 of Form 1099-C; therefore, they may be "falsely" representing to consumer borrowers both the principal, interest and other components of the consumer's account balance and the amount of each component "discharged."

In addition, if a Debt Buyer issues to a consumer borrower a Form 1099-C that reflects cancellation of indebtedness because one of the eight "identifiable events" under Treas. Reg. § 1.6050P-1(b)(2) has occurred, such as the "expiration of a statutory period for filing a claim or commencing a deficiency judgment proceeding (Treas. Reg. § 1.6050P-1(b)(2)(i)(C)), the Debt Buyer will have effectively made a representation for FDCPA purposes that such indebtedness is no longer outstanding. This representation will act under the FDCPA to prohibit the Debt Buyer from taking further action to collect the debt, even though under most state laws, the Debt Buyer would usually be entitled to continue collection and enforcement efforts.

The mandatory application of Section 6050P, as required by Treas. Reg. § 1.6050P-2(e), effectively forces Debt Buyers to violate a federal law – to choose between willful noncompliance with Section 6050P or a violation of the FDCPA.

## DISCUSSION

## I.    THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS

This Court has jurisdiction to grant declaratory and injunctive relief with respect to DBA's action pursuant to Sections 1331, 1340, 2201, and 2202 of Title 28 of the United States Code, as well as Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65.1.[2]  Further,

---

[2]    Plaintiff DBA has standing to bring this suit on behalf of its members.  The Supreme Court discussed when an organization has standing to bring suit on behalf of its members in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).  Under *Hunt*, an organization has "associational" or "representative" standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id.* at 343.  All the requirements for representative standing are met here.

In determining whether DBA's members would have standing to sue in their own right, at least one member must demonstrate "'actual or imminent' 'injury-in-fact' that is 'fairly traceable' to the challenged decision and 'likely' to be 'redressed by a favorable decision.'"  *Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C. Cir. 1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  As alleged in its complaint, DBA asserts that at least one of its members will be directly and adversely affected by Treas. Reg. § 1.6050P-2(e).  *See Compl.* ¶ 53.  Indeed, in reality, the majority of DBA members have discharged during 2005 the indebtedness of a person for purposes of Section 6050P, and therefore face the January 31, 2006 deadline for furnishing to those borrowers the information required under the statute.  These members are directly affected by the statute, made applicable to them by Treas. Reg. § 1.6050P-2(e), because they bear the burden of issuing and filing Forms 1099-C and, as a consequence, risk immediately violating critical provisions of the FDCPA.

The second *Hunt* requirement is satisfied because a challenge to Treas. Reg. § 1.6050P-2(e) clearly falls within DBA's stated purposes of "building a reliable and credible market for delinquent receivables" and supporting "industry legislative issues."  *See* Knauf Decl. ¶ 5 (Ex. 1).

Finally, the third *Hunt* requirement is met because DBA's arguments regarding the illegality of Treas. Reg. § 1.6050P-2(e) constitute a facial challenge to a regulation that does not require "individualized proof" from DBA members and could be "properly resolved in a group context."  *Hunt*, 432 U.S. at 344; *see also Committee for Effective Cellular Rules*, 53 F.3d at

- 14 -

the Administrative Procedures Act provides this Court with authority to review agency action

adversely affecting and aggrieving DBA's members, here Treas. Reg.§ 1.6050P-2(e), *see* 5

U.S.C. § 702, and requires that this Court declare Treas. Reg. § 1.6050P-2(e) unlawful, null and

void upon a determination that it is unconstitutional or otherwise contrary to law, *see* 5 U.S.C. §

706(2)(B)-(C).[3]

    The purpose of DBA's suit is to contest the validity of Treas. Reg. § 1.6050P-2(e) as it

relates to Debt Buyers. Specifically, the enforcement of Treas. Reg. § 1.6050P-2(e) effects a host

of constitutional violations, including the deprivation of DBA's members' due process rights,

violation of Article I of the Constitution and the Separation of Powers Doctrine, and violation of

---

1315 (broad facial challenges to regulations do not necessitate participation of individual members of organization).

    Thus, it is beyond credible debate that DBA has standing to challenge the legality of Treas. Reg. § 1.6050P-2(e) on behalf of its members. DBA also has standing under the Administrative Procedure Act, 5 U.S.C. § 702 (1994) ("APA"). Under the APA, DBA must establish that it has "prudential standing" by showing that its interests are "arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Scheduled Airlines Traffic Offices v. Dep't of Defense*, 87 F.3d 1356, 1359 (D.C. Cir. 1996) (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396 (1987) (citation omitted). Here, DBA contends, among other things, that Treas. Reg. § 1.6050P-2(e) conflicts with and is contrary to the FDCPA – a statutory scheme regulating debt collection activities. DBA's members fall squarely within the "zone of interests" as the FDCPA regulates their debt collection activities. Accordingly, DBA has prudential standing under the APA.

[3]     Section 706 governs the scope of judicial review over agency action, and provides in pertinent part the following:

    To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court *shall*…(2) *hold unlawful and set aside agency action*, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) *contrary to constitutional right*, power, privilege, or immunity; (C) *in excess of statutory jurisdiction, authority, or limitations, or short of statutory right*; (D) without observance of procedure required by law….

5 U.S.C. § 706(2) (emphasis added).

the independent sovereignty of the collective states and the principles of federalism and comity. The Anti-Injunction Act, therefore, does not apply to the instant suit[4] – DBA neither contests nor seeks to restrain the Defendants' right to assess and collect taxes. Moreover, assuming *arguendo* that the Anti-Injunction Act is held to apply, it does not operate to bar this action because, as addressed in Section I.B., *infra*, DBA's suit falls squarely within the two exceptions to the Act.

A.    **DBA Seeks Relief From The Unconstitutional Effects Of Treasury Regulation § 1.6050P-2(e), And Therefore The Anti-Injunction Act Does Not Apply**

DBA seeks to protect its members from the significant constitutional violations arising from the Defendants' enforcement of Treas. Reg. § 1.6050P-2(e). The fact that Treas. Reg. § 1.6050P-2(e) is a regulation of the Department of the Treasury is merely incidental to the crux of DBA's claims. The primary purpose of this suit is to prevent the following: (1) the direct conflict Treas. Reg. § 1.6050P-2(e) poses to the regulatory scheme Congress *expressly implemented* to govern Debt Buyers, as "debt collectors," under the FDCPA; (2) the continuing deprivation of DBA's members' due process rights that will result from the Defendants' enforcement of Treas. Reg. § 1.6050P-2(e); and (3) the unauthorized federal preemption of the collective states' statutes of limitation controlling Debt Buyers' rights to bring enforcement and collection actions on their purchased consumer loans. Indeed, the heart of Plaintiff's suit is not to restrain the Defendants from assessing and collecting taxes, but to restrain the Defendants

---

[4]    Additionally, the Declaratory Judgment Act does not preclude the relief Plaintiff seeks. The reach of the Anti-Injunction Act and Declaratory Judgment Act has been held to be coterminous, and should therefore be considered together. *See National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1430 (D.C. Cir. 1995) (citing *Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4 (D.C. Cir. 1979). *See also McGlotten v. Connally*, 338 F. Supp. 448, 452-53 (D.D.C. 1972).

from unconstitutionally forcing members of the debt buying industry to (1) violate the FDCPA, and/ or (2) forego their legal and economic rights.

The Anti-Injunction Act does not bar the instant suit. While the Anti-Injunction Act has been interpreted broadly,[5] it is not without limits. If the purpose of an action (such as this one) is clearly *not* to restrain the assessment or collection of taxes, the Anti-Injunction Act has been held not to apply. *See Cardwell v. Kurtz*, 765 F.2d 776, 779-80 (9th Cir. 1985) (reversing a dismissal of plaintiffs' action holding that the Anti-Injunction Act did not bar relief because plaintiffs were seeking "the return of information allegedly seized in violation of their Fourth Amendment rights [and] it [was] not particularly relevant that the government agents who took the information were IRS agents."); *Linn v. Chivatero*, 714 F.2d 1278, 1282-83 (5th Cir. 1983) (reversing a dismissal of plaintiff's action, finding that the "'primary purpose' of [plaintiff's] lawsuit is to recover his property, irrespective of the involvement of the IRS agents...[and not] to restrain the collection of taxes or the collection of information that would aid in the assessment of taxes."); *Retirement Care Associates, Inc. v. United States*, 3 F. Supp.2d 1434, 1441 (N.D. Ga. 1998) (denying defendants' motion for summary judgment pursuant to the Anti-Injunction Act, finding that the purpose of plaintiffs' action was to "prohibit illegal actions by IRS agents rather than merely to restrain the collection of taxes."). Thus, when the involvement of the IRS is merely incidental to the underlying purpose of an action, the Anti-Injunction Act is inapplicable.

This Circuit has recognized such a distinction: "the Act must yield when the denial of

---

[5] The Anti-Injunction Act provides that "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). It has been interpreted to apply also to "activities which are intended to or may culminate in the assessment or collection of taxes." *Kemlon Products & Development Co. v. United States*, 638 F.2d 1315, 1320 (5th Cir. 1981).

judicial review rises to the level of a constitutional infirmity." *Blumenthal*, 609 F.2d at 6. Defendants' enforcement of Treas. Reg. § 1.6050P-2(e) against DBA's members does, indeed, rise to the level of constitutional infirmity. Specifically, by including Debt Buyers within the interpretation of "applicable financial entities" engaged in the business of the "lending of money," the Defendants have ensured a continuing violation of the 5th Amendment due process rights of DBA's members because Treas. Reg. § 1.6050P-2(e) compels Debt Buyers to violate federal law (as discussed further below). Additionally, Defendants – officers of the Executive Branch – have violated Article I of the Constitution by legislating a new, retroactive regulatory scheme over the debt buying industry without the necessary Congressional delegation of power to do so. Indeed, promulgation of Treas. Reg. § 1.6050P-2(e) was beyond the scope of Defendants' statutory authority, and enforcement of that regulation will not only desecrate certain fundamental constitutional principles, but also trigger a landslide of derivative class action litigation in the federal courts under the FDCPA.

Defendants have promulgated an interpretive regulation that directly conflicts with the express statutory scheme of the FDCPA. This places DBA's members' in a position where compliance with the Form 1099-C information reporting requirements of Section 6050P forces them to violate the FDCPA continuously and on an annual basis. DBA members will face recurring and substantial costs of defending FDCPA civil liability claims as a result, as well as the prospective damage awards resulting under this strict liability statute.

Further, application to Debt Buyers of this reporting requirement through Treas. Reg. § 1.6050P-2(e) has the effect of imposing a federally mandated three-year statute of limitations upon Debt Buyers for enforcement and collection actions, which is in direct conflict with the states' respective statutes of limitation regarding such actions and the current rights of Debt

Buyers afforded to them by state law. Thus, enforcement of Treas. Reg. § 1.6050P-2(e) creates an implied preemption of sovereign state law contrary to the intent of Congress. When enacting the FDCPA, Congress specifically *did not preempt* this area of state law but chose to allow states to continue regulating this aspect of the debt buying industry. The combined effects of Treas. Reg. § 1.6050P-2(e) work a continuing deprivation of the due process rights of DBA's members, violate Article I of the Constitution and the Separation of Powers doctrine, and intrude upon the sovereignty of the states contrary to the principles of federalism and comity. The primary purpose of DBA's suit, therefore, is to restrain unconstitutional and unlawful agency action.

**B.      Even If The Anti-Injunction Act Applies, This Suit Falls Within The Judicially-Created Exceptions To The Act, And Is Therefore Properly Before This Court**

Even assuming, without conceding, that the Anti-Injunction Act applies, it does not operate to bar the instant action because this case falls squarely within the judicially-created exceptions to the Act. The courts have prevented the type of irreparable injury present here by carving out two exceptions to the Anti-Injunction Act. The first was articulated by the Supreme Court in *Enochs v. Williams Packing & Navigation Co., Inc.*, 370 U.S. 1 (1962) (hereinafter, "*Williams Packing*") and allows a suit to go forward where the government could "under no circumstances" prevail on the merits and the prerequisites for equity jurisdiction exist. The second exception was articulated in *South Carolina v. Regan*, 465 U.S. 367 (1984) (hereinafter, "*South Carolina*") and allows a suit to go forward where "an aggrieved party has no access at all to judicial review." Both of these exceptions have been recognized in this Circuit, *see National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995), and both apply to grant this Court jurisdiction over DBA's claims.

### 1. This Court Has Jurisdiction Under *Williams Packing*

DBA's action satisfies both prongs of the *Williams Packing* exception to the Anti-Injunction Act: (1) considering the facts in the light most favorable to the Defendants (the "under no circumstances test"), DBA will ultimately succeed on the merits of this action; and (2) equity jurisdiction is present because of the gross inadequacy of any possible alternative legal remedy available to DBA's members. *See National Taxpayers*, 68 F.3d at 1436 (citing *Williams Packing*, 370 U.S. at 7). *See also Blumenthal*, 609 F.2d at 5.

### a. DBA Will Prevail On the Merits of Its Claim Because Treasury Regulation §1.6050P-2(e) Is Unconstitutional and Otherwise Contrary To Law

The Defendants have exceeded their statutory authority in promulgating Treas. Reg. § 1.6050P-2(e) by applying Section 6050P to a new class of entities beyond those specifically enumerated by Congress. Treasury Regulation § 1.6050P-2(e) is an interpretive rule that is inconsistent with the face of Section 6050P of the Code, its original legislative history, the legislative history accompanying the expansion of the scope of Section 6050P in 1999, and the IRS' own historical interpretation of the same. Not only does Treas. Reg. § 1.6050P-2(e) conflict with its own statute, however, it also directly contravenes a separate and distinct federal statutory scheme, the FDCPA and its regulations. Further, application of Treas. Reg. § 1.6050P-2(e) conflicts with the respective statutes of limitation on collection and enforcement enacted by the sovereign states without any, express or implied, Congressional intent authorizing such preemption.

### i. The Defendants Exceeded Their Statutory Authority

Through the addition of Section 6050P to the Code as part of the Omnibus Budget Reconciliation Act of 1993, Congress intended *only* to "require *lenders* to file information

returns with respect to discharged debt." H.R. REP. NO. 103-213 at 670-71 (1993) (Conf. Rep.), *as reprinted in* 1993 U.S.C.C.A.N. 1359-1360 (emphasis added).   Aware that lenders were already generally required to report to the IRS certain foreclosures and abandonments of property in satisfaction of a debt secured by that property, and that such events might also effect a discharge of indebtedness, Congress explicitly directed that as to the informational filings required from *lenders*, "the Treasury Department issue guidance to coordinate reporting under [Section 6050P] with reporting on foreclosures and abandonments under section 6050J." *Id.* at n. 96.

Section 6050P, as originally enacted, imposed the obligation to file information returns with respect to discharged debt upon "applicable financial entities," defined to mean (i) the FDIC, the RTC, the National Credit Union Administration, any other Federal agency and any successor or subunit of any of them, (ii) any financial institution as described in Section 581 of the Code or Section 591(a) of the Code (which apply, respectively, to banks subject to supervision and examination by state or federal authorities, and to mutual savings banks, cooperative banks, domestic building and loan associations and other savings institutions chartered and supervised as savings and loans or similar associations under federal or state law), (iii) any credit union, and (iv) any subsidiary of any entity described in clause (ii) or (iii) which, by virtue of being affiliated with such an entity, is subject to supervision and examination by a federal or state agency regulating such entities.  26 U.S.C. § 6050P(c)(2)(A)-(C).  In other words, consistent with the legislative history, Section 6050P originally applied *solely* to regulated financial institutions that *originate loans* as part of their regular course business and to Federal agencies.

As part of the Ticket to Work and Work Incentives Improvement Act of 1999 (Pub. L. No. 107-204, § 533(a), 113 Stat. 1860, (the "Act"), Congress expanded the applicability of Section 6050P to "any organization a significant trade or business of which is the *lending of money*." Section 6050P(c)(2)(D) (emphasis added). According to the Conference Committee Report accompanying the Act, Congress believed it was "appropriate to treat discharges of indebtedness that are made by similar entities in a similar manner," and "to extend the scope of this information reporting provision to include indebtedness discharged by any organization a significant trade or business of which is the *lending of money* (such as finance companies and credit card companies whether or not affiliated with financial institutions)." *See* H.R. REP. NO. 106-478 (1999) (Conf. Rep.), 106 H. Rpt. 478, at \*110 (Lexis). Thus, Congress could not have been clearer; it intended Section 6050P to apply only to regulated and unregulated originators of loans (and to federal agencies).

DBA's members are *not* engaged in the business of the *"lending of money."* Moreover, they are not "similar" to the federal agencies, banks, savings and loan institutions and credit unions to which Section 6050P originally applied, nor to finance companies and credit card companies. Unlike the lenders listed in Section 6050P of the Code, DBA's members, and Debt Buyers generally, do not (i) market to or otherwise attempt to attract borrowers, (ii) negotiate and document loans, (iii) engage in credit analysis, collateral examination and other underwriting functions, (iv) originate or approve loans, or, most importantly, (v) lend money. Debt Buyers, unlike lenders, also do not expect to earn a specified rate of interest as a return on investment. Rather, their business is the purchase of assets, namely defaulted loans, and initiation of debt collection activities either directly or through third-party collection agencies in an attempt to collect more on the defaulted debt than the debt buyer paid for that debt. *See* Knauf Decl. ¶ 13

(Ex. 1).  As a consequence, the extension of Section 6050P to Debt Buyers far exceeds what Congress intended when it amended that provision in 1999.

Further, at the time Congress enacted the Act in 1999, the term "business of lending money" had a well-established meaning, under a variety of Treasury Regulations and IRS published advice, that *did not include* businesses that merely buy and collect loans. Significantly, prior to 1999, Defendants interpreted "lending money" *only* to encompass organizations that were in the business of "making" or originating loans.  For example, prior to its repeal in 1996, Section 133(a) of the Code excluded from gross income 50% of the interest received with respect to a "securities acquisition loan" by, among others, "a corporation actively engaged in the *business of lending money.*" *See,* Section 133(a) of the Code (repealed by the Small Business Job Protection Act of 1996, Pub. L. No. 104-188) (emphasis added).  Treasury Regulations under Section 133(a) of the Code stated that "a corporation is actively engaged in the business of lending money *if it lends money to the public* on a regular and continuing basis . . ." *See* Treas. Reg. §1.133-1TA-2 (emphasis added). *See also*, *Priv. Ltr. Rul.* 9119065 (Feb. 14, 1991).  Similarly, Treas. Reg. § 1.1362-2(c)(5)(iii)(B), which helps define whether income is "passive" for S corporation qualification purposes, defines income from the "business of lending or financing" as gain or interest income "with respect to loans originated in a lending business,. . ."  It is clear, therefore, that prior to Congress' expansion of the applicability of Section 6050P to "any organization a significant trade or business of which is the lending of money" Treasury had interpreted the term "business of lending money" to encompass only organizations that were engaged in the business of "making" loans or "lending money," and not organizations engaged only in the business of buying loans from organizations who made them.

Despite the Defendants' own longstanding interpretation of the term "lending of money," they issued proposed regulations to provide guidance on the definition of an "organization a significant trade or business of which is the lending of money" that was at odds with that interpretation to implement the change to Section 6050P made by the Act in 1999. Included in those regulations was Prop. Treas. Reg. § 1.6050P-2(e) which stated that "lending money includes acquiring an indebtedness. . . ." *Id.* The preamble to the proposed regulations confirms that under those regulations "an organization that buys and holds loans is treated as an organization that lends money." *See* Guidance Under Section 6050P Regarding Cancellation of Indebtedness, 67 Fed. Reg. 40629-30 (proposed June 12, 2002) (Ex. 2). The only purported rationale for such treatment was that, according to the IRS in the preamble, it was "consistent with the temporary regulations under Section 6050J (relating to information returns for acquisitions and abandonments of property that is security for indebtedness)." *Id.*

Of critical importance, however, Section 6050J of the Code, by its terms, *does not apply to consumer loans.*[6] When Treas. Reg. § 1.6050P-2(e) became final pursuant to Treasury Decision 9160 (October 22, 2004), it contained no similar exception for consumer loans. As a result, Treas. Reg. § 1.6050P-2(e) is plainly *not* consistent with the temporary regulations under

_____

[6]    Section 6050J, by its terms, does not apply to consumer loans. Section 6050J(a) states that any person who, in connection with a trade or business, lends money secured by property and who either "(i) in full or partial satisfaction of any indebtedness, acquires an interest in any property that is security for such indebtedness or (ii) has a reason to know that the property in which such person has a security interest has been abandoned," must make an information return. 26 U.S.C. § 6050J(a). The IRS has provided Form 1099-A for this purpose. Section 6050J(b) provides that Section 6050J(a) does *not apply* "to any loan to an individual secured by an interest in tangible personal property which is not held for investment and which is not used in a trade or business." 26 U.S.C. § 6050J(b). The legislative history accompanying the enactment of Section 6050J specifically states that this exception was "provided *for all consumer loans.*" *See* H.R. REP. NO. 98-432II, at 1355 (Deficit Reduction Act of 1984).

Section 6050J since Treas. Reg. § 1.6050P-2(e) applies to all purchased loans, including consumer loans, while the temporary regulations under Section 6050J *expressly do not* apply to consumer loans.    Defendants cannot reasonably argue, therefore, that the regulation was promulgated pursuant to Congress' direction to coordinate information reporting under Section 6050P with information reporting under Section 6050J.    The absence of an exception for consumer loans to the information reporting requirements imposed by Section 6050P of the Code is particularly unfortunate in the context of the debt buying industry because most of the portfolios of defaulted debt that are purchased and sold are, in fact, consumer loans.    In sum, not only is Treas. Reg. § 1.6050P-2(e) inconsistent with the plain language of its own statute *and* its legislative history (both of which refer only to *lenders* of money), it wholly fails to satisfy the avowed purpose of that regulation as set forth in the preamble to the proposed regulations under Section 6050P – namely, that those regulations be consistent with the temporary regulations under Section 6050J of the Code.    As a consequence, that regulation cannot be deemed a valid exercise of the Defendants' authority to promulgate interpretive regulations under Section 6050P.

Treasury Regulation § 1.6050P-2(e) is an "interpretive" regulation because Congress did not grant specific authority to the Defendants to promulgate regulations under Section 6050P of the Code, except with respect to the "form" (i.e., Form 1099-C) and "time" in which a taxpayer must file a Form 1099-C.   26 U.S.C.   § 6050P(a) (which refers to information returns being filed "at such time and in such form as the Secretary [of the Treasury] may by regulations prescribe.").    An interpretive regulation, however, *must only* explain or construe statutory provisions, it must not redefine their scope *or* apply a preexisting regulatory requirement retroactively to an industry previously outside the reach of such requirements.    "An interpretive rule is one which merely explains the meaning of particular terms in the statute, and does not substantially affect the rights

of those over whom the agency exercises authority. 'Interpretive rules consist of administrative construction of a statutory provision on a question of law reviewable in the courts.'" *National Restaurant Ass'n v. Simon*, 411 F. Supp. 993, 999 (D.D.C. 1976) (quoting *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974)).

Interpretive rules that overreach their statutory limitations are invalid. *See United States v. Calamaro*, 354 U.S. 351 (1957) (invalidating an interpretive Treasury Regulation that attempted to expand the applicability of a statute to persons that Congress did not intend to target); *Beneficial Corp. & Subs. v. United States*, 814 F.2d 1570 (Fed. Cir. 1987) (invalidating an interpretive regulation that required a taxpayer to compute bad debt reserves in accordance with a formula accounting for only a portion of outstanding debts, reasoning that because the agency interpretation "contravenes clearly discernible legislative intent" it should not stand). As the Supreme Court has stated, "neither [the Court] nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon." *Calamaro*, 354 U.S. at 357. Since Defendants' promulgation of Treas. Reg. § 1.6050P-2(e) "substantially affect[s] the rights of "Debt Buyers," *see Simon*, 411 F.Supp. at 999, it is an unlawful exercise of agency authority, surpassing the specific intent of Congress to exempt the debt buying industry from the reach of Section 6050P.

### ii. The Defendants Promulgated An Interpretive Rule That Transgresses The FDCPA

Not only is Treas. Reg. § 1.6050P-2(e) beyond the scope of its enabling statute, it also unlawfully contravenes an existing statute over which the Treasury Department has no authority – the FDCPA, which is governed by the Federal Trade Commission ("FTC"). It is well-settled that agency action must be invalidated if it either "conflicts with an agency's own statute, [or] if

it conflicts with another federal law." *Nextwave Pers. Comm'n Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001) (citing *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Def.*, 87 F.3d 1356, 1361 (D.C. Cir. 1996)). *See also Cousins v. Sec'y of the U.S. Dept. of Transp.*, 880 F.2d 603, 608 (1st Cir. 1989) (finding that Section 706 of the Administrative Procedures Act does not restrict courts to consideration of the agency's own enabling statute); 2 AM. JUR. 2D ADMINISTRATIVE LAW § 225 ("An agency has no authority to promulgate a rule that is contrary to a statute…rules that violate, conflict, or contravene statutory provisions are invalid, as a matter of law.") (citing various decisions in support).    Thus, Defendants cannot prevail under any circumstance: Treas. Reg. § 1.6050P-2(e) is invalid because it (1) requires information reporting from an entirely new class of business entity (Debt Buyers) not enumerated or contemplated by Congress either when it enacted Section 6050P in 1993 or when it amended Section 6050P in 1999, and (2) causes a direct conflict with the FDCPA – a federal statute specifically enacted to regulate debt collection practices of "debt collectors," which includes Debt Buyers.

The FDCPA was adopted in 1977 for the purpose of eliminating abusive practices by debt collectors, insuring that debt collectors who refrain from abusive debt collection practices are not competitively disadvantaged, and promoting consistent state action to protect consumers against debt collection abuses.   15 U.S.C. § 1692(e).   The FDCPA regulates the activities of "debt collectors" (Debt Buyers), those who collect "debts" from "consumers," and expressly exempts "creditors" (lenders) from the definition of "debt collector." *Id.* at § 1692a (limiting the exemption to those creditors that either originate debts or acquire them *prior* to default).  Thus, a creditor that acquires a consumer debt *after* the account is in default is a "debt collector" under the Act to the same degree as a collection agency.  *See, e.g., Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th

Cir. 1985); *Kizer v. Fin. Am. Credit Corp.*, 454 F. Supp. 937, 939 (N.D. Miss. 1978); *Holmes v. Telecredit Corp.*, 736 F. Supp. 1289, 1291 (D. Del. 1990); *Cirkot v. Diversified Fin. Sys., Inc.*, 839 F. Supp. 941, 944-45 (D. Conn. 1993).  By including Debt Buyers as "lenders" in Treas. Reg. § 1.6050P-2(e), the Defendants have asserted a definition clearly inconsistent with the preexisting distinction between "debt collector" and "creditor" explicitly set forth by Congress in the FDCPA.  Furthermore, and most importantly, Treas. Reg. § 1.6050P-2(e) contravenes each of the three specific purposes of the FDCPA:  as explained below, it (1) contributes to, rather than eliminates, abusive practices by Debt Buyers; (2) eliminates the distinction between Debt Buyers who refrain from abusive debt collection practices and those who do not; and (3) contravenes state laws regulating the debt buying industry and protecting consumers against debt collection abuses (discussed in the following section).

Section 807 of the FDCPA (15 U.S.C. § 1692e) is the section of the Act intruded upon by Treas. Reg. § 1.6050P-2(e).  Section 807 governs false and misleading representations, and provides in pertinent part, the following:

> A debt collector may not use *any* false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the *following conduct is a violation* of this section:
> * * *
> (2) The false representation of --
>     (A) the character, amount, or legal status of any debt; or
>     (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> * * *
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.
> * * *
> (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

\* \* \*

> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Because the FDCPA is a strict liability statute, *see Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996), a violation of any of the above provisions establishes civil liability under the Act, *see Clomon v. Jackson*, 988 F.2d 1314, 1318 (2nd Cir. 1993); *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2d Cir. 1993); *Taylor v. Perrin, Landry, DeLaunay & Durand*, 103 F.3d 1232, 1238 (5th Cir. 1997); *Nielsen v. Dickerson*, 307 F.3d 623, 640 (7th Cir. 2002).

The protections of Section 807 place DBA's members and other Debt Buyers having to file Forms 1099-C in a "Catch-22" dilemma. Compliance with 6050P *will result* in a violation of these FDCPA provisions. For instance, a DBA member who furnishes a consumer with a Form 1099-C (and files a copy of the Form with the INS) stating that the consumer's debt has been "discharged" or "forgiven" has made a *representation as to the legal status of the debt*. If that member subsequently pursues collection of the consumer's account or even sells the account, it is exposed to defending an FDCPA suit asserting any of the following viable claims: that the DBA member has violated (1) Section 1692e(2)(A) because it misrepresented the character or legal status of the debt by either falsely stating in the Form 1099-C that the debt was forgiven when it was not, or by falsely claiming that the debt still exists when it has actually been forgiven or canceled; (2) Section 1692e(5) because it threatened to take an action that it did not intend to take by falsely stating that it intended to forgive or discharge the debt (so as to impose a tax liability on the consumer as punishment for non-payment); (3) Section 1692e(8) because it communicated to the Defendants credit information which it knew to be false because it falsely represented that the debt was canceled or forgiven; (4) Section 1692e(10) and the general

prohibition of Section 1692e because it used a false representation or deceptive means to collect or attempt to collect a debt either by falsely stating in the Form 1099-C that the debt was forgiven when it was not (thereby imposing a tax liability on the consumer as punishment for non-payment), or by falsely claiming that the debt still existed when it had actually been forgiven or canceled.[7]

Additionally, the FTC's Official Staff Commentary on Section 807(10) of the Act states that "[a] debt collector may not mislead the consumer as to the legal consequences of the consumer's actions (e.g., by falsely implying that a failure to respond is an admission of liability)."[8] 53 Fed. Reg. 50106. Informing a consumer that his/her non-payment has resulted in forgiveness or cancellation of the debt when, in fact, it has not, has the effect of misleading the consumer as to the consequences of his or her actions. Thus, Defendants, through an interpretive regulation that conflicts with its own enabling statute and is contrary to the intent of Congress,

---

[7]    Lest the Court think that such arguments are so hypertechnical that the courts will not entertain them, the DBA would point out that the case law demonstrates a willingness on the part of even appellate courts to indulge extremely narrow and technical arguments in favor of liability under the Act. *See, e.g., Duffy v. Landberg*, 215 F.3d 871, 875 (8th Cir. 2000) (an interest error of as little as 65 cents is a violation of the Act); *Chauncey v. JDR Recovery Corp.*, 118 F.3d 516 (7th Cir. 1997) (narrow, hypertechnical construction of 15 U.S.C. § 1692g(a).

[8]    Multiple courts have concluded that the standard by which an alleged violation of the FDCPA will be judged is whether the "least sophisticated consumer" would tend to be deceived. *See, e.g., Clomon, supra; Graziano, supra; United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996); *Smith v. Transworld Sys., Inc.*, 953 F.2d 1025 (6th Cir. 1992); *Swanson v. Southern Oregon Credit Serv., Inc.*, 869 F.2d 1222 (9th Cir. 1988); *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168 (11th Cir. 1985). The basic purpose of this standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd. This standard is consistent with the norms that courts have traditionally applied in consumer-protection law. *See Nat'l Fin. Serv., Inc.*, 98 F.3d at 136. "Least sophisticated" refers to "the ignorant, the unthinking, and the credulous." *Id.* Although the Seventh and Eighth Circuits have opted instead for the "unsophisticated" consumer standard, *see Gammon v. GC Servs. Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994); *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767, 771 (8th Cir. 2001); *Duffy v. Landberg*, 215 F.3d 871 (8th Cir. 2000), there is little distinction between the two standards.

seek to force Debt Buyers to do that which the FTC explicitly states they may not do.  DBA

members are now pitted, therefore, between compliance with an agency rule or compliance with

a Congressional statute, between possible penalties assessed by the Defendants or civil liability

claims by aggrieved consumers or by the FTC.[9]

        **iii.**      **The Defendants Promulgated An Interpretive Rule That Preempts State Law Rights And Violates The Principles Of Federalism And Comity**

The extension of Section 6050P to Debt Buyers through Treas. Reg. § 1.6050P-2(e) is

further invalid because it impermissibly intrudes upon and effectively displaces the independent,

sovereign states' regulation of debt collection practices utilized by Debt Buyers.  This

consequence of the regulation is in direct contravention of the purposes of the FDCPA, one of

which is to promote consistent state action to protect consumers against debt collection abuses.

15 U.S.C. § 1692(e).

For example, Treas. Reg. § 1.6050P-1(a)(1) provides, in part, that solely for purposes of

the information reporting requirements of Section 6050P and the accompanying regulations, a

discharge of indebtedness is deemed to have occurred if and only if there has occurred an

"identifiable event" described in Treas. Reg. § 1.6050P-1(b)(2), whether or not an *actual*

discharge of indebtedness has occurred on or before the date of the identifiable event.  Eight

identifiable events are described in the regulations, the last of which is the expiration of the "non-

---

[9]     FDCPA liability does not require proof of actual damages.  Even in the *absence* of any actual damages whatsoever, a debt collector can be liable to an individual consumer for statutory damages under these provisions, as well as attorney's fees and costs.  15 U.S.C. § 1692k(a); *Emmanuel v. Am. Credit Exch.*, 870 F.2d 805, 809 (2d Cir. 1989); *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 28 (2d Cir. 1989); *Graziano v. Harrison*, 950 F.2d 107, 113-114 (3d Cir. 1991).  If an FDCPA claim is brought as a class action, moreover, the debt collector can also be liable for statutory class damages of up to $500,000 or one percent of the debt collector's net worth, whichever is less.  15 U.S.C. § 1692k(a)(2)(B).

payment testing period." Under that rule, if the debtor has not made a payment during a period of 36 consecutive months and the Debt Buyer has not engaged in "significant, bona fide collection activity" during the last 12 months, then an "identifiable event" is deemed to have occurred, *compelling* the issuance of a Form 1099-C to the IRS and the debtor. Treas. Reg. §§ 1.6050P-1(b)(2)(i)(H) and 1.6050P-1(b)(2)(iv).

Consistent with state law, however, Debt Buyers *routinely* attempt to collect debts long after 36 months of nonpayment by the debtor, and with little or no prior collection activity by the Debt Buyer. *See* Knauf Decl. ¶ 19 (Ex. 1). The effect of this 36-month "non-payment" rule imposes a federal statute of limitation for collecting defaulted debt in direct conflict with the respective laws of the states.[10] For example, many state statutes of limitation relating to the collection of debt or enforcement of debt judgment are longer than 36 months (3 years). *See* Matrix of state statutes, attached here as Exhibit 5. Indeed, in some instances, there are no applicable limitation periods (*i.e.*, federally insured education loans). Furthermore, government originated student loan obligations typically have applicable statute of limitations. Since the doctrine of conflict preemption, "which applies when a state law conflicts with a federal statute or regulation" requires that "the purpose of Congress is the ultimate touchstone," in determining whether to lawfully displace state statute of limitations for collections actions, Defendants' promulgation of Treas. Reg. § 1.6050P-2(e) must have been in accordance with the specific intent of Congress. Congress enumerated the specific categories of entities it intended to regulate through Section 6050P. The conspicuous absence of Debt Buyers (among the enumerated

---

[10]     Courts have already recognized this problem. *See In re: Crosby*, 261 B.R. 470 (Bankr. Ct., D. Ka. 2001), (rejecting an enforcement claim on grounds that the prior issuance of a Form 1099-C had rendered the debt discharged and unenforceable).

entities) in the statute together with the express legislative history of § 6050P underscore that Congress did not intend to include Debt Buyers.

### b.    The Prerequisites Of Equity Jurisdiction Exist

Debt Buyers are damned if they do and damned if they don't. The dilemma faced by Debt Buyers, specifically, of choosing between filing Forms 1099-C pursuant to Treas. Reg. § 1.6050P-2(e) (and violating the FDCPA) or not filing (and violating the federal regulation) is precisely the type of action over which this Court can and should exercise its equitable jurisdiction. Unless this Court asserts jurisdiction, Debt Buyers will be faced with conflicting federal and state obligations and the very real threat of industry litigation. There is no other forum that can provide complete relief to the Debt Buyers or resolve the inherent federalism, comity, separation of powers and due process issues – except this Court. Equity jurisdiction is present in the instant suit because *any* other possible forum available to DBA's members is grossly inadequate to remedy the continuing and irreparable harm they will suffer from the Defendants' enforcement of Treas. Reg. § 6050P-2(e). *See National Taxpayers*, 68 F.3d at 1436. *See e.g., Younger v. Harris*, 401 U.S. 37, 43-44 (1971).

### i.    Treas. Reg. § 1.6050P-2(e) Subjects DBA Members To Continuing Financial And Due Process Deprivations

The enforcement of Treas. Reg. § 1.6050P-2(e) against DBA's members and other similarly situated Debt Buyers forces them to violate the Defendants' Form 1099-C reporting and filing requirements *whether or not they actually file Forms 1099-C.* As discussed above, Debt Buyers are not furnished by Originating Lenders the pertinent information regarding the consumer loans they have purchased to fully comply with the information requested under Form 1099-C. Therefore, even those Debt Buyers who wish to comply with the information reporting requirements of Section 6050P will be unable to accurately complete Forms 1099-C to the full

extent required. Such a violation entitles the IRS to impose penalties against those Debt Buyers under Sections 6721 and 6722 of the Code for each inaccurate form. Similarly, Debt Buyers who *do not* issue and file Forms 1099-C precisely because they do not possess the requisite information are also subject to IRS penalty assessments. Most importantly, however, the issuance of inaccurate Forms 1099-C to consumer borrowers will inevitably lead to FDCPA litigation for any variety of claims under 15 U.S.C. § 1692e for false and misleading representations regarding a consumer debt. Both the penalties the Defendants could assess against DBA's members *and* the ensuing costs and potential liability of defending against FDCPA strict liability claims for each incomplete Form 1099-C filing cannot be adequately redressed by any one forum, including refund litigation under the Code.

Additionally, DBA's members face significant non-economic injury from the Defendants' unlawful extension of Section 6050P's reporting scheme to the debt buying industry. Enforcement of Treas. Reg. § 1.6050P-2(e) effectively forces DBA's members to violate federal law. Debt Buyers who choose not to issue and file Forms 1099-C in an attempt to avoid resulting FDCPA civil liability are, obviously, violating Section 6050P of the Code. In contrast, Debt Buyers who issue and file Forms 1099-C will violate *both* the Code, due to the unavailability of the information required by the form, *and* the FDCPA for disseminating to consumers and the IRS false and/or misleading information regarding the consumer debts they own.

Moreover, enforcement of Treas. Reg. § 1.6050P-2(e) will likely preempt the legal rights Debt Buyers have enjoyed under state statutes of limitation for the pursuit of enforcement and collection actions, as well as deny to Debt Buyers the financial gains that would typically result from such state enforcement and collection actions. Compelling DBA's members and other Debt Buyers to forego these legal and economic rights violates the fundamental purpose of our

Constitution and system of government – to protect individual rights and liberties, not to force relinquishment of the same. Indeed, such harm has been recognized as irreparable and beyond the reach of the Anti-Injunction Act: "[When] persons are deprived of their own property, or a common law or statutory right, there is [] basis for a claim that government has 'deprived' them of property." *Blumenthal*, 609 F.2d at 7-8 (stating that when a denial of judicial review amounts to a due process violation, such as would occur when persons are deprived of property or legal rights, the Anti-Injunction Act must give way because such harm rises to the level of a constitutional infirmity).

> **ii.    IRS Penalty Refund Litigation Does Not Ensure An Available Forum In Which To Contest Treas. Reg. § 1.6050P-2(e)**

The only other conceivable judicial avenue for challenging Treas. Reg. § 1.6050P-2(e) and the exposure to IRS penalty assessments necessarily occasioned by Debt Buyers' attempted compliance with Section 6050P as a result of Treas. Reg. § 1.6050P-2(e) is refund litigation in this Court or the Claims Court. Refund litigation under the Code, however, does not provide Debt Buyers with an adequate remedy both because (1) it is not available to Debt Buyers at their discretion, but rather only with the cooperation of the IRS, the very party against whom they seek relief, and (2) assuming *arguendo* that penalty-refund litigation is determined an adequate remedy (which it is not), it would *only* address a Debt Buyer's specific violation of the Form 1099-C requirements, *not* the harm resulting from the attendant violation of the FDCPA (and the consequences which may flow therefrom), and *not* the loss of a Debt Buyer's legal and economic rights. In other words, refund litigation is an entirely inadequate remedy for the due process deprivations Debt Buyers will suffer by virtue of Treas. Reg. § 1.6050P-2(e).

Under the circumstances presented by Treas. Reg. § 1.6050P-2(e), refund litigation for penalties which might be assessed against Debt Buyers presents *only a mere possibility* of a forum in which to contest the regulation and seek relief for three reasons: (1) Debt Buyers have no assurance that penalties will actually be assessed by the IRS for filing inaccurate Forms 1099-C (for example, the IRS may simply not audit any Debt Buyers or may waive such penalties for "reasonable cause"), (2) Penalties voluntarily remitted by a Debt Buyer for failing to issue and file accurate Forms 1099-C would be treated as a "deposit" rather than a "tax" under the Code, and therefore, not grounds for a refund suit; and (3) even if voluntarily remitted penalties were treated by the IRS as a payment of "tax" in this situation, the IRS could simply choose to refund them upon a filing of a refund claim and thereby deprive this Court and the Claims Court of jurisdiction to review Treas. Reg. § 1.6050P-2(e).

It is well-established that a "deposit" remitted to the IRS (sometimes referred to as a deposit in the nature of a cash bond), as distinguished from a "payment of tax," is simply a refundable deposit that does not support a claim for refund or an ultimate refund lawsuit against the IRS. More recently, Congress in 2004 enacted Section 6603 of the Code to clarify the circumstances under which a deposit will stop the running of interest on a pre-existing or future tax liability. *See* 26 U.S.C. § 6603. Last year, the IRS issued Rev. Proc. 2005-18, 2005-13 I.R.B. 798, in order to provide additional detailed guidance on Section 6603. Section 6.01 of the Revenue Procedure reiterates that a deposit made pursuant to Section 6603 is *not* subject to a claim for refund as an overpayment until the deposit is applied by the IRS as payment of an assessed tax of the taxpayer. That section of the Revenue Procedure goes on to state that a taxpayer may request the return of all or part of a tax deposit at anytime before the IRS has used the deposit for payment of a tax liability. If a member of the DBA voluntarily paid a penalty to

- 36 -

the IRS for the purpose of establishing the predicate for a refund claim and then a refund lawsuit

to challenge Treas. Reg. § 1.6050P, based upon the pertinent case law, that payment would be

treated as a mere tax "deposit" that would not support a refund claim or a refund lawsuit in which

to challenge Treas. Reg. § 6050P-2(e).[11]  Under these circumstances, there is simply no available

alternative forum in which DBA members can, on their own and without the cooperation of the

Defendants, challenge the constitutional infirmities that infect Treas. Reg. § 1.6050P-2(e).  *See*

*Farnworth & Chambers Company, Inc. v. Phinney,* 178 F. Supp. 330 (S. D. Tex. 1959), *aff'd,*

---

[11]    In *Risman v. Commissioner*, the Tax Court accurately summarized the status of the law
on whether a remittance by a taxpayer to the IRS constitutes a tax payment or a deposit. *See* 100
T.C. 191 (1993).  The court in that case stated that, "A remittance by a taxpayer to respondent
[the IRS] generally will not be regarded as a payment of Federal income tax until the taxpayer
intends that the remittance satisfy what the taxpayer regards as an existing tax liability. *See also*
*Rosenman v. United States*, 323 U.S. 658, 661-662 (1945); *Ewing v. United States*, at 503-504;
*Fortugno v. Commissioner*, 353 F.2d 429, 453 (3d Cir. 1965), *affg.* 41 T.C. 316, 322 (1963);
*Perkins v. Commissioner*, 92 T.C. 749, 754-759 (1989).  Until such time and absent such intent, a
remittance by a taxpayer to respondent [the IRS] generally will be regarded, not as a payment of
tax, but merely as a deposit in the nature of a cash bond with respect to a tax liability that is to be
determined at a later point in time." *Risman*, 100 T.C. at 197.  The court in *Risman* further noted
that, "A taxpayer's intent to have a remittance treated as a payment or as a mere deposit is
generally to be established by all of the relevant facts and circumstances associated with the
remittance." [Citations omitted.] *Id.*  Lastly, the court stated that, "if a definite amount of tax
liability for a year has not been ascertained or even proposed at the time of a remittance, a
remittance generally will be presumed to have been intended by the taxpayer to be a deposit."
[Citations omitted.] *Id.* at 197-198.

      If a Debt Buyer were to issue an inaccurate Form 1099-C and then voluntarily remit to the
IRS the applicable penalty for purposes of ultimately creating an opportunity to challenge the
validity of Treas. Reg. § 1.6050P-2(e), such a remittance would be treated as a "deposit" based
upon the foregoing discussion in *Risman*.  That is, such a taxpayer clearly would not intend that
the remittance satisfy what the taxpayer regarded as a tax liability since the taxpayer would be
making such a remittance in an attempt to establish that it had no obligation to file any Forms
1099-C to begin with.  Therefore, such a taxpayer would not intend that the remittance satisfy an
existing tax liability and, in the absence of any indication from the IRS that such a penalty was
otherwise due, such a remittance would clearly be a deposit and not a payment of tax.  Because
such a remittance would be a deposit, it could not form the basis for a refund claim and
ultimately a refund lawsuit against the IRS.

279 F.2d 538 (5th Cir. 1960) (where the court illustrated the point that the cooperation of the IRS is necessary to transform a voluntary advance payment into the foundation for a refund lawsuit).

Further, the existence of penalty-refund litigation does *nothing* to rectify the substantial legal and economic injury Debt Buyers will suffer as a result of Treas. Reg. § 6050P-2(e)'s conflict with the independent federal and state law regulation of the debt buying industry – namely, the FDCPA and state statutes of limitation as discussed above. Refund litigation pursuant to the Code presents no forum in which to redress these injuries. This is not simply a harm for which refund litigation is not an "ideal" remedy, *see National Taxpayers*, 68 F.3d at 1437; the deprivation of Debt Buyers' due process rights effectively worked by the enforcement of Treas. Reg. § 6050P-2(e) surpasses the reach of *any possible* relief under the Code.

**2.    This Court Has Jurisdiction Under *South Carolina***

Congress has provided no forum in which Debt Buyers can challenge the constitutionality of Treas. Reg. § 6050P-2(e) and seek relief for the irreparable harm that they will endure, and therefore, this Court also has jurisdiction under *South Carolina*. In *South Carolina*, the Supreme Court was perfectly clear that the Anti-Injunction Act does not apply where, as here, a plaintiff demonstrates that it has no alternative legal means to challenge the validity of a tax. *See South Carolina v. Regan*, 465 U.S. 367, 378-379 (1984). *See also National Taxpayer's*, 68 F.3d at 1436. This is especially true when the challenged tax regulation is informational in nature and ancillary to plaintiff's core claims. As explained above, the enforcement of Treas. Reg. § 6050P-2(e) effectively strips DBA's members of the legal rights and economic entitlements they have historically enjoyed under the FDCPA and similar state law. The instant suit seeks to prevent the constitutional infirmities permeating Treas. Reg. § 6050P-2(e), and Congress has provided no other forum in which to do so.

## II.  PLAINTIFF HAS MET ALL THE REQUIREMENTS FOR INJUNCTIVE RELIEF

This Court should enter a temporary and/or preliminary injunction enjoining Defendants from enforcing Treas. Reg. § 1.6050P-2(e) against DBA's members.  Having demonstrated that the Anti-Injunctive Action does not bar this Court from hearing DBA's claims, injunctive relief is warranted because Debt Buyers have surpassed all of the requirements for such relief for all the foregoing reasons.  *See e.g., American Federation of Government Employees*, *supra*, 2005 WL 1017877, at *4.[12]

Granting DBA's request for injunctive relief will also serve the public interest in several important aspects.  By preventing Defendants' enforcement of Treas. Reg. § 1.6050P-2(e), a tide of class action litigation that could be brought under the FDCPA will be stemmed, protecting already overwhelmed courtrooms and frustrated litigants from the delays and practical interference a new and recurring body of litigation will set in motion.  Injunctive relief will also avert the potential confusion created by having two federal statutory schemes pitted against one another, as well as causing the displacement of state common and statutory law.  Moreover,

---

[12]    In order to prevail on a motion for temporary restraining order or preliminary injunction, a plaintiff must demonstrate the following:  (1) a substantial likelihood of success on the merits; (2) that plaintiff will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief.  *See e.g., American Fed'n of Gov't Employees v. Dist. of Columbia*, 2005 WL 1017877 (D.D.C. May 2, 2005) (Case No. 05-0472) (citing *Mova Pharm. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).  No single factor is controlling as to whether injunctive relief is warranted.  *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."  *Id.*

During the initial proceedings on motions for injunctive relief, a court may consider sworn declarations and other credible evidence in the record even if such evidence might not meet all of the formal requirements for admissibility at a trial.  *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (decision on a preliminary injunction may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (same).

granting DBA's request for relief will prevent the eventual erosion of the debt buying industry – an industry that provides economic benefits to the public by allowing lenders to recoup a portion of their losses, and thereby contain interest rates and stabilize the costs of consumer products and services.

## CONCLUSION

What is fair? The search for the answer to this question has always driven matters in equity. Principles of fairness – due process, comity, redress of grievances, and opportunity to be heard are the basic underpinnings of our search. Ultimately, this Court must determine whether the promulgation of Treas. Reg. § 1.6050P-2(e) and its harmful effects are such that it is an unlawful exercise of agency authority – and if so, this Court can and must intervene.

It is fundamentally unfair to place an entire category of persons in the position of having to choose – not whether to violate a law – but rather, which federal law *must* be violated. In this case, where Defendants have (1) promulgated a regulation that exceeds the enabling statute; (2) trampled an independent federal statutory scheme established by Congress expressly to govern this same category; (3) acted in contravention of their own, longstanding interpretation of a regulatory terms; (4) preempted the statutory laws of the sovereign states; and (5) forced an entire

category of persons to violate both federal and state laws – this Court can and should exercise jurisdiction and declare Treas. Reg. § 1.6050P-2(e), as promulgated, unlawful and enjoin enforcement thereof.

Respectfully submitted,

_____
Deborah J. Israel, Esq. (D.C. Bar. No. 430841)
Louis J. Rouleau, Esq. (D.C. Bar No. 471654)
Womble Carlyle Sandridge & Rice, PLLC
1401 Eye Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: (202) 467-6900
Fax: (202) 467-6910

*Counsel for Plaintiff Debt Buyers' Association*

Of Counsel:

Howard N. Solodky, Esq.
Alida M. Dagostino, Esq.
Womble Carlyle Sandridge & Rice, PLLC
1401 Eye Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: (202) 467-6900
Fax: (202) 467-6910

**EXHIBIT 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| DEBT BUYERS' ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| JOHN W. SNOW, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF ROGER A. KNAUF

I, Roger A. Knauf, a person of the full age of majority, states under penalty of perjury as follows:

1. The facts stated in this Declaration are based on my personal knowledge and are true and correct to the best of my knowledge, information, and belief.

2. I am a director and member of Fourscore Resource Capital, LLC ("FRC"), 7900 Highway 7, Suite 200, St. Louis Park, Minnesota 55426. FRC is a Minnesota Limited Liability Company that purchases delinquent consumer loans and receivables from lenders (*e.g.*, banks, finance companies, and credit card companies) ("Consumer Loans"), at a discount and then attempts to collect those loans. Put another way, FRC is in the business of buying, collecting and sometimes reselling delinquent consumer debt. As a result of working in the debt buying industry for more than 10 years, I have gained significant knowledge about that industry and consumer lending.

3.    The industry in which FRC operates is commonly known and referred to as the "debt buying industry," and firms, like FRC, that purchase and then attempt to collect defaulted consumer debt are referred to in this Affidavit as "Debt Buyers."

4.    Examples of Consumer Loans that Debt Buyers routinely purchase include mortgage loans, home equity lines of credit, student loans, automobile loans, and credit card receivables. Consumer Loans are usually originated by large, institutional lenders like banks, finance companies and credit card companies ("Originating Lenders").

5.    FRC is a member of the Debt Buyers' Association. I am also the President of the Board of Directors of the Debt Buyers' Association ("DBA"). DBA is a tax-exempt trade association incorporated under the laws of the State of California and having its principal place of business at 10440 Pioneer Boulevard, Suite 2, Santa Fe Springs, California 90670. DBA has approximately 550 members; almost all of whom are Debt Buyers or associated with the debt buying industry. Chief among DBA's missions is to build and maintain a reliable and credible market for the delinquent receivables market. To that end, DBA tracks state and federal legislation affecting the debt buying industry and educates its members about significant changes in the law. DBA, on behalf of its members, also lobbies state and federal agencies regulating and/or monitoring the delinquent receivables market and debt collection activities, including those of Debt Buyers.

6.    DBA has approximately 550 members. The debt buying and collection industry comprises more than 10,000 companies and employs roughly 200,000 individuals engaged in the purchasing and collecting of consumer debt.

7.    The debt buying industry provides a valuable service and a substantial benefit to the United States financial markets and American consumers. Lending institutions, such as

2

SENT BY: PCSI;                    9529398100;            JAN-20-06 12:39PM;        PAGE 4

banks, savings and loan associations, and credit card companies, each year charge-off bad or delinquent consumer debt in excess of $100 billion, representing tens of millions of individual consumer loans.   By purchasing Consumer Loans in default, Debt Buyers enable lending institutions to recoup a portion of their losses which, in turn, helps keep interest rates low and the prices of homes and consumer products and services more stable.   Without an efficient market for the disposition of defaulted consumer debt provided by the debt buying industry, consumer interest rates and prices would be higher.

8.       Before making a Consumer Loan, an Originating Lender typically (i) evaluates the creditworthiness of the consumer borrower, (ii) analyzes the collateral, if any, pledged as security for the Consumer Loan, (iii) establishes payment and other terms for the Consumer Loan, and most importantly, (iv) provides the underlying documentation for the consumer lending or credit arrangement.  If a Consumer Loan becomes delinquent, the underlying documentation usually allows the Originating Lender to charge default interest, late charges, attorneys' fees and other costs and expenses of enforcing and collecting the loan.

9.       It is customary in the consumer lending industry that once a Consumer Loan has been delinquent for more than 180 days, the Originating Lender charges off on its books the aggregate amount of the unpaid principal, accrued and unpaid interest, late charges, attorneys' fees and other related costs and expenses (a "Charge-Off").

10.      Once a Charge-Off has been taken, the Originating Lender ordinarily transfers the Consumer Loan to a book account that records the aggregate amount of the Charge-Off, but does not memorialize the debt components at the time of the Charge-Off.

11.    Often, an Originating Lender will seek to recoup a portion of its lost investment in a Consumer Loan that has been charged-off by selling it, usually as part of a portfolio of delinquent Consumer Loans, to a member of the DBA or a similarly situated Debt Buyer.

12.    Unlike an Originating Lender, a Debt Buyer does not engage in any of the underwriting or collateral analysis associated with originating a Consumer Loan. Rather, a Debt Buyer will offer a purchase price for a portfolio of delinquent Consumer Loans based primarily on (i) the size of the portfolio, (ii) the type of consumer debt involved, and (iii) sometimes a computer analysis that provides data on the likelihood of repayment based on statistical models of the account data. Very often, this equation translates into a Debt Buyer purchasing a portfolio of delinquent Consumer Loans for a fraction of the total amount owed to the Originating Lender.

13.    Not only are there striking differences in the activities performed by Originating Lenders, on the one hand, and Debt Buyers, on the other, but the risks and rewards of their respective businesses diverge greatly. Originating Lenders are financial intermediaries who borrow money at one rate of interest (either from the Federal Reserve Bank or other institutional lenders, or through deposits made by customers), loan out that money at a higher rate of interest, and realize a profit based upon the "spread" between the two interest rates. Debt Buyers, in contrast, are not financial intermediaries, but rather investors who purchase assets (defaulted consumer debt) at a discount and attempt to earn a return on that investment through the debt collection process. The realization of profit by originating lenders is more certain while the potential for realization of significant profits, at the risk of substantial losses, by Debt Buyers is greater.

14.    When a Debt Buyer acquires a portfolio of defaulted consumer loans, the Debt Buyer generally receives from the Originating Lender only the account balance with respect to

4

each Charge-Off taken by the lender. In other words, the Debt Buyer often does not know the component amounts of stated principal, unpaid accrued interest, late fees and other charges that comprise the total amount due from the consumer borrower.

15.    Once a Debt Buyer has purchased a portfolio of defaulted Consumer Loans, it may engage in collection efforts (or hire a third-party collection agency to engage in such efforts), which may include locating the borrowers, determining whether the borrowers are in bankruptcy, commencing legal proceedings, or otherwise encouraging payment of all or a portion of the delinquency.

16.    When a Debt Buyer forgives or discharges all or a portion of a defaulted Consumer Loan that it has purchased (or is otherwise required by the regulations under Section 6050P of the Internal Revenue Code of 1986, 26 U.S.C. § 6050P (the "Code") to issue a Form 1099-C because some other "identifiable event" has occurred), that Debt Buyer usually will not be in a position to accurately reflect on the Form 1099-C the amounts to be filled in Box 2 or Box 3 of the Form. The Debt Buyer generally does not have the debt components from the Originating Lender, representing the stated principal of the Consumer Loan nor the unpaid accrued interest on the loan. Nor can the Debt Buyer calculate or reverse engineer the debt components on its own. The Debt Buyer typically receives from the Originating Lender only the aggregate amount owed by the consumer borrower that includes the total of principal, interest and other sums. As a result, the Debt Buyer is usually unable to accurately report (i) in Box 2 only the amount of stated principal discharged and (ii) in Box 3 the amount of interest included in Box 2.

17.    Because Debt Buyers are customarily provided with only an account balance for each Consumer Loan they purchase, they usually lack a detailed breakdown of the principal,

interest and other components of those loans. As a result, they risk violating (and incurring liability under) the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1629 *et seq.*, by making "false representations" of the "character, amount, or legal status" of such loans through the issuance of Forms 1099-C that contain incorrect information. In particular, because Debt Buyers are generally not furnished with the information to accurately complete Boxes 2 and 3 of Form 1099-C, they may, for example, overstate the amount of stated principal and understate the amount of unpaid interest "cancelled."

18.    The threat of FDCPA litigation is a very real concern to DBA's members and similarly situated Debt Buyers. Upon information and belief, the plaintiff's bar involved in FDCPA litigation has "promised" to institute class action lawsuits based upon inaccurate Forms 1099-C constituting false or misleading communications to consumer debtors.

19.    I believe that the filing of Forms 1099-C may impact FRC's ability to collect debt and/or enforce debt judgments beyond three years due to the 36 month "non-payment" rule in Section 6050P's regulations. This is because case law suggests that courts are willing to find debt, including judgment debts, unenforceable if the creditor (here, a Debt Buyer), has issued to the debtor a Form 1099-C reporting discharge of indebtedness income. *See e.g., In re Crosby,* 261 B.R. 470 (Bankr. Ct. D. Ka. 2001) (finding creditor's claim "unenforceable" in light of creditor's issuance and filing of a Form 1099-C); *Long v. Turner,* 134 F.3d 312 (5th Cir. 1998) (finding that a debt may be unenforceable if a debtor that has received a Form 1099-C asserts equitable estoppel and show detrimental reliance such as the payment of Federal income taxes). This issue is of major concern to FRC and other Debt Buyers who engage in collection activities beyond three years as permitted under applicable state statutes of limitations.

6

20.    In December 2005, DBA engaged the law firm of Womble Carlyle Sandridge & Rice PLLC to petition the Internal Revenue Service for a one-year postponement of the applicability of the information reporting requirements of Section 6050P to Debt Buyers. The purpose of the requested postponement was to give (i) the debt buying industry time to work with the United States Congress so that it could consider whether it intended to extend the application of Section 6050P to the industry, and (ii) the IRS time to consider how, if at all, the information reporting requirements of Section 6050P can practically be applicable to purchasers of consumer indebtedness. After a meeting with IRS representatives and two written submissions to the IRS, the IRS denied DBA's request for a one-year postponement on or about January 12, 2006.

21.    The industry practice regarding information obtained and maintained related to defaulted Consumer Loan debt has been driven by the fact that Originating Lenders have not been required to maintain on their books the stated principal, accrued interest and other components of the debt beyond the total amount owed once a Charge-Off has been taken. Thus, Originating Lenders have been unable to and have not provided this information to Debt Buyers for decades. Treasury Regulation § 1.6050P-2(e) effectively reaches backwards to impose requirements that cannot be complied with.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _January 19_, 2006.

Roger A. Knauf

7

**EXHIBIT 2**

---

# ¶152,291. Prop Regs. 6/13/2002. Fed. Reg. Vol. 67, No. 114, p. 40629.

[REG-107524-00]

**Guidance Under Section 6050P Regarding Cancellation of Indebtedness** Reg. §§1.6050P-0, 1.6050P-1, 1.6050P-2

**Caution:** This Notice of Proposed Rulemaking was finalized by TD 9160, 10/22/2004.

## Background

This document contains proposed amendments to the Income Tax Regulations (26 CFR part 1) defining an organization a significant trade or business of which is the lending of money under section 6050P(c)(2)(D). Section 6050P(c)(2)(D) was enacted by section 553(a) of the Ticket to Work and Work Incentives Improvement Act of 1999, Public Law 106-170, 113 Stat. 1860, 1931 (1999) ("the Act"), effective for discharges of indebtedness occurring after December 31, 1999. Generally, section 6050P (a) requires organizations that are subject to that section (applicable entities) to file returns with the Service and to provide statements to persons whose names are required to be shown on the returns ("payees"), setting forth certain information regarding discharges of indebtedness of $600 or more. Section 553(a) of the Act amended section 6050P of the Code by expanding the types of entities that are required to report discharges of indebtedness to include any organization "a significant trade or business of which is the lending of money." Notice 2000-22, 2000-16 I.R.B. 902, April 17, 2000, provides that penalties under sections 6721 and 6722 will not be imposed on the lending organizations newly required to report discharges of indebtedness for failures to report discharges of indebtedness occurring before January 1, 2001. In addition, Notice 2001-8, 2001-4 I.R.B. 374, January 22, 2001, extended that suspension of penalties for failures to file information returns for any discharge of indebtedness that occurs prior to the first calendar year beginning at least two months after the date that appropriate guidance is issued.

This document also contains proposed amendments to the Income Tax Regulations (26 CFR part 1) conforming the existing regulations under section 6050P to statutory changes made by the Debt Collection Improvement Act of 1996.

## Explanation of Provisions

Under section 6050P(c)(2)(D), any organization "a significant trade or business of which is the lending of money" is required to report discharges of indebtedness. These proposed regulations provide guidance on when a trade or business is the lending of money and when that trade or business is significant. In general, the proposed regulations provide that the lending of money is a significant trade or business if money is lent on a regular and continuing basis. The regulations provide three safe harbors under which organizations will not be considered to have a significant trade or business of lending money. The IRS and the Treasury Department believe that these safe harbors satisfy the information reporting objectives of the statute while minimizing the administrative burden on taxpayers.

The first safe harbor applies to organizations that were not required to report under section 6050P in the previous calendar year. Such an organization will be considered not to have a significant trade or business of lending money for the calendar year if its gross income from lending money in the most recent test year (the most recent taxable year ending before July 1 of the previous calendar year) is less than both 15 percent of the organization's gross income and $5 million.

The second safe harbor applies to organizations that were required to report under section 6050P for the previous calendar year. Such an organization will be considered not to have a significant trade or business of lending money for the calendar year if, for each of the three most recent test years, its gross income from lending money is less than both 10 percent of the organization's gross income and $3 million. The IRS and the Treasury Department believe that a stricter safe harbor is appropriate for taxpayers that have been subject to section 6050P in a prior year and, therefore, presumably have systems in place to comply with the information reporting requirements of the statute.

The third safe harbor applies to certain newly formed organizations. Except for an entity that is formed or availed of for the principal purpose of holding loans acquired by an applicable entity (as defined in section 6050P), an organization that does not have a test year is considered not to have a significant trade or business of lending money even if that organization lends money on a regular and continuing basis. This safe harbor and the use of a "test year" in determining whether a taxpayer fits within the other safe harbors provides taxpayers with some advance notice (i.e., at least six months) of whether they will need to establish systems to track and report discharges of indebtedness.

In addition to the safe harbors discussed above, the proposed regulations provide a general exception to information reporting for entities whose principal trade or business is the sale of nonfinancial goods or the provision of nonfinancial services. Such entities are not considered to have a significant trade or business of lending money with respect to lending or credit extended in connection with the purchase by customers of those goods and services. This is consistent with the legislative history, which indicates that, in amending section 6050P, Congress was concerned with credit card and finance companies. S. Rpt. No. 201, 106th Cong., 1st Sess. 28 (1999). The IRS and the Treasury Department believe that Congress did not mean to extend the reporting requirement to retailers and other entities who extend credit to customers in connection with the purchase of nonfinancial goods and services. However, consistent with applying the tests under section 6050P on an entity-by-entity basis, this exception is not available to a separate financing subsidiary of such a retailer. In addition, if such a retailer is subject to section 6050P regardless of its accounts receivable, it is required to report discharges of indebtedness of accounts receivable as well as other debt.

The proposed regulations also provide that, for purposes of section 6050P(c)(2)(D), lending money includes acquiring a loan, and gross income arising from that loan is gross income from lending money. Therefore, an organization that buys and holds loans is treated as an organization that lends money. This is consistent with the temporary regulations under section 6050J (relating to information returns for acquisitions and abandonments of property that is security for indebtedness). See §1.6050J-1T, Q&A-22.

Finally, the proposed regulations amend §1.6050P-1 to provide a new rule applicable to all entities subject to section 6050P, not just those newly made subject to section 6050P by the 1999 amendment. The current regulations under section 6050P (§1.6050P-1(e)(2)) contain rules respecting the reporting requirements of debtors when indebtedness is owned by more than one creditor. Each creditor that is an applicable entity is required to report with respect to any discharge of indebtedness of $600 or more allocable to that creditor. For purposes of this rule, indebtedness owned by a partnership is treated as owned by the partners, with the result that reporting may be required of the partners with respect to a cancellation of debt held by the partnership. Rules respecting compliance with this pass-through reporting requirement by holders of interests in certain pass-through securitized indebtedness arrangements and REMICs were reserved. §1.6050P-1(e)(2)(iii) & (iv). The preamble to those regulations states that penalties will not be imposed for nonreporting by holders of interests in these entities.

Conceivably, an entity that otherwise would be required to report under section 6050P with respect to its debt (for example, an entity that regularly and continuously lends money and does not meet the safe harbors of these proposed regulations), could transfer debt that it originates to a special purpose subsidiary or trust in a single transaction. Through this structure, the originator could possibly avoid application of section 6050P by arguing that the reservation of rules in the regulations for pass-through securitized indebtedness arrangements absolves them of any reporting obligation and that the transferee entity does not meet the requirements of regular and continuous lending activity.

To address the foregoing concern, the amendment to §1.6050P-1 by the proposed regulations provides that an entity formed or availed of by an applicable entity for the principal purpose of holding loans acquired or originated by the applicable entity is treated as having a significant trade or business of lending money. Accordingly, the transferee entity itself is treated as an applicable entity for purposes of section 6050P(c)(2)(D). If the entity formed or availed of by the applicable entity is a REMIC or a pass-through securitized indebtedness arrangement as defined in §1.6050P-1(e)(2)(iii)(B), the REMIC or pass-through securitized indebtedness arrangement will be treated as an applicable entity for purposes of section 6050P(c)(2)(D), despite the reservation in §1.6050P-1(e)(2)(iii) and (iv) of the application of section 6050P to holders of interests in REMICs and pass-through securitized indebtedness arrangements.

## Proposed Effective Date

The regulations, as proposed, apply to any discharge of indebtedness occurring in any calendar year beginning at least two months after the date that the final regulations are published in the Federal Register. Regardless of when the final regulations are made effective, the rules in these proposed regulations may be relied on for prior taxable periods.

## Special Analyses

It has been determined that this notice of proposed rulemaking is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because the regulation does not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. The information collection referenced in this proposed rule (Form 1099-C) has been previously reviewed and approved by the Office of Management and Budget under OMB Control Number 1545-1424. An agency may not collect or sponsor the collection of information unless it displays a valid OMB Control Number. Pursuant to section 7805(f) of the Code, this notice of proposed rulemaking will be submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

## Comments and Public Hearing

Before these proposed regulations are adopted as final regulations, consideration will be given to any electronic or written comments (a signed original and eight (8) copies) that are submitted timely to the IRS. The IRS and Treasury Department request comments on the clarity of the proposed rules and how they can be made easier to understand. All comments will be available for public inspection and copying.

A public hearing has been scheduled for October 8, 2002, beginning at 10 a.m. in Room 4718 of the Internal Revenue Building, 1111 Constitution Avenue, NW., Washington, DC. Because of access restrictions, visitors must enter at the main entrance, located at 1111 Constitution Avenue, NW. All visitors must present photo identification to enter the building. Because of access restrictions, visitors will not be admitted beyond the immediate entrance area more than 30 minutes before the hearing starts. For information about having your name placed on the building access list to attend the hearing, see the FOR FURTHER INFORMATION CONTACT portion of this preamble.

The rules of 26 CFR 601.601(a)(3) apply to the hearing. Persons who wish to present oral comments must submit electronic or written comments and an outline of the topic to be discussed and time to be devoted to each topic (preferably a signed original and eight (8) copies) by September 17, 2002. A period of 10 minutes will be allotted to each person for making comments. An agenda showing the scheduling of the speakers will be prepared after the deadline for receiving outlines has passed. Copies of the agenda will be available free of charge at the hearing.

## Drafting Information

The principal author of these proposed regulations is Sharon L. Hall, Office of Associate Chief Counsel (Income Tax & Accounting). However, other personnel from the IRS and Treasury Department participated in their development.

## List of Subjects 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

## Proposed Amendment to the Regulations

Accordingly, 26 CFR part 1 is proposed to be amended as follows:

## 1. INCOME TAXES

PAR. 1 The authority citation for part 1 is amended by adding an entry in numerical order to read as follows:

26 U.S.C. 7805 ***

Section 1.6050P-1 and 1.6050P-2 also issued under 26 U.S.C. 6050P. ***

PAR. 2 Section 1.6050P-0 is amended as follows:

1. The introductory text is amended by adding the language "and §1.6050P-2" immediately after the language "Sec. 1.6050P-1".

2. The heading for §1.6050P-1 is amended by removing the word "financial".

3. The entry for §1.6050P-1(e)(2)(v) is added.

4. The entries for Secs. 1.6050P-1(e)(5) through (e)(8) are redesignated as entries for §§1.6050P-1(e)(6) through (e)(9) and a new entry for §1.6050P-1(e)(5) is added.

5. The entries for §1.6050P-2 are added.

The additions read as follows:

**Prop Reg § 1.6050P-0. Table of contents.**

**Caution:** This Notice of Proposed Rulemaking was finalized by TD 9160, 10/22/2004.

(1.6050P-1) Information reporting for discharges of indebtedness for certain entities.

*****

(e)

*****

(2) ***

(v) No double reporting.

\*\*\*\*\*

(5) Entity formed or availed of to hold indebtedness.

\*\*\*\*\*

(1.6050P-2) Organizations a significant trade or business of which is the lending of money.

(a) In general.

(b) Safe harbors.

(1) Organizations not subject to section 6050P in the previous calendar year.

(2) Safe harbor for organizations that were subject to section 6050P in the previous calendar year.

(3) No test year.

(c) Seller financing.

(d) Gross income from lending of money.

(e) Acquisition of indebtedness by subsequent holder.

(f) Test year.

(g) Predecessor organization.

(h) Examples.

(i) Effective date.

PAR. 3 Section 1.6050P-1 is amended as follows:

1. The heading for §1.6050P-1 is amended by removing the word "financial".

2. Paragraphs (a)(1), (b)(2)(i)(F), (c), (e)(2)(i), (e)(3), (e)(7), (f)(1) introductory text, (f)(1)(ii) and (f)(2) are amended by removing the word "financial".

3. The first sentence of paragraph (c) is amended by adding "and section 1.6050P-2" immediately after the word "section".

4. Paragraph (e)(2)(v) is added.

5. Paragraph (e)(4) is amended by removing "6050P(c)(1)(A)" each time it appears and adding "6050P (c)(2)(A)" in its place and by removing "6050P(c)(1)(C)" and adding "6050P(c)(2)(C)" in its place.

6. Paragraphs (e)(5) through (e)(8) are redesignated as paragraphs (e)(6) through (e)(9) and a new paragraph (e)(5) is added.

7. Paragraph (e)(7)(i), as redesignated, is amended by removing "(e)(6)" where it appears and adding "(e)(7)" and paragraph (e)(7)(ii), as redesignated, is amended by removing "(e)(6)(i)" where it appears and adding "(e)(7)(i)" in its place.

8. Paragraph (h)(1) is amended by adding "and except paragraph (e)(5) of this section, which applies to discharges of indebtedness occurring in any calendar year beginning at least two months after the date that the final regulations are published in the Federal Register.", immediately after the language "1994".

The additions read as follows:

### Prop Reg § 1.6050P-1. Information reporting for discharges of indebtedness by certain entities.

**Caution:** This Notice of Proposed Rulemaking was finalized by TD 9160, 10/22/2004.

\*\*\*\*\*

w‡ε(e) \*\*\*

w‡ε(2) \*\*\*

w‡ε(v) No double reporting. If multiple creditors are considered to hold interests in an indebtedness under paragraph (e)(2) of this section, and an entity is required to report a discharge of that indebtedness under paragraph (e)(5) of this section, then such multiple creditors are not required to report the discharge of indebtedness.

\*\*\*\*\*

w‡ε(5) *Entity formed or availed of to hold indebtedness.* Notwithstanding §1.6050P-2(b)(3), if an entity (the transferee entity) is formed or availed of by an applicable entity (within the meaning of section 6050P(c)(1)) for the principal purpose of holding indebtedness acquired (including originated) by the applicable entity, then, for purposes of section 6050P(c)(2)(D), the transferee entity has a significant trade or business of lending money.

\*\*\*\*\*

PAR. 4 A new §1.6050P-2 is added as follows:

### Prop Reg § 1.6050P-2. Organization a significant trade or business of which is the lending of money.

**Caution:** This Notice of Proposed Rulemaking was finalized by TD 9160, 10/22/2004.

w‡ε**(a) In general.** For purposes of section 6050P(c)(2)(D), the lending of money is a significant trade or business of an organization in a calendar year if the organization lends money on a regular and continuing basis during the calendar year.

w‡ε**(b) Safe harbors.**

w‡ε*(1) Organizations not subject to section 6050P in the previous calendar year.* For an organization that was not required to report under section 6050P in the previous calendar year, the lending of money will not be treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money in the organization's most recent test year (as defined in paragraph (f) of this section) is both

less than $5 million and less than 15 percent of the organization's gross income for that test year.

ᵛ⁺ᵉ*(2) Organizations that were subject to section 6050P in the previous calendar year.* For an organization that was required to report under section 6050P for the previous calendar year, the lending of money will not be treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money in each of the organization's three most recent test years is both less than $3 million and less than 10 percent of the organization's gross income for that test year.

ᵛ⁺ᵉ*(3) No test year.* The lending of money will not be treated as a significant trade or business for an organization for the calendar year in which the lending occurs if the organization does not have a test year for that calendar year.

ᵛ⁺ᵉ**(c) Seller financing.** If the principal trade or business of an organization is selling nonfinancial goods or providing nonfinancial services and if the organization extends credit to the purchasers of those goods or services in order to finance the purchases, then, for purposes of section 6050P(c)(2)(D), these extensions of credit are not a significant trade or business of lending money.

ᵛ⁺ᵉ**(d) Gross income from lending of money.** For purposes of this section, gross income from lending of money includes income from interest, fees, penalties, merchant discount, interchange and gains arising from the sale of an indebtedness.

ᵛ⁺ᵉ**(e) Acquisition of indebtedness by subsequent holder.** For purposes of this section, lending money includes acquiring an indebtedness, and gross income arising from such an acquired indebtedness is treated as gross income from lending money, without regard to whether the indebtedness was originated by either an applicable entity or a related party.

ᵛ⁺ᵉ**(f) Test year.** For any calendar year, a test year is a taxable year of the organization that ends before July 1 of the previous calendar year.

ᵛ⁺ᵉ**(g) Predecessor organization.** If an organization acquires substantially all of the property that was used in a trade or business of some other organization (the predecessor) (including when two or more corporations are parties to a merger agreement under which the surviving corporation becomes the owner of all the assets and assumes all the liabilities of the absorbed corporations(s)) or was used in a separate unit of the predecessor, then whether the organization at issue qualifies for one of the safe harbors in paragraph (b) of this section is determined by also taking into account the test years, reporting obligations, and gross income of the predecessor.

ᵛ⁺ᵉ**(h) Examples.** The rules of this section are illustrated by the following examples.

*Example (1).* Finance Company A, a calendar year taxpayer, was formed in Year 1 as a non-bank subsidiary of Manufacturing Company and has no predecessor. A lends money to purchasers of Manufacturing Company's products on a regular and continuing basis to finance the purchase of those products. A's gross income from interest in Year 1 is $4.7 million. A's gross income from fees and penalties related to the lending activity in Year 1 is $.5 million. Section 6050P does not require A to report discharges of indebtedness occurring in Years 1 or 2, because A has no test year for those years. Notwithstanding that A lends money in those years on a regular and continuing basis, under paragraph (b)(3) of this section, A does not have a significant trade or business of lending money in those years for purposes of section 6050P(c)(2)(D). However, for Year 3, A's test year is Year 1. A's gross income from lending in Year 1 is not less than $5 million

for purposes of the applicable safe harbor of paragraph (b)(1) of this section. Because A lends money on a regular and continuing basis and does not meet the applicable safe harbor, section 6050P requires A to report discharges of indebtedness occurring in Year 3.

*Example (2).* The facts are the same as in Example 1, except that A is a division of Manufacturing Company, rather than a separate subsidiary. Manufacturing Company's principal activity is the manufacture and sale of non-financial products, and other than financing the purchase of those products Manufacturing Company does not extend credit or otherwise lend money. Accordingly, under paragraph (c) of this section, that financing activity is not a significant trade or business of lending money for purposes of section 6050P(c)(2)(D), and section 6050P does not require Manufacturing Company to report discharges of indebtedness.

*Example (3).* Company B, a calendar year taxpayer, is formed in Year 1. B has no predecessor and a part of its activities consists of the lending of money. B packages and sells part of the indebtedness it originates and holds the remainder. B is engaged in these activities on a regular and continuing basis. For Year 1, B's gross income from sales of the indebtedness, combined with interest income, fees, and penalties related to the lending activity is only $4.8 million, but it is 16% of B's gross income in Year 1. Because B lends money on a regular and continuing basis and does not meet the applicable safe harbor of paragraph (b)(1) of this section, section 6050P requires B to report discharges of indebtedness occurring in Year 3. B is not required to report discharges of indebtedness in years 1 and 2 because B has no test year for years 1 and 2.

*Example (4).* The facts are the same as in Example 3. In addition, in each of Years 2, 3, and 4, B's gross income from sales of the indebtedness combined with interest income, fees, and penalties related to the lending activity is less than both $3 million and 10% of B's gross income. Because B was required to report under section 6050P for Year 3, the applicable safe harbor for Year 4 is paragraph (b)(2) of this section, which is satisfied only if B's gross income from lending activities for each of the three most recent test years is less than both $3 million and 10% of B's gross income. For Year 4, even though B has only two test years, B's gross income in one of those test years, Year 1, causes B to fail to meet this safe harbor. Accordingly, B is required to report discharges of indebtedness under section 6050P in Year 4. For Year 5, B's three most recent test years are Years 1, 2, and 3. However, B's gross income from lending activities in Year 1 is not less than $3 million and 10% of B's gross income. Accordingly, section 6050P requires B to report discharges of indebtedness in Year 5. For Year 6, B satisfies the applicable safe harbor requirements of paragraph (b)(2) for each of the three most recent test years (Years 2, 3, and 4). Therefore, section 6050P does not require B to report discharges of indebtedness in Year 6. Because B is not required to report for Year 6, the applicable safe harbor for Year 7 is the one contained in paragraph (b)(1) of this section, and thus the only relevant test year is year 5.

**(i) Effective date.** This section is effective for discharges of indebtedness occurring in any calendar year beginning at least two months after the date that the final regulations are published in the Federal Register.

Robert E. Wenzel,

*Deputy Commissioner of Internal Revenue.*

[FR Doc. 02-14825 Filed 6-12-02; 8:45 am]

END OF DOCUMENT - © Copyright 2006 RIA. All rights reserved.

**EXHIBIT 3**

8585    ☐ VOID    ☐ CORRECTED

| CREDITOR'S name, street address, city, state, and ZIP code | | OMB No. 1545-1424 | Cancellation of Debt |
|---|---|---|---|
| | | **2005** | |
| | | Form **1099-C** | |
| CREDITOR'S federal identification number | DEBTOR'S identification number | 1 Date canceled | 2 Amount of debt canceled $ | **Copy A** |
| DEBTOR'S name | | 3 Interest if included in box 2 $ | 4 | **For Internal Revenue Service Center** File with Form 1096. |
| Street address (including apt. no.) | | 5 Debt description | | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| City, state, and ZIP code | | | | |
| Account number (see instructions) | | 6 Check for bankruptcy ☐ | 7 Fair market value of property $ | |

Form **1099-C**      Cat. No. 26280W      Department of the Treasury - Internal Revenue Service

**Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page**

☐ CORRECTED (if checked)

| CREDITOR'S name, street address, city, state, and ZIP code | | OMB No. 1545-1424 **20****05** Form **1099-C** | **Cancellation of Debt** |
|---|---|---|---|
| CREDITOR'S Federal identification number | DEBTOR'S identification number | **1** Date canceled<br><br>**2** Amount of debt canceled<br>$ | **Copy B For Debtor** |
| DEBTOR'S name | | **3** Interest if included in box 2<br><br>$<br><br>**4** | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported. |
| Street address (including apt. no.) | | **5** Debt description | |
| City, state, and ZIP code | | | |
| Account number (see instructions) | | **6** Bankruptcy (if checked) ☐ | **7** Fair market value of property<br>$ |

Form **1099-C**                    (keep for your records)                    Department of the Treasury · Internal Revenue Service

## Instructions for Debtor

If a federal government agency, certain agency connected with the Federal government, financial institution, credit union, or an organization having a significant trade or business of lending money (such as a finance or credit card company) cancels or forgives a debt you owe of $600 or more, this form must be provided to you. Generally, if you are an individual, you must include the canceled amount on the "Other income" line of Form 1040. If you are a corporation, partnership, or other entity, report the canceled debt on your tax return. See the instructions for your tax return.

However, some canceled debts are not includible in your income, such as certain student loans (see Pub. 525), certain debts reduced by the seller after purchase (see Pub. 334), qualified farm debt (see Pub. 225), qualified real property business debt (see Pub. 334), or debts canceled in bankruptcy (see Pub. 908). Do not report a canceled debt as income if you did not deduct it but would have been able to do so on your tax return if you had paid it. Also, do not include canceled debts in your income to the extent you were insolvent. If you exclude a canceled debt from your income because it was canceled in a bankruptcy case or during insolvency, or because the debt is qualified farm debt or qualified real property business debt, file Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment).

**Account number.** May show an account or other unique number the creditor assigned to distinguish your account.

**Box 1.** Shows the date the debt was canceled.

**Box 2.** Shows the amount of debt canceled.

**Box 3.** Shows interest if included in the canceled debt in box 2. See Pub. 525, Taxable and Nontaxable Income, to see if you must include the interest in gross income.

**Box 5.** Shows a description of the debt. If box 7 is completed, box 5 shows a description of the property.

**Box 6.** If the box is marked, the creditor has indicated the debt was canceled in a bankruptcy proceeding.

**Box 7.** If, in the same calendar year, a foreclosure or abandonment of property occurred in connection with the cancellation of the debt, the fair market value of the property will be shown, or you will receive a separate Form 1099-A, Acquisition or Abandonment of Secured Property. You may have income or loss because of the acquisition or abandonment. See Pub. 544, Sales and Other Dispositions of Assets, for information about foreclosures and abandonments.

☐ VOID     ☐ CORRECTED

| CREDITOR'S name, street address, city, state, and ZIP code | | OMB No. 1545-1424 | **Cancellation of Debt** |
|---|---|---|---|
| | | **20**05 | |
| | | Form **1099-C** | |
| CREDITOR'S Federal identification number | DEBTOR'S identification number | 1 Date canceled | 2 Amount of debt canceled $ | **Copy C** **For Creditor** |
| DEBTOR'S name | | 3 Interest if included in box 2 $ | 4 | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| Street address (including apt. no.) | | 5 Debt description | | |
| City, state, and ZIP code | | | | |
| Account number (see instructions) | | 6 Check for bankruptcy ☐ | 7 Fair market value of property $ | |

Form **1099-C**                                                  Department of the Treasury - Internal Revenue Service

## Instructions for Creditors

General and specific form instructions are provided as separate products. The products you should use to complete Form 1099-C are the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G, and the 2005 Instructions for Forms 1099-A and 1099-C. A chart in the general instructions gives a quick guide to which form must be filed to report a particular payment. To order these instructions and additional forms, call 1-800-TAX-FORM (1-800-829-3676).

**Caution:** *Because paper forms are scanned during processing, you cannot file Forms 1096, 1098, 1099, or 5498 that you download and print from the IRS website.*

**Due dates.** Furnish Copy B of this form to the debtor by January 31, 2006.

File Copy A of this form with the IRS by February 28, 2006. If you file electronically, the due date is March 31, 2006.

# 20**05**



Department of the Treasury
**Internal Revenue Service**

# Instructions for Forms 1099-A and 1099-C

Section references are to the Internal Revenue Code unless otherwise noted.

## Reminder

In addition to these specific instructions, you should also use the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. Those general instructions include information about:

- Backup withholding
- Magnetic media and electronic reporting requirements
- Penalties
- Who must file (nominee/middleman)
- When and where to file
- Taxpayer identification numbers
- Statements to recipients
- Corrected and void returns
- Other general topics

You can get the general instructions from the IRS website at *www.irs.gov* or by calling 1-800-TAX-FORM (1-800-829-3676).

## Specific Instructions for Form 1099-A

File Form 1099-A, Acquisition or Abandonment of Secured Property, by February 28, 2006 (March 31, 2006, if filed electronically) for each borrower if you lend money in connection with your trade or business and, in full or partial satisfaction of the debt, you acquire an interest in property that is security for the debt, or you have reason to know that the property has been abandoned. You need not be in the business of lending money to be subject to this reporting requirement.

### Coordination With Form 1099-C

If, in the same calendar year, you cancel a debt in connection with a foreclosure or abandonment of secured property, it is not necessary to file both Form 1099-A and Form 1099-C, Cancellation of Debt, for the same debtor. You may file Form 1099-C only. You will meet your Form 1099-A filing requirement for the debtor by completing boxes 5 and 7 on Form 1099-C. However, if you file both Forms 1099-A and 1099-C, do not complete boxes 5 and 7 on Form 1099-C. See the instructions for Form 1099-C on page AC-2.

### Property

Property means any real property (such as a personal residence), any intangible property, and tangible personal property except:

- No reporting is required for tangible personal property (such as a car) held only for personal use. However, you must file Form 1099-A if the property is totally or partly held for use in a trade or business or for investment.
- No reporting is required if the property securing the loan is located outside the United States and the borrower has furnished the lender a statement, under penalties of perjury, that the borrower is an exempt foreign person (unless the lender knows that the statement is false).

### Who Must File

In addition to the general rule specified above, the following rules apply.

**Multiple owners.** If there are multiple owners of undivided interests in a single loan, such as in pools, fixed investment trusts, or other similar arrangements, the trustee, record owner, or person acting in a similar capacity must file Form 1099-A on behalf of all the owners of beneficial interests or participations.

In this case, only one form for each borrower must be filed on behalf of all owners with respect to the loan. Similarly, for bond issues, only the trustee or similar person is required to report.

**Governmental unit.** A governmental unit, or any of its subsidiary agencies, that lends money secured by property must file Form 1099-A.

**Subsequent holder.** A subsequent holder of a loan is treated as the lender for purposes of the reporting requirement for events occurring after the loan is transferred to the new holder.

**Multiple lenders.** If more than one person lends money secured by property and one lender forecloses or otherwise acquires an interest in the property and the sale or other acquisition terminates, reduces, or otherwise impairs the other lenders' security interests in the property, the other lenders must file Form 1099-A for each of their loans. For example, if a first trust holder forecloses on a building, and the second trust holder knows or has reason to know of such foreclosure, the second trust holder must file Form 1099-A for the second trust even though no part of the second trust was satisfied by the proceeds of the foreclosure sale.

### Abandonment

An abandonment occurs when the objective facts and circumstances indicate that the borrower intended to and has permanently discarded the property from use. You have "reason to know" of an abandonment based on all the facts and circumstances concerning the status of the property. You will be deemed to know all the information that would have been discovered through a reasonable inquiry when, in the ordinary course of business, you become aware or should become aware of circumstances indicating that the property has been abandoned. If you expect to commence a foreclosure, execution, or similar sale within 3 months of the date you had reason to know that the property was abandoned, reporting is required as of the date you acquire an interest in the property or a third party purchases the property at such sale. If you expect to but do not commence such action within 3 months, the reporting requirement arises at the end of the 3-month period.

### Statements to Borrowers

If you are required to file Form 1099-A, you must provide a statement to the borrower. Furnish a copy of Form 1099-A or an acceptable substitute statement to each borrower. For more information about the requirement to furnish a statement to the borrower, see part H in the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.

### Account Number

The account number is required if you have multiple accounts for a borrower for whom you are filing more than one Form 1099-A. Additionally, the IRS encourages you to designate an account number for all Forms 1099-A that you file. See part P in the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.

### Box 1. Date of Lender's Acquisition or Knowledge of Abandonment

For an acquisition, enter the date you acquired the secured property. An interest in the property generally is acquired on the earlier of the date title is transferred to the lender or the date possession and the burdens and benefits of ownership are

transferred to the lender. If an objection period is provided by law, use the date the objection period expires. If you purchase the property at a sale held to satisfy the debt, such as at a foreclosure or execution sale, use the later of the date of sale or the date the borrower's right of redemption, if any, expires.

For an abandonment, enter the date you knew or had reason to know that the property was abandoned unless you expect to commence a foreclosure, execution, or similar action within 3 months, as explained earlier. If a third party purchases the property at a foreclosure, execution, or similar sale, the property is treated as abandoned, and you have reason to know of its abandonment on the date of sale.

## Box 2. Balance of Principal Outstanding

Enter the balance of the debt outstanding at the time the interest in the property was acquired or on the date you first knew or had reason to know that the property was abandoned. Include only unpaid principal on the original debt. Do not include accrued interest or foreclosure costs.

## Box 3. Reserved

## Box 4. Fair Market Value (FMV) of Property

For a foreclosure, execution, or similar sale, enter the FMV of the property. See Temporary Regulations section 1.6050J-1T, Q/A-32. Generally, the gross foreclosure bid price is considered to be the FMV. If an abandonment or voluntary conveyance to the lender in lieu of foreclosure occurred, check "Yes" in box 5 and enter the appraised value of the property. Otherwise, make no entry in this box.

## Box 5. Was Borrower Personally Liable for Repayment of the Debt

Enter an "X" in the applicable box to indicate whether the borrower was personally liable for repayment of the debt at the time the debt was created or, if modified, at the time of the last modification.

## Box 6. Description of Property

Enter a general description of the property. For real property, generally you must enter the address of the property, or, if the address does not sufficiently identify the property, enter the section, lot, and block.

For personal property, enter the applicable type, make, and model. For example, describe a car as "Car—2001 Honda Accord." Use a category such as "Office Equipment" to describe more than one piece of personal property, such as six desks and seven computers. Enter "CCC" for crops forfeited on Commodity Credit Corporation loans.

# Specific Instructions for Form 1099-C

File Form 1099-C, Cancellation of Debt, for each debtor for whom you canceled a debt owed to you of $600 or more only if:

1. You are an entity described under *Who Must File* below and

2. An identifiable event has occurred. It does not matter whether the actual cancellation is on or before the date of the identifiable event. See *When Is a Debt Canceled* on page AC-3.

 *Form 1099-C must be filed regardless of whether the debtor is required to report the debt as income.*

The debtor may be an individual, corporation, partnership, trust, estate, association, or company.

Do not combine multiple cancellations of a debt to determine whether you meet the $600 reporting requirement unless the separate cancellations are under a plan to evade the Form 1099-C requirements.

## Coordination With Form 1099-A

If, in the same calendar year, you cancel a debt in connection with a foreclosure or abandonment of secured property, it is not necessary to file both Form 1099-A, Acquisition or

Abandonment of Secured Property, and Form 1099-C for the same debtor. You may file Form 1099-C only. You will meet your Form 1099-A filing requirement for the debtor by completing boxes 5 and 7 on Form 1099-C. However, you may file both Forms 1099-A and 1099-C; if you do, do not complete boxes 5 and 7 on Form 1099-C. See the instructions for Form 1099-A on page AC-1 and *Box 5* and *Box 7* on page AC-4.

## Who Must File

File Form 1099-C if you are:

1. A financial institution described in section 581 or 591(a) (such as a domestic bank, trust company, building and loan or savings and loan association).

2. A credit union.

3. A federal government agency including:

a. A department,

b. An agency,

c. A court or court administrative office, or

d. An instrumentality in the executive, judicial, or legislative branch of the government, including government corporations.

4. Any of the following, its successor, or subunit of one of the following:

a. Federal Deposit Insurance Corporation,

b. Resolution Trust Corporation,

c. National Credit Union Administration,

d. Any military department,

e. U.S. Postal Service, or

f. Postal Rate Commission.

5. A corporation that is a subsidiary of a financial institution or credit union, but only if, because of your affiliation, you are subject to supervision and examination by a federal or state regulatory agency.

6. For discharges occurring on or after January 1, 2005, any organization, a significant trade or business of which is the lending of money, such as a finance company or credit card company (whether or not affiliated with a financial institution). The lending of money is a significant trade or business if money is lent on a regular and continuing basis. Regulations section 1.6050P-2(b) of the final regulations published October 25, 2004, lists three safe harbors (see *Safe harbor rules* below) under which reporting may not be required for the current year.

**Safe harbor rules under Regulations section 1.6050P-2(b).** The three safe harbor rules in which an entity will not be considered to have a significant trade or business of lending money are:

1. No prior year reporting required. An organization will not have a significant trade or business of lending money for the current year if the organization was not required to report in the prior year and if its gross income from lending money in the most recent test year (see item *3* below) is less than 15% of the organization's gross income and $5 million.

2. Prior year reporting requirement. An organization that had a prior year reporting requirement will not have a significant trade or business of lending money for the current year if, for each of the three most recent test years, its gross income from lending money is less than both 10% of the organization's gross income and $3 million.

3. No test year. Newly formed organizations are considered not to have a significant trade or business of lending money even if the organization lends money on a regular and continuing basis. However, this safe harbor does not apply to an entity formed or availed of for the principal purpose of holding loans acquired or originated by another entity. In this instance, the transferee entity (including real estate mortgage investment conduits (REMICs) and pass-through securitized indebtedness arrangements) may be required to report cancellation of indebtedness on Form 1099-C. See Regulations section 1.6050P-1(e)(5).

**Test year defined.** A test year is a taxable year of the organization that ends before July 1 of the previous calendar year. For example, X, a calendar year taxpayer who has a significant trade or business of lending money, is formed in year one. X will not have a test year in year one or year two.

However, for year three, X's test year will be year one. In year three, year one is the only year that ended before July 1 of the previous calendar year (in this example, year two).

**Penalties.** See Penalties in the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.

*Amounts discharged in nonlending transactions.* Until further guidance is issued, no penalty will apply for failure to file Form 1099-C, or provide statements to debtors, for amounts discharged in nonlending transactions.

*Amounts forgiven pursuant to the terms of a debt obligation.* Until further guidance is issued, no penalty will apply for failure to file Form 1099-C, or provide statements to debtors, for amounts forgiven pursuant to the terms of a debt obligation.

**Multiple creditors.** If a debt is owned (or treated as owned for federal income tax purposes) by more than one creditor, each creditor that is described under *Who Must File* on page AC-2 must issue a Form 1099-C if that creditor's part of the canceled debt is $600 or more. To meet this requirement, a lead bank, fund administrator, or other designee of the creditor may file a single Form 1099-C reporting the aggregate canceled debt or may file Form 1099-C for that creditor's part of the canceled debt. Use any reasonable method to determine the amount of each creditor's part of the canceled debt.

Debt owned by a partnership is treated as owned by the partners and must follow the rules for multiple creditors.

**Pass-throughs and REMICs.** Until further guidance is issued, no penalty will apply for failure to file Form 1099-C, or provide statements to debtors, for a canceled debt held in a pass-through securitized debt arrangement or held by a REMIC. However, see item 3 under *Safe harbor rules* on page AC-2.

A pass-through securitized debt arrangement is any arrangement in which one or more debts are pooled and held for 20 or more persons whose interests in the debt are undivided co-ownership interests that are freely transferable. Co-ownership interests that are actively traded personal property (as defined in Regulations section 1.1092(d)-1) are presumed to meet these requirements.

## Debt Defined

A debt is any amount owed to you including stated principal, stated interest, fees, penalties, administrative costs, and fines. The amount of debt canceled may be all or only part of the total amount owed. However, for a lending transaction, you are required to report only the stated principal. See *Exceptions* below.

## When To File

Generally, file Form 1099-C for the year in which an identifiable event occurs. See *Exceptions* below. If you cancel a debt before an identifiable event occurs, you may choose to file Form 1099-C for the year of cancellation. No further reporting is required even if a second identifiable event occurs on the same debt. Also, you are not required to file an additional or corrected Form 1099-C if you receive payment on a prior year debt.

## When Is a Debt Canceled

A debt is canceled on the date an identifiable event occurs. An identifiable event is:

1. A discharge in bankruptcy under Title 11 of the U.S. Code for business or investment debt (see *Exceptions* on this page).

2. A cancellation or extinguishment making the debt unenforceable in a receivership, foreclosure, or similar federal or state court proceeding.

3. A cancellation or extinguishment when the statute of limitations for collecting the debt expires, or when the statutory period for filing a claim or beginning a deficiency judgment proceeding expires. Expiration of the statute of limitations is an identifiable event only when a debtor's affirmative statute of limitations defense is upheld in a final judgment or decision of a court and the appeal period has expired.

4. A cancellation or extinguishment when the creditor elects foreclosure remedies that by law end or bar the creditor's right to collect the debt. This event applies to a mortgage lender or holder who is barred by local law from pursuing debt collection after a "power of sale" in the mortgage or deed of trust is exercised.

5. A cancellation or extinguishment due to a probate or similar proceeding.

6. A discharge of indebtedness under an agreement between the creditor and the debtor to cancel the debt at less than full consideration.

7. A discharge of indebtedness because of a decision or a defined policy of the creditor to discontinue collection activity and cancel the debt. A creditor's defined policy can be in writing or an established business practice of the creditor. A creditor's practice to stop collection activity and abandon a debt when a particular nonpayment period expires is a defined policy.

8. The expiration of nonpayment testing period. This event occurs when the creditor has not received a payment on the debt during the testing period. The testing period is a 36-month period ending on December 31 plus any time when the creditor was precluded from collection activity by a stay in bankruptcy or similar bar under state or local law. The creditor can rebut the occurrence of this identifiable event if:

a. The creditor (or a third-party collection agency) has engaged in significant bona fide collection activity during the 12-month period ending on December 31 or

b. Facts and circumstances that exist on January 31 following the end of the 36-month period indicate that the debt was not canceled.

Significant bona fide collection activity does not include nominal or ministerial collection action, such as an automated mailing. Facts and circumstances indicating that a debt was not canceled include the existence of a lien relating to the debt (up to the value of the security) or the sale or packaging for sale of the debt by the creditor.

## Exceptions

You are not required to report on Form 1099-C the following:

1. Certain bankruptcies. You are not required to report a debt canceled in bankruptcy unless you know from information included in your books and records that the debt was incurred for business or investment purposes. If you are required to report a business or investment debt canceled in bankruptcy, report it for the later of:

a. The year in which the amount of canceled debt first can be determined or

b. The year in which the debt is canceled in bankruptcy.

A debt is incurred for business if it is incurred in connection with the conduct of any trade or business other than the trade or business of performing services as an employee. A debt is incurred for investment if it is incurred to purchase property held for investment (as defined in section 163(d)(5)).

2. Interest. You are not required to report interest. However, if you choose to report interest as part of the canceled debt in box 2, you must show the interest separately in box 3.

3. Nonprincipal amounts. Nonprincipal amounts include penalties, fines, fees, and administrative costs. For a lending transaction, you are not required to report any amount other than stated principal. A lending transaction occurs when a lender loans money to, or makes advances on behalf of, a borrower (including revolving credit and lines of credit). For a nonlending transaction, nonprincipal amounts are included in the debt. However, until further guidance is issued, no penalties will be imposed for failure to report these amounts in nonlending transactions.

4. Foreign debtors. Until further guidance is issued, no penalty will apply if a financial institution does not file Form 1099-C for a debt canceled by its foreign branch or foreign office for a foreign debtor provided all the following apply:

a. The financial institution is engaged in the active conduct of a banking or similar business outside the United States.

**AC-3**

b. The branch or office is a permanent place of business that is regularly maintained, occupied, and used to carry on a banking or similar financial business.

c. The business is conducted by at least one employee of the branch or office who is regularly in attendance at the place of business during normal working hours.

d. The indebtedness is extended outside the United States by the branch or office in connection with that trade or business.

e. The financial institution does not know or have reason to know that the debtor is a U.S. person.

5. **Related parties.** Generally, a creditor is not required to file Form 1099-C for the deemed cancellation of a debt that occurs when the creditor acquires the debt of a related debtor, becomes related to the debtor, or transfers the debt to another creditor related to the debtor. However, if the transfer to a related party by the creditor was for the purpose of avoiding the Form 1099-C requirements, Form 1099-C is required. See section 108(e)(4).

6. **Release of a debtor.** You are not required to file Form 1099-C if you release one of the debtors on a debt as long as the remaining debtors are liable for the full unpaid amount.

7. **Guarantor or surety.** You are not required to file Form 1099-C for a guarantor or surety. A guarantor is not a debtor for purposes of filing Form 1099-C even if demand for payment is made to the guarantor.

8. **Seller financing.** Organizations whose principal trade or business is the sale of non-financial goods or non-financial services, and who extend credit to customers in connection with the purchase of those non-financial goods and non-financial services, are not considered to have a significant trade or business of lending money, with respect to the credit extended in connection with the purchase of those goods or services, for reporting discharge of indebtedness on Form 1099-C. See Regulations section 1.6050P-2(c). But the reporting applies if a separate financing subsidiary of the retailer extends the credit to the retailer's customers.

## Multiple Debtors

For debts of $10,000 or more incurred after 1994 that involve debtors who are jointly and severally liable for the debt, you must report the entire amount of the canceled debt on each debtor's Form 1099-C. Multiple debtors are jointly and severally liable for a debt if there is no clear and convincing evidence to the contrary. If it can be shown that joint and several liability does not exist, a Form 1099-C is required for each debtor for whom you canceled a debt of $600 or more.

For debts incurred before 1995 and for debts of less than $10,000 incurred after 1994, you must file Form 1099-C only for the primary (or first-named) debtor.

If you know or have reason to know that the multiple debtors were husband and wife who were living at the same address when the debt was incurred, and you have no information that these circumstances have changed, you may file only one Form 1099-C.

## Recordkeeping

If you are required to file Form 1099-C, you must retain a copy of that form or be able to reconstruct the data for at least 4 years from the due date of the return.

## Requesting TINs

You must make a reasonable effort to obtain the correct name and taxpayer identification number (TIN) of the person whose debt was canceled. You may obtain the TIN when the debt is incurred. If you do not obtain the TIN before the debt is canceled, you must request the debtor's TIN. Your request must clearly notify the debtor that the IRS requires the debtor to furnish its TIN and that failure to furnish such TIN subjects the debtor to a $50 penalty imposed by the IRS. You may use Form W-9, Request for Taxpayer Identification Number and Certification, to request the TIN. However, a debtor is not required to certify his or her TIN under penalties of perjury.

## Statements to Debtors

If you are required to file Form 1099-C, you must provide a statement to the debtor. Furnish a copy of Form 1099-C or an acceptable substitute statement to each debtor. For more information about the requirement to furnish a statement to the debtor, see part H in the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. You have furnished a statement to the debtor if it is mailed to the debtor's last known address.

## Account Number

The account number is required if you have multiple accounts for a debtor for whom you are filing more than one Form 1099-C. Additionally, the IRS encourages you to designate an account number for all Forms 1099-C that you file. See part P in the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.

## Box 1. Date Canceled

Enter the date the debt was canceled. See *When Is a Debt Canceled* on page AC-3.

## Box 2. Amount of Debt Canceled

Enter the amount of the canceled debt. See *Debt Defined* on page AC-3 and *Exceptions* on page AC-3. Do not include any amount the lender receives in satisfaction of the debt by means of a settlement agreement, foreclosure sale, etc.

## Box 3. Interest if Included in Box 2

Enter any interest you included in the canceled debt in box 2. You are not required to report interest in box 2. But if you do, you also must report it in box 3.

## Box 4. Reserved

## Box 5. Debt Description

Enter a description of the origin of the debt, such as student loan, mortgage, or credit card expenditure. Be as specific as possible. If you are filing a combined Form 1099-C and 1099-A, include a description of the property.

## Box 6. Check for Bankruptcy

Check the box if you are reporting a debt canceled in bankruptcy.

## Box 7. Fair Market Value (FMV) of Property

If you are filing a combined Form 1099-C and 1099-A for a foreclosure, execution, or similar sale, enter the FMV of the property. Generally, the gross foreclosure bid price is considered to be the FMV. If an abandonment or voluntary conveyance to the lender in lieu of foreclosure occurred, enter the appraised value of the property.

**AC-4**

**EXHIBIT 4**

Federal Tax - Primary Sources - Rulings & Other Docs. -

# MISC-DOC, 99ARD 110-5, Returns: Cancellation of debt: Form 1099-C: Comment request.

### Notice and Request for Comments Regarding Form 1099-C▶

*[Code Sec. 6050P]*

◀**Returns:▶ Cancellation of debt: Form 1099-C: Comment request.**

DEPARTMENT OF THE TREASURY
Internal Revenue Service
Proposed Collection; Comment Request for ◀**Form 1099-C.▶**
AGENCY: Internal Revenue Service (IRS), Treasury.
ACTION: Notice and request for comments.
SUMMARY: The Department of the Treasury, as part of its continuing effort to reduce paperwork and respondent burden, invites the general public and other Federal agencies to take this opportunity to comment on proposed and/or continuing information collections, as required by the Paperwork Reduction Act of 1995, Public Law 104-13 (44 U.S.C. 3506(c)(2)(A)). Currently, the IRS is soliciting comments concerning ◀**Form 1099-C,▶** Cancellation of Debt.
DATES: Written comments should be received on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION OF THIS DOCUMENT IN THE FEDERAL REGISTER] to be assured of consideration.
ADDRESSES: Direct all written comments to Garrick R. Shear, Internal Revenue Service, room 5571, 1111 Constitution Avenue NW., Washington, DC 20224.
FOR FURTHER INFORMATION CONTACT: Requests for additional information or copies of the ◀**form▶** and instructions should be directed to Faye Bruce, (202) 622-6665, Internal Revenue Service, room 5577, 1111 Constitution Avenue NW., Washington, DC 20224.
SUPPLEMENTARY INFORMATION:

Title: Cancellation of Debt.

OMB Number: 1545-1424.

◀**Form▶** Number: 1099-C.

Abstract: ◀**Form 1099-C▶** is used by Federal government agencies, financial institutions, and credit unions to report the cancellation or forgiveness of a debt of $600 or more, as required by section 6050P of the Internal Revenue Code. The IRS uses the **form** to verify compliance with the reporting rules and to verify that the debtor has included the proper amount of canceled debt in income on his or her income **tax return.**

Current Actions: There are no changes being made to the ◀**form▶** at this time. However, separate specific **form** instructions are being proposed for payers who wish to order only the information pertaining to **Form 1099-C.** The specific instructions would be combined with the general instructions to create a booklet similar to the 1999 Instructions for **Forms** 1099, 1098, 5498, and W-2G.

Type of Review: Extension of a currently approved collection.

Affected Public: Business or other for-profit organizations, not-for-profit institutions, and the Federal government.

Estimated Number of Responses: 647,993.

Estimated Time Per Response: 10 min.

Estimated Total Annual Burden Hours: 110,159.

The following paragraph applies to all of the collections of information covered by this notice:

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control number. Books or records relating to a collection of information must be retained as long as their contents may become material in the administration of any internal revenue law. Generally, ◀tax returns▶ and tax return information are confidential, as required by 26 U.S.C. 6103.

REQUEST FOR COMMENTS: Comments submitted in response to this notice will be summarized and/or included in the request for OMB approval. All comments will become a matter of public record. Comments are invited on: (a) Whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other ◀forms of information technology; and (e) estimates of capital or start-up costs and costs of operation, maintenance, and purchase of services to provide information.
Approved: June 1, 1999
Garrick R. Shear,
IRS Reports Clearance Officer

NON: RCB01 99ARD110-5 http://tax.cchgroup.com/network&JA=LK&INoSplash=Y&&LKQ=GUID%3Aabca3853-b413-3f8a-87be-56ab98c5d599&KT=L&INoLFN=TRUE& RCB01 #30235 [RULINGS RULINK CBLINK ]

© 2006, CCH INCORPORATED.     Find help at http://support.cch.com, call Research Specialists at 800-344-3734,   | Back to Top
All Rights Reserved.                                                        or call Tech Support at 800-835-0105.

**EXHIBIT 5**

LIMITATIONS FOR CIVIL ACTIONS

(Letters indicate footnotes. Figures indicate years.)

O-Oral—W-Written

11-40

| State | Promissory Notes | Open Accounts | Instruments and Contracts Under Seal | Ordinary Contracts | Domestic Judgments in Courts of Record | Domestic Judgments in Courts Not of Record | Foreign Judgments in Courts of Record | Foreign Judgments in Courts Not of Record |
|---|---|---|---|---|---|---|---|---|
| Ala. | 6(o) | 3(a) | 10 | 6(a) | 20 | 6 | 20 | No prov. |
| Alaska | 6 | 6(a) | 10 | 6(a) | 10 | 10 | 10 | No prov. |
| Ariz. | 6(b) | 3(a) | 6(b) | 6-W—3-O(a) | 5 | 5 | 4 or (d) | 4 or (d) |
| Ark. | 5* | 3(a) | 5* | 5-W—3-O(a)* | 10 | 10* | 10 | 10 |
| Calif. | 4 | 4(a) | 4 | 4-W—2-O(a) | 10 | 10 | 10 | 10 |
| Colo. | 6 | 6(a) | 6(a)(c) | 6(a)(c) | 20 | 10 | 10 | 10 |
| Conn. | 6 | 6(a) | 6-W—3-O(a) | 6-W—3-O(a) | 20(ff) | 20(ff) | 6 | 6 |
| Del. | 6 | 3(a) | No prov. | 3(a) | No prov. | No prov. | No prov. | No prov. |
| D.C. | 3 | 3(a) | 12 | 3(a) | 3 | 3 | No prov. | No prov. |
| Fla. | 5 | 4(a) | No prov. | 5-W—4-O(a) | 20 | 5 | (d) | (d) |
| Ga. | 6 | 4(a) | 20 | 6-W—4-O(a) | 7(e) | 7(e) | 7 | 7 |
| Hawaii | 6 | 6(a) | 6(a) | 6(a) | 10 | 6 | 5 | 5 |
| Idaho | 5 | 4(a) | 5 | 5-W—4-O(a) | 6 | 6 | 6 | 4 |
| | | | | | | | 6 | 6 |

11-51

| State | Promissory Notes | Open Accounts | Instruments and Contracts Under Seal | Ordinary Contracts | Domestic Judgments in Courts of Record | Domestic Judgments in Courts Not of Record | Foreign Judgments in Courts of Record | Foreign Judgments in Courts Not of Record |
|---|---|---|---|---|---|---|---|---|
| Ill. | 10 | 5(a) | 10(f) | 10-W—5-O(a) | 20 | No prov. | 5 | 5 |
| Ind. | 10 | 6(a) | 20 | (y)(a) | 20 | 15 | 20 | 15 |
| Iowa | 10 | 5(a) | 10 | 10-W—5-O(a) | 20(ee) | 10 | 20 | 15 |
| Kan. | 5 | 3(a) | 5 | 5W—3O(a) | 20(ee) | 10 | 20 | No. prov. |
| Ky. | 15(h) | 5(x)(i) | 15 | 15-W—5-O(a) | Kept alive by execution every five years | 15 | 15 | |
| La. | 5 | 3 | 10 | 15-W—5-O(a) | 15 | 15 | 10(dd) | 10(dd) |
| Me. | 6(j) | 6(a) | 20(a) | 10 | 10(dd) | 10(dd) | 20 | 6 |
| Md. | 3(a) | 3(a) | 12 | 6(a) | 20(v) | 6(k)(v) | 12 | 12 |
| Mass. | 6(l) | 6(a) | 20 | 3(a) | 12 | 12 | 20(v) | 9 |
| Mich. | 6(a) | 6(a) | 6(a) | 6(a) | 20(v) | 6 | 10 | 6 |
| Minn. | 6(a)(cc) | 6(a)(cc) | 6 | 6(a) | 10 | 10 | 10 | 10 |
| Miss. | 3* | 3 | 3* | 6(a)(cc) | 10* | 10 | 7(m) | 3* |
| Mo. | 10W-5O(a) | 5 | 10W-5O(a) | 3-W—3-O(a)* | 7 | 3* | 7(m) | 3* |
| Mont. | 8 | 5(a) | 8 | 10W-5O(a) | 10 | 5 | 10 | 5 |
| Neb. | 5 | 4(a) | 5 | 8-W—5-O(a) | 10 | 5 | 5 | 5 |
| Nev. | 6 | 4(a)(aa) | 6 | 5-W—4-O(a) | Kept alive by execution every five years | 5 | 5 | |
| N.H. | 3 | 3(a) | 20 | 6-W—4-O(a) | 6(aa) | 6 | 6 | 6 |
| N.J. | 6 | 6(a) | 16 | 3(a) | 20 | 20 | 20 | 20 |
| | | | | 6(a) | 20 | 6 | 20 | 20(d) |

### LIMITATIONS FOR CIVIL ACTIONS

(Letters indicate footnotes. Figures indicate years.) *(Continued)*
O-Oral—W-Written

| State | Promissory Notes | Open Accounts | Instruments and Contracts Under Seal | Ordinary Contracts | Domestic Judgments in Courts of Record | Domestic Judgments in Courts Not of Record | Foreign Judgments Courts of Record | Foreign Judgments in Courts Not of Record |
|---|---|---|---|---|---|---|---|---|
| N.M. | 6 | 4(a) | 6 | 6-W—4-O(a) | 14 | | 14 | 6 |
| N.Y. | 6(a) | 6(a) | 6(a) | 6(a) | 20 | 20(v) | 20(v) | 20(v) |
| N.C. | 3 | 3(a) | 10 | 3(a) | 10 | 7 | 10 | 7 |
| N.D. | 6(a) | 6(a) | 6(c) | 6(a) | 10 | 10 | 10 | 10 |
| Ohio | 15 | 15W-60(a) | 15 | 15W-60(a) | 21 | 21 | 15 | 15 |
| Okla. | 5 | 3(a) | 5 | 5-W—3-O(a) | Execution or garnishment summons kept alive by every five years | | 3 | 3 |
| Ore. | 6 | 6(a) | No limit(u) | 6(a) | 10 | 10 | 10 | 10 |
| Pa. | 6 | 6(a) | 20 | 6W-40 | 4 | 4 | 4 | 4 |
| P.R. | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 15 |
| R.I. | 10 | 10 | 20 | 10 | 20 | 20 | 20 | 20 |
| S.C. | 3 | 3(a) | 20 | 3(a) | 10 | 10 | 20 | 20 |
| S.D. | 6 | 6(a) | 20 | 6(a) | 20 | 20 | 10 | 10 |
| Tenn. | 6 | 6(a) | 6(a) | 6(a) | | | | |
| Texas | 4 | 4(a) | 4 | 4(a)* | 10 | 10 | 10 | 10 |
| Utah | 6 | 4(a) | 6 | 6-W—4-O(a) | 10 | 10 | 10 | 10 |
| Vt. | 6(o) | 6(a) | 8 | 6-W—4-O(a) | 8 | 8 | 8 | 8 |
| Va. | 5 | 3(a) | 5 | 5-W—3-O(a) | 8(bb) | 6 | 8(bb) | 6 |
| Wash. | 6 | 3(a)* | 6 | 6-W—3-O(a)* | 20 | 20 | 10 | 10 |
| W.Va. | 10 | 5(z) | 10 | 6-W—3-O(a)* | 10 | 10 | 10 | 10 |
| Wis. | 6* | 6(a)* | 10 | 10-W—5-O(a) | 10 | 10 | 10 | 10 |
| Wyo. | 10 | 8(a) | 6* | 6(a) | 20 | 6 | 20 | 6 |
| | | | | 10-W8-O(a) | 5(q) | 5(q) | 5 | 5 |

\* Can be renewed.

\* Agricultural property owed by a farm debtor may not be executed upon real or personal property after three years from the date the judgment was entered.

¹ Note: An action founded upon an instrument under seal by a merchant or bank, finance company, or other financial institutions in New Jersey must be commenced within six years after the cause of action accrues.

(a) Uniform Commercial Code §2-725 provides a four year statute of limitations as to sales contracts. The parties may by original agreement reduce the period of limitation to not less than one year, but they may not extend it.
(b) Instruments executed without the state, four years.
(c) Contracts affecting real property, 10 years.
(d) Suit may be brought on a foreign judgment unless statute of limitations has run against it in the jurisdiction where it was entered.
(e) Judgments are dormant seven years after rendition if no execution, or seven years after execution or seven years after written notice of public effort to enforce is filed with the clerk.
(f) Vendor's lien, mortgage, 20 years.
(g) Contract to convey land, 15 years; contract for payment of money, 10 years.

(h) If note has been placed on the footing of a bill of exchange, five years.
(i) An action on a merchant's account must be instituted within five years from January 1 following the dates or time of delivery of the articles charged in the account.
(j) If attested by witnesses, 20 years.
(k) Judgments of Trial Justices Courts, 20 years.
(l) If note attested by witness and action brought by original payee or executor or administrator, 20 years.
(m) If debtor resided in Mississippi when foreign judgment was rendered, then it is barred in three years.
(n) Held by case law to be 20 years.
(o) If note attested by witnesses, 21 years.

11-52

11-53

(p) If action accrues outside the state, 10 years.

(q) May be revived within 21 years after it becomes dormant.

(r) As provided in state giving judgment.

(s) May be revived once by filing a transcript of the judgment before the limitation expires, action may be brought within seven years after revival.

(t) 15 years written accounts.

(u) An action on a sealed instrument entered into before August 13, 1965, must be commenced within 10 years.

(v) Presumption of payment arises after 20 years.

(x) Special limitations apply to counterclaims.

(w) Except as provided in Maine UCC Sec. 2-725.

(y) Six years Oral, 10 years Money, 15 years Realty, 20 years other than money.

(z) An action on a merchant's account must be commenced within five years of the next January 1st succeeding the date of delivery.

(aa) Nevada limitation periods apply unless further limited by UCC.

(bb) If a promissory note was witnessed—21 years.

(cc) Except where Uniform Commercial Code otherwise applies.

(dd) Foreign judgments unenforceable in foreign state are unenforceable in Louisiana.

(ee) No judgment in an action for foreclosure of a real estate mortgage or deed of trust or for rent or judgment of credits assigned by a receiver of a closed bank when assignee is not a trustee for creditors or depositors shall be enforced and no execution thereon given for other than as a set-off or counterclaim after two years from the entry thereof. The judgment may not be renewed except by voluntary written stipulation of the parties.

(ff) 10 years small claims.