**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEBT BUYERS' ASSOCIATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:06CV00101 (CKK) |
| | ) |
| JOHN W. SNOW, Secretary | ) |
| of the Treasury, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT**
**OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Debt Buyers' Association ("DBA"), through its undersigned counsel and

pursuant to this Court's order of January 20, 2006, hereby supplements Plaintiff's Memorandum

in Support of Temporary Restraining Order and/or Preliminary Injunction ("Plaintiff's Initial

Brief" or "Memorandum").[1]  This supplemental brief, which incorporates, references, and is to

be read with, Plaintiff's Memorandum, more fully sets forth the legal standard for injunctive

relief and demonstrates that all factors under that standard weigh in favor of issuing an

injunction.

I.    **LEGAL STANDARD**

In order to prevail on a motion for preliminary injunction, a plaintiff must demonstrate

the following:  (1) a substantial likelihood of success on the merits; (2) that plaintiff will suffer

irreparable harm absent the relief requested; (3) that the other parties in interest will not be

---

[1]    At the hearing (telephonic) on January 20, 2006, the parties agreed to continue the motion
for temporary restraining order and preliminary injunction.

harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *American Fed'n of Gov't Employees v. Dist. of Columbia*, No. Civ. A. 05-0472, 2005 WL 1017877, *4 (D.D.C. May 2, 2005) (standard for temporary restraining order and preliminary injunction are the same). *See also, Mova Pharm. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). No single factor is controlling as to whether injunctive relief is warranted. *See CityFed Fin.*, 58 F.3d at 747. "The Four factors should be balanced on a sliding scale, and a party can compensate for a lesser showing on one factor by making a very strong showing on another factor." *Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp.2d 112, 116 (D.D.C. 2005) (citing *CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005)).

Notwithstanding this sliding scale, "it is particularly important for the [movant] to demonstrate a substantial likelihood of success on the merits." *Barton v. Dist. of Columbia*, 131 F. Supp.2d 236, 242 (D.D.C. 2001) (citing *Benton v. Kessler*, 505 U.S. 1084, 1085 (1992)). "If the movant fails to do so, 'it would take a very strong showing with respect to the other preliminary factors to turn the tide in plaintiff['s] favor.'" *Emily's List v. FEC*, 362 F. Supp.2d 43, 51-52 (D.D.C. 2005) (quoting *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 366 (D.C. Cir. 1999).

Additionally, movant must "demonstrate at least 'some injury'" to warrant the granting of an injunction. *City Fed Financial*, 58 F.3d at 747 (D.C. Cir. 1995) (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)). "The basis for injunctive relief in the federal courts has always been irreparable harm." *Id.* (quoting *Sampson v. Murry*, 415 U.S. 61, 88, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974)). In this Circuit, injury is considered irreparable only if it is "both certain and great." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.

1985). This is a two-part test, requiring first that the alleged harm be "actual and not theoretical" and "of such *imminence* that that there is a clear and present" need for equitable relief to prevent the harm. *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.), *aff'd.*, 548 F.2d 977 (D.C. Cir. 1976) (internal quotation omitted, emphasis in original). The second prong – harm that is "great" – provides that "financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business." *Emily's List*, 362 F. Supp.2d at 52 (citation omitted).

Finally, during the initial proceedings on motions for injunctive relief, a court may consider sworn declarations and other credible evidence in the record even if such evidence might not meet all of the formal requirements for admissibility at a trial. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (decision on a preliminary injunction may be made "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004) (same).

This Court should enter a temporary and/or preliminary injunction enjoining Defendants John W. Snow, Secretary of the Treasury, and Mark W. Everson, Commissioner of Internal Revenue (collectively, "Defendants") from enforcing Treas. Reg. § 1.6050P-2(e) against DBA's members. Having demonstrated that the Anti-Injunction Act, 26 U.S.C. (I.R.C.) § 7421 ("Anti-Injunction Act"), does not bar this Court from hearing DBA's claims, injunctive relief is warranted here because all four factors for such relief weigh uncontrovertibly in favor of Debt Buyers and the issuance of an injunction.[2]

---

[2]    Plaintiff addresses this Court's jurisdiction in connection with the Anti-Injunction Act in Plaintiff's Initial Brief. Plaintiff respectfully refers the Court to Plaintiff's Initial Brief for the merits argument regarding the Anti-Injunction Act. For purposes of this brief, Plaintiff is addressing the preliminary injunction standards only (and assuming, *arguendo*), that either (1)

## II.    **PLAINTIFF WILL SUCCEED ON THE MERITS**

As fully set forth in DBA's Memorandum, DBA seeks to protect its members from the significant constitutional violations arising from the Defendants' enforcement of Treas. Reg. § 1.6050P-2(e).  The primary purpose of this suit is to prevent the following:  (1) the direct conflict Treas. Reg. § 1.6050P-2(e) poses to the regulatory scheme Congress *expressly implemented* to govern Debt Buyers, as "debt collectors," under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692a-1692o; (2) the continuing deprivation of DBA's members' 5th Amendment rights that will result from the Defendants' enforcement of Treas. Reg. § 1.6050P-2(e); and (3) the unauthorized federal preemption of the collective states' statutes of limitation controlling Debt Buyers' rights to bring enforcement and collection actions on their purchased consumer loans.  Indeed, the heart of Plaintiff's suit is to restrain the Defendants from unconstitutionally forcing members of the debt buying industry to (1) violate the FDCPA, and (2) forego their legal and economic rights.

### A.    **Treas. Reg. § 1.6050P-2(e) Conflicts With The FDCPA**

In its Memorandum, DBA demonstrated the ways in which Treas. Reg. § 1.6050P-2(e) directly conflicts with the FDCPA.  *See* Pl.'s Mem. at 20-31.  Specifically, by including Debt Buyers within the interpretation of "applicable financial entities" engaged in the business of the "lending of money," the Defendants have ensured a continuing violation of the 5th Amendment due process rights of DBA's members because Treas. Reg. § 1.6050P-2(e) compels Debt Buyers to issue and file Forms 1099-C, which form asks for certain discharge of indebtedness information that Debt Buyers do not typically receive from originating lenders and cannot

---

the Anti-Injunction Act does not apply to Plaintiff's claims or (2) Plaintiff's claims fall within one or both of the two exceptions thereto, such that this Court has subject matter jurisdiction over this case.

otherwise obtain.  Filing inaccurate Forms 1099-C (as effectively required by Treas. Reg. § 1.6050P-2(e)) will cause the Debt Buyers to simultaneously violate the FDCPA. *See id.* at 26-31 (discussing pertinent liability provisions of the FDCPA).

For example, a DBA member who furnishes a consumer with a Form 1099-C (and files a copy of the Form with the IRS) stating that the consumer's debt has been "discharged" or "forgiven" has made a *representation as to the legal status of the debt*.  The very issuance and filing of the Form 1099-C with inaccurate information regarding the amount of principal and interest that has been "canceled" (because the Debt Buyer usually has only received information as to the consumer debtor's total account balance) is, in and of itself, a false representation under the FDCPA.

In addition, any collection or even enforcement actions that the Debt Buyer would typically take thereafter expose the Debt Buyer to any of the following viable claims: that the Debt Buyer has violated (1) Section 1692e(2)(A) of the FDCPA because it misrepresented the character or legal status of the debt by either falsely stating in the Form 1099-C that the debt was forgiven when it was not (since the Debt Buyer intended to continue collection or even enforcement activities after issuance of a Form 1099-C required by the occurrence of one of the eight "identifiable events" under Defendants' Section 6050P regulations), or by falsely claiming that the debt still exists when it has actually been forgiven or canceled as a result of the issuance of a Form 1099-C as a number of state and federal courts have held; (2) Section 1692e(5) because it threatened to take an action that it did not intend to take by falsely stating through the issuance of a Form 1099-C that it intended to forgive or discharge the debt (so as to impose a tax liability on the consumer as punishment for non-payment); (3) Section 1692e(8) because it communicated to the Defendants credit information which it knew to be false because it falsely

represented that the debt was canceled or forgiven when, in fact, it was not since the Debt Buyer intended to continue to collect the debt despite the forced issuance of a Form 1099-C; and (4) Section 1692e(10) and the general prohibition of Section 1692e because it used a false representation or deceptive means to collect or attempt to collect a debt either by falsely stating in the Form 1099-C that the debt was forgiven when it was not (thereby imposing a tax liability on the consumer as punishment for non-payment), or by falsely claiming that the debt still existed when it had actually been forgiven or canceled as a result of issuing the Form 1099-C.

Additionally, the Federal Trade Commission's Official Staff Commentary on Section 807(10) of the Act states that "[a] debt collector may not mislead the consumer as to the legal consequences of the consumer's actions (e.g., by falsely implying that a failure to respond is an admission of liability)." 53 Fed. Reg. 50106. Informing a consumer, through the issuance to the consumer of a Form 1099-C under, for example the "36-month non-payment" rule discussed in DBA's Memorandum (*See* Pl.'s Mem. at 32), that his/her non-payment has resulted in forgiveness or cancellation of the debt when, in fact, it has not, has the effect of misleading the consumer as to the consequences of his or her actions. Thus, Defendants, through an interpretive regulation that conflicts with its own enabling statute and is contrary to the intent of Congress, seek to force Debt Buyers to do that which the FTC explicitly states they may not do. DBA members are now pitted, therefore, between compliance with an agency rule or compliance with a Congressional statute, between possible penalties assessed by the Defendants for non-issuance or civil liability claims by aggrieved consumers or by the FTC.

It is beyond credible debate that compliance with Treas. Reg. § 1.6050P-2(e) effectively exposes DBA's members to liability under FDCPA. DBA's members should not have to choose

6

between two conflicting statutes. Defendants cannot force DBA's members to break one law for the sake of attempted compliance with another law.

### B.    The Defendants Exceeded Their Statutory Authority

DBA is also likely to succeed on the merits of its claim that Defendants exceeded their statutory authority in promulgating Treas. Reg. § 1.6050P-2(e). *See* Pl.'s Mem. at 20-26 (discussing merits of how Defendants exceeded their authority). To determine Congress' intent, the statutory language controls. *In re England*, 375 F.3d 1169, 1178 (D.C. Cir. 2004) (Court's "begin with the plain language of the statute in question"). The Court, however, should not limit itself to examining the statute alone, but must look to the language and design of the statute, the overall statutory scheme and the legislative history. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000); *see also, Citizens Coal Council v. Norton*, 330 F.3d 478, 481 (D.C. Cir. 2003).

Congress did not intent Section 6050P of the Code to apply to Debt Buyers. Congress enumerated the entities it intended to encompass and *nowhere* are "Debt Buyers" identified. If Congress intended to include Debt Buyers, Congress would have referenced them specifically in the statute. Through the addition of Section 6050P to the Code as part of the Omnibus Budget Reconciliation Act of 1993, Congress intended *only* to "require *lenders* to file information returns with respect to discharged debt." H.R. REP. NO. 103-213 at 670-71 (1993) (Conf. Rep.), *as reprinted in* 1993 U.S.C.C.A.N. 1359-1360 (emphasis added). Aware that lenders were already generally required to report to the IRS certain foreclosures and abandonments of property in satisfaction of a debt secured by that property, and that such events might also effect a discharge of indebtedness, Congress explicitly directed that as to the informational filings required from *lenders*, "the Treasury Department issue guidance to coordinate reporting under

[Section 6050P] with reporting on foreclosures and abandonments under section 6050J." *Id.* at n. 96.

Section 6050P, as originally enacted, imposed the obligation to file information returns with respect to discharged debt upon "applicable financial entities," defined to mean (i) the FDIC, the RTC, the National Credit Union Administration, any other Federal agency and any successor or subunit of any of them, (ii) any financial institution as described in Section 581 of the Code or Section 591(a) of the Code (which apply, respectively, to banks subject to supervision and examination by state or federal authorities, and to mutual savings banks, cooperative banks, domestic building and loan associations and other savings institutions chartered and supervised as savings and loans or similar associations under federal or state law), (iii) any credit union, and (iv) any subsidiary of any entity described in clause (ii) or (iii) which, by virtue of being affiliated with such an entity, is subject to supervision and examination by a federal or state agency regulating such entities.  26 U.S.C. § 6050P(c)(2)(A)-(C).  In other words, consistent with the legislative history, Section 6050P originally applied *solely* to regulated financial institutions that *originate loans* as part of their regular course of business and to federal agencies.  Congress amended Section 6050P in 1999 by expanding the definition of "applicable financial entity" to include "any organization a significant trade or business of which is the *lending of money*." *See* Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 107-204, § 533(a), 113 Stat. 1860 (emphasis added).  The accompanying legislative history makes clear that Congress believed it was "appropriate to treat discharges of indebtedness that are made by similar entities in a similar manner," and " to extend the scope of [Section 6050P] to include the indebtedness discharged by any organization a significant trade or business of which is the lending of money (such as *finance companies and credit card companies whether or not*

*affiliated with financial institutions.). See* H.R. Rep. No. 106-478 (1999) (Conf. Rep.), 106 H. Rpt. 478, at *110 (lexis) (emphasis added). In other words, Congress intended Section 6050P to apply to regulated (as originally enacted) and unregulated (as amended) originators of loans, and to certain federal agencies.

DBA's members are *not* engaged in the business of the *"lending of money."* Moreover, they are not "similar" to the federal agencies, banks, savings and loan institutions and credit unions to which Section 6050P originally applied, nor to finance companies and credit card companies. Unlike the lenders listed in Section 6050P of the Code, DBA's members, and Debt Buyers generally, do not (i) market to or otherwise attempt to attract borrowers, (ii) negotiate and document loans, (iii) engage in credit analysis, collateral examination and other underwriting functions, (iv) originate or approve loans, or, most importantly, (v) lend money. Debt Buyers, unlike lenders, also do not expect to earn a specified rate of interest as a return on investment. Rather, their business is the purchase of assets, namely defaulted loans, and initiation of debt collection activities either directly or through third-party collection agencies in an attempt to collect more on the defaulted debt than the debt buyer paid for that debt. *See* Knauf Decl. ¶ 13 (Ex. 1 to Pl.'s Mem.). As a consequence, the extension of Section 6050P to Debt Buyers far exceeds what Congress intended when it amended that provision in 1999.

Further, at the time Congress enacted the Act in 1999, the term "business of lending money" had a well-established meaning to the IRS and Congress. Under a variety of Treasury Regulations and IRS published advice, that term *did not include* businesses that merely buy and

collect loans. Significantly, prior to 1999, Defendants interpreted "lending money" *only* to encompass organizations that were in the business of "making" or originating loans.[3]

The IRS defined, for the first time, an "organization a significant trade or business of which is the lending of money" as including purchasers of debt in Prop. Treas. Reg. § 1.6050P-2(e), which stated that "lending money includes acquiring an indebtedness. . . ." The preamble to the proposed regulations confirms that under those regulations "an organization that buys and holds loans is treated as an organization that lends money." *See* Guidance Under Section 6050P Regarding Cancellation of Indebtedness, 67 Fed. Reg. 40629-30 (proposed June 12, 2002) (Ex. 2). The only purported rationale for such treatment was that, according to the IRS in the preamble, it was "consistent with the temporary regulations under Section 6050J (relating to information returns for acquisitions and abandonments of property that is security for indebtedness)." *Id.*

Of critical importance, however, Section 6050J of the Code, by its terms, *does not apply to consumer loans.* (*See* discussion in Plaintiff's Initial Brief). When Treas. Reg. § 1.6050P-2(e)

---

[3]     For example, prior to its repeal in 1996, Section 133(a) of the Code excluded from gross income 50% of the interest received with respect to a "securities acquisition loan" by, among others, "a corporation actively engaged in the *business of lending money.*" *See,* Section 133(a) of the Code (repealed by the Small Business Job Protection Act of 1996, Pub. L. No. 104-188) (emphasis added).  Treasury Regulations under Section 133(a) of the Code stated that "a corporation is actively engaged in the business of lending money *if it lends money to the public on a regular and continuing basis . . .*" *See* Treas. Reg. §1.133-1TA-2 (emphasis added). *See also, Priv. Ltr. Rul.* 9119065 (Feb. 14, 1991). Similarly, Treas. Reg. § 1.1362-2(c)(5)(iii)(B), which helps define whether income is "passive" for S corporation qualification purposes, defines income from the "business of lending or financing" as gain or interest income "with respect to loans originated in a lending business,. . ." It is clear, therefore, that prior to Congress' expansion of the applicability of Section 6050P to "any organization a significant trade or business of which is the lending of money" Treasury had interpreted the term "business of lending money" to encompass only organizations that were engaged in the business of "making" loans or "lending money," and not organizations engaged only in the business of buying loans from organizations who made them.

became final pursuant to Treasury Decision 9160 (October 22, 2004), it contained no similar exception for consumer loans. As a result, Treas. Reg. § 1.6050P-2(e) is plainly *not* consistent with the temporary regulations under Section 6050J since Treas. Reg. § 1.6050P-2(e) applies to all purchased loans, including consumer loans, while the temporary regulations under Section 6050J *expressly do not* apply to consumer loans. Defendants cannot reasonably argue, therefore, that the regulation was promulgated pursuant to Congress' direction to coordinate information reporting under Section 6050P with information reporting under Section 6050J. The absence of an exception for consumer loans to the information reporting requirements imposed by Section 6050P of the Code is particularly unfortunate in the context of the debt buying industry because most of the portfolios of defaulted debt that are purchased and sold are, in fact, consumer loans.

In sum, not only is Treas. Reg. § 1.6050P-2(e) inconsistent with the plain language of its own statute *and* its legislative history (both of which refer only to *lenders* of money), it wholly fails to satisfy the avowed purpose of that regulation as set forth in the preamble to the proposed regulations under Section 6050P – namely, that those regulations be consistent with the temporary regulations under Section 6050J of the Code. As a consequence, that regulation cannot be deemed a valid exercise of the Defendants' authority to promulgate interpretive regulations under Section 6050P.

Treasury Regulation § 1.6050P-2(e) is an "interpretive" regulation because Congress did not grant specific authority to the Defendants to promulgate regulations under Section 6050P of the Code, except with respect to the "form" (*i.e.*, Form 1099-C) and "time" in which a taxpayer must file a Form 1099-C. 26 U.S.C. § 6050P(a) (which refers to information returns being filed "at such time and in such form as the Secretary [of the Treasury] may by regulations prescribe."). An interpretive regulation, however, *must only* explain or construe statutory provisions, it must

not redefine their scope *or* apply a preexisting regulatory requirement retroactively to an industry previously outside the reach of such requirements. "An interpretive rule is one which merely explains the meaning of particular terms in the statute, and does not substantially affect the rights of those over whom the agency exercises authority. '[I]nterpretative rules consist of administrative construction of a statutory provision on a question of law reviewable in the courts.'" *National Restaurant Ass'n v. Simon*, 411 F. Supp. 993, 999 (D.D.C. 1976) (quoting *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1113 (D.C. Cir. 1974)).

Interpretive rules that overreach their statutory limitations are invalid. *See United States v. Calamaro*, 354 U.S. 351 (1957) (invalidating an interpretive Treasury Regulation that attempted to expand the applicability of a statute to persons that Congress did not intend to target); *Beneficial Corp. & Subs. v. United States*, 814 F.2d 1570 (Fed. Cir. 1987) (invalidating an interpretive regulation that required a taxpayer to compute bad debt reserves in accordance with a formula accounting for only a portion of outstanding debts, reasoning that because the agency interpretation "contravenes clearly discernible legislative intent" it should not stand); *The Ann Jackson Family Foundation v. Commissioner*, 97 T.C. 534 (1991), *aff'd*, 15 F.3d 917 (9th Cir. 1994) (invalidating an interpretive regulation that Defendants believed furthered Congress' intent because even if there was a "gap" that ought to have been closed, "we are not at liberty to add to, or alter, the language of a statute in order to accomplish such a result.") *Id.* at 541. As the Supreme Court has stated, "neither [the Court] nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon." *Calamaro*, 354 U.S. at 357. Since Defendants' promulgation of Treas. Reg. § 1.6050P-2(e) "substantially affect[s] the rights of "Debt Buyers," *see Simon*, 411 F. Supp. at 999, it is an unlawful exercise of

agency authority, surpassing the specific intent of Congress to exclude the debt buying industry from the reach of Section 6050P.

The DBA will succeed on the merits because the Defendants have exceeded their statutory authority in promulgating Treas. Reg. § 1.6050P-2(e) by applying Section 6050P to a new class of entities beyond those specifically enumerated by Congress. Treasury Regulation § 1.6050P-2(e) is an interpretive rule that is inconsistent with the face of Section 6050P of the Code, its original legislative history, the legislative history accompanying the expansion of the scope of Section 6050P in 1999, and the IRS' own historical interpretation of the same. Not only does Treas. Reg. § 1.6050P-2(e) conflict with its own statute, however, it also directly contravenes a separate and distinct federal statutory scheme, the FDCPA. Further, as discussed below, application of Treas. Reg. § 1.6050P-2(e) conflicts with the respective statutes of limitation on collection and enforcement enacted by the sovereign states without any, express or implied, Congressional intent authorizing such preemption – patently another, independent reason why Plaintiff will succeed on the merits.

### C.    Treas. Reg. § 1.6050P-2(e) Preempts State Law Rights And Violates The Principles Of Federalism And Comity

The extension of Section 6050P to Debt Buyers through Treas. Reg. § 1.6050P-2(e) impermissibly intrudes upon and effectively displaces the independent, sovereign states' regulation of debt collection practices.

Treas. Reg. § 1.6050P-1(a)(1) provides, in part, that solely for purposes of the information reporting requirements of Section 6050P and the accompanying regulations, a discharge of indebtedness is deemed to have occurred if and only if there has occurred an "identifiable event" described in Treas. Reg. § 1.6050P-1(b)(2), whether or not an *actual*

discharge of indebtedness has occurred on or before the date of the identifiable event. Eight identifiable events are described in the regulations. By way of example, the last identifiable event is the expiration of the "non-payment testing period." Under that rule, if the debtor has not made a payment during a period of 36 consecutive months and the Debt Buyer has not engaged in "significant, bona fide collection activity" during the last 12 months, then an "identifiable event" is deemed to have occurred, *compelling* the issuance of a Form 1099-C to the IRS and the debtor. Treas. Reg. §§ 1.6050P-1(b)(2)(i)(H) and 1.6050P-1(b)(2)(iv).

Consistent with state law, however, Debt Buyers *routinely* attempt to collect debts long after 36 months of nonpayment by the debtor, and with little or no prior collection activity by the Debt Buyer. *See* Knauf Decl. ¶ 19 (Ex. 1 to Pl.'s Mem.). The effect of this 36-month "non-payment" rule imposes a federal statute of limitation for collecting defaulted debt in direct conflict with the respective laws of the states. (*See* Plaintiff's Initial Brief for discussion of various examples of the impact of Treas. Reg. § 1.6050P-2(e) on the state laws.)

**D.    Treasury Regulation § 1.6050P-2(e) Violates Debt Buyers' Fifth Amendment Rights**

As explained, Treas. Reg. § 1.6050P-2(e) compels Debt Buyers to violate federal law – the Defendants' own Form 1099-C reporting requirement (because Debt Buyers do not receive from originating lenders the necessary Form 1099-C information), and, for those Debt Buyers attempting to comply with the Defendants' requirement, Section 1692e of the FDCPA. Not only, however, have Debt Buyers lost their legal right to comply with the law, Defendants' have promulgated a regulation that causes a taking of Debt Buyers' property rights in direct violation of the Fifth Amendment takings clause.

The Fifth Amendment provides, in pertinent part, the following: "nor shall private property be taken for public use, without just compensation." U.S. CONST. AMEND. V, CL. 4. This prohibition extends to regulatory takings, as well as to physical invasions and confiscations of property. *See Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). Here, the effect of Treas. Reg. § 1.6050P-2(e) strips Debt Buyers' consumer debts – assets that Debt Buyers have the "right to possess, use, and dispose of," *see Conti v. U.S.*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) – of any economic value. The issuance of a Form 1099-C to a consumer renders the consumer's debt discharged and unenforceable under state law according to a number of federal and state court decisions. *See e.g., Ellis v. Commissioner of IRS*, No. 16393-04S, 2005 WL 3241888 (U.S. Tax Ct. Dec. 1, 2005) (finding that the issuance of a Form 1099-C is evidence that the Debt Buyer did not intend to pursue collection of the debtor's debt, regardless that a more formal notice of discharge was not issued) (cited for illustrative purposes only, not as precedent); *In re Crosby*, 261 B.R. 470, 474 (D. Kan. 2001) (finding that a credit union's filing of Forms 1099-C "was analogous to assigning the debts to the IRS, necessarily passing to the IRS any right to collect money from the debtors on account of the debts…[thus,] the actual (or at least potential) tax consequences of the form make it inequitable to allow the credit union to enforce its claims against the debtors."); *Franklin Credit Mgmt. Corp. v. Nicholas*, No. CV980546721S, 2001 WL 893894, at *2 (Sup. Ct. Conn. July 12, 2001) (finding that defendants' "debt was discharged pursuant to the terms of the IRS form 1099-C," because the form "tells a debtor the amount of the debt which has been discharged and that the debtor must generally report the discharged amount as income in his federal tax return…. It would be inequitable, therefore, to require that the [defendant] report the discharge of debt as income on his federal tax return or

face the potential tax consequences and hold that the plaintiff may continue to hold him liable on the debt.").

Thus, by compelling Debt Buyers to issue Forms 1099-C well before they typically stop collection or even enforcement efforts, Defendants have eliminated Debt Buyers' rights to collect upon their own property interests and have, therefore, imposed a categorical taking. *Conti*, 291 F.3d at 1339. In addition, as discussed in Plaintiff's Initial Brief, many state statutes of limitation relating to the collection of debt or enforcement of debt judgment are much longer than 36 months (3 years). Furthermore, government originated student loan obligations typically have no applicable statute of limitations. Because the courts have found that the issuance of a Form 1099-C renders the underlying debt unenforceable, the effect of Treas. Reg. § 1.6050P-2(e) is a further deprivation of Debt Buyers' rights in violation of the Fifth Amendment.

## III.    DEBT BUYERS' WILL SUFFER IRREPARABLE HARM IF THE INJUNCTION IS NOT ISSUED

The dilemma faced by Debt Buyers, specifically, of choosing between filing Forms 1099-C pursuant to Treas. Reg. § 1.6050P-2(e) (and violating both the regulation and the FDCPA) or not filing (and violating the federal regulation) is precisely the type of action over which this Court can and should exercise its equitable jurisdiction. Unless this Court asserts jurisdiction, Debt Buyers will be faced with (1) conflicting federal obligations; (2) deprivation of their rights under state laws; (3) the elimination of the value of their assets insofar as Debt Buyers must legally refrain from collecting; and (4) the reality of litigation alleging FDCPA and state consumer protection law violations.[4] Indeed, class-action industry litigation under the FDCPA has already commenced precisely because of Defendants' unlawful extension of the Form 1099-

---

[4]    DBA's attempts to avoid the very dilemma in which it now finds itself are set forth in the Declaration of Dennis Hammond ("Hammond Decl.") ¶¶ 7-26, attached hereto as Exhibit 2.

C filing requirement to the debt buying industry. *See Johnston v. Arrow Financial Services, LLC,* No. 06C 0013 (N.D. Ill. Jan. 3, 2006), attached hereto as Exhibit 1.

Any possible forum other than this Court that could arguably be available to DBA's members subsequent to the enforcement of Treas. Reg. § 1.6050P-2(e) is grossly inadequate to remedy the continuing and irreparable harm Debt Buyers will suffer. Consequently, there is no alternative forum that can provide complete relief to the Debt Buyers or resolve the inescapable due process, separation of powers, federalism and comity issues sparked by Treas. Reg. § 1.6050P-2(e). *See National Taxpayers,* 68 F.3d at 1436 (finding that equity jurisdiction exists when a plaintiff has no other adequate remedy by which to challenge the Government action and prevent the irreparable harm that will result) (citing *Younger v. Harris,* 401 U.S. 37, 43-44 (1971) for principles of equity jurisprudence).

This Court adheres to these principles of equity jurisdiction and has invoked them to prevent Government action that would otherwise cause irreparable harm. *See Abdah v. Bush,* No. Civ. A. 04-1254, 2005 WL 711814 at *3-6 (D.D.C. March 29, 2005) (granting petitioners injunctive relief against the Department of Defense, finding that the irreparable injury prong was satisfied upon petitioners' demonstration that without the exercise of equity jurisdiction they would be deprived of their due process rights as well as their ability "to ever obtain a fair adjudication" of their rights in the Federal courts); *Brendsel v. Office of Federal Housing Enterprise Oversight,* 339 F. Supp.2d 52, 66-67 (D.D.C. 2004) (granting injunctive relief to petitioner against OFHEO, and finding that the irreparable injury prong was satisfied because petitioner's right to certain financial entitlements OFHEO was seeking to unlawfully withhold would be forever extinguished; petitioner would be unable to subsequently sue the federal agency

for recovery of his financial loss because of the constraints of the sovereign immunity doctrine and the exemption of constitutional tort actions under the Federal Tort Claims Act).

### A.    Treas. Reg. § 1.6050P-2(e) Subjects DBA Members To Actual and Imminent Due Process Deprivations And Industry-Threatening Financial Harm

The harm DBA's members will suffer because of Treas. Reg. § 1.6050P-2(e) is "both certain and great." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). In this Circuit, the irreparable injury standard involves a two-part inquiry that first requires a demonstration that "the alleged harm 'be actual and not theoretical' and 'of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Emily's List*, 362 F. Supp.2d at 52 (quoting *Wisconsin Gas*, 758 F.2d at 674). Secondly, it requires that a petitioner, here DBA, demonstrate more than financial harm unless the financial harm it would suffer "threatens the very existence of the movant's business." *Id.* (internal citations omitted). As discussed in Plaintiff's Initial Brief, not only is the injury to DBA's members actual and imminent, it includes both non-economic harm and economic harm that does, indeed, threaten the continued existence of the debt buying industry.

The enforcement of Treas. Reg. § 1.6050P-2(e) against DBA's members and other similarly situated Debt Buyers forces them to violate the Defendants' Form 1099-C reporting and filing requirements *whether or not they actually file Forms 1099-C*. Specifically, Debt Buyers simply do not generally receive from originating lenders the pertinent information regarding the consumer loans they have purchased to fully comply with the information requested under Form 1099-C. Therefore, even those Debt Buyers who wish to comply with the information reporting requirements of Section 6050P will be unable to accurately complete Forms 1099-C to the extent required. More importantly, however, the issuance of inaccurate Forms 1099-C to consumer

borrowers violates the FDCPA, specifically Section 1692e governing false and misleading representations regarding consumer debt, and has already led to the institution of class action litigation on this precise issue. *See Johnston*, *supra*, No. 06C 0013 (N.D. Ill. Jan. 3, 2006) (Ex. 1). Thus, the enforcement of Treas. Reg. § 1.6050P-2(e) compels Debt Buyers to violate one or more federal laws: Debt Buyers who choose not to issue and file Forms 1099-C in an attempt to avoid resulting FDCPA civil liability are, obviously, violating Section 6050P of the Code; in contrast, Debt Buyers who issue and file Forms 1099-C will violate *both* the Code, due to the unavailability of the information required by the form, *and* the FDCPA for disseminating to consumers and the IRS false and/or misleading information regarding the consumer debts they own. The Defendants cannot, in this manner, force an entire industry to become law-breakers. Insisting upon such a result, despite Defendants' unlawful basis for doing so, unquestionably results in "actual and not theoretical" harm to Debt Buyers – the recurring violation of their due process rights under the Fifth Amendment for each required Form 1099-C. *See Id.* Thus, foregoing their legal rights is not a mere "allegation[] of what is likely to occur," but is a certain result of Treas. Reg. § 1.6050P-2(e). *See Senior Resources v. Martinez*, No. Civ. A. 01-0983, 2001 WL 34807628, at *21 (D.D.C. May 31, 2001) (stating that for harm to qualify as "certain" the petitioner "must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.") (citing *Wisconsin Gas*, 758 F.2d at 674).

Additionally, DBA's members face significant economic injury from the Defendants' unlawful extension of Section 6050P's reporting scheme to the debt buying industry. First and foremost, as mentioned above, Debt Buyers have already started defending against FDCPA class action litigation as a result of Treas. Reg. § 1.6050P-2(e). Notably, plaintiffs' counsel in this

action did not even wait until Forms 1099-C were filed by a Debt Buyer; the action (and an entire subclass, moreover) is based upon a Debt Buyer's mere dissemination of letters informing the subclass members of the Debt Buyer's impending obligation to file Forms 1099-C regarding their debts.[5] *Johnston, supra*, No. 06C0013 (N.D. Ill. Jan. 3, 2006) (Ex. 1).  Once Debt Buyers issue Forms 1099-C to their debtors (an event that will occur within the next seven days to ensure compliance with the Defendants' January 31, 2006 deadline) additional class action litigation alleging violations of the FDCPA, as well as any similar state consumer protection laws, will certainly ensue.[6]  Many of the DBA's members will suffer economic injury so great, that they will be put out of business arising from either (1) the class-action litigation and/or (2) the rendering of their assets (*i.e.*, the underlying debt) uncollectable.  In fact, a majority of DBA's members are smaller Debt Buyers who generally collect in a single state.  *See* Hammond Decl. ¶ 5 (Ex. 2).  The legal fees and costs associated with defending against, and the damages awarded under, class-action lawsuits for FDCPA violations will render the business operations of these Debt Buyers no longer economically viable.  *See Id.*

---

[5]     This type of claim has previously been brought under state consumer protection laws, resulting in a court-approved settlement and a granting of plaintiffs' motion for attorneys' fees and incentive award.  *See Follansbee v. Discover Financial Services, Inc.*, No. 99-C 3827, 2000 WL 804690 (N.D. Ill. June 21, 2000) (warning letter sent by lenders alleged to be deceptive and misleading under federal and state consumer protection law where letter created false impression that lenders were required to report unpaid debt to the IRS as taxable income).

[6] Adding insult to injury, moreover, the Defendants have *guaranteed* their right to charge the debt buying industry penalties for each Form 1099-C Debt Buyers are required to file.  As discussed, Debt Buyers have not received break-out information regarding the debts they have purchased and cannot accurately complete Forms 1099-C.  *See* Pl.'s Mem. at 7, ¶13.  Debt Buyers who attempt to comply with the Form 1099-C issuance and filing requirements will, therefore, be subject to penalty assessments by Defendants for each inaccurate Form pursuant to Sections 6721 and 6722 of the Code.  Furthermore, Debt Buyers who refuse to file Forms 1099-C in an attempt to avoid the greater costs and burdens of FDCPA litigation will also be subject to IRS penalty assessments.  Indeed, an intentional violation of Section 6050P results in greater penalties being imposed under Section 6721 and 6722.  *See* 26 U.S.C. §§ 6721(e) and 6722(c).

Additionally, enforcement of Treas. Reg. § 1.6050P-2(e) will preempt the legal rights of Debt Buyers under state statutes of limitation for the pursuit of enforcement and collection actions against debtors.    Specifically, Treas. Reg. § 1.6050P-2(e) effectively renders the underlying debt (*i.e.*, the very assets of Debt Buyers) uncollectable and therefore, valueless.  As discussed above, the imposition (by virtue of the 36-month non-payment rule as one of the eight "identifiable events" under the Section 6050P regulations) of a federally-mandated three year statute of limitation for discharging debt forecloses any subsequent attempts by Debt Buyers to collect on that debt. *See supra*, *Ellis,* No. 16393-04S, 2005 WL 3241888; *In re Crosby*, 261 B.R. at 474;  *Franklin Credit Mgmt. Corp.*, No. CV980546721S, 2001 WL 893894, at *2.  Because Debt Buyers typically pursue both collection and enforcement actions well beyond the 36-month non-payment time frame allowed by Treas. Reg. § 1.6050P-1(b)(2)(i)(H) even though they engage in no more than ministerial collection activities during that time frame, they are being stripped of their legal rights to continue doing so irrespective of the fact that Congress expressly intended state law to continue governing these activities in conjunction with the dictates of the FDCPA, 15 U.S.C. § 1692(e).  More importantly, in light of the courts' willingness to find that the issuance of a Form 1099-C to a consumer under any circumstance renders the consumer's debt unenforceable and uncollectible, the effect of Treas. Reg. § 1.6050P-2(e) is to override state law rights that Debt Buyers have exercised routinely since the debt buying industry began almost 20 years ago.

The combined effects of defending class action litigation and paying substantial damages awards, while having their sole means of profitability significantly constrained (if not foreclosed), will drain many Debt Buyers of the necessary profit to continue operating.  Indeed, the continued existence of the industry is threatened by Defendants' enforcement of Treas. Reg. §

1.6050P-2(e), which at its most basic level constitutes a government taking without just compensation. *See Emily's List*, 362 F. Supp.2d at 52 (explaining that financial harm is irreparable if it "threatens the very existence of the movant's business") (citing *Wisconsin Gas*, 758 F.2d at 674). *See also Guam Industrial Serv. Inc. v. Rumsfeld*, 383 F. Supp.2d 112, 121 (D.D.C. 2005) (stating that "where the loss threatens the very existence of the movant's business," injunctive relief is appropriate).

Similarly, the above-enumerated economic injuries are irreparable precisely because there is no subsequent remedy that will compensate Debt Buyers for the losses Defendants are imposing upon them. *See Rumsfeld*, 383 F. Supp.2d at 121. In *Brendsel v. Office of Federal Housing Enterprise Oversight*, ("OFHEO"), the plaintiff sought injunctive relief against OFHEO for its order freezing payment of his employment benefits and assets pending the outcome of an administrative hearing. The freeze order, however, effectively extinguished certain stock options that plaintiff was given because they were due to expire *prior* to the resolution of the administrative hearing. The Court recognized that any subsequent attempt by plaintiff to bring suit to recover the loss of this economic benefit would be prohibited precisely because the entity extinguishing his economic rights was a government agency:

> While it is well-established that the "possibility that adequate compensatory or other corrective relief will be available at a later date…weighs heavily against a claim of irreparable harm, it is of no avail in this case where the plaintiff will be unable to sue to recover any monetary damages against either Freddie Mac or OFHEO. For example, to the extent that [plaintiff] might seek to sue Freddie Mac on a breach of contract theory, Freddie Mac would likely present the defense that it was acting pursuant to OFHEO's order…Meanwhile, OFHEO is immune from suit because there is no relevant waiver of sovereign immunity permitting it to be sued on these claims…the Federal Tort Claims Act does not in fact provide a relevant waiver of sovereign immunity because claims based on interference with contracts rights are expressly excepted from the FTCA, and the Supreme Court has held that Constitutional torts are not "cognizable" under the FTCA. Furthermore, even if [plaintiff] were able to identify another sustainable tort

theory, OFHEO would likely be shielded by the "discretionary function" exception to the FTCA, which provides immunity even if the regulation involved is invalid or if the agency action was an abuse of discretion.

339 F. Supp.2d at 66-67 (internal citations omitted).

Only this Court will provide a forum that can provide relief necessary to address all the component parts of injury to Debt Buyers. For example, assuming tax refund litigation were available as an alternative forum, (which it is not – *see* discussion in Plaintiff's Initial Brief at pp. 35-38), such forum cannot address the FDCPA conflicts and attendant harms. Moreover, Debt Buyers cannot sue the IRS to recover for any of the injuries they will sustain beyond the narrow substance of that which is the subject of the refund litigation.

The possibility of penalty-refund litigation does *nothing* to rectify the substantial legal and economic injury Debt Buyers will suffer as a result of Treas. Reg. § 1.6050P-2(e)'s conflict with the independent federal and state law regulation of the debt buying industry – namely, the FDCPA and state statutes of limitation as discussed above. Refund litigation pursuant to the Code presents no forum in which to redress these injuries. This is not simply a harm for which refund litigation is not an "ideal" remedy, *see National Taxpayers*, 68 F.3d at 1437; the deprivation of Debt Buyers' due process rights effectively worked by the enforcement of Treas. Reg. § 1.6050P-2(e) surpasses the reach of *any possible* relief under the Code. Both the penalties the Defendants could assess against DBA's members *and* the ensuing costs and potential liability of defending against FDCPA strict liability claims for each inaccurate Form 1099-C issuance and filing cannot be adequately redressed by any one forum, including refund litigation under the Code. Further, Debt Buyers cannot gain any relief under the FDCPA because the FTC is expressly prohibited from promulgating "trade regulation rules or other regulations with respect to the collection of debts by debt collectors." 15 U.S.C. § 1692l(d).

Moreover, compelling DBA's members and other Debt Buyers to forego these legal and economic rights violates the fundamental purpose of our Constitution and system of government – to protect individual rights and liberties, not to force relinquishment of the same. Indeed, such harm has been recognized as irreparable and beyond the reach of the Anti-Injunction Act: "[When] persons are deprived of their own property, or a common law or statutory right, there is [] basis for a claim that government has 'deprived' them of property." *Blumenthal*, 609 F.2d at 7-8 (stating that when a denial of judicial review amounts to a due process violation, such as would occur when persons are deprived of property or legal rights, the Anti-Injunction Act must give way because such harm rises to the level of a constitutional infirmity).

## IV. DEFENDANTS WILL NOT BE HARMED IF THE REQUESTED RELIEF IS GRANTED

Given that Debt Buyers typically do not receive from the originating lenders a breakdown of the stated principal, unpaid interest, late charges and other components of the purchased debt, compelling Debt Buyers to issue and file Forms 1099-C that will be inaccurate frustrates, rather than furthers, Defendants' purposes of fairly and efficiently administering the federal tax laws and encouraging taxpayer voluntary compliance.

Section 61 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that "gross income means all income from whatever source derived," including, among other things, "income from discharge of indebtedness." 26 U.S.C. § 61(a)(12). However, under Section 108(a)(1) of the Code, gross income does not include any amount that would be includable in gross income by reason of the discharge, in whole or in part, of indebtedness of the taxpayer if (i) the discharge occurs in a title 11 case or (ii) the discharge occurs when the taxpayer is insolvent. 26 U.S.C. § 108(a)(1)(A) and (B). A variety of other exceptions to having to include in gross

income discharge of indebtedness income are also provided in Section 108 of the Code. Section 108(a)(3) clarifies that in the case of a discharge of indebtedness when the taxpayer is insolvent, the amount excluded from gross income may not exceed the amount by which the taxpayer is insolvent. Section 108(d) of the Code defines the term (i) "indebtedness of the taxpayer" to include any indebtedness for which the taxpayer is liable, (ii) "title 11 case" to mean "a case under title 11 of the United States Code (relating to bankruptcy), but only if the taxpayer is under the jurisdiction of the court in such case and the discharge of indebtedness is granted by the court or is pursuant to a plan approved by the court," and (iii) "insolvent" to mean "the excess of liabilities over the fair market value of assets." 26 U.S.C. § 108(d)(1), (2) and (3). In other words, if a taxpayer is in bankruptcy, or if a taxpayer is insolvent to any meaningful extent, then typically the realization of discharge of indebtedness income will not produce any tax consequences.

In the context of consumer debtors who are unable to pay their credit card bills, or, worse yet, who are unable to repay their home mortgages or home equity lines of credit, it should come as no surprise that such consumers are typically in extreme financial distress. In such circumstances, it is often the case that the consumer either is in bankruptcy, or is obligated on liabilities that exceed the fair market value of the consumer's assets, resulting in the consumer being insolvent. *See* Hammond Decl. ¶ 6. In both of those circumstances, the consumer debtor will not have to include as income any discharge of indebtedness under Section 108 of the Code. Therefore, the failure of the IRS to receive a Form 1099-C with respect to that consumer debtor will not prejudice the collection of federal tax revenue. Perhaps more importantly, because our federal tax system is based upon voluntary compliance, regardless of whether a consumer debtor receives a Form 1099-C, that debtor is, in fact, obligated to report that debt-discharge income on

his or her personal tax return unless one of the exceptions to including in gross income discharge of indebtedness income is available under Section 108. Indeed, just as the receipt by the IRS of a Form 1099-C does not establish any tax liability for the debtor who is named on the form, the failure of such a debtor to receive a Form 1099-C does not excuse the debtor from compliance with the federal tax laws. *See Vaughan v. Commissioner*, T.C. Memo. 1992-317, *affd.* without published opinion, 15 F.3d 1095 (9th Cir. 1993) (where the court held that the failure of the taxpayer to receive a Form 1099 did not excuse the taxpayer from having to include in income the amount that would have been reported on the form). In short, releasing Debt Buyers from the obligation to file Forms 1099-C will not prejudice the collection of federal revenue because the forms, in and of themselves, do not establish tax liability and the consumers that the IRS might have otherwise audited had the IRS received those forms are not likely to have any resulting taxable income from the forgiveness of debt that would have been reflected (albeit inaccurately) on those forms.

On the other hand, effectively compelling Debt Buyers to frequently issue inaccurate Forms 1099-C will undoubtedly confuse consumer debtors and frustrate the administration of the federal tax laws. As discussed in Plaintiff's Initial Brief, because Debt Buyers usually receive from originating lenders only the total account balance when they purchase defaulted consumer debt, compliance with Section 6050P will inevitably lead to overstating on Forms 1099-C the amount of stated principal forgiven and understating the amount of interest discharged. But forgiven interest, unlike discharged principal, is often excludable from the income of a consumer debtor under another provision of Section 108. In particular, Section 108(e)(2) of the Code states that "No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction." In the case of, for example, interest that is

discharged or forgiven with respect to a mortgage loan, home equity line of credit or credit card liability with a credit card that is used for business or investment purposes, forgiveness of the interest due on those obligations does not, under Section 108(e)(2) produce any discharge of indebtedness income because, had the consumer debtor paid that interest, it would have resulted in a tax deduction. Because the effect of Treas. Reg. § 1.6050P-2(e) will force Debt Buyers to issue and file Forms 1099-C that often overstate principal and understate interest discharged, the IRS on audit will either overassess taxes against uninformed consumers or face disputes with consumers on the correct amount of debt discharge income. Patently, creating the potential for frequent conflicts between the IRS and consumer debtors because of the forced issuance and filing of inaccurate Forms 1099-C is not in the interest of our federal tax system of voluntary compliance. Therefore, excusing Debt Buyers from compliance with Section 6050P may actually have a net beneficial effect on the IRS' tax collection efforts.

Lastly, the FDCPA has been the law of the land for nearly 30 years. On the other hand, until now, Defendants have administered the tax laws without receiving Forms 1099-C from Debt Buyers. As discussed above, the Defendants cannot claim that the requested injunction will cause them any meaningful harm. Indeed, in light of the inaccuracy of the forms that would be prepared by Debt Buyers and the financial position of the consumer debtors, any claim of harm by Defendants would be speculative and tenuous. This contrasts with the real harm that Debt Buyers will suffer under the FDCPA and as a result of being foreclosed from enforcing and collecting debts after the issuance of such forms. In that circumstance, the speculative harm suffered by Defendants must not control. *See Abdah*, 2005 WC 71814 at *6. ("In evaluating the alleged injury Respondents would suffer if the preliminary injunction is granted, the Court

balances the respective hardships imposed upon the parties.") (citing *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)).

V.    **PUBLIC INTEREST WILL BE SEND BY THE ISSUANCE OF AN INJUNCTION**

Granting DBA's request for injunctive relief will serve the public interest in several critical ways: First, injunctive relief will avert the conflict between the regulation (Treas. Reg. 1.6050P-2(e)) and the federal statutory scheme that regulates Debt Buyers (the FDCPA); second, an injunction will avert the confusion that will be created by having two federal regulatory schemes pitted against each other; third, injunctive relief will prevent the displacement of state law statutes of limitation; fourth, injunctive relief will stem a tide of class action litigation that will be brought under the FDCPA; and fifth, injunctive relief will prevent the erosion and collapse of Debt Buyers and the debt buying industry - an industry integral to the economics of

the lending industry.  Indeed as this Court stated in *Abdah v. Bush*, "[i]t is always in the public's interest to prevent the violation of a party's constitutional rights."  *Id.* at 6 (quoting *G&V Lounge, Inc. v Mich. Liquor Control Comm'n*, 23 1071, 1079 (6th Cir. 1994).

Respectfully submitted,

_____/s/_____

Deborah J. Israel, Esq. (D.C. Bar. No. 430841)
Womble Carlyle Sandridge & Rice, PLLC
1401 Eye Street, N.W., 7th Floor
Washington, D.C.  20005
Tel: (202) 467-6900
Fax: (202) 467-6910

*Counsel for Plaintiff Debt Buyers' Association*

Of Counsel:

Howard N. Solodky, Esq.
Louis J. Rouleau, Esq.
Alida M. Dagostino, Esq.
Womble Carlyle Sandridge & Rice, PLLC
1401 Eye Street, N.W., 7th Floor
Washington, D.C. 20005
Tel: (202) 467-6900
Fax: (202) 467-6910

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Supplemental Brief in Support of Motion for Preliminary Injunction has been served this 23rd day of January, 2006, via electronic service and U.S. First-Class Mail, postage prepaid, on the following:

>Mercedeh Momeni, Esq.
>Assistant U.S. Attorney
>United States Department of Justice
>Washington, DC  20530

>_____/s/_____
>Deborah J. Israel