IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEBT BUYERS' ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06-cv-00101-CKK |
| | ) | |
| JOHN W. SNOW, Secretary of the | ) | |
| Treasury, and MARK W. EVERSON, | ) | |
| Commissioner of Internal Revenue, | ) | |
| | ) | |
| Defendants | ) | |

Memorandum in Support of Motion to Dismiss
and Opposing Motion for Temporary Restraining
Order and Preliminary Injunction

The Debt Buyers' Association seeks two types of relief, a declaration that

Treasury Regulation § 1.6050P-2(e) is "contrary to law, unenforceable and invalid" and

an injunction preventing the Commissioner of Internal Revenue from "enforcing"

Section 6050P or Treasury Regulation § 1.6050P-2(e). That relief, however, is barred by

the Declaratory Judgment Act and by the Anti-Injunction Act in the Internal Revenue

Code. Accordingly, the Secretary of the Treasury and Commissioner of Internal

Revenue submit that Association's motion for a temporary restraining order and a

preliminary injunction must be denied, and the case dismissed because the Court lacks

jurisdiction.

2

## Table of Contents

1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2.    The Anti-Injunction Act and Declaratory Judgment Act bar this case . . . . . . . . . 8

3.    The exceptions to the Anti-Injunction Act do not apply in this case . . . . . . . . . .12

A.    Because there is a penalty for failing to file information returns,
      an alternate remedy is available and the *South Carolina* exception
      does not apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

B.    The Association cannot meet the *Williams Packing* exception because the
      Regulation is reasonable, does not require any action contrary to law,
      and the record is insufficient to support the allegation . . . . . . . . . . . . . . . . . . . .  14

      *(1) The Regulation is a reasonable interpretation of the §6050P provisions for
      information return reporting.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

      *(2) The Regulations do not compel violations of the FDPCA, and the Association's
      argument is not supported by the evidence at the time the suit was filed* . . . . . . . . . . . 20

      *(3) The Regulations do not preempt state law because the Association's members
      are free to collect the debts after issuing a 1099* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C.    Equity jurisdiction does not exist because alternate legal remedies
      are available and the Association's claimed harm is unsupported
      by the record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4.    If the Court has jurisdiction to consider issuing an injunction, the
      Association has unfairly delayed commencing the action to the United
      States' prejudice and the injunction must be denied. . . . . . . . . . . . . . . . . . . . . . . 27

5.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3

## 1.    Introduction

The Association's dispute, at bottom, arises out of Section 61 of the Internal Revenue Code, which recognizes that a person who receives money in the form of a loan has income when the loan is later forgiven in whole or in part and the person keeps the money.[1]  In order to improve the taxpayers' ability to report accurately their income and allow the Internal Revenue Service to review those returns as efficiently as possible, the Code has many provisions requiring third parties to send to taxpayers, and file with the Service, "information returns" that disclose various types of income the third party paid to the taxpayer during a year.  These forms, 1099s, cover interest, dividends, unemployment benefits, and many other types of payments or income.[2]  Section 6050P, one such provision, calls on certain entities to issue 1099s reporting the amount of a debt, and its parts, when they forgive it.  Matching information returns filed with the Service to the returns filed by taxpayers is estimated to be the second largest compliance program revenue producer for the United States.[3]  The Association complains about

---

[1]  26 U.S.C. §61(a)(12)(gross income includes "Income from discharge of indebtedness.").  Section 61(a)(12) is complemented by a host of exceptions and additional rules in §108, but those provisions are irrelevant here.

[2]  *See* 26 U.S.C. §§ 6041 - 6050T.

[3]  George Guttman, *Why Did the K-1 Matching Program Go Awry?*, 97 Tax Notes
(continued...)

4

being a part of that program when its members forgive debt that may give rise to income. Specifically, the Association complains that Treasury Regulation §1.6050P-2(e)—which includes organizations who acquire debt to collect it in organizations required to file 1099s—is invalid. And the Association asks this Court to declare the Regulation invalid and enjoin the Service from "enforcing" it.

The complaint should be dismissed for three reasons: first, two statutes explicitly bar the relief sought; second, the Association is unable to meet the rigid exceptions to those statutes; and, third, if the Court considers injunctive relief, the Association has waited too long and the prejudice to the United States is too great for the Court to exercise equity jurisdiction.

First, despite the Association's protestations, the Declaratory Relief Act and the Anti-Injunction Act apply to this case.[4] And each leaves the Court without jurisdiction to grant the relief requested. In *Bob Jones University v. Simon* the University claimed the Service was withdrawing its tax exempt status for reasons violating the Constitution,

---

[3](...continued)
736, Lexis 97 Tax Notes 736 (November 11, 2002).

[4] 28 U.S.C. §2201(a) (declaratory relief allowed "except with respect to Federal taxes") and 26 U.S.C. § 7421 (except as provided in sections no relevant here, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.").

5

and that the allegedly unconstitutional act would cause the University irreparable harm before any tax might be assessed at a later date and a refund suit in court became available.[5]  The University sought to enjoin the Service from its unconstitutional actions that were not themselves assessing or collecting a tax.  The Supreme Court concluded, however, that the requested relief ultimately had the effect of barring assessments that might arise if an organization is no longer tax exempt, and for that reason the Anti-Injunction Act applied.[6]

This case is no different.  The Association's members complain of preparing information returns because, among other things, they contend enforcing the Treasury Regulation would be unconstitutional.  Although the Association never specifies what acts of "enforcement" it wants enjoined, the Regulation does not give the Commissioner any authority except to assess a penalty if information returns are not filed or filed inaccurately.[7]  Assessing the penalties and all the steps leading up to it are the only acts to be enjoined.  And those acts, like the situation in *Bob Jones University*, fall within the

---

[5] *Bob Jones University v. Simon*, 416 U.S. 725 (1974).

[6] *Bob Jones University*, 416 U.S. at 739 ("Thus in any of its implications, this case falls within the literal scope and the purposes of the Act.").

[7] *See* 26 U.S.C. §6721 (failure to file information return); 26 U.S.C. §6722 (failure to furnish correct payee statements); and 26 U.S.C. §6723 (failure to comply with other reporting requirements).  Each of the three penalties is mitigated by 26 U.S.C. §6724 which has a reasonable cause safe haven.

scope and purposes of the Anti-Injunction Act.  Because the Declaratory Judgment Act's

prohibition on judgments "with respect to Federal taxes" is at least as broad as the Anti-

Injunction Act, both counts are barred and should be dismissed.

Second, there are no exceptions to the Anti-Injunction Act that apply to this case.

Under *South Carolina v. Regan* a party can seek an injunction if it can establish Congress

has provided no alternative way to challenge the validity of the tax.[8]  Failing to follow

the Regulations and file the 1099s as required is subject to penalty.  The Association's

members can pay the penalty due for one return and file a claim for refund.  The Court

of Appeals for this Circuit has already found that very remedy to be sufficient in

*Foodservice & Lodging Institute, Inc. v. Regan*.[9]  Therefore, the *South Carolina* exception

does not apply.  A party can also seek an injunction under the separate *Williams Packing*

exception if it can prove irreparable harm and certain success on the merits.[10]  But as *Bob*

*Jones University* made clear, these are not the general injunction standards in

overcoming the Anti-Injunction Act.  Irreparable harm is not based on the Association's

perceived injury—for even "ruination of the taxpayer's enterprise" may not be

sufficient—but whether the Association can establish that the Regulation is "completely

---

[8]  *South Carolina v. Regan*, 465 U.S. 367, 373 (D.C. Cir. 1984).

[9]  809 F.2d 842, 843-844 (D.C. Cir. 1987).

[10]  *Bob Jones University*, 416 U.S. at 737; *Enochs v. Williams Packing & Navigation Co., Inc.,* 370 U.S. 1, 7 (1962).

without a legal basis."[11]  And success on the merits means that, under the most liberal

view of the law and the facts available to the Government at the time the suit is filed,

the Government cannot prevail on its claim under any circumstances.[12]  The Association

cannot meet these standards because the Regulation reasonably interprets the meaning

of "trade or business of which is lending money" to apply to organizations that

purchase loans in order to collect them.  In short, the business of lending money

includes collecting the amount due; the Association's argument requires looking at

isolated words in a pinched manner.  Of course, regulations reasonably interpreting

statutes are valid.  Thus, the Association cannot establish it will prevail under all

circumstances.

Finally, an injunction must be denied because of laches.  The Association filed

this case January 19, 2006, just 12 days before the Forms 1099 must be mailed to

taxpayers.[13]  The Regulation causing the Association's claims of imminent demise

requiring extraordinary remedies was published for comment in **June 2002**, the subject

of a public hearing in **August 2002**, and published in its final form on **October 25, _2004_**.

---

[11]  *Bob Jones University*, 416 U.S. at 745.

[12]  *Bob Jones University*, 416 U.S. at 737.

[13]  26 C.F.R. §1.6050P-1(f)(3).  The Forms 1099 must be filed with the Service by February 28, or March 31 if filed electronically.  26 C.F.R. § 1.6050P-1(a)(4) and 26 U.S.C. § 6071(b).

At that time, the Regulation was made effective beginning January 1, 2005, which meant the first forms were known to be due at that time on January 31, 2006, 15 months later. The Association did nothing, however, until it requested a meeting—not required since the period for public comment on the Regulation had *long* passed—in December 2005, when it asked for a one-year delay of the effective date set 14 months earlier. There is no evidence that the Association did anything to avoid the harm it fears, except wait for the very last minute to try and disrupt an important Government program. The Association may not avail itself of the Court's equity in these circumstances.

We address each reason to dismiss the case—and deny the temporary restraining order and preliminary injunction—in turn.

## 2.     The Anti-Injunction Act and Declaratory Judgment Act bar this case.

The Association argues (Association Memorandum pp. 14-19) that the Anti-Injunction Act and Declaratory Judgment Act do not apply to this case because the complaint's primary purpose is not to restrain or prohibit actions that may lead to the assessment and collection of a tax, but to restrain the Government from, variously, violating the Constitution or forcing Association members to violate the Fair Debt Collection Practices Act and forego their legal and economic rights. We will deal with the merits of those claims in considering the Anti-Injunction Act's possible exceptions,

but simply alleging constitutional violations does nothing to overcome the Anti-

Injunction Act.[14]  Hence, determining if the Anti-Injunction Act applies is

straightforward:  whether "the district court's order would operate to prevent IRS from

assessing and collecting taxes called for" should the Association's members fail to file

the Forms 1099 required by the Regulations, despite the fact that "the suit has no

current effect on collection of taxes."[15]  The complaint seeks just that relief—even

though the Association has been careful to always say it wants to enjoin "enforcing" the

Regulations and avoid stating what that means.  It is of no import that the restraint

prevents assessing penalties, because the penalties in §§6721 - 6723 are considered to be

a tax.[16]  Moreover, the injunction would also severely impede the Service's ability to

assess and collect tax due on income from discharge of indebtedness.  If Forms 1099 are

not mailed to taxpayers or filed with the Service by the entity discharging the debt, how

will either know income has accrued?

    As noted earlier, the Supreme Court in *Bob Jones University* plainly held that the

Anti-Injunction Act reaches injunctions beyond those that directly prevent an

---

[14]  *Bob Jones University*, 416 U.S. at 736 (University alleging violations of First and Fifth Amendment rights); *see also R.L. Black v. United States*, 534 F.2d 524, 526-527 (2d Cir. 1975)(notwithstanding plaintiffs' allegations that Service violated equal protection rights, action barred by Anti-Injunction Act).

[15]  *Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4-5 (D.C. Cir. 1979).

[16]  26 U.S.C. § 6724(b).

1510775.5

assessment or collection.  There the University was trying to prevent the revocation of

its tax exempt status, which did not cause an immediate tax bill but might have led to

taxes accruing and its donors losing a potential tax deduction.  That situation fell within

the Anti-Injunction Act.[17]  Similarly, the Association's situation is not substantially

different from the restauranteurs in *Foodservice and Lodging Institute* who were

attempting to enjoin four Treasury Regulations calling for them to meet new, and in

their view cumbersome, reporting requirements for tips earned by employees.[18]  The

Court of Appeals concluded that two regulations—one defining how tips should be

allocated among employees in order to be reported and one defining which

establishments fell under the statute—"plainly concern the assessment or collection of

federal taxes."[19]  The Circuit assumed hypothetical jurisdiction for one regulation

defining the priority in which amounts were withheld from employees without

deciding the jurisdictional issue, because that regulation plainly failed to meet any

exception.[20]  The Circuit did find that one regulation did not fall within the Anti-

Injunction Act's purview because the information it called for did not relate to any

---

[17]  *Bob Jones University*, 416 U.S. at 738-739.

[18]  *Foodservice & Lodging Institute, Inc. v. Regan*, 809 F.2d 842, 843-844 (D.C. Cir. 1987).

[19]  *Foodservice & Lodging Institute, Inc.*, 809 F.2d at 844.

[20]  *Foodservice & Lodging Institute, Inc.*, 809 F.2d at 845.

1510775.5

particular taxpayer but was to be used for statistical purposes.[21]  *Foodservice and Lodging Institute* establishes that regulations addressing reporting requirements with respect to individual income taxes and individual taxpayers are within the Anti-Injunction Act's scope.  And because the relief sought in this case will both prevent the Service from assessing penalties if the Association's members refuse to comply and render the Service unable to implement the matching program called for by Congress, the injunctive relief the Association seeks is well within the Anti-Injunction Act's ambit.

The Association does not address *Foodservice & Lodging Institute* in this context, but cites three cases outside this circuit instead.[22]  (Association memorandum at p. 17.)  In two of those cases, the taxpayers were attempting to recover documents held by the Service without their consent.  The courts determined that those cases involved Fourth Amendment claims.  It is telling that neither court went so far as to enjoin the Service from later attempting to gather the same documents through other means.  In the third

---

[21]  *Foodservice & Lodging Institute, Inc.*, 809 F.2d at 845-846.

[22]  *Cardwell v. Kurtz*, 765 F.2d 776 (9th Cir. 1985); *Linn v. Chavatero*, 714 F.2d 1278 (5th Cir. 1983); and, *Retirement Case Associates, Inc. v. United States*, 3 F.Supp.2d 1424 (N.D. Ga. 1998).  The Association also appears to cite *Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1 (D.C. Cir 1979), on page 18 of its memorandum for the proposition that the Anti-Injunction Act does not apply to "constitutional infirmities." The language cited, however, was discussing the *South Carolina* exception and when the complete absence of any judicial review might itself implicate "constitutional infirmities."  The opinion does not support the Association's point about the Anti-Injunction Act's scope.

case, *Retirement Care Associates*, the taxpayer was alleging a number of actions based on a false affidavit submitted by a Service agent. Again, the case was not prohibiting the assessment of any tax against the taxpayer, but stopping allegedly unconstitutional actions. These cases are each inapposite. The Service has taken nothing from the Association's members, and the only unconstitutional act alleged is promulgating a Regulation that affects not just the Association but a whole industry. Consequently, these cases provide little insight here.

## 3.  The exceptions to the Anti-Injunction Act do not apply in this case.

As described earlier, the Anti-Injunction Act has two limited exceptions that might confer jurisdiction and allow a court to consider whether an injunction is appropriate.[23]  Neither provides any relief here.

### A.  Because there is a penalty for failing to file information returns, an alternate remedy is available and the *South Carolina* exception does not apply.

The *South Carolina* exception to the Anti-Injunction Act applies only if a party has no alternate means of challenging the provision. The Association, of course, plays no role in the analysis.[24]  The Association's members, however, will either file 1099s in

---

[23]  The Anti-Injunction Act has several statutory exceptions, but the Association has not claimed to satisfy any.

[24]  *National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1436 (D.C. Cir. 1995).

1510775.5

accordance with the Regulations, or not.  Those failing to file 1099s are subject to

penalty under Section 6721.[25]  If a penalty is not assessed there can be no peril or harm.

If a penalty is assessed, they could pay as little as the penalty for one return and sue for

a refund.  In fact, in *Foodservice & Lodging Institute* the Circuit Court disposed of the

Institute's claim that it had no remedy for challenging the tip reporting requirements

similar to the 1099s required here by reasoning "employers can refuse to comply, pay

the statutory fine, and sue for a refund of the fine."[26]  When one considers that the

District Court in *Foodservice & Lodging Institute* had concluded "the round-about penalty

route suggested by the government is not an 'alternative remedy' prescribed by

Congress," the Circuit Court's rejecting that position and concluding an alternate

remedy exists is controlling here.[27]

    The Association posits a number of circumstances in which no member is

assessed a penalty, or that if a penalty is paid the Service might refund it without

---

[25]  It is also possible that the United States could commence an action under 26 U.S.C. § 7402 to compel Association members to file the information returns required by the Regulations.  Obviously, such an action would only be brought at the Government's discretion.

[26]  *Foodservice & Lodging Institute, Inc.*, 809 F.2d at 844-845 (footnote omitted). The Court cited to the now repealed §6678, a precursor to §6721 that imposes similar penalties for failing to file information returns today.

[27]  *See Foodservice and Lodging Institute, Inc. v. United States*, 583 F. Supp. 1018, 1023 (D.D.C. 1984), *aff'd in part and vacated and remanded in part*, 809 F.2d 842 (D.C. Cir. 1987).

1510775.5

allowing a challenge in court. (*See* Association memorandum at p. 39.) These imagined and speculative circumstances are insufficient to meet the *South Carolina* exception. As the Supreme Court recognized in *Bob Jones University* it is enough that the alternate remedy exists, even if the remedy is delayed or comes with severe consequences, because those effects "do not rise to the level of constitutional infirmities, in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference."[28]

Because the Association's members have other means of challenging the Regulation besides this action, the *South Carolina* exception does not apply.

**B. The Association cannot meet the *Williams Packing* exception because the Regulation is reasonable, does not require any action contrary to law, and the record is insufficient to support the Association's allegations.**

The Association argues the *Williams Packing* exception is satisfied because the Secretary of the Treasury exceeded his authority in promulgating the Regulation, the Regulation impermissibly transgresses the FDCPA, and the Regulation preempts the Association's members' rights under state laws. We will not attempt to address each of these claims on its merits; while we believe the Association's claims are incorrect, litigating the merits of an important Treasury Regulation's validity is not fully accomplished with little more than 72 hours after being notified of the case, most of it

---

[28] *Bob Jones University*, 416 U.S. at 725 (citations omitted).

outside business hours.  But closely examining the merits is unnecessary because the test here is whether the Association can establish that the Regulation is "completely without a legal basis,"[29] or, in other words, that under the most liberal view of the law and the facts available to the Government at the time the suit was filed the Government cannot prevail on its claim under any circumstances.[30]  And this we can do.

### (1) The Regulation is a reasonable interpretation of the §6050P provisions for information return reporting.

It is important to note at the outset what the Association has conceded by not contesting in its papers.  It concedes that the Regulation was properly promulgated after notice and an appropriate time for comment.[31]  It concedes that the Service properly considered the comments it received.[32]  And it concedes that the

---

[29]  *Bob Jones University*, 416 U.S. at 745.

[30]  *Bob Jones University*, 416 U.S. at 737.

[31]  Although the §1.6050P-2 regulations are "interpretative" and therefore exempt from the notice and comment procedures under 5 U.S.C. § 553(b), the Service's policy is to issue all regulations following notice and comment procedures.  A copy of the Federal Register from October 25, 2005 is in our Appendix.

[32]  Several comments are described in the Summary of Comments preceding the final Regulations.  *See* 69 Federal Register 62181, 62182-62185 (October 25, 2004).  Some letters have been released to the public and published.  *Attorneys Request Guidance on Proposed Regs on Reporting Discharge of Debt*, 2003 Tax Notes Today 203-28, Lexis 2003 TNT 203-28 (October 21, 2003); *[Letter regarding] Proposed DOI Regs Will Harm ["Buy Here, Pay Here] Car Dealers*, 2004 Tax Notes Today 72-21, Lexis 2004 TNT 72-21 (April 14, 2004); *Attorney Seeks Meeting on DOI Reporting Requirements*, 2005 Tax Notes Today 150-
(continued...)

1510775.5

Administrative Procedure Act was followed in issuing the Regulations.  Thus, the

Administrative Procedure Act has nothing to do with the case.[33]

   In this case, the *Williams Packing* exception is about whether the Treasury

Regulation is valid.  The Association does not evaluate the Regulation under *Chevron*,

but its argument that the Regulations exceed the Treasury's statutory authority seems

to be arguing that the Regulation is not entitled to deference and therefore invalid.[34]

(Association memorandum at pp. 20-26.)  The Department of the Treasury, given its

obligation under § 7805(a) to "prescribe all needful rules and regulations" for enforcing

the Internal Revenue Code, promulgated Regulation §1.6050P-2 to implement

Congressional intent that "applicable entities" file information returns disclosing

---

[32](...continued)
25, Lexis 2005 TNT 150-25 (August 5, 2005); *Attorney Forwards Documents on DOI Reporting Rules to Treasury*, 2005 Tax Notes Today 168-7, Lexis 2005 TNT 168-7 (August 31, 2005).

[33]  The Court has requested the administrative record for this Regulation.  Besides the public record described in note 32, the only existing file we know of is the Treasury Department's background file of deliberative material.  These files are not released to the public, and when sought in discovery the United States asserts the applicable privileges to resist disclosure.  The file in this case is a 1-2 foot stack of paper.  We are attempting to have it copied, and if ordered by the Court will submit it *in camera*.

[34]  The Association obliquely refers to retroactivity on page 18 without explaining or expanding its argument.  We will simply note that the Regulation's effective date was after its final publication and, in any event, tax statutes and regulations are constitutional and valid even if they affect transactions made in the past with other expectations.  *See United States v. Carlton*, 512 U.S. 26, 30-31 (1994).

1510775.5

potential discharge of indebtedness income.  Regulations issued under the Treasury's general authority are entitled to deference if "the agency's interpretation is reasonable."[35]  These Treasury Regulations are entitled to considerable deference.[36]

Congress added Section 6050P to the Internal Revenue Code requiring "applicable entities" discharging indebtedness to file information returns with the Internal Revenue Service, essentially providing information that the Service could otherwise gather only with great difficulty.  Section 6050P(c)(2) defines "applicable entity" to include "applicable financial entity" which ultimately in §6050P(c)(2)(D) includes "any organization a significant trade or business of which is the lending of money."  Treasury Regulation §1.6050P-2(e) defines the business of lending money to include buying a debt from the original lender in order to collect it:  "For purposes of this section, lending money includes acquiring an indebtedness not only from the debtor at origination but also from a prior holder of the indebtedness....If an organization acquires an indebtedness, the organization is required to report any cancellation of the indebtedness if the organization is engaged in a significant trade or business of lending money."  This provision ensures that the large business of the

---

[35]  *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001).

[36]  *See e.g., National Muffler Dealers Association v. United States*, 440 U.S. 472 (1979); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

17

Association's members is captured by the statute Congress passed with the purpose of requiring information returns when debt is discharged.

The Regulation is a reasonable interpretation of §6050P's reference to organizations with a business "which is the lending of money." The business of lending money is not just the act of handing over cash to a borrower and watching him stroll out the door never to be heard from again. The *business* of lending money necessarily includes collecting what has been lent plus interest and fees and, if the circumstances arise, determining when the debt is uncollectible. Reading the statutory terms in isolation as the Association would do leaves the statute impotent with respect to the very loans most likely to give rise to discharge of indebtedness income, the loans that the original lender finds too difficult to collect and sells to a business specializing in collecting those loans. Thus, the Regulation is a reasonable interpretation of the term used by Congress, and entitled to deference. And in the context of considering the *Williams Packing* exception, the rationale is not so "palpably off the track" as to meet the requirement that Government cannot prevail under the most liberal interpretation of the law and facts.[37] Accordingly, the Association cannot meet the *Williams Packing* requirement to confer jurisdiction.

---

[37] *See Investment Annuity, Inc.*, 609 F.2d at 9.

1510775.5

The Association's arguments (Association memorandum at pp. 22-26) are not to the contrary.  First, the Association cites how "lending money" or the "business of lending money" had been interpreted in the past for provisions that governed whether the organization had income from lending money or whether its income was passive. None of those statutes, however, were in a provision designed by Congress to impose reporting requirements to determine if third parties had income when a business discharges debt.  The Association's apples-to-oranges analysis does not hold up when one considers the nature and purpose of the statutes underlying the argument.  Second, the Association tries to create an irrelevant argument by contending that the Regulations for §6050P do not comport with exceptions in the Temporary Regulations for §6050J, despite the Treasury Department's stated goal in announcing the proposed Regulation for comment in 2002.  Section 6050J imposes reporting requirements on lenders who secure their loans with property and then either forecloses the interest and acquires the property or abandons the property.  That business is different from the business addressed in §6050P.  Dealing with the two businesses differently in some respects is not blatant inconsistency giving rise to circumstances under which the Government can in no way can prevail.  Moreover, it is hard to fathom how a final regulation promulgated after notice and comment must fall because of a perceived conflict with *temporary* regulations under a separate statute.

19

In the liberal review of the Regulation's validity called for in this circumstance, the Court cannot find the Regulation will not be upheld under any circumstances. Accordingly, the Association cannot meet the *Williams Packing* exception.

**(2) *The Regulations do not compel violations of the FDPCA, and the Association's argument is not supported by the evidence at the time the suit was filed.***

The Association next argues that the Regulations conflict with the Fair Debt Collection Practices Act. After reviewing the FDCPA on pages 26 through 29, the Association proclaims, "Compliance with 6050P *will result* in a violation of these FDCPA provisions." (Emphasis in original.) The example posed is a member first issuing a 1099 stating that a debt has been discharged or forgiven that makes "a representation as to the legal status of the debt" and later pursuing collection of that account. This argument is, however, irrelevant and unsupported by the evidence. The record is devoid of any reason why the Association members cannot issue 1099s noting (1) that they are issuing a 1099 because one or more of the circumstances in Treasury Regulation §1.6050P-1 have been met, (2) that the business intends to, or may, continue collecting the debt until barred by state or federal law governing debt collection, and (3) that the recipient should consult with a tax advisor if he or she does not know whether income arises under 26 U.S.C. §§ 61(a)(12) and 108 in his or her particular circumstances. There is no misleading statement about whether the debt will be collected or why the 1099 has

been issued.  The Regulations specifically provide that "discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the discharged debt under sections 61 and 108," and in doing so establish that issuing a 1099 is not a declaration by the issuer that the recipient has income.[38]  Issuing a 1099 is a statement that the issuer is required to issue a 1099 under §6050P, nothing more.  The Association's litany of transgressions wrought by the Regulation is based on circumstances that do not exist and are not supported by the facts viewed most favorably to the Government at the time the suit was filed.

### (3) The Regulations do not preempt state law because the Association's members are free to collect the debts after issuing a 1099.

Using the same strawperson that the Association's members are compelled to issue 1099s which then preclude them from collecting unpaid debts still collectable under state or federal law, the Association contends it will lose economic rights.  The Regulations require a 1099 to be issued when a debtor has made no payment for three years and the  creditor has taken no action to collect a debt in the last year.[39]  But the 1099 is not a tax assessment.  It is an information return.  The Association's evidence proves as much.  Page 3 of Exhibit 3 to its Brief is the Instructions that accompany a 1099 received by a taxpayer.  They caution, "some cancelled debts are not includible in

---

[38]  26 C.F.R. §1.6050P-1.

[39]  *See* 26 C.F.R. §1.6050P-1(b)(2)(H).

1510775.5

your income" and go on to refer to many exceptions.   Debtors receiving a 1099 with a notice from that the creditor intends to continue collecting the debt will decide whether they have income under §61, or not.  The 1099 simply does not have the legal force the Association imagines in order to create its argument.  Again, based on the law and facts viewed most favorably to the Government, this argument fails.

**C.  Equity jurisdiction does not exist because alternate legal remedies are available and the Association's claimed harm is unsupported by the record.**

The Association on pages 33 through 38 comes back to argue that equity jurisdiction exists because it will suffer "financial and due process deprivations" and that it has no alternate remedy.  We will address the alternate remedy argument first, which we answered above in showing with the *South Carolina* exception to the Anti-Injunction Act did not apply.  Simply, the Court of Appeals for the District of Columbia has already held that an entity called on to file information returns who believes the requirement is improper or unauthorized may "refuse to comply, pay the statutory fine, and sue for a refund of the fine."[40]  That is the alternate remedy, and that precludes equity relief here.  As noted in our *South Carolina* exception discussion, the *Williams Packing* exception does not require the alternate remedy be efficient, speedy, or

---

[40]  *Foodservice & Lodging Institute, Inc.*, 809 F.2d at 844-845 (footnote omitted).  The Court cited to the now repealed §6678, a precursor to §6721 that imposes similar penalties for failing to file information returns today.

22

inexpensive.  Congress designed the Anti-Injunction Act to prevent the Service and the courts from dealing with every taxpayer's perceived harm from statutes or regulations in premature cases when no tax has been assessed or collected.[41]  The Association presents no arguments here that have not been previously rejected, and equity jurisdiction is not conferred because an alternate remedy exists.

With respect to the requirement that the Association will be suffering irreparable harm, as we discussed earlier, the facts alleged do not give rise to the level of ruination generating constitutional concerns recognized as the only possible exception. Moreover, the whole argument is unsupported by the record.  On page 33 of their brief, the Association assures the court that "Debt Buyers are not furnished by Originating Lenders the pertinent information regarding the consumer loans they have purchased to fully comply with the information requested under Form 1099-C."  The implied inherent unavailability of the needed information is the factual premise for the injury attributed to the Regulations from having to issue 1099s without sufficient information. This alarming statement, however, is unsupported by the record.  Rather, Knauf presents a less convincing statement of what information is available and unavailable in his Declaration (emphasis added):

- ¶ 14: "the Debt Buyer *generally* receives only the account balance..."

---

[41]  *See Investment Annuity, Inc.,* 609 F.2d at 8-9.

1510775.5

- ¶14: "the Debt Buyer *often* does not know the component amounts..."

- ¶16: "Debt Buyer *usually* will not be in a position to accurately reflect on the Form 1099-C the amounts to be filled in..."

- ¶16: "The Debt Buyer *generally* does not have the debt components from the Originating Lender..."

- ¶16: "The Debt Buyer *typically* receives from the Originating Lender only the aggregate amount owed..."

- ¶16: "the Debt Buyer is *usually* unable to accurately report..."

- ¶17: "Debt Buyers are *customarily* provided with only an account balance..."

- ¶17: "[Debt Buyers] *usually* lack a detailed breakdown..."

- ¶17: "because Debt Buyers are *generally* not furnished with the information to accurately complete...".

The record does not support the Association's categorical statement because the evidence is qualified at every point. Even further, Knauf's conclusory statements are never supported with a foundation explaining his notion of what "generally," "usually," "often," "typically," or "customarily" actually mean in terms of the information available for each the Association's members who are the plaintiffs with standing. As such, Knauf's testimony on these issues should be excluded, and the

24

defendants object to it.  More importantly, given the record at the start of this case viewed most favorably to the Government, the Association's claimed harm is unsupported.  Once this premise crumbles, the whole argument falls.

In addition, the record lacks any evidence why the Association cannot comply in any way with the Regulation's requirements.  The Association complains that it cannot get the necessary information about the debt's total balance, the amount of the accrued interest, and the amount that is penalty, administrative fees, or other costs.  Without any foundation for his statement, Knauf speculates that the original lenders "have been unable to" provide the information.  (Knauf Declaration ¶21.)  But it defies common sense to say businesses making consumer loans do not have this information about their accounts.  The relevant factual inquiry is whether there is any impediment to the necessary information being obtained in a commercial transaction between original lenders and debt buyers.  The Regulation imposes none, and the record is silent on that necessary point.  And even if we assume for purposes of argument that the information was not "generally" obtained in the past so the Association's members are without the information for debts discharged during 2005, the record is again silent on why the Association could not obtain this information since June 2002 when the Regulation was made public, since August 2002 when a public hearing was held, or even since October 2004 when the Regulation became final.  There is no statement about why information

about accounts already purchased was unavailable to them, or why information for new accounts being purchased is currently unavailable. The Association's failure to establish this premise to its argument, leaves it without establishing any harm.

Perhaps the most damaging blow to the Association's argument is that the Service recognized some businesses falling under the §6050P Regulation might have difficulty in gathering the information for accounts they already owned. In a letter dated October 7, 2005 directed to a trade group—whose name is redacted—the Service addressed the Association's claimed dilemma (on pages 2 - 3 in the letter attached in the Appendix) by saying "If, however, the entity cannot obtain this information, the entity should report using the best available information."[42] The letter went on to refer to and describe the "reasonable cause" exceptions that apply to penalty assessments in this circumstance. This letter was released to the public on December 30, 2005, and published in the *Daily Tax Report*, a popular daily tax digest, on January 10, 2006. Thus, at the time this suit was filed, the record does not support the draconian choice posited by the Association.

---

[42] *See* BNA Daily Tax Reporter, INFO 2005-0208 at Q & A 3 (January 10, 2006). Although available from Lexis, a copy is attached in the Appendix. A short article was published the same day. *Section 6050P—Information Returns for Cancellation of Indebtedness*, BNA Daily Tax Reporter p. K-8 (January 10, 2006), Lexis 06 DTR K-8 (2006).

1510775.5

The Association asserted three bases for invoking the *Williams Packing* exception. Under the applicable standard of reviewing the evidence and law, none can prevail. Accordingly, the complaint should be dismissed.

## 4. If the Court has jurisdiction to consider issuing an injunction, the Association has unfairly delayed commencing the action to the United States' prejudice and the injunction must be denied.

In response to a Regulation the Association claims may ruin its members that was first published for comment in June 2002, the subject of a public hearing in August 2002, and published in its final form on October 25, 2004, the record does not disclose that the Association took any steps until December 2005 when it hired their counsel to ask for a meeting to seek a one-year delay. (Association memorandum at p.8, ¶ 16.) Further, there is no evidence that the Association took *any* action before that date. It did not submit any comments during the regulation drafting process, did not attend the hearing, and did not seek a meeting when the Regulations—that are the downfall of the Association's members—became effective in October 2004. Instead, the Association did nothing until December 2005. There is no evidence in the record that the Association has considered the guidance the Service has given to a similarly-situated trade association about using the best information available to complete its Forms 1099 before bringing this suit. Instead, the Association filed the action seeking the benefit of the Court's equity just twelve days before it was required to issue 1099s to debtors.

Equity, however, "aids the vigilant and not those who slumber on their rights."[43] Laches is an affirmative defense that requires the Government establish first that the Association was not diligent and second that the United States will be prejudiced by the delay. As set out above, it is hard to imagine how the Association's conduct could be cast as diligently acting to prevent the harm it foresees. And prejudice to the United States is easy to see. Forms 1099 are required to be issued at the end of January so that taxpayers may begin preparing their returns to file by April 15. The Forms 1099 are filed with the Service in February in paper or electronically in March so that the Service can begin to prepare the data for matching to returns as the tax returns are filed. Returns that do not match information provided by Forms 1099 are a valuable starting place for the Service to inquire. The General Accounting Office reported to Congress in 2003 that the matching program led to more than 2 million inquiries where returns did not match information returns.[44] Section 6050P's purpose of capturing information about circumstances when particular debtors may have had debt discharged is especially important because there is no other place for the Service to get the information besides the two parties involved. Disrupting this program less than two

---

[43] *Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 47 (D.C. Cir. 2005)(citing *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C. Cir. 1985)).

[44] *See IRS Should Continue to Expand Reporting on its Enforcement Efforts* page 40, figure 4 (GAO Report 03-378 January 2003).

28

1510775.5

weeks before Forms 1099 are to be issued would severely prejudice the ability of taxpayers to complete their tax returns and for the Service to determine if proper returns have been filed.  Any injunction with just a short duration between now and April 15 would disrupt the individual income tax return filing season for this information return matching program.  In contrast, the Association has shown no reason why it waited nearly from October 2004 until January 2006 to file its action. Laches appropriately denies the Association's request for equity.

## Conclusion

Although we have attempted to address each of the Association's major points, in the end the issue is elementary:  whether the Court has jurisdiction to declare a Treasury Regulation requiring businesses to file information returns invalid and enjoin the Commissioner from taking any actions to enforce it.  Because the Declaratory Judgment Act and Anti-Injunction Act both specifically bar the relief, and the Court of

29

Appeals for this Circuit has ruled a taxpayer has the alternate remedy of refusing to file

the returns, paying the penalty, and suing for a refund, the case motion for a temporary

restraining order and preliminary injunction must be denied and the case dismissed.


Dated:  January 23, 2006                    Respectfully submitted,


                                            __/s/ Jennifer L. Vozne_____
                                            DAVID A. HUBBERT
                                            JENNIFER L. VOZNE
                                            Trial Attorneys, Tax Division
                                            U.S. Department of Justice
                                            P.O. Box 227, Ben Franklin Station
                                            Washington, D.C. 20044
                                            (202) 307-6555 (202) 514-6866 (fax)
                                            COUNSEL FOR DEFENDANTS

OF COUNSEL:

KENNETH L. WAINSTEIN
United States Attorney

MERCEDEH MOMENI
Assistant United States Attorney

1510775.5

APPENDIX

1.      69 Federal Register 61281 (October 24, 2004)

2.      INFO 2005-0208 - IRC Section 6050P - Returns Relating to the Cancellation of
        Indebtedness by Certain Entities, BNA Daily Tax Reporter (January 10, 2006.)

1510775.5

**SUPPLEMENTARY INFORMATION:** Phoenix Scientific, Inc., 3915 South 48th St. Ter., St. Joseph, MO 64503, filed a supplement to ANADA 200–265 that provides for use of PRAZI–C (praziquantel) Tablets for the removal of certain tapeworm parasites in dogs. Phoenix Scientific, Inc.'s PRAZI–C Tablets are approved as a generic copy of Bayer HealthCare LLC's Tape Worm Tabs approved under NADA 111–798. The supplemental ANADA is approved as of September 15, 2004, and the regulations are amended in 21 CFR 520.1870 to reflect the approval. The basis of approval is discussed in the freedom of information summary.

In accordance with the freedom of information provisions of 21 CFR part 20 and 21 CFR 514.11(e)(2)(ii), a summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

The agency has determined under 21 CFR 25.33(a)(1) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 520**

Animal drugs.

■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 520 is amended as follows:

## PART 520—ORAL DOSAGE FORM NEW ANIMAL DRUGS

■ 1. The authority citation for 21 CFR part 520 continues to read as follows:

**Authority:** 21 U.S.C. 360b.

■ 2. Section 520.1870 is amended by revising paragraph (b)(2) to read as follows:

### § 520.1870   Praziquantel tablets.

*   *   *   *   *

(b) * * *
(2) No. 059130 for use of the product described in paragraph (a)(1) of this section, as in paragraph (c)(1) of this section.

*   *   *   *   *

Dated: October 14, 2004.

**Steven D. Vaughn,**
*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*
[FR Doc. 04–23761 Filed 10–22–04; 8:45 am]
**BILLING CODE 4160–01–S**

---

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Food and Drug Administration

### 21 CFR Part 524

### Ophthalmic and Topical Dosage Form New Animal Drugs; Ivermectin Topical Solution

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is amending the animal drug regulations to reflect approval of an abbreviated new animal drug application (ANADA) filed by Norbrook Laboratories, Ltd. The ANADA provides for topical use of ivermectin on cattle for treatment and control of various species of external and internal parasites.

**DATES:** This rule is effective October 25, 2004.

**FOR FURTHER INFORMATION CONTACT:** Lonnie W. Luther, Center for Veterinary Medicine (HFV–104), Food and Drug Administration, 7519 Standish Pl., Rockville, MD 20855, 301–827–8549, e-mail: *lonnie.luther@fda.gov.*

**SUPPLEMENTARY INFORMATION:** Norbrook Laboratories, Ltd., Station Works, Newry BT35 6JP, Northern Ireland, filed ANADA 200–272 for NOROMECTIN (ivermectin) Pour On for Cattle. The application provides for topical use of 0.5 percent ivermectin solution on cattle for the treatment and control of various species of gastrointestinal nematodes, lungworms, grubs, horn flies, lice, and mites. Norbrook Laboratories, Ltd.'s NOROMECTIN Pour-On for Cattle is approved as a generic copy of Merial Ltd.'s IVOMEC Pour-On for Cattle, approved under NADA 140–841. The application is approved as of September 13, 2004, and the regulations are amended in 21 CFR 524.1193 to reflect the approval. The basis of approval is discussed in the freedom of information summary.

In accordance with the freedom of information provisions of 21 CFR part 20 and 21 CFR 514.11(e)(2)(ii), a summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

The agency has determined under 21 CFR 25.33(a)(1) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 524**

Animal drugs.

■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 524 is amended as follows:

## PART 524—OPHTHALMIC AND TOPICAL DOSAGE FORM NEW ANIMAL DRUGS

■ 1. The authority citation for 21 CFR part 524 continues to read as follows:

**Authority:** 21 U.S.C. 360b.

### § 524.1193   [Amended]

■ 2. Section 524.1193 is amended in paragraph (b)(2) by adding in numerical order "055529".

Dated: October 8, 2004.

**Steven D. Vaughn,**
*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*
[FR Doc. 04–23760 Filed 10–22–04; 8:45 am]
**BILLING CODE 4160–01–S**

---

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

### 26 CFR Parts 1 and 602

[TD 9160]

RIN 1545–AY35

### Information Reporting Under Section 6050P for Discharges of Indebtedness

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final regulations.

**SUMMARY:** This document contains final regulations relating to the information reporting requirement under section 6050P of the Internal Revenue Code (Code) for discharges of indebtedness. These final regulations reflect the enactment of section 6050P(c)(2)(D) by the Ticket to Work and Work Incentives Improvement Act of 1999. These final regulations provide guidance on the information reporting requirements for discharges of indebtedness by organizations that have a significant trade or business of lending money. This document also contains amendments to the existing final regulations to reflect the amendments to section 6050P by the Debt Collection Improvement Act of 1996.

**DATES:** *Effective date:* These regulations are effective October 25, 2004.

*Applicability date:* These regulations are applicable to discharges of indebtedness occurring on or after January 1, 2005.

**FOR FURTHER INFORMATION CONTACT:** Joseph P. Dewald, at (202) 622–4910 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**Background**

This document contains amendments to 26 CFR parts 1 and 602. The amendments describe circumstances in which an organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D). The amendments also conform the existing final regulations under section 6050P to cover applicable entities, including executive, judicial, and legislative agencies.

In general, section 6050P(a) requires certain organizations (applicable entities) to file information returns with the Internal Revenue Service (IRS), and to furnish information statements to debtors, reporting discharges of indebtedness of $600 or more. As enacted by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103–66 (107 Stat. 312, 531–532 (1993)), section 6050P required "applicable financial entities" (including Federal executive agencies) to report discharges of indebtedness. The Debt Collection Improvement Act of 1996, Pub. L. 104–134 (110 Stat. 1321, 368–369 (1996)) (the 1996 Act), amended section 6050P to cover "applicable entities." Section 6050P(c)(1) as amended defines an *applicable entity* to include: (1) Any executive, judicial, or legislative agency (as defined in 31 U.S.C. 3701(a)(4)); and (2) any applicable financial entity.

Section 6050P(c)(2)(D) was enacted by section 553(a) of the Ticket to Work and Work Incentives Improvement Act of

1999, Pub. L. 106–170 (113 Stat. 1860, 1931 (1999)) (the 1999 Act), effective for discharges of indebtedness occurring after December 31, 1999. The 1999 Act amended section 6050P by expanding the applicable financial entities required to report. As expanded, the term includes any organization "a significant trade or business of which is the lending of money."

The IRS issued Notice 2000–22 (2000–1 C.B. 902), which provides that penalties under sections 6721 and 6722 for failures to report discharges of indebtedness occurring before January 1, 2001, will not be imposed on organizations newly required to report under section 6050P(c)(2)(D). In Notice 2001–8 (2001–1 C.B. 374), for these same organizations, the IRS extended the waiver of penalties to failures to report discharges of indebtedness occurring before the first calendar year that begins at least two months after final regulations under section 6050P(c)(2)(D) are issued.

A notice of proposed rulemaking under section 6050P(c)(2)(D) (REG–107524–00) was published in the **Federal Register** (67 FR 40629) on June 13, 2002. The proposed regulations address whether an organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D). The proposed regulations also reflect the amendments made by the 1996 Act. A public hearing was held on the proposed regulations on October 8, 2002. The IRS received written and electronic comments responding to the notice of proposed rulemaking. After consideration of all comments, the proposed regulations are adopted as revised by this Treasury decision.

**Explanation of Provisions and Summary of Comments**

Section 6050P(c)(2)(D) requires any organization "a significant trade or business of which is the lending of money" to report discharges of indebtedness. The proposed regulations provide guidance on whether an organization is engaged in a trade or business of lending money and whether that trade or business is significant. In general, the proposed regulations provide that the lending of money is a significant trade or business if money is loaned on a regular and continuing basis. The proposed regulations provide three safe harbors under which organizations will be considered not to have a significant trade or business of lending money. The final regulations retain these rules.

*1. Comments Concerning the Proposed Regulations*

A. Obligations Acquired From Persons Other Than the Debtor

Several commentators requested clarification of the information reporting requirements for debt obligations acquired from persons other than the debtor. Section 1.6050P–2(e) of the proposed regulations provides that lending money includes acquisition of a debt obligation from a prior holder of the obligation and that gross income from an indebtedness is treated as gross income from lending money regardless of whether the debt was originated by the organization itself or by a related party. The final regulations clarify that a debt obligation acquired from the debtor or any person other than the debtor is subject to reporting under section 6050P(c)(2)(D) if the owner of the obligation is engaged in a significant trade or business of lending money.

B. Gross Income From Lending of Money

One commentator requested clarification on what amounts constitute gross income from lending money. Section 1.6050P–2(d) of the proposed regulations provides that gross income from lending money includes income from interest, fees, penalties, merchant discount, interchange, and gains arising from the sale of an indebtedness. The final regulations clarify that gross income from lending money includes: Interest (including qualified stated interest, original issue discount, and market discount); gains arising from the sale or other disposition of indebtedness; penalties with respect to indebtedness (whether or not the penalty is interest for Federal tax purposes); and fees with respect to indebtedness, including merchant discount or interchange (whether or not the fee is interest for Federal tax purposes).

C. "Factoring" Transactions

(i) Commentators' Description of "Factoring" Transactions.—Several commentators addressed reporting issues associated with what the commentators called "factoring." One commentator described factoring transactions, primarily between unrelated parties, as ordinarily involving (a) a factor, who performs the functions described below with respect to a pool of short-term accounts receivable (30-, 60-, or 90-day debt), (b) the factor's client, who sells goods in exchange for the short-term accounts receivable, and (c) the client's customers, who buy the goods and who

issue the accounts receivable. According to the commentator, the factor generally performs the following functions: Initial credit investigation, selective assumption of the risk of loss (sometimes referred to as guaranteeing credit), on-going credit monitoring of the client's customers, collection, and bookkeeping.

As described by the commentator, after the credit investigation (on either a customer-specific or a pooled basis), the factor informs the client if the factor is willing to guarantee the receivables from some or all of the client's customers. For customers whose accounts receivable the factor will not guarantee, the client may enter into the sale and accept an account receivable without the benefit of the factor's guarantee or may refuse to extend credit and either make the sale for cash or forego the sale altogether.

The commentator described factors' competitive fees for typical transactions with unrelated parties as ranging between 0.35 percent of the face value of the accounts receivable (if the client retains the collection function) and 0.70 percent of that face value (if the factor undertakes the collection function). In either case, the face value on the basis of which the fee is computed includes any accounts receivable that the client accepts from customers even though the factor is unwilling to assume the risk of loss on those accounts receivable. The factor determines the rate at which fees are charged on the basis of the initial credit investigation and of whether the factor undertakes collection and bookkeeping.

To facilitate collection, according to the commentator, factors generally take legal title to the accounts receivable either at the time of, or shortly after, the sales transactions. If the factor performs all collection, the factor may take title to all accounts receivable as soon as they are issued by the customers. If, however, the client retains the initial collection responsibilities for a specified short period of time, the factor may take title at the end of that period only to those accounts receivable that are not paid within that period. If the factor guarantees the accounts receivable and collects, the factor pays the client, net of the factor's fees, either soon after the receivables are collected or by a specified time if the receivables have not been collected. If the receivables are not guaranteed, the client receives payment only if and when the customer pays. The commentator explained that, if the factor has guaranteed the receivables, the factor has the right to recovery against a customer. If the factor does not guarantee the receivable and

assumes collection responsibility, the factor assigns title back to the client when the receivables become uncollectible under the contract.

For some clients, the factor also provides liquidity by advancing funds against the client's aggregate accounts receivable. Advances are made based on the factor's assessment of the client's creditworthiness and are treated as a reduction of the amount the factor owes the client when the receivables are collected or, if the receivables are guaranteed, when the factor is required to pay the client under the guarantee. These advances are satisfied by the factor reducing the payments otherwise owed to the client. Interest is charged for the period of the outstanding advances, and the interest provides additional income to the factor over and above the fees for the credit investigation, credit guarantee, collection, and bookkeeping functions.

The commentator urged that the unique aspects of these three-party relations make it extremely difficult for factors to report discharges under section 6050P. The commentator pointed out that, although the factor may hold title to a customer account receivable at the time the account receivable is discharged, the client is the one with a direct relation with the customer. Even if the factor agreed to guarantee accounts receivable of a customer, that decision may have been made after an inquiry into the characteristics of the client's customers as a group, without any specific knowledge about the particular customer. Thus, the factor may know nothing about a customer that happens to be in default.

For these reasons, the commentator suggested that reporting under section 6050P should be the responsibility of the client, which has, or had, a direct relation with the debtor. The commentator further suggested that, if factors are required to report, the $600 dollar threshold should be increased or any inclusion of the debtor's taxpayer identification number (TIN) should be optional.

The reporting requirements under section 6050P fall on the entity that owns the debt that is discharged. In the case of the transactions that the commentator called "factoring," therefore, it is necessary to determine who is the owner of the account receivable for Federal tax purposes. This determination has to be made on the basis of all the facts and circumstances.

The first question is whether the lending of money is a significant trade or business of the factor for the taxable year. This will be the case if, on a

regular and continuing basis during the calendar year, the factor makes advances to the clients or acquires the clients' accounts receivable. If the factor is an applicable entity for purposes of section 6050P(c)(2)(D), the second question is whether the factor owned the account receivable for Federal tax purposes when the account receivable was discharged. Section 6050P(c)(2)(D) does not require reporting by a factor if the factor was not the owner of the account receivable for Federal tax purposes at the time of the identifiable event marking the discharge.

The final regulations do not provide guidance on whether a factoring transaction should be treated as a purchase of accounts receivable for Federal tax purposes. Whether or not a factoring transaction is treated as a purchase for Federal tax purposes depends on the facts and circumstances of each transaction. The final regulations provide an example describing the reporting obligations if an account receivable is treated as purchased for Federal tax purposes and, alternatively, if it is not treated as purchased. This example, however, is not intended to address whether a purchase has taken place for Federal tax purposes, and, thus, no inference is intended concerning the character of the transactions addressed in these regulations for purposes of section 6050P or for other provisions, including for purposes of determining effectively connected income of a foreign factor under § 1.864–4(c)(5).

After evaluating the concerns described by the commentator and the requirements imposed by section 6050P, the IRS and the Treasury Department believe that the reporting requirements of these final regulations, combined with the January 1, 2005, effective date, provide reasonable and administrable rules and are consistent with the general requirements applicable to information reporting. The final regulations, therefore, do not adopt the recommendation that the $600 threshold be raised for debt obligations acquired from persons other than the debtor, nor do the final regulations adopt the recommendation that a factor be allowed to report discharges without the debtor's TIN. The $600 threshold and the requirement to include the debtor's TIN derive from section 6050P.

(ii) *Filer May Request a Waiver of Penalty if the Filer Cannot Obtain the Debtor's TIN.*—If section 6050P requires an applicable entity to file an information return, the applicable entity may request a waiver under section 6724 of any information reporting penalties under section 6721 and 6722.

Under section 6724, the IRS may waive the penalties if the failure is due to reasonable cause and is not due to willful neglect. Therefore, upon a showing of reasonable cause, the IRS may waive the penalty under section 6721 for failure to file complete and correct information returns (including the failure to include a TIN) and the penalty under section 6722 for failure to furnish complete and correct information statements (including the failure to include a TIN).

Under § 301.6724–1(a)(2)(ii), a penalty may be waived for reasonable cause if the failure arose from events beyond the filer's control. Section 301.6724–1(c)(6)(i) provides that events beyond the filer's control include the failure of another person to provide the information necessary for the filer to file a correct information return. Section 301.6724–1(a)(2) of the regulations provides that to establish reasonable cause, the filer must have acted in a responsible manner both before and after the failure occurred. Section 301.6724–1(e) provides that a filer must undertake to act in a responsible manner in order to establish reasonable cause for failure to include a TIN (the TIN solicitation rules).

Section 1.6050P–1(e)(6) of the existing final regulations provides special TIN solicitation rules for discharges of indebtedness. Under these rules, a filer must undertake to act in a responsible manner for purposes of section 6724 and the regulations. Section 1.6050P–1(e)(6) provides that a TIN obtained at the time of the indebtedness satisfies the solicitation requirements, unless the entity required to file knows that the TIN is incorrect. The regulations require the filer to solicit the debtor's TIN if it has not obtained the debtor's TIN prior to the occurrence of an identifiable event marking the discharge of indebtedness. The regulations further provide that, if the filer solicits the debtor's TIN in the manner described in § 301.6724–1(e)(1)(i) and (2), the filer is deemed to have acted in a responsible manner for purposes of section 6724. Section 1.6050P–1(e)(6)(ii) contemplates that the filer may undertake the TIN solicitation after the occurrence of the identifiable event. Therefore, a factor that fails to include a debtor's TIN on the required information return and information statement may request a waiver of penalties and may establish reasonable cause under section 6724 if it complies with the special TIN solicitation rules in § 1.6050P–1(e)(6).

### D. Related Sellers of Nonfinancial Goods or Services

Commentators requested clarification as to whether a finance company that acquires installment sales contracts from a related seller should be considered an organization that has a significant trade or business of lending money even if the seller would qualify for the exception to reporting for seller-financing transactions. Specifically, the commentators urged that a finance company related to a commonly owned automobile dealership not be required to report the discharge of an installment sales contract that originated between the automobile dealership and an automobile purchaser.

The preamble to the proposed regulations explains that section 6050P(c)(2)(D) applies on an entity-by-entity basis and that the seller-financing exception is not available to a separate financing subsidiary of a retailer. The 1999 Act took an entity-by-entity approach when it expanded the scope of section 6050P to reach "any organization a significant trade or business of which is the lending of money (such as finance companies and credit card companies *whether or not affiliated with financial institutions*)." *See* Joint Committee on Taxation Staff, *General Explanation of Tax Legislation Enacted in the 106th Congress*, 107th Cong., 1st Sess. 48 (2001) (emphasis added). The final regulations, therefore, do not adopt the recommendation to provide an exception to reporting for a company that finances purchases by the customers of a separate, but related, seller of nonfinancial goods or services.

### E. Reporting Amounts That Section 108 Excludes From the Debtor's Income

Several commentators noted that often debtors may be insolvent at the time the debt is discharged and that, in these cases, the discharge is excludable from income under section 108(a)(1)(B). The legislative history to section 6050P, however, reflects that Congress intended entities to report discharges regardless of whether the debtor is subject to tax on the discharged debt, including whether the discharge qualifies for exclusion under section 108. *See* H.R. Conf. Rep. No. 213, 103d Cong., 1st Sess. 671 (1993). This principle is reflected in the general rule of § 1.6050P–1(a)(3) of the existing final regulations and is not changed by this Treasury Decision. The existing regulations provide, "Except as otherwise provided in [§ 1.6050P–1], discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the

discharged debt under sections 61 and 108 or otherwise by applicable law."

### F. Reporting Discharges of FFELP Loans

Other commentators requested clarification on the information reporting requirements for public, nonprofit guarantors that participate in the Federal Family Education Loan Program (FFELP) if the debtor defaults on the FFELP loan. According to the comments, a typical FFELP transaction involves a borrower, a lender (such as a bank, savings and loan association, credit union, school, or state or private nonprofit agency), a state or private nonprofit organization (guaranty agency), and the U.S. Department of Education. If a guaranty agency receives a default claim for nonpayment of a FFELP student loan, the guaranty agency generally pays a percentage of the outstanding balance to the holder of the loan. The U.S. Department of Education, in turn, reimburses the guaranty agency for a percentage of the default claim paid to the holder of the loan. The guaranty agency then acts on behalf of the U.S. Department of Education collecting against the borrower and remitting any amount collected, less a percentage for collection costs, to the U.S. Department of Education.

One commentator suggested that the activities of the guaranty agency do not constitute the lending of money. This commentator suggested that guarantors of FFELP student loans are not applicable entities as defined in section 6050P(c)(2)(D). Another commentator suggested that the final regulations provide that the information reporting requirements under section 6050P do not apply to any student loan made under Title IV of the Higher Education Act, including student loans under the FFELP.

The information reporting requirements under section 6050P apply to student loans made under Title IV of the Higher Education Act. If the owner of the student loan for Federal tax purposes is an entity or organization that is an applicable entity within the meaning of section 6050P(c)(1), the owner must report under section 6050P upon the occurrence of an identifiable event marking the discharge of the indebtedness.

### 2. Comments Concerning the Existing Final Regulations

Several commentators raised issues relating to the reporting requirements in § 1.6050P–1 of the existing final regulations. These comments are beyond the scope of this regulation project, which addresses whether an

organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D), but these comments may be addressed in future guidance.

A. Amounts Forgiven Pursuant to the Terms of a Loan

Commentators requested clarification as to whether an organization is required to report amounts forgiven pursuant to the terms of a debt obligation, including loan forgiveness under the FFELP upon a stated event (such as death, disability, or satisfaction of the service requirements of the Teacher Loan Forgiveness Program). The IRS may issue future guidance under section 6050P addressing amounts forgiven pursuant to the terms of a debt obligation for purposes of section 6050P. Pending issuance of future guidance, applicable entities will not be subject to penalties under section 6721 and section 6722 for failure to report under section 6050P amounts forgiven pursuant to the terms of a debt obligation.

B. Amounts That Are Defined as "Indebtedness" Under § 1.6050P–1(c) of the Existing Final Regulations but That Do Not Arise in the Context of a Money-Lending Transaction

One commentator requested clarification of the information reporting requirements for amounts that are owed to an organization but that do not arise in the context of a money-lending transaction. The commentator suggested that the definition of indebtedness in § 1.6050P–1(c) of the existing final regulations should be revised to require reporting only of discharged amounts that would give rise to income under section 61(a)(12) and that the definition should cover only amounts arising in money-lending transactions. Alternatively, the commentator suggested that amounts owed that arise in non-money-lending transactions should not be "indebtedness" for purposes of section 6050P unless, and until, reduced to judgment. This commentator also suggested that discharges of amounts such as fees, penalties, administrative costs, and fines should not be subject to reporting under section 6050P regardless of whether the transaction is a money-lending transaction. Section 1.6050P–1(d)(3) of the existing final regulations provides an exception to reporting for discharges of these amounts only in lending transactions.

In particular, the commentator was concerned about amounts arising in leasing transactions. An organization that engages only in transactions that

are treated as leases, and not as sales, for Federal tax purposes is not required to report under section 6050P, because leasing is not lending money for purposes of section 6050P(c)(2)(D) and § 1.6050P–2(a). However, if an organization is otherwise engaged in a significant trade or business of lending money and is also engaged in leasing transactions, the existing final regulations under section 6050P would require the organization to report the discharge of any amount owed to it, including fees, administrative costs, and fines for the non-lending leasing transactions.

The IRS and the Treasury Department may issue future guidance under section 6050P addressing the requirements for reporting amounts discharged in non-lending transactions. Pending issuance of future guidance, applicable entities will not be subject to penalties under section 6721 and section 6722 for failure under section 6050P to report amounts discharged in non-lending transactions.

**Effective Date**

In order to give organizations that are subject to section 6050P(c)(2)(D) time to comply with the reporting requirements of section 6050P, these regulations apply to discharges that occur on or after January 1, 2005.

**Special Analyses**

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because the regulations do not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding this regulation was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

**Drafting Information**

The principal author of these final regulations is Joseph P. Dewald, Office of Associate Chief Counsel (Procedure and Administration), Administrative Provisions and Judicial Practice Division. However, other personnel from the IRS and Treasury Department participated in the development of the regulations.

**List of Subjects**

*26 CFR Part 1*

Income taxes, Reporting and recordkeeping requirements.

*26 CFR Part 602*

Reporting and recordkeeping requirements.

**Adoption of Amendment to the Regulations**

■ Accordingly, 26 CFR parts 1 and 602 are amended as follows:

**PART 1—INCOME TAXES**

■ **Paragraph 1.** The authority citation for part 1 is amended by adding an entry in numerical order to read, in part, as follows:

**Authority:** 26 U.S.C. 7805. * * *
Section 1.6050P–2 also issued under 26 U.S.C. 6050P. * * *

■ **Par. 2.** Section 1.6050P–0 is amended as follows:
■ 1. The introductory text is amended by adding the language "and § 1.6050P–2" immediately after the language "§ 1.6050P–1".
■ 2. The entry for § 1.6050P–1 is amended by removing the word "financial".
■ 3. The entry for § 1.6050P–1(e)(2)(v) is added.
■ 4. The entries for §§ 1.6050P–1(e)(5) through (e)(8) are redesignated as entries for §§ 1.6050P–1(e)(6) through (e)(9) and a new entry for § 1.6050P–1(e)(5) is added.
■ 5. The entries for § 1.6050P–2 are added.
The additions read as follows:

**§ 1.6050P–0   Table of contents.**

* * * * *

**§ 1.6050P–1   Information reporting for discharges of indebtedness by certain entities.**

* * * * *
    (e) * * *
    (2) * * *
    (v) No double reporting.
* * * * *
    (5) Entity formed or availed of to hold indebtedness.

* * * * *

**§ 1.6050P–2   Organization a significant trade or business of which is the lending of money.**

    (a) In general.
    (b) Safe harbors.
    (1) Organizations not subject to section 6050P in the previous calendar year.
    (2) Organizations that were subject to section 6050P in the previous calendar year.

(3) No test year.

(c) Seller financing.

(d) Gross income from lending of money.

(e) Acquisition of an indebtedness from a person other than the debtor included in lending money.

(f) Test year.

(g) Predecessor organization.

(h) Examples.

(i) Effective date.

■ **Par. 3.** Section 1.6050P–1 is amended as follows:

■ 1. The section heading for § 1.6050P–1 is amended by removing the word "financial".

■ 2. Paragraphs (a)(1), (b)(2)(i)(F), (c), (e)(2)(i), (e)(3), (e)(7), (f)(1) introductory text, (f)(1)(ii), and (f)(2) are amended by removing the word "financial".

■ 3. The first sentence of paragraph (c) is amended by adding the language "and § 1.6050P–2" immediately after the word "section".

■ 4. Paragraph (e)(2)(v) is added.

■ 5. Paragraph (e)(4) is amended by removing "6050P(c)(1)(A)" each time it appears and adding "6050P(c)(2)(A)" in its place and by removing "6050P(c)(1)(C)" and adding "6050P(c)(2)(C)" in its place.

■ 6. Paragraphs (e)(5) through (e)(8) are redesignated as (e)(6) through (e)(9) and a new paragraph (e)(5) is added.

■ 7. Paragraph (e)(7)(i), as redesignated, is amended by removing "(e)(6)" where it appears and adding "(e)(7)" and paragraph (e)(7)(ii), as redesignated, is amended by removing "(e)(6)(i)" where it appears and adding "(e)(7)(i)" in its place.

■ 8. Paragraph (h)(1) is amended by adding "and, except paragraph (e)(5) of this section, which applies to discharges of indebtedness occurring after December 31, 2004.", immediately after the language "1994".

The additions read as follows:

### § 1.6050P–1   Information reporting for discharges of indebtedness by certain entities.

\*    \*    \*    \*    \*

(e) \*  \*  \*

(2) \*  \*  \*

(v) No double reporting. If multiple creditors are considered to hold interests in an indebtedness for purposes of this paragraph (e)(2) by virtue of holding ownership interests in an entity, and the entity is required to report a discharge of that indebtedness under paragraph (e)(5) of this section, then the multiple creditors are not required to report the discharge of indebtedness.

\*    \*    \*    \*    \*

(5) Entity formed or availed of to hold indebtedness. Notwithstanding

§ 1.6050P–2(b)(3), if an entity (the transferee entity) is formed or availed of by an applicable entity (within the meaning of section 6050P(c)(1)) for the principal purpose of holding indebtedness acquired (including originated) by the applicable entity, then, for purposes of section 6050P(c)(2)(D), the transferee entity has a significant trade or business of lending money.

\*    \*    \*    \*    \*

■ **Par. 4.** Section 1.6050P–2 is added to read as follows:

### § 1.6050P–2   Organization a significant trade or business of which is the lending of money.

(a) In general. For purposes of section 6050P(c)(2)(D), the lending of money is a significant trade or business of an organization in a calendar year if the organization lends money on a regular and continuing basis during the calendar year.

(b) Safe harbors—(1) Organizations not subject to section 6050P in the previous calendar year. For an organization that was not required to report under section 6050P in the previous calendar year, the lending of money is not treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money (as described in paragraph (d) of this section) in the organization's most recent test year (as defined in paragraph (f) of this section) is both less than $5 million and less than 15 percent of the organization's gross income for that test year.

(2) Organizations that were subject to section 6050P in the previous calendar year. For an organization that was required to report under section 6050P for the previous calendar year, the lending of money is not treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money (as described in paragraph (d) of this section) in each of the organization's three most recent test years is both less than $3 million and less than 10 percent of the organization's gross income for that test year.

(3) No test year. The lending of money is not treated as a significant trade or business for an organization for the calendar year in which the lending occurs if the organization does not have a test year for that calendar year.

(c) Seller financing. If the principal trade or business of an organization is selling nonfinancial goods or providing nonfinancial services and if the organization extends credit to the

purchasers of those goods or services to finance the purchases, then, for purposes of section 6050P(c)(2)(D), these extensions of credit are not a significant trade or business of lending money.

(d) Gross income from lending of money. For purposes of this section, gross income from lending of money includes—

(1) Income from interest, including qualified stated interest, original issue discount, and market discount;

(2) Gains arising from the sale or other disposition of indebtedness;

(3) Penalties with respect to indebtedness (whether or not the penalty is interest for Federal tax purposes); and

(4) Fees with respect to indebtedness, including merchant discount or interchange (whether or not the fee is interest for Federal tax purposes).

(e) Acquisition of an indebtedness from a person other than the debtor included in lending money. For purposes of this section, lending money includes acquiring an indebtedness not only from the debtor at origination but also from a prior holder of the indebtedness. Gross income arising from indebtedness is gross income from the lending of money without regard to who originated the indebtedness. If an organization acquires an indebtedness, the organization is required to report any cancellation of the indebtedness if the organization is engaged in a significant trade or business of lending money.

(f) Test year. For any calendar year, a test year is a taxable year of the organization that ends before July 1 of the previous calendar year.

(g) Predecessor organization. If an organization acquires substantially all of the property that was used in a trade or business of some other organization (the predecessor) (including when two or more corporations are parties to a merger agreement under which the surviving corporation becomes the owner of the assets and assumes the liabilities of the absorbed corporation(s)) or was used in a separate unit of the predecessor, then whether the organization at issue qualifies for one of the safe harbors in paragraph (b) of this section is determined by also taking into account the test years, reporting obligations, and gross income of the predecessor.

(h) Examples. The rules of this section are illustrated by the following examples:

Example 1. (i) Facts. Finance Company A, a calendar year taxpayer, was formed in Year 1 as a non-bank subsidiary of Manufacturing Company and has no predecessor. A lends

money to purchasers of Manufacturing Company's products on a regular and continuing basis to finance the purchase of those products. A's gross income from stated interest in Year 1 is $4.7 million. In Year 1, A's gross income from fees and penalties with respect to the indebtedness is $0.5 million, and A has no other gross income from lending money within the meaning of paragraph (d) of this section.

(ii) *Results.* Section 6050P does not require A to report discharges of indebtedness occurring in Years 1 or 2, because A has no test year for those years. Notwithstanding that A lends money in those years on a regular and continuing basis, under paragraph (b)(3) of this section, A does not have a significant trade or business of lending money in those years for purposes of section 6050P(c)(2)(D). However, for Year 3, A's test year is Year 1. A's gross income from lending in Year 1 is not less than $5 million for purposes of the applicable safe harbor of paragraph (b)(1) of this section. Because A lends money on a regular and continuing basis and does not meet the applicable safe harbor, section 6050P requires A to report discharges of indebtedness occurring in Year 3.

*Example 2.* (i) *Facts.* The facts are the same as in *Example 1,* except that A is a division of Manufacturing Company, rather than a separate subsidiary. Manufacturing Company's principal activity is the manufacture and sale of non-financial products, and, other than financing the purchase of those products, Manufacturing Company does not extend credit or otherwise lend money.

(ii) *Results.* Under paragraph (c) of this section, that financing activity is not a significant trade or business of lending money for purposes of section 6050P(c)(2)(D), and section 6050P does not require Manufacturing Company to report discharges of indebtedness.

*Example 3.* (i) *Facts.* Company B, a calendar year taxpayer, is formed in Year 1. B has no predecessor and a part of its activities consists of the lending of money. B packages and sells part of the indebtedness it originates and holds the remainder. B is engaged in these activities on a regular and continuing basis. For Year 1, the sum of B's gross income from sales of the indebtedness, plus other income described in paragraph (d) of this section, is only $4.8 million, but it is 16% of B's gross income in Year 1.

(ii) *Results.* Because B lends money on a regular and continuing basis and does not meet the applicable safe harbor of paragraph (b)(1) of this section, section 6050P requires B to report discharges of indebtedness occurring in Year 3. B is not required to report discharges of indebtedness in Years 1 and 2 because B has no test year for Years 1 and 2.

*Example 4.* (i) *Facts.* The facts are the same as in *Example 3.* In addition, in each of Years 2, 3, and 4, the sum of B's gross income from sales of the indebtedness, plus other income described in paragraph (d) of this section, is less than both $3 million and 10% of B's gross income.

(ii) *Results.* (A) Because B was required to report under section 6050P for Year 3, the

applicable safe harbor for Year 4 is paragraph (b)(2) of this section, which is satisfied only if B's gross income from lending activities for each of the three most recent test years is less than both $3 million and 10% of B's gross income. For Year 4, even though B has only two test years, B's gross income in one of those test years, Year 1, causes B to fail to meet this safe harbor. Accordingly, B is required to report discharges of indebtedness under section 6050P in Year 4. For Year 5, B's three most recent test years are Years 1, 2, and 3. However, B's gross income from lending activities in Year 1 is not less than $3 million and 10% of B's gross income. Accordingly, section 6050P requires B to report discharges of indebtedness in Year 5.

(B) For Year 6, B satisfies the applicable safe harbor requirements of paragraph (b)(2) of this section for each of the three most recent test years (Years 2, 3, and 4). Therefore, section 6050P does not require B to report discharges of indebtedness in Year 6. Because B is not required to report for Year 6, the applicable safe harbor for Year 7 is the one contained in paragraph (b)(1) of this section, and thus the only relevant test year is Year 5.

*Example 5.* (i) *Facts.* (A) Company C, a calendar year taxpayer, was formed in Year 1 and, on a regular and continuing basis, enters into the following transactions with its clients, all of whom are unrelated parties to C. C does not have any other income.

(B) C's clients sell goods to customers, frequently accepting as payment accounts receivable that are due in 30 to 90 days. Under a contract with each client, C investigates the creditworthiness of the client's customers with respect to the prospective sales, and, for each customer, C determines whether, and to what extent, C is willing to assume the risk of loss on accounts receivable to be issued by the customer. C's decision whether to assume risk of loss may be based on an evaluation of the credit quality of particular customers or on the aggregate credit quality of all of the client's prospective customers. If C is unwilling to assume the risk, the client either may refuse to extend any credit to the customer or may accept the account receivable and bear the risk of loss.

(C) Pursuant to some contracts between C's clients and C, C's clients assign legal title to the accounts receivable to C when the accounts receivable are issued by the customers. For these accounts receivable, C agrees to undertake collections and to remit the amounts collected to the client, less a fee of 0.70 percent of the face value of the accounts receivable. Pursuant to other contracts between C's clients and C, C's clients retain legal title to the accounts receivable and retain the initial collection responsibility. For these accounts receivable, C's fee is reduced to 0.35 percent. Both groups of accounts receivable include accounts receivable for which C has assumed the risk of loss and accounts receivable for which C has not assumed the risk of loss.

(D) Based on all the facts and circumstances, C acquires ownership for Federal tax purposes of some, but not all, of the accounts receivable that it has agreed to collect and of some, but not all, of the

accounts receivable for which the client has retained collection responsibility.

(E) In Year 1, C's total fee income with respect to accounts receivable of which it acquired tax ownership was $2 million. C's fee income in Year 1 from accounts receivable of which it did not acquire tax ownership was $700,000. C does not have any other income for Year 1.

(F) In Year 3, there were discharges of $950,000, representing $100,000 of customer defaults on those accounts receivable of which C was the owner for Federal tax purposes at the time of the identifiable event marking the discharge and $850,000 of customer defaults on the accounts receivable of which the clients, and not C, were the owner. Whenever C determined the uncollectibility of an account receivable for which it had not assumed the risk of loss, C reassigned title to the account receivable to the appropriate client. Each defaulting customer defaulted on an account receivable with an outstanding balance of at least $600.

(ii) *Results.* (A) For Year 3, C's test year is Year 1. Under paragraph (e) of this section, C's $2 million fee income from the accounts receivable of which it acquired tax ownership is "gross income from lending money" for purposes of paragraph (b) of this section, because C was the owner of the accounts for Federal tax purposes. Under paragraph (e) of this section, C's $700,000 fee income from the accounts receivable of which it did not acquire tax ownership is not "gross income from lending money" for purposes of paragraph (b) of this section, because C was not the owner of the accounts receivable for Federal tax purposes. In Year 1, therefore, C's gross income from lending money is less than $5 million but is not less than 15% of C's gross income. Because C lends money on a regular and continuing basis and does not meet the applicable safe harbor, section 6050P requires C to report discharges of indebtedness occurring in Year 3.

(B) In Year 3, section 6050P requires C to report the $100,000 of discharges of the accounts receivable of which C was the owner for Federal tax purposes at the time of the identifiable event marking the discharge. Unless an exception to reporting under paragraph (b) or (c) of this section applies, section 6050P requires C's clients to report the $850,000 of discharges of the accounts receivable of which C did not become the owner.

(i) *Effective date.* This section applies to discharges of indebtedness occurring on or after January 1, 2005.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

■ **Par. 5.** The authority citation for part 602 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

■ **Par. 6.** In § 602.101, paragraph (b) is amended by removing two entries from the table as follows:

## § 602.101   OMB Control numbers.

\*    \*    \*    \*    \*

(b) * * *

| CFR part or section where identified and described | Current OMB control No. |
|---|---|
| * * * * * | |
| 1.6050P–1 ................................ | 1545–1419 |
| 1.6050P–1T ............................... | 1545–1419 |
| * * * * * | |

Approved: October 18, 2004.

**Mark E. Matthews,**

*Deputy Commissioner for Services and Enforcement.*

**Gregory F. Jenner,**

*Assistant Secretary of the Treasury.*

[FR Doc. 04–23747 Filed 10–22–04; 8:45 am]

**BILLING CODE 4830–01–P**

---

**DEPARTMENT OF VETERANS AFFAIRS**

**38 CFR Parts 1 and 2**

**RIN 2900–AK10**

**Standards for Collection, Compromise, Suspension, or Termination of Collection Effort, and Referral of Civil Claims for Money or Property; Regional Office Committees on Waivers and Compromises; Salary Offset Provisions; Delegations of Authority**

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** This final rule revises the Department of Veterans Affairs (VA) regulations concerning the collection, compromise, suspension, termination, and referral of debts owed to VA. The revision clarifies and simplifies debt collection standards and reflects changes to Federal debt collection procedures under the Debt Collection Improvement Act of 1996. VA is also amending regulations pertaining to the administration of regional office Committees on Waivers and Compromises, as well as provisions pertaining to debt collection and to the Chief Financial Officer in the delegations of authority regulations. Other nonsubstantive changes are made for purposes of clarification.

**DATES:** *Effective Date:* November 24, 2004.

**FOR FURTHER INFORMATION CONTACT:** Peter Mulhern, Cash and Debt Management Division (047GC1), Department of Veterans Affairs, 810 Vermont Ave., NW., Washington, DC 20420, (202) 273–5570.

**SUPPLEMENTARY INFORMATION:** On December 29, 2003, VA published in the **Federal Register** (68 FR 74893) a proposed rule to bring VA's debt collection regulations into compliance with the provisions of the Debt Collection Improvement Act of 1996 (DCIA), Public Law 104–134, 110 Stat. 1321, 1358 (April 26, 1996), the subsequent revision of the Federal Claims Collection Standards (FCCS)(31 CFR parts 900 through 904) by the Department of the Treasury (Treasury) and the Department of Justice in 2000, and with Treasury's additional rules in 31 CFR part 285. VA's current debt collection regulations include tools such as offset of VA benefit payments, assessment of interest and late payment charges, use of consumer reporting and private collection agencies, and Federal salary offset. We proposed to add to VA's debt collection regulations more collection tools now authorized by the DCIA and revised FCCS. These tools include centralized administrative offset through the use of the Treasury Offset Program (TOP), the transfer or referral of delinquent debt to Treasury for collection (cross-servicing), and administrative wage garnishment. We also proposed to amend our debt collection regulations by deleting provisions that are either obsolete or duplicative of Treasury and Treasury/ DOJ regulations, as well as to ensure that our regulations are consistent with statutory mandates and that they are clearly written.

In addition, VA proposed to amend a regulation pertaining to the Committees on Waivers and Compromises to allow each station Director the authority to appoint the person responsible for the Committee's administrative control. Our current regulation, which states that the station Fiscal Officer must have administrative control authority, does not allow the station Director any discretion in this matter.

We further proposed to amend a regulation so that VA's Chief Financial Officer (CFO) would have the ability to redelegate debt collection authority to administration heads and staff office directors as the CFO deems appropriate.

We provided a 60-day comment period which ended on February 27, 2004. We received two submissions in response to our invitation for comments on the proposed regulations. One, from an individual, discussed the individual's experience with VA after VA informed him that an overpayment existed due to his son's dropping out of college, and said that VA had withheld almost all of a monthly payment of benefits (which he asserted was without prior notice). He said that the VA employee he contacted had not been aware of an allegedly larger amount VA owed him due to an increase in the number of his children. He asserted that VA's efficiency in the measures involved in collecting a debt are far ahead of those involved in paying veterans their benefits, and asked for help in putting "customer needs (benefit payments) first." He did not say whether he thought rulemaking changes could provide the help he was requesting nor whether adoption of the proposed rule would itself help, and we see no need for changes in the proposed rule to be made based on this submission. The other submission, from the Disabled American Veterans (DAV), is discussed below.

DAV states that our proposed new paragraph (c)(4) in 38 CFR 1.912a violates 38 U.S.C. 5314(b). This new paragraph states that VA will begin collection action from VA benefit payments after an initial adverse decision on a debtor's request for waiver or the debtor's informal dispute of the existence or amount of a benefit debt. DAV argues that there is no statutory change to section 5301(c) or section 5314 justifying the addition of this provision, and that VA provides no explanation of this change in the preamble. DAV notes that the preamble cites the DCIA as the authority for most of the changes for our proposed rulemaking. DAV notes further that the DCIA's principal amendments to strengthen debt collection authority included amendments to the administrative offset provisions of 31 U.S.C. 3716. DAV correctly states that while collections under 38 U.S.C. 5301(c) must be conducted in accordance with procedures prescribed in 31 U.S.C. 3716, collections under 38 U.S.C. 5314 are not subject to the general provisions applicable to other claims collections as set forth in 31 U.S.C. 3716. According to DAV, there is no statutory authority or other explanation for our proposed new paragraph (c)(4) in 38 CFR 1.912a.

The preamble to the proposed rule did contain an explanation that encompassed the proposed change to add paragraph (c)(4) to 38 CFR 1.912a, since it is one of the changes that was proposed to ensure that our debt collection regulations are consistent with statutory mandates and clearly written (68 FR 74893, 74894). DAV is correct that there is no statutory change to 38 U.S.C. 5301(c) or 5314 that pertains to the addition of this provision. However, we believe that DAV is incorrect in stating that our proposed new paragraph violates section 5314(b).

2 of 12 DOCUMENTS

Copyright © 2006 The Bureau of National Affairs, Inc.
TaxCore(R)

Volume 6, Number 6

Jan. 10, 2006

IRS Documents
Information Letters

INFO 2005-0208 - IRC Section 6050P - Returns Relating to the Cancellation of Indebtedness by Certain Entities

Related To: IRC Section 6050P

Document Date: October 07, 2005

**TEXT:** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

OFFICE OF CHIEF COUNSEL

October 07, 2005

Number: INFO 2005-0208 CC:PA:APJP:B01
Release Date: 12/30/05 GENIN-130393-05
UIL: 6050P.00-00

Dear * * * :

This letter responds to your request for information dated May 18, 2005, regarding the requirements under section 6050P of the Internal Revenue Code (Code) for reporting cancellation of indebtedness. Specifically, you request information concerning the reporting requirements under section 6050P(c)(2)(D) for organizations that purchase debt.

You state that your association's members are organizations that purchase debt for less than the face value of the debt. You also state that these organizations generally pursue collection activity on purchased debts until the collection activity is either prohibited by law or the period for reporting the debt to a credit reporting agency expires.

You state that an organization may purchase debt for a lump sum amount and may not know the breakdown of that amount into principal, interest, charges, and fees. Often these debts are settled for an amount less than the full amount owed. The typical settlement arrangement provides that the debtor will pay an amount equal toot approximating the principal balance due and that all interest, fees, and charges (to the extent these amounts can best be determined or estimated) will be discharged.

You requested clarification on the section 6050P reporting rules in the form of published guidance or a private letter ruling. The Internal Revenue Service (Service) has decided to address your inquiries in the form of an information letter rather than published guidance or a private letter ruling. Before issuing the final regulations under section 6050P(c)(2)(D) of the Code, the Service published a notice of proposed rulemaking in the Federal Register on June 13, 2002. See 67 F.R. 40629. The notice of proposed rulemaking contained a rule that, for purposes of section 6050P(c)(2)(D), "lending money" includes acquiring an indebtedness. See section 1.6050P-2(e) of the proposed regula-

tions. The notice of proposed rulemaking provided the opportunity for public comment; the Service did not receive any comments from organizations that purchase debt on the rule in section 1.6050P-2(e) before issuing the final regulations. The * * * Service is not in a position to address your concerns in published guidance at this time. In addition, your request does not meet the requirements of a private letter ruling request set forth in Rev. Proc. 2005-1,2005-1 I.R.B. 1.

Your inquiry poses several specific questions. We have grouped the questions and answers into the following categories.

Q1. Who is required to report a discharge of indebtedness under section 6050P of the Code and when does the requirement to report arise?

Al. Section 6050P(a) of the Code provides that any applicable entity that discharges indebtedness of any person during a calendar year must file an information return reporting the discharge. Section 6050P(b) provides that no information reporting is required under section 6050P(a) if the amount of the discharge is less than $600. Section 6050P(c)(2)(D) defines an "applicable entity" to include an organization with a significant trade or business of lending money.

Section 1.6050P-2(a) of the Income Tax Regulations (regulations) provides that lending money is a significant trade or business if the organization lends money on a regular and continuous basis during the calendar year. Section 1.6050P-2(e) provides that lending money includes acquiring an indebtedness. An organization that purchases debt may be an organization with a significant trade or business of lending money for purposes of section 6050P(c)(2)(D) of the Code and the regulations. The section 6050P(c)(2)(D) reporting requirements apply to discharges of indebtedness that occur on or after January 1, 2005. See section 1.6050P-2(i).

The reporting requirements of section 6050P of the Code and the regulations apply on a calendar year basis. Section 1.6050P-1 of the regulations provides that, upon the occurrence of an identifiable event during a calendar year, an applicable entity must report cancellation of indebtedness of $600 or more during the calendar year unless an exception to reporting applies. Section 1.6050P-1(b)(2)(i) provides eight identifiable events that trigger reporting of cancellation of indebtedness.

Q.2. How does the 36-month non-payment testing period identifiable event apply to an organization that purchases debt, and how may the organization rebut the presumption that this identifiable event has occurred?

A2. Section 1.6050P-1 (b)(2)(i)(H) of the regulations provides a rebuttable presumption that an identifiable event has occurred during a calendar year if a creditor has not received a payment during a 36 month testing period ending at the close of the year. In applying the non-payment testing period to an organization that purchases debt on December 31 of each year, the organization must determine how long it has not received payment. See section 1.6050P-1(b)(2)(iv).

The section 6050P(c)(2)(D) reporting requirements apply to discharges of indebtedness that occur on or after January 1,2005. See section 1.6050P-2(i). If the non-payment testing period identifiable event, or any other identifiable event, occurred prior to the effective date of section 1.6050P-2, no reporting is required upon the occurrence of a subsequent identifiable event. If, however, an identifiable event has not occurred before the effective date of section 1.6050P-2, an organization must determine if an identifiable event, including the non-payment testing period identifiable event, has occurred during 2005 or during any subsequent year for purposes of section 6050P reporting.

An organization can rebut the presumption that the non-payment testing period identifiable event occurred by engaging in significant, bona fide collection activity during the last 12 months that is more than nominal or ministerial. See section 1.6050P-l(b)(2)(iv) of the regulations. This would require the organization to pursue collection activity beyond merely generating an automated mailing. See section 1.6050P-l(b)(2)(iv)(A). The organization can also rebut the presumption if the facts and circumstances on January 31 of the following year indicate the debt has not been discharged. See section 1.6050P- 1(b)(2)(iv). The facts and circumstances may include the existence of a lien relating to the debt. See section 1.6050P-1(b)(2)(iv)(B).

Q3. How should an organization that purchases debt report discharges of indebtedness if it does not know the breakdown of an amount owed into principal, interest, charges, and fees?

A3. Section 1.6050P-1 (c) of the regulations provides that an "indebtedness" means any amount owed and may include stated principal, fees, stated interest, penalties, administrative costs and fines. However, a discharge of interest is not required to be reported (see section 1.6050P-1(d)(2)), and only discharges of stated principal are required to be reported in the case of a lending transaction (.see section 1.6050P-l(d)(3)).

Section 1.6050P-l(a)(1 ) of the regulations provides, in part, that an applicable entity must report the amount of the indebtedness discharged and any other information required by Form 1099-C, "Cancellation of Debt." The amount of the discharged debt is reported in Box 2. Any amount of interest that is included i n Box 2 is separately reported in Box 3. Accordingly, to report properly, an applicable entity must separately report the amount of discharged interest in Box 3 if it included the discharged interest in the total amount reported in Box 2.

If an applicable entity does not know the breakdown of a purchased debt into principal, interest, charges, and fees, it should try to obtain this information so that it can determine the amount of interest and principal discharged. If, however, the entity cannot obtain this information, the entity should report using the best available information. See Q&A8 for discussion of waiver of penalties for failure to file correct information returns and furnish correct information statements.

Q4. If an organization that purchases debt discharges an amount owed that includes interest and principal, is the organization required to report only discharges of stated principal of $600 or more?

A4. Section 6050P(b) of the Code provides that no information reporting is required under section 6050P(a) if the amount of the discharge is less than $600. Section 1.6050P-1 (a)(1) of the regulations provides that, except as provided in section 1.6050P-l(d), an applicable entity must report cancellation of indebtedness of $600 or more during a calendar year. Section 1.6050P-1 (c) defines indebtedness to mean any amount owed to an applicable entity, including stated principal, fees, stated interest, penalties, administrative costs, and fines. Section 1.6050P-1(d)(3) provides that an applicable entity is not required to report amounts other than stated principal in lending transactions. Section 1.6050P-2(e) provides that lending money includes acquiring an indebtedness.

Although section 1.6050P-1 (c) of the regulations provides a broad definition of what may constitute indebtedness for purposes of section 6050P of the Code, section 1.6050P-1(d)(3) provides that an applicable entity is required to report only stated principal in lending transactions. If an organization that purchases debt, which has a significant trade or business of lending money, discharges an amount owed that includes interest and principal, the organization is required to report only discharges of stated principal of $600 or more.

Q5. Does filing a Form 1099-C upon the occurrence of an identifiable event prohibit future collection activity on the amount reported?

A5. Section 1.6050P-1(a)(1) of the regulations provides that solely for purposes of the reporting requirements of section 6050P of the Code, a discharge of indebtedness is deemed to have occurred upon the occurrence of an identifiable event whether or not there is an actual discharge of indebtedness. Section 6050P and the regulations do not prohibit collection activity after a creditor reports by filing a Form 1099-C.

Q6. Is an organization that is required to report under section 6050P of the Code also required to notify a debtor that it will report a discharge of indebtedness prior to filing or that the discharge may be gross income?

A6. Section 6050P of the Code and the regulations do not require an applicable entity to notify a debtor that it will report a discharge of indebtedness prior to filing the Form 1099-C with the Service or that the discharge of indebtedness may be gross income. Section 6050P(d) provides, however, that an applicable entity required to file a return with the Service must also furnish a copy of the information return to the debtor.

Q7. Does section 6050P of the Code require collection attorneys, collection agencies, or organizations that purchase debt to notify a debtor of the tax consequences of a discharge of indebtedness resulting from a settlement at less than the full amount owed?

A7. Section 6050P of the Code and the regulations do not require collection attorneys, collection agencies, or applicable entities to notify a debtor of the tax consequences of a discharge of indebtedness resulting from a settlement at less than the full amount owed.

Q8. Does section 6050P of the Code or the regulations provide a safe harbor to protect a creditor who informs a debtor that it will report cancellation of indebtedness from inadvertent violations of the Fair Debt Collections Practices Act, state consumer protection laws, the Federal Trade Commission Act, and state deceptive trade practices acts?

A8. Section 6050P of the Code and the regulations do not provide a safe harbor to protect a creditor who informs a debtor that it will report cancellation of indebtedness from inadvertent violations of the Fair Debt Collections Practices Act, state consumer protection laws, the Federal Trade Commission Act, and state deceptive trade practices acts. How the information reporting requirements of section 6050P impact other Federal or state consumer laws is beyond the scope of regulations under section 6050P.

Q9. What penalties may the Service impose for failure to report under section 6050P of the Code, and are there circumstances in which the Service may waive the penalties?

A9. Section 6721 of the Code provides a penalty for failure to file correct information returns with the Service. The Service may impose the penalty for. (1) a failure to file an information return before the due date, or (2) a failure to include all of the information required to be shown on the return or the inclusion of incorrect information. The penalty amount under section 6721 is generally $50 for each return with respect to which a failure occurs, not to exceed $250,000 per filer/per year. There are exceptions to the penalty and limitations to the maximum penalty amount that may be imposed if the filer corrects the failure within a specified time period, if the filer's failures to include information are de minimis, or if the filer's gross receipts do not exceed certain amounts. See section 6721 (b)-(d). Section 6721(e) allows the Service to impose a higher penalty in the case of failures due to intentional disregard of filing requirements.

Section 6722 of the Code provides a penalty for a failure to furnish correct information statements. The Service may impose the penalty for. (1) failure to furnish an information statement on or before the due date, or (2) failure to include all of the information required to be shown on a n information statement or the inclusion of incorrect information. The penalty amount under section 6722 is $50 per failure, not to exceed $100,000 per filer/per year. Section 6722(c) allows the Service to impose a higher penalty in the case of failures due to intentional disregard.

Pursuant to section 6724 of the Code and the regulations, the Service may waive penalties under section 6721 and section 6722 if the filer can demonstrate that the failure is due to reasonable cause and not to willful neglect. A filer may obtain a waiver of the penalty if it can establish that either. (1) there are significant mitigating factors with respect to the failure, as described in section 301.6724-1 (b) of the Regulations on Procedure and Administration, or (2) the failure arose from events beyond the filer's control, as described in section 301.6724-1(c). In addition, the filer must demonstrate that it acted in a responsible manner, as described in section 301.6724-1(d), both before and after the failure occurred.

This letter calls your attention to certain general principles of the law. It is intended for informational purposes only and does not constitute a ruling. See Section 2.04 of Rev. Proc. 2005-1,2005-1 I.R.B. 1. If you have any additional questions, please contact our office at * * * .

Sincerely yours,

Donna Welch
 Senior Counsel, Administrative Provisions & Judicial Practice
 (Procedure & Administration)

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that the foregoing Memorandum in Support of

Motion to Dismiss and Opposing Motion for Temporary Restraining Order and

Preliminary Injunction was served upon counsel for the plaintiffs this 23d day of

January 2006, by electronic delivery and sending copies First Class mail, postage

prepaid, addressed to:

> Deborah J. Israel
> Louis J. Rouleau
> Womble Carlyle Sandridge & Rice
> 1401 Eye Street, N.W., 7th Floor
> Washington, D.C. 20005

> ___/s/ Jennifer L. Vozne___