IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DEBT BUYERS' ASSOCIATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:06-cv-00101-CKK |
| | ) | |
| JOHN W. SNOW, Secretary of the | ) | |
| Treasury, and MARK W. EVERSON, | ) | |
| Commissioner of Internal Revenue, | ) | |
| | ) | |
| Defendants | ) | |

Notice of Filing the Public Portions of the Internal Revenue
Service's Background File for 26 C.F.R. §1.6050P-2.

Attached are sixty-seven pages that comprise the Internal Revenue Service's

background files for 26 C.F.R. §1.6050P-2 available to the public.  These documents have

been redacted to remove only telephone numbers that appear to be "direct" numbers

for those submitting comments, as well as e-mail addresses for those individuals.

The Defendants are withholding the portions of the file that contain deliberative

material or documents otherwise privileged.  If ordered to do so by the Court, the

Defendants will file those documents in their entirety with the Court *in camera*, but object to producing them to the Association or the public.

Dated:  January 23, 2006                    Respectfully submitted,

                                            ___/s/ Jennifer L. Vozne_____
                                            DAVID A. HUBBERT
                                            JENNIFER L. VOZNE
                                            Trial Attorneys, Tax Division
                                            U.S. Department of Justice
                                            P.O. Box 227, Ben Franklin Station
                                            Washington, D.C. 20044
                                            (202) 307-6555 (202) 514-6866 (fax)
                                            COUNSEL FOR DEFENDANTS

OF COUNSEL:
KENNETH L. WAINSTEIN
United States Attorney

MERCEDEH MOMENI
Assistant United States Attorney

1514235.1

**SUPPLEMENTARY INFORMATION:** Phoenix Scientific, Inc., 3915 South 48th St. Ter., St. Joseph, MO 64503, filed a supplement to ANADA 200–265 that provides for use of PRAZI–C (praziquantel) Tablets for the removal of certain tapeworm parasites in dogs. Phoenix Scientific, Inc.'s PRAZI–C Tablets are approved as a generic copy of Bayer HealthCare LLC's Tape Worm Tabs approved under NADA 111–798. The supplemental ANADA is approved as of September 15, 2004, and the regulations are amended in 21 CFR 520.1870 to reflect the approval. The basis of approval is discussed in the freedom of information summary.

In accordance with the freedom of information provisions of 21 CFR part 20 and 21 CFR 514.11(e)(2)(ii), a summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

The agency has determined under 21 CFR 25.33(a)(1) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 520**

Animal drugs.

■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 520 is amended as follows:

**PART 520—ORAL DOSAGE FORM NEW ANIMAL DRUGS**

■ 1. The authority citation for 21 CFR part 520 continues to read as follows:

    **Authority:** 21 U.S.C. 360b.

■ 2. Section 520.1870 is amended by revising paragraph (b)(2) to read as follows:

**§ 520.1870  Praziquantel tablets.**

\*   \*   \*   \*   \*

(b) \* \* \*

(2) No. 059130 for use of the product described in paragraph (a)(1) of this section, as in paragraph (c)(1) of this section.

\*   \*   \*   \*   \*

    Dated: October 14, 2004.

**Steven D. Vaughn,**

*Director, Office of New Animal Drug Evoluation, Center for Veterinary Medicine.*

[FR Doc. 04–23761 Filed 10–22–04; 8:45 am]

**BILLING CODE 4160–01–S**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Food and Drug Administration**

**21 CFR Part 524**

**Ophthalmic and Topical Dosage Form New Animal Drugs; Ivermectin Topical Solution**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA) is amending the animal drug regulations to reflect approval of an abbreviated new animal drug application (ANADA) filed by Norbrook Laboratories, Ltd. The ANADA provides for topical use of ivermectin on cattle for treatment and control of various species of external and internal parasites.

**DATES:** This rule is effective October 25, 2004.

**FOR FURTHER INFORMATION CONTACT:** Lonnie W. Luther, Center for Veterinary Medicine (HFV–104), Food and Drug Administration, 7519 Standish Pl., Rockville, MD 20855, 301–827–8549, e-mail: *lonnie.luther@fda.gov.*

**SUPPLEMENTARY INFORMATION:** Norbrook Laboratories, Ltd., Station Works, Newry BT35 6JP, Northern Ireland, filed ANADA 200–272 for NOROMECTIN (ivermectin) Pour On for Cattle. The application provides for topical use of 0.5 percent ivermectin solution on cattle for the treatment and control of various species of gastrointestinal nematodes, lungworms, grubs, horn flies, lice, and mites. Norbrook Laboratories, Ltd.'s NOROMECTIN Pour On for Cattle is approved as a generic copy of Merial Ltd.'s IVOMEC Pour-On for Cattle, approved under NADA 140–841. The application is approved as of September 13, 2004, and the regulations are amended in 21 CFR 524.1193 to reflect the approval. The basis of approval is discussed in the freedom of information summary.

In accordance with the freedom of information provisions of 21 CFR part 20 and 21 CFR 514.11(e)(2)(ii), a

summary of safety and effectiveness data and information submitted to support approval of this application may be seen in the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852, between 9 a.m. and 4 p.m., Monday through Friday.

The agency has determined under 21 CFR 25.33(a)(1) that this action is of a type that does not individually or cumulatively have a significant effect on the human environment. Therefore, neither an environmental assessment nor an environmental impact statement is required.

This rule does not meet the definition of "rule" in 5 U.S.C. 804(3)(A) because it is a rule of "particular applicability." Therefore, it is not subject to the congressional review requirements in 5 U.S.C. 801–808.

**List of Subjects in 21 CFR Part 524**

Animal drugs.

■ Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs and redelegated to the Center for Veterinary Medicine, 21 CFR part 524 is amended as follows:

**PART 524—OPHTHALMIC AND TOPICAL DOSAGE FORM NEW ANIMAL DRUGS**

■ 1. The authority citation for 21 CFR part 524 continues to read as follows:

    **Authority:** 21 U.S.C. 360b.

**§ 524.1193  [Amended]**

■ 2. Section 524.1193 is amended in paragraph (b)(2) by adding in numerical order "055529".

    Dated: October 8, 2004.

**Steven D. Vaughn,**

*Director, Office of New Animal Drug Evaluation, Center for Veterinary Medicine.*

[FR Doc. 04–23760 Filed 10–22–04; 8:45 am]

**BILLING CODE 4160–01–S**

---

**DEPARTMENT OF THE TREASURY**

**Internal Revenue Service**

**26 CFR Parts 1 and 602**

**[TD 9160]**

**RIN 1545–AY35**

**Information Reporting Under Section 6050P for Discharges of Indebtedness**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final regulations.

**SUMMARY:** This document contains final regulations relating to the information reporting requirement under section 6050P of the Internal Revenue Code (Code) for discharges of indebtedness. These final regulations reflect the enactment of section 6050P(c)(2)(D) by the Ticket to Work and Work Incentives Improvement Act of 1999. These final regulations provide guidance on the information reporting requirements for discharges of indebtedness by organizations that have a significant trade or business of lending money. This document also contains amendments to the existing final regulations to reflect the amendments to section 6050P by the Debt Collection Improvement Act of 1996.

**DATES:** *Effective date:* These regulations are effective October 25, 2004.

*Applicability date:* These regulations are applicable to discharges of indebtedness occurring on or after January 1, 2005.

**FOR FURTHER INFORMATION CONTACT:** Joseph P. Dewald, at (202) 622–4910 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**Background**

This document contains amendments to 26 CFR parts 1 and 602. The amendments describe circumstances in which an organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D). The amendments also conform the existing final regulations under section 6050P to cover applicable entities, including executive, judicial, and legislative agencies.

In general, section 6050P(a) requires certain organizations (applicable entities) to file information returns with the Internal Revenue Service (IRS), and to furnish information statements to debtors, reporting discharges of indebtedness of $600 or more. As enacted by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103–66 (107 Stat. 312, 531–532 (1993)), section 6050P required "applicable financial entities" (including Federal executive agencies) to report discharges of indebtedness. The Debt Collection Improvement Act of 1996, Pub. L. 104–134 (110 Stat. 1321, 368–369 (1996)) (the 1996 Act), amended section 6050P to cover "applicable entities." Section 6050P(c)(1) as amended defines an *applicable entity* to include: (1) Any executive, judicial, or legislative agency (as defined in 31 U.S.C. 3701(a)(4)); and (2) any applicable financial entity.

Section 6050P(c)(2)(D) was enacted by section 553(a) of the Ticket to Work and Work Incentives Improvement Act of

1999, Pub. L. 106–170 (113 Stat. 1860, 1931 (1999)) (the 1999 Act), effective for discharges of indebtedness occurring after December 31, 1999. The 1999 Act amended section 6050P by expanding the applicable financial entities required to report. As expanded, the term includes any organization "a significant trade or business of which is the lending of money."

The IRS issued Notice 2000–22 (2000–1 C.B. 902), which provides that penalties under sections 6721 and 6722 for failures to report discharges of indebtedness occurring before January 1, 2001, will not be imposed on organizations newly required to report under section 6050P(c)(2)(D). In Notice 2001–8 (2001–1 C.B. 374), for these same organizations, the IRS extended the waiver of penalties to failures to report discharges of indebtedness occurring before the first calendar year that begins at least two months after final regulations under section 6050P(c)(2)(D) are issued.

A notice of proposed rulemaking under section 6050P(c)(2)(D) (REG–107524–00) was published in the **Federal Register** (67 FR 40629) on June 13, 2002. The proposed regulations address whether an organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D). The proposed regulations also reflect the amendments made by the 1996 Act. A public hearing was held on the proposed regulations on October 8, 2002. The IRS received written and electronic comments responding to the notice of proposed rulemaking. After consideration of all comments, the proposed regulations are adopted as revised by this Treasury decision.

**Explanation of Provisions and Summary of Comments**

Section 6050P(c)(2)(D) requires any organization "a significant trade or business of which is the lending of money" to report discharges of indebtedness. The proposed regulations provide guidance on whether an organization is engaged in a trade or business of lending money and whether that trade or business is significant. In general, the proposed regulations provide that the lending of money is a significant trade or business if money is loaned on a regular and continuing basis. The proposed regulations provide three safe harbors under which organizations will be considered not to have a significant trade or business of lending money. The final regulations retain these rules.

*1. Comments Concerning the Proposed Regulations*

A. Obligations Acquired From Persons Other Than the Debtor

Several commentators requested clarification of the information reporting requirements for debt obligations acquired from persons other than the debtor. Section 1.6050P–2(e) of the proposed regulations provides that lending money includes acquisition of a debt obligation from a prior holder of the obligation and that gross income from an indebtedness is treated as gross income from lending money regardless of whether the debt was originated by the organization itself or by a related party. The final regulations clarify that a debt obligation acquired from the debtor or any person other than the debtor is subject to reporting under section 6050P(c)(2)(D) if the owner of the obligation is engaged in a significant trade or business of lending money.

B. Gross Income From Lending of Money

One commentator requested clarification on what amounts constitute gross income from lending money. Section 1.6050P–2(d) of the proposed regulations provides that gross income from lending money includes income from interest, fees, penalties, merchant discount, interchange, and gains arising from the sale of an indebtedness. The final regulations clarify that gross income from lending money includes: Interest (including qualified stated interest, original issue discount, and market discount); gains arising from the sale or other disposition of indebtedness; penalties with respect to indebtedness (whether or not the penalty is interest for Federal tax purposes); and fees with respect to indebtedness, including merchant discount or interchange (whether or not the fee is interest for Federal tax purposes).

C. "Factoring" Transactions

(i) Commentators' Description of "Factoring" Transactions.—Several commentators addressed reporting issues associated with what the commentators called "factoring." One commentator described factoring transactions, primarily between unrelated parties, as ordinarily involving (a) a factor, who performs the functions described below with respect to a pool of short-term accounts receivable (30-, 60-, or 90-day debt), (b) the factor's client, who sells goods in exchange for the short-term accounts receivable, and (c) the client's customers, who buy the goods and who

issue the accounts receivable. According to the commentator, the factor generally performs the following functions: Initial credit investigation. selective assumption of the risk of loss (sometimes referred to as guaranteeing credit), on-going credit monitoring of the client's customers, collection, and bookkeeping.

As described by the commentator, after the credit investigation (on either a customer-specific or a pooled basis), the factor informs the client if the factor is willing to guarantee the receivables from some or all of the client's customers. For customers whose accounts receivable the factor will not guarantee, the client may enter into the sale and accept an account receivable without the benefit of the factor's guarantee or may refuse to extend credit and either make the sale for cash or forego the sale altogether.

The commentator described factors' competitive fees for typical transactions with unrelated parties as ranging between 0.35 percent of the face value of the accounts receivable (if the client retains the collection function) and 0.70 percent of that face value (if the factor undertakes the collection function). In either case, the face value on the basis of which the fee is computed includes any accounts receivable that the client accepts from customers even though the factor is unwilling to assume the risk of loss on those accounts receivable. The factor determines the rate at which fees are charged on the basis of the initial credit investigation and of whether the factor undertakes collection and bookkeeping.

To facilitate collection, according to the commentator, factors generally take legal title to the accounts receivable either at the time of, or shortly after, the sales transactions. If the factor performs all collection, the factor may take title to all accounts receivable as soon as they are issued by the customers. If, however, the client retains the initial collection responsibilities for a specified short period of time, the factor may take title at the end of that period only to those accounts receivable that are not paid within that period. If the factor guarantees the accounts receivable and collects, the factor pays the client, net of the factor's fees, either soon after the receivables are collected or by a specified time if the receivables have not been collected. If the receivables are not guaranteed, the client receives payment only if and when the customer pays. The commentator explained that, if the factor has guaranteed the receivables, the factor has the right to recovery against a customer. If the factor does not guarantee the receivable and

assumes collection responsibility, the factor assigns title back to the client when the receivables become uncollectible under the contract.

For some clients, the factor also provides liquidity by advancing funds against the client's aggregate accounts receivable. Advances are made based on the factor's assessment of the client's creditworthiness and are treated as a reduction of the amount the factor owes the client when the receivables are collected or, if the receivables are guaranteed, when the factor is required to pay the client under the guarantee. These advances are satisfied by the factor reducing the payments otherwise owed to the client. Interest is charged for the period of the outstanding advances, and the interest provides additional income to the factor over and above the fees for the credit investigation, credit guarantee, collection, and bookkeeping functions.

The commentator urged that the unique aspects of these three-party relations make it extremely difficult for factors to report discharges under section 6050P. The commentator pointed out that, although the factor may hold title to a customer account receivable at the time the account receivable is discharged, the client is the one with a direct relation with the customer. Even if the factor agreed to guarantee accounts receivable of a customer, that decision may have been made after an inquiry into the characteristics of the client's customers as a group, without any specific knowledge about the particular customer. Thus, the factor may know nothing about a customer that happens to be in default.

For these reasons, the commentator suggested that reporting under section 6050P should be the responsibility of the client, which has, or had, a direct relation with the debtor. The commentator further suggested that, if factors are required to report, the $600 dollar threshold should be increased or any inclusion of the debtor's taxpayer identification number (TIN) should be optional.

The reporting requirements under section 6050P fall on the entity that owns the debt that is discharged. In the case of the transactions that the commentator called "factoring," therefore, it is necessary to determine who is the owner of the account receivable for Federal tax purposes. This determination has to be made on the basis of all the facts and circumstances.

The first question is whether the lending of money is a significant trade or business of the factor for the taxable year. This will be the case if, on a

regular and continuing basis during the calendar year, the factor makes advances to the clients or acquires the clients' accounts receivable. If the factor is an applicable entity for purposes of section 6050P(c)(2)(D), the second question is whether the factor owned the account receivable for Federal tax purposes when the account receivable was discharged. Section 6050P(c)(2)(D) does not require reporting by a factor if the factor was not the owner of the account receivable for Federal tax purposes at the time of the identifiable event marking the discharge.

The final regulations do not provide guidance on whether a factoring transaction should be treated as a purchase of accounts receivable for Federal tax purposes. Whether or not a factoring transaction is treated as a purchase for Federal tax purposes depends on the facts and circumstances of each transaction. The final regulations provide an example describing the reporting obligations if an account receivable is treated as purchased for Federal tax purposes and, alternatively, if it is not treated as purchased. This example, however, is not intended to address whether a purchase has taken place for Federal tax purposes, and, thus, no inference is intended concerning the character of the transactions addressed in these regulations for purposes of section 6050P or for other provisions, including for purposes of determining effectively connected income of a foreign factor under § 1.864–4(c)(5).

After evaluating the concerns described by the commentator and the requirements imposed by section 6050P, the IRS and the Treasury Department believe that the reporting requirements of these final regulations, combined with the January 1, 2005, effective date, provide reasonable and administrable rules and are consistent with the general requirements applicable to information reporting. The final regulations, therefore, do not adopt the recommendation that the $600 threshold be raised for debt obligations acquired from persons other than the debtor, nor do the final regulations adopt the recommendation that a factor be allowed to report discharges without the debtor's TIN. The $600 threshold and the requirement to include the debtor's TIN derive from section 6050P.

(ii) Filer May Request a Waiver of Penalty if the Filer Cannot Obtain the Debtor's TIN.—If section 6050P requires an applicable entity to file an information return, the applicable entity may request a waiver under section 6724 of any information reporting penalties under section 6721 and 6722.

Under section 6724, the IRS may waive the penalties if the failure is due to reasonable cause and is not due to willful neglect. Therefore, upon a showing of reasonable cause, the IRS may waive the penalty under section 6721 for failure to file complete and correct information returns (including the failure to include a TIN) and the penalty under section 6722 for failure to furnish complete and correct information statements (including the failure to include a TIN).

Under § 301.6724–1(a)(2)(ii), a penalty may be waived for reasonable cause if the failure arose from events beyond the filer's control. Section 301.6724–1(c)(6)(i) provides that events beyond the filer's control include the failure of another person to provide the information necessary for the filer to file a correct information return. Section 301.6724–1(a)(2) of the regulations provides that to establish reasonable cause, the filer must have acted in a responsible manner both before and after the failure occurred. Section 301.6724–1(e) provides that a filer must undertake to act in a responsible manner in order to establish reasonable cause for failure to include a TIN (the TIN solicitation rules).

Section 1.6050P–1(e)(6) of the existing final regulations provides special TIN solicitation rules for discharges of indebtedness. Under these rules, a filer must undertake to act in a responsible manner for purposes of section 6724 and the regulations. Section 1.6050P–1(e)(6) provides that a TIN obtained at the time of the indebtedness satisfies the solicitation requirements, unless the entity required to file knows that the TIN is incorrect. The regulations require the filer to solicit the debtor's TIN if it has not obtained the debtor's TIN prior to the occurrence of an identifiable event marking the discharge of indebtedness. The regulations further provide that, if the filer solicits the debtor's TIN in the manner described in § 301.6724–1(e)(1)(i) and (2), the filer is deemed to have acted in a responsible manner for purposes of section 6724. Section 1.6050P–1(e)(6)(ii) contemplates that the filer may undertake the TIN solicitation after the occurrence of the identifiable event. Therefore, a factor that fails to include a debtor's TIN on the required information return and information statement may request a waiver of penalties and may establish reasonable cause under section 6724 if it complies with the special TIN solicitation rules in § 1.6050P–1(e)(6).

D. Related Sellers of Nonfinancial Goods or Services

Commentators requested clarification as to whether a finance company that acquires installment sales contracts from a related seller should be considered an organization that has a significant trade or business of lending money even if the seller would qualify for the exception to reporting for seller-financing transactions. Specifically, the commentators urged that a finance company related to a commonly owned automobile dealership not be required to report the discharge of an installment sales contract that originated between the automobile dealership and an automobile purchaser.

The preamble to the proposed regulations explains that section 6050P(c)(2)(D) applies on an entity-by-entity basis and that the seller-financing exception is not available to a separate financing subsidiary of a retailer. The 1999 Act took an entity-by-entity approach when it expanded the scope of section 6050P to reach "any organization a significant trade or business of which is the lending of money (such as finance companies and credit card companies *whether or not affiliated with financial institutions*)." *See* Joint Committee on Taxation Staff, *General Explanation of Tax Legislation Enacted in the 106th Congress,* 107th Cong., 1st Sess. 48 (2001) (emphasis added). The final regulations, therefore, do not adopt the recommendation to provide an exception to reporting for a company that finances purchases by the customers of a separate, but related, seller of nonfinancial goods or services.

E. Reporting Amounts That Section 108 Excludes From the Debtor's Income

Several commentators noted that often debtors may be insolvent at the time the debt is discharged and that, in these cases, the discharge is excludable from income under section 108(a)(1)(B). The legislative history to section 6050P, however, reflects that Congress intended entities to report discharges regardless of whether the debtor is subject to tax on the discharged debt, including whether the discharge qualifies for exclusion under section 108. *See* H.R. Conf. Rep. No. 213, 103d Cong., 1st Sess. 671 (1993). This principle is reflected in the general rule of § 1.6050P–1(a)(3) of the existing final regulations and is not changed by this Treasury Decision. The existing regulations provide, "Except as otherwise provided in [§ 1.6050P–1], discharged indebtedness must be reported regardless of whether the debtor is subject to tax on the

discharged debt under sections 61 and 108 or otherwise by applicable law."

F. Reporting Discharges of FFELP Loans

Other commentators requested clarification on the information reporting requirements for public, nonprofit guarantors that participate in the Federal Family Education Loan Program (FFELP) if the debtor defaults on the FFELP loan. According to the comments, a typical FFELP transaction involves a borrower, a lender (such as a bank, savings and loan association, credit union, school, or state or private nonprofit agency), a state or private nonprofit organization (guaranty agency), and the U.S. Department of Education. If a guaranty agency receives a default claim for nonpayment of a FFELP student loan, the guaranty agency generally pays a percentage of the outstanding balance to the holder of the loan. The U.S. Department of Education, in turn, reimburses the guaranty agency for a percentage of the default claim paid to the holder of the loan. The guaranty agency then acts on behalf of the U.S. Department of Education collecting against the borrower and remitting any amount collected, less a percentage for collection costs, to the U.S. Department of Education.

One commentator suggested that the activities of the guaranty agency do not constitute the lending of money. This commentator suggested that guarantors of FFELP student loans are not applicable entities as defined in section 6050P(c)(2)(D). Another commentator suggested that the final regulations provide that the information reporting requirements under section 6050P do not apply to any student loan made under Title IV of the Higher Education Act, including student loans under the FFELP.

The information reporting requirements under section 6050P apply to student loans made under Title IV of the Higher Education Act. If the owner of the student loan for Federal tax purposes is an entity or organization that is an applicable entity within the meaning of section 6050P(c)(1), the owner must report under section 6050P upon the occurrence of an identifiable event marking the discharge of the indebtedness.

*2. Comments Concerning the Existing Final Regulations*

Several commentators raised issues relating to the reporting requirements in § 1.6050P–1 of the existing final regulations. These comments are beyond the scope of this regulation project, which addresses whether an

**Federal Register** / Vol. 69, No. 205 / Monday, October 25, 2004 / Rules and Regulations     **62185**

organization has a significant trade or business of lending money for purposes of section 6050P(c)(2)(D), but these comments may be addressed in future guidance.

## A. Amounts Forgiven Pursuant to the Terms of a Loan

Commentators requested clarification as to whether an organization is required to report amounts forgiven pursuant to the terms of a debt obligation, including loan forgiveness under the FFELP upon a stated event (such as death, disability, or satisfaction of the service requirements of the Teacher Loan Forgiveness Program). The IRS may issue future guidance under section 6050P addressing amounts forgiven pursuant to the terms of a debt obligation for purposes of section 6050P. Pending issuance of future guidance, applicable entities will not be subject to penalties under section 6721 and section 6722 for failure to report under section 6050P amounts forgiven pursuant to the terms of a debt obligation.

## B. Amounts That Are Defined as "Indebtedness" Under § 1.6050P–1(c) of the Existing Final Regulations but That Do Not Arise in the Context of a Money-Lending Transaction

One commentator requested clarification of the information reporting requirements for amounts that are owed to an organization but that do not arise in the context of a money-lending transaction. The commentator suggested that the definition of indebtedness in § 1.6050P–1(c) of the existing final regulations should be revised to require reporting only of discharged amounts that would give rise to income under section 61(a)(12) and that the definition should cover only amounts arising in money-lending transactions. Alternatively, the commentator suggested that amounts owed that arise in non-money-lending transactions should not be "indebtedness" for purposes of section 6050P unless, and until, reduced to judgment. This commentator also suggested that discharges of amounts such as fees, penalties, administrative costs, and fines should not be subject to reporting under section 6050P regardless of whether the transaction is a money-lending transaction. Section 1.6050P–1(d)(3) of the existing final regulations provides an exception to reporting for discharges of these amounts only in lending transactions.

In particular, the commentator was concerned about amounts arising in leasing transactions. An organization that engages only in transactions that

are treated as leases, and not as sales, for Federal tax purposes is not required to report under section 6050P, because leasing is not lending money for purposes of section 6050P(c)(2)(D) and § 1.6050P–2(a). However, if an organization is otherwise engaged in a significant trade or business of lending money and is also engaged in leasing transactions, the existing final regulations under section 6050P would require the organization to report the discharge of any amount owed to it, including fees, administrative costs, and fines for the non-lending leasing transactions.

The IRS and the Treasury Department may issue future guidance under section 6050P addressing the requirements for reporting amounts discharged in non-lending transactions. Pending issuance of future guidance, applicable entities will not be subject to penalties under section 6721 and section 6722 for failure under section 6050P to report amounts discharged in non-lending transactions.

## Effective Date

In order to give organizations that are subject to section 6050P(c)(2)(D) time to comply with the reporting requirements of section 6050P, these regulations apply to discharges that occur on or after January 1, 2005.

## Special Analyses

It has been determined that this Treasury decision is not a significant regulatory action as defined in Executive Order 12866. Therefore, a regulatory assessment is not required. It has also been determined that section 553(b) of the Administrative Procedure Act (5 U.S.C. chapter 5) does not apply to these regulations, and because the regulations do not impose a collection of information on small entities, the Regulatory Flexibility Act (5 U.S.C. chapter 6) does not apply. Pursuant to section 7805(f) of the Code, the notice of proposed rulemaking preceding this regulation was submitted to the Chief Counsel for Advocacy of the Small Business Administration for comment on its impact on small business.

## Drafting Information

The principal author of these final regulations is Joseph P. Dewald, Office of Associate Chief Counsel (Procedure and Administration), Administrative Provisions and Judicial Practice Division. However, other personnel from the IRS and Treasury Department participated in the development of the regulations.

## List of Subjects

### 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

### 26 CFR Part 602

Reporting and recordkeeping requirements.

## Adoption of Amendment to the Regulations

■ Accordingly, 26 CFR parts 1 and 602 are amended as follows:

## PART 1—INCOME TAXES

■ **Paragraph 1.** The authority citation for part 1 is amended by adding an entry in numerical order to read, in part, as follows:

   **Authority:** 26 U.S.C. 7805. * * *
   Section 1.6050P–2 also issued under 26 U.S.C. 6050P. * * *

■ **Par. 2.** Section 1.6050P–0 is amended as follows:
■ 1. The introductory text is amended by adding the language "and § 1.6050P–2" immediately after the language "§ 1.6050P–1".
■ 2. The entry for § 1.6050P–1 is amended by removing the word "financial".
■ 3. The entry for § 1.6050P–1(e)(2)(v) is added.
■ 4. The entries for §§ 1.6050P–1(e)(5) through (e)(8) are redesignated as entries for §§ 1.6050P–1(e)(6) through (e)(9) and a new entry for § 1.6050P–1(e)(5) is added.
■ 5. The entries for § 1.6050P–2 are added.
   The additions read as follows:

**§ 1.6050P–0   Table of contents.**
*     *     *     *     *

**§ 1.6050P–1   Information reporting for discharges of indebtedness by certain entities.**
*     *     *     *     *
   (e) * * *
   (2) * * *
   (v) No double reporting.
*     *     *     *     *
   (5) Entity formed or availed of to hold indebtedness.
*     *     *     *     *

**§ 1.6050P–2   Organization a significant trade or business of which is the lending of money.**
   (a) In general.
   (b) Safe harbors.
   (1) Organizations not subject to section 6050P in the previous calendar year.
   (2) Organizations that were subject to section 6050P in the previous calendar year.

**62186**    Federal Register / Vol. 69, No. 205 / Monday, October 25, 2004 / Rules and Regulations

(3) No test year.

(c) Seller financing.

(d) Gross income from lending of money.

(e) Acquisition of an indebtedness from a person other than the debtor included in lending money.

(f) Test year.

(g) Predecessor organization.

(h) Examples.

(i) Effective date.

■ Par. 3. Section 1.6050P–1 is amended as follows:

■ 1. The section heading for § 1.6050P–1 is amended by removing the word "financial".

■ 2. Paragraphs (a)(1), (b)(2)(i)(F), (c), (e)(2)(i), (e)(3), (e)(7), (f)(1) introductory text, (f)(1)(ii), and (f)(2) are amended by removing the word "financial".

■ 3. The first sentence of paragraph (c) is amended by adding the language "and § 1.6050P–2" immediately after the word "section".

■ 4. Paragraph (e)(2)(v) is added.

■ 5. Paragraph (e)(4) is amended by removing "6050P(c)(1)(A)" each time it appears and adding "6050P(c)(2)(A)" in its place and by removing "6050P(c)(1)(C)" and adding "6050P(c)(2)(C)" in its place.

■ 6. Paragraphs (e)(5) through (e)(8) are redesignated as (e)(6) through (e)(9) and a new paragraph (e)(5) is added.

■ 7. Paragraph (e)(7)(i), as redesignated, is amended by removing "(e)(6)" where it appears and adding "(e)(7)" and paragraph (e)(7)(ii), as redesignated, is amended by removing "(e)(6)(i)" where it appears and adding "(e)(7)(i)" in its place.

■ 8. Paragraph (h)(1) is amended by adding "and, except paragraph (e)(5) of this section, which applies to discharges of indebtedness occurring after December 31, 2004.", immediately after the language "1994".

The additions read as follows:

**§ 1.6050P–1  Information reporting for discharges of indebtedness by certain entities.**

*    *    *    *    *

(e) * * *

(2) * * *

(v) *No double reporting.* If multiple creditors are considered to hold interests in an indebtedness for purposes of this paragraph (e)(2) by virtue of holding ownership interests in an entity, and the entity is required to report a discharge of that indebtedness under paragraph (e)(5) of this section, then the multiple creditors are not required to report the discharge of indebtedness.

*    *    *    *    *

(5) *Entity formed or availed of to hold indebtedness.* Notwithstanding

§ 1.6050P–2(b)(3), if an entity (the transferee entity) is formed or availed of by an applicable entity (within the meaning of section 6050P(c)(1)) for the principal purpose of holding indebtedness acquired (including originated) by the applicable entity, then, for purposes of section 6050P(c)(2)(D), the transferee entity has a significant trade or business of lending money.

*    *    *    *    *

■ Par. 4. Section 1.6050P–2 is added to read as follows:

**§ 1.6050P–2  Organization a significant trade or business of which is the lending of money.**

(a) *In general.* For purposes of section 6050P(c)(2)(D), the lending of money is a significant trade or business of an organization in a calendar year if the organization lends money on a regular and continuing basis during the calendar year.

(b) *Safe harbors*—(1) *Organizations not subject to section 6050P in the previous calendar year.* For an organization that was not required to report under section 6050P in the previous calendar year, the lending of money is not treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money (as described in paragraph (d) of this section) in the organization's most recent test year (as defined in paragraph (f) of this section) is both less than $5 million and less than 15 percent of the organization's gross income for that test year.

(2) *Organizations that were subject to section 6050P in the previous calendar year.* For an organization that was required to report under section 6050P for the previous calendar year, the lending of money is not treated as a significant trade or business for the calendar year in which the lending occurs if gross income from lending money (as described in paragraph (d) of this section) in each of the organization's three most recent test years is both less than $3 million and less than 10 percent of the organization's gross income for that test year.

(3) *No test year.* The lending of money is not treated as a significant trade or business for an organization for the calendar year in which the lending occurs if the organization does not have a test year for that calendar year.

(c) *Seller financing.* If the principal trade or business of an organization is selling nonfinancial goods or providing nonfinancial services and if the organization extends credit to the

purchasers of those goods or services to finance the purchases, then, for purposes of section 6050P(c)(2)(D), these extensions of credit are not a significant trade or business of lending money.

(d) *Gross income from lending of money.* For purposes of this section, gross income from lending of money includes—

(1) Income from interest, including qualified stated interest, original issue discount, and market discount;

(2) Gains arising from the sale or other disposition of indebtedness;

(3) Penalties with respect to indebtedness (whether or not the penalty is interest for Federal tax purposes); and

(4) Fees with respect to indebtedness, including merchant discount or interchange (whether or not the fee is interest for Federal tax purposes).

(e) *Acquisition of an indebtedness from a person other than the debtor included in lending money.* For purposes of this section, lending money includes acquiring an indebtedness not only from the debtor at origination but also from a prior holder of the indebtedness. Gross income arising from indebtedness is gross income from the lending of money without regard to who originated the indebtedness. If an organization acquires an indebtedness, the organization is required to report any cancellation of the indebtedness if the organization is engaged in a significant trade or business of lending money.

(f) *Test year.* For any calendar year, a *test year* is a taxable year of the organization that ends before July 1 of the previous calendar year.

(g) *Predecessor organization.* If an organization acquires substantially all of the property that was used in a trade or business of some other organization (the predecessor) (including when two or more corporations are parties to a merger agreement under which the surviving corporation becomes the owner of the assets and assumes the liabilities of the absorbed corporation(s)) or was used in a separate unit of the predecessor, then whether the organization at issue qualifies for one of the safe harbors in paragraph (b) of this section is determined by also taking into account the test years, reporting obligations, and gross income of the predecessor.

(h) *Examples.* The rules of this section are illustrated by the following examples:

*Example 1.* (i) *Facts.* Finance Company A, a calendar year taxpayer, was formed in Year 1 as a non-bank subsidiary of Manufacturing Company and has no predecessor. A lends

money to purchasers of Manufacturing Company's products on a regular and continuing basis to finance the purchase of those products. A's gross income from stated interest in Year 1 is $4.7 million. In Year 1, A's gross income from fees and penalties with respect to the indebtedness is $0.5 million, and A has no other gross income from lending money within the meaning of paragraph (d) of this section.

(ii) *Results.* Section 6050P does not require A to report discharges of indebtedness occurring in Years 1 or 2, because A has no test year for those years. Notwithstanding that A lends money in those years on a regular and continuing basis, under paragraph (b)(3) of this section, A does not have a significant trade or business of lending money in those years for purposes of section 6050P(c)(2)(D). However, for Year 3, A's test year is Year 1. A's gross income from lending in Year 1 is not less than $5 million for purposes of the applicable safe harbor of paragraph (b)(1) of this section. Because A lends money on a regular and continuing basis and does not meet the applicable safe harbor, section 6050P requires A to report discharges of indebtedness occurring in Year 3.

*Example 2.* (i) *Facts.* The facts are the same as in *Example 1*, except that A is a division of Manufacturing Company, rather than a separate subsidiary. Manufacturing Company's principal activity is the manufacture and sale of non-financial products, and, other than financing the purchase of those products, Manufacturing Company does not extend credit or otherwise lend money.

(ii) *Results.* Under paragraph (c) of this section, that financing activity is not a significant trade or business of lending money for purposes of section 6050P(c)(2)(D), and section 6050P does not require Manufacturing Company to report discharges of indebtedness.

*Example 3.* (i) *Facts.* Company B, a calendar year taxpayer, is formed in Year 1. B has no predecessor and a part of its activities consists of the lending of money. B packages and sells part of the indebtedness it originates and holds the remainder. B is engaged in these activities on a regular and continuing basis. For Year 1, the sum of B's gross income from sales of the indebtedness, plus other income described in paragraph (d) of this section, is only $4.8 million, but it is 16% of B's gross income in Year 1.

(ii) *Results.* Because B lends money on a regular and continuing basis and does not meet the applicable safe harbor of paragraph (b)(1) of this section, section 6050P requires B to report discharges of indebtedness occurring in Year 3. B is not required to report discharges of indebtedness in Years 1 and 2 because B has no test year for Years 1 and 2.

*Example 4.* (i) *Facts.* The facts are the same as in *Example 3*. In addition, in each of Years 2, 3, and 4, the sum of B's gross income from sales of the indebtedness, plus other income described in paragraph (d) of this section, is less than both $3 million and 10% of B's gross income.

(ii) *Results.* (A) Because B was required to report under section 6050P for Year 3, the

applicable safe harbor for Year 4 is paragraph (b)(2) of this section, which is satisfied only if B's gross income from lending activities for each of the three most recent test years is less than both $3 million and 10% of B's gross income. For Year 4, even though B has only two test years, B's gross income in one of those test years, Year 1, causes B to fail to meet this safe harbor. Accordingly, B is required to report discharges of indebtedness under section 6050P in Year 4. For Year 5, B's three most recent test years are Years 1, 2, and 3. However, B's gross income from lending activities in Year 1 is not less than $3 million and 10% of B's gross income. Accordingly, section 6050P requires B to report discharges of indebtedness in Year 5.

(B) For Year 6, B satisfies the applicable safe harbor requirements of paragraph (b)(2) of this section for each of the three most recent test years (Years 2, 3, and 4). Therefore, section 6050P does not require B to report discharges of indebtedness in Year 6. Because B is not required to report for Year 6, the applicable safe harbor for Year 7 is the one contained in paragraph (b)(1) of this section, and thus the only relevant test year is Year 5.

*Example 5.* (i) *Facts.* (A) Company C, a calendar year taxpayer, was formed in Year 1 and, on a regular and continuing basis, enters into the following transactions with its clients, all of whom are unrelated parties to C.

(B) C's clients sell goods to customers, frequently accepting as payment accounts receivable that are due in 30 to 90 days. Under a contract with each client, C investigates the creditworthiness of the client's customers with respect to the prospective sales, and, for each customer, C determines whether, and to what extent, C is willing to assume the risk of loss on accounts receivable to be issued by the customer. C's decision whether to assume risk of loss may be based on an evaluation of the credit quality of particular customers or on the aggregate credit quality of all of the client's prospective customers. If C is unwilling to assume the risk, the client either may refuse to extend any credit to the customer or may accept the account receivable and bear the risk of loss.

(C) Pursuant to some contracts between C's clients and C, C's clients assign legal title to the accounts receivable to C when the accounts receivable are issued by the customers. For these accounts receivable, C agrees to undertake collections and to remit the amounts collected to the client, less a fee of 0.70 percent of the face value of the accounts receivable. Pursuant to other contracts between C's clients and C, C's clients retain legal title to the accounts receivable and retain the initial collection responsibility. For these accounts receivable, C's fee is reduced to 0.35 percent. Both groups of accounts receivable include accounts receivable for which C has assumed the risk of loss and accounts receivable for which C has not assumed the risk of loss.

(D) Based on all the facts and circumstances, C acquires ownership for Federal tax purposes of some, but not all, of the accounts receivable that it has agreed to collect and of some, but not all, of the

accounts receivable for which the client has retained collection responsibility.

(E) In Year 1, C's total fee income with respect to accounts receivable of which it acquired tax ownership was $2 million. C's fee income in Year 1 from accounts receivable of which it did not acquire tax ownership was $700,000. C does not have any other income for Year 1.

(F) In Year 3, there were discharges of $950,000, representing $100,000 of customer defaults on those accounts receivable of which C was the owner for Federal tax purposes at the time of the identifiable event marking the discharge and $850,000 of customer defaults on the accounts receivable of which the clients, and not C, were the owner. Whenever C determined the uncollectibility of an account receivable for which it had not assumed the risk of loss, C reassigned title to the account receivable to the appropriate client. Each defaulting customer defaulted on an account receivable with an outstanding balance of at least $600.

(ii) *Results.* (A) For Year 3, C's test year is Year 1. Under paragraph (e) of this section, C's $2 million fee income from the accounts receivable of which it acquired tax ownership is "gross income from lending money" for purposes of paragraph (b) of this section, because C was the owner of the accounts for Federal tax purposes. Under paragraph (e) of this section, C's $700,000 fee income from the accounts receivable of which it did not acquire tax ownership is not "gross income from lending money" for purposes of paragraph (b) of this section, because C was not the owner of the accounts receivable for Federal tax purposes. In Year 1, therefore, C's gross income from lending money is less than $5 million but is not less than 15% of C's gross income. Because C lends money on a regular and continuing basis and does not meet the applicable safe harbor, section 6050P requires C to report discharges of indebtedness occurring in Year 3.

(B) In Year 3, section 6050P requires C to report the $100,000 of discharges of the accounts receivable of which C was the owner for Federal tax purposes at the time of the identifiable event marking the discharge. Unless an exception to reporting under paragraph (b) or (c) of this section applies, section 6050P requires C's clients to report the $850,000 of discharges of the accounts receivable of which C did not become the owner.

(i) *Effective date.* This section applies to discharges of indebtedness occurring on or after January 1, 2005.

## PART 602—OMB CONTROL NUMBERS UNDER THE PAPERWORK REDUCTION ACT

■ **Par. 5.** The authority citation for part 602 continues to read as follows:

**Authority:** 26 U.S.C. 7805.

■ **Par. 6.** In § 602.101, paragraph (b) is amended by removing two entries from the table as follows:

**§ 602.101    OMB Control numbers.**

\*    \*    \*    \*    \*

(b) * * *

| CFR part or section where identified and described | Current OMB control No. |
|---|---|
| * | * | * | * |
| 1.6050P–1 ......................................... | 1545–1419 |
| 1.6050P–1T ....................................... | 1545–1419 |
| * | * | * | * |

Approved: October 18, 2004.

**Mark E. Matthews,**
*Deputy Commissioner for Services and Enforcement.*

**Gregory F. Jenner,**
*Assistant Secretary of the Treasury.*

[FR Doc. 04–23747 Filed 10–22–04; 8:45 am]

BILLING CODE 4830–01–P

## DEPARTMENT OF VETERANS AFFAIRS

**38 CFR Parts 1 and 2**

**RIN 2900–AK10**

**Standards for Collection, Compromise, Suspension, or Termination of Collection Effort, and Referral of Civil Claims for Money or Property; Regional Office Committees on Waivers and Compromises; Salary Offset Provisions; Delegations of Authority**

**AGENCY:** Department of Veterans Affairs.

**ACTION:** Final rule.

**SUMMARY:** This final rule revises the Department of Veterans Affairs (VA) regulations concerning the collection, compromise, suspension, termination, and referral of debts owed to VA. The revision clarifies and simplifies debt collection standards and reflects changes to Federal debt collection procedures under the Debt Collection Improvement Act of 1996. VA is also amending regulations pertaining to the administration of regional office Committees on Waivers and Compromises, as well as provisions pertaining to debt collection and to the Chief Financial Officer in the delegations of authority regulations. Other nonsubstantive changes are made for purposes of clarification.

**DATES:** *Effective Date:* November 24, 2004.

**FOR FURTHER INFORMATION CONTACT:** Peter Mulhern, Cash and Debt Management Division (047GC1), Department of Veterans Affairs, 810 Vermont Ave., NW., Washington, DC 20420, (202) 273–5570.

**SUPPLEMENTARY INFORMATION:** On December 29, 2003, VA published in the **Federal Register** (68 FR 74893) a proposed rule to bring VA's debt collection regulations into compliance with the provisions of the Debt Collection Improvement Act of 1996 (DCIA), Public Law 104–134, 110 Stat. 1321, 1358 (April 26, 1996), the subsequent revision of the Federal Claims Collection Standards (FCCS)(31 CFR parts 900 through 904) by the Department of the Treasury (Treasury) and the Department of Justice in 2000, and with Treasury's additional rules in 31 CFR part 285. VA's current debt collection regulations include tools such as offset of VA benefit payments, assessment of interest and late payment charges, use of consumer reporting and private collection agencies, and Federal salary offset. We proposed to add to VA's debt collection regulations more collection tools now authorized by the DCIA and revised FCCS. These tools include centralized administrative offset through the use of the Treasury Offset Program (TOP), the transfer or referral of delinquent debt to Treasury for collection (cross-servicing), and administrative wage garnishment. We also proposed to amend our debt collection regulations by deleting provisions that are either obsolete or duplicative of Treasury and Treasury/ DOJ regulations, as well as to ensure that our regulations are consistent with statutory mandates and that they are clearly written.

In addition, VA proposed to amend a regulation pertaining to the Committees on Waivers and Compromises to allow each station Director the authority to appoint the person responsible for the Committee's administrative control. Our current regulation, which states that the station Fiscal Officer must have administrative control authority, does not allow the station Director any discretion in this matter.

We further proposed to amend a regulation so that VA's Chief Financial Officer (CFO) would have the ability to redelegate debt collection authority to administration heads and staff office directors as the CFO deems appropriate.

We provided a 60-day comment period which ended on February 27, 2004. We received two submissions in response to our invitation for comments on the proposed regulations. One, from an individual, discussed the individual's experience with VA after VA informed him that an overpayment existed due to his son's dropping out of college, and said that VA had withheld almost all of a monthly payment of benefits (which he asserted was without prior notice). He said that the VA

employee he contacted had not been aware of an allegedly larger amount VA owed him due to an increase in the number of his children. He asserted that VA's efficiency in the measures involved in collecting a debt are far ahead of those involved in paying veterans their benefits, and asked for help in putting "customer needs (benefit payments) first." He did not say whether he thought rulemaking changes could provide the help he was requesting nor whether adoption of the proposed rule would itself help, and we see no need for changes in the proposed rule to be made based on this submission. The other submission, from the Disabled American Veterans (DAV), is discussed below.

DAV states that our proposed new paragraph (c)(4) in 38 CFR 1.912a violates 38 U.S.C. 5314(b). This new paragraph states that VA will begin collection action from VA benefit payments after an initial adverse decision on a debtor's request for waiver or the debtor's informal dispute of the existence or amount of a benefit debt. DAV argues that there is no statutory change to section 5301(c) or section 5314 justifying the addition of this provision, and that VA provides no explanation of this change in the preamble. DAV notes that the preamble cites the DCIA as the authority for most of the changes for our proposed rulemaking. DAV notes further that the DCIA's principal amendments to strengthen debt collection authority included amendments to the administrative offset provisions of 31 U.S.C. 3716. DAV correctly states that while collections under 38 U.S.C. 5301(c) must be conducted in accordance with procedures prescribed in 31 U.S.C. 3716, collections under 38 U.S.C. 5314 are not subject to the general provisions applicable to other claims collections as set forth in 31 U.S.C. 3716. According to DAV, there is no statutory authority or other explanation for our proposed new paragraph (c)(4) in 38 CFR 1.912a.

The preamble to the proposed rule did contain an explanation that encompassed the proposed change to add paragraph (c)(4) to 38 CFR 1.912a, since it is one of the changes that was proposed to ensure that our debt collection regulations are consistent with statutory mandates and clearly written (68 FR 74893, 74894). DAV is correct that there is no statutory change to 38 U.S.C. 5301(c) or 5314 that pertains to the addition of this provision. However, we believe that DAV is incorrect in stating that our proposed new paragraph violates section 5314(b).

# WHANN & ASSOCIATES
## ATTORNEYS AT LAW

*KEITH E. WHANN*
*DEANNA L. STOCKAMP*
*JONATHAN R. FULKERSON*
*JAY F. MCKIRAHAN*
*of Counsel*

6300 FRANTZ ROAD
DUBLIN, OHIO 43017

Personal Privacy

*REG-107524-00*

# REGULATIONS UNIT
# CC:ITA:RU

SEP 17 2002

September 17, 2002

Internal Revenue Service
Attn: Treena Garrett
CC:ITA:RU (REG-107524-00), Room 5226
P.O. Box 7604, Ben Franklin Station
Washington, DC 20044

# ROOM 5226
*Welch/Hall*

Re: **Comments of the National Independent Automobile Dealers Association Regarding the Cancellation of Indebtedness (CC:ITA:RU (REG-107524-00))**

Dear Ms. Garrett:

Per our telephone conversation, attached please find a copy of NIADA's Comments Regarding the Cancellation of Indebtedness. Per your recommendation, we have also e-mailed a copy to www.irs.gov/regs and mailed an original and eight (8) copies via certified mail.

If you have any questions regarding this filing, please do not hesitate to contact me.

Very truly yours,

Deanna L. Stockamp

DLS/sjm

Enclosure

Personal Privacy

## 26 CFR PART 1 [REG-107524-00]: GUIDANCE UNDER SECTION 6050P REGARDING CANCELLATION OF INDEBTEDNESS

**Comments of the National Independent Automobile Dealers Association Directed to: Internal Revenue Service**
**Attn: CC:ITA:RU (REG-107524-00), Room 5226**
**P.O. Box 7604, Ben Franklin Station**
**Washington, DC 20044**
          **or**
**Via E-Mail to: www.irs.gov/regs**

### SECTION A. Background.

On June 13, 2002, the Internal Revenue Service ("Service"), published in the Federal Register, Vol. 67, No. 114, a Notice of Proposed Rulemaking and Notice of Public Hearing concerning Information reporting requirements mandated by Section 6050P of the Internal Revenue Code ("IRC") for cancellation of indebtedness. In part, the Proposed Rulemaking clarifies which entities are deemed to be an organization "a significant trade or business of which is the lending of money." Interested parties were asked to submit comments on or before September 17, 2002.

Section 6050P of the IRC was added by Section 13252 of the Omnibus Budget Reconciliation Act of 1993. It requires certain financial entities to report discharges of indebtedness of $600 or more during any calendar year to the Service and to provide statements to persons whose names must be shown on the returns. Section 533(a) of the Ticket to Work and Work Incentives Improvement Act of 1999 ("Ticket to Work Act") amended Section 6050P by expanding the types of entities that are required to report discharges of indebtedness to include organizations "a significant trade or business of which is the lending of money". The provisions of the Ticket to Work Act became effective for discharges of indebtedness occurring after December 31, 1999. However, the Service issued Notice 2000-22, 2000-16 I.R.B. 902 on April 17, 2000 and Notice 200108, 2001-4 I.R.B. 374 on January 22, 2001, which provided that penalties would not be imposed on lending organizations newly required to report discharges of indebtedness for any discharge of indebtedness that occurs prior to the fist calendar year beginning at least two months after the date that appropriate guidance is issued.

The definition of the types of entities that are required to report discharges of indebtedness as set forth in Section 533(a) of the Ticket to Work Act, i.e. any organization a significant trade or business of which is the lending of money, could be interpreted as encompassing motor vehicle dealerships that engage in certain retail sales of motor vehicles to consumers. For example, if a dealership operates as a "buy here-pay here" dealership, it enters into a retail installment sales contract with a consumer and holds the contract itself for collection. In some cases, dealers sell receivables generated from retail installment sales at a discount to their own (i.e. related) finance company in order to decrease negative tax consequences associated with holding and servicing the notes themselves and for various business purposes recognized by the Service.


Recent research by the Federal Reserve Board indicates that household debt is at a record high relative to disposable income.[1] In 2000, 18% of the loan applicants for used vehicle loans had no credit history or had scores below 620, up from 16% in 1999.[2] The number of new bankruptcies filed during calendar year 2001 rose to a historic high of 1,492,129 cases, a 19% increase from the 1,253,444 cases filed in 2000 and a 3.4% increase from the prior high of 1,442,549 cases filed in 1998. The total number of new bankruptcies filed in the fourth quarter of 2001 (Oct. 1 to Dec. 31) was 364,921, an 18% increase over the same period a year ago and the highest fourth quarter ever.[3] These facts, combined with the trend of various subprime lenders exiting the market of financing purchases of used vehicles, makes the situation even more disconcerting. It is becoming next to impossible for individuals with impaired credit to find and obtain affordable transportation, which, in today's world, has become a necessity, not a luxury. One of the few places credit impaired consumers have to turn is a motor vehicle dealership that is willing to extend credit to the customer for the purchase itself.

The National Independent Automobile Dealers Association (NIADA) has represented independent motor vehicle dealers for over 50 years. The National Association and its State Affiliate Associations represent more than 15,000 independent motor vehicle dealers located throughout the United States. In the year 2000, there were in excess of 59 million retail sales of motor vehicles that generated $743 billion in revenues. Approximately 41.6 million, or 70%, of these sales were used motor vehicles generating over $363 billion in revenues.[4] In a recent survey of NIADA Members, 43.9% of the responding motor vehicle dealers indicated that they offer buy here-pay here financing.[5] Industry estimates place the total sales volume of buy here-pay here transactions between $80 and $110 billion per year. This represents approximately 8.5 to 10 million motor vehicle sales.[6] A significant number of the motor vehicle dealers who offer buy here-pay here financing have also formed a related finance company pursuant to the Service's Guidelines. Given the number of buy here-pay here motor vehicle transactions that take place each year, their effect on the motor vehicle industry and consumers alike, and the potential impact that the Proposed Regulations could have on the used motor vehicle industry, NIADA is submitting comments regarding the Proposed Regulations published by the Service.

### SECTION B. Proposed Regulations Issued by the Service Regarding When a Trade or Business Is the Lending of Money and when that Trade or Business Is Significant: The General Exception for Retail Sellers.

The Proposed Regulations issued by the Service contain amendments to the Income Tax Regulations (26 CFR Part 1) defining an organization a significant trade or business of which is the lending of money under Section 6050P(c)(2)(D) and provide guidance on when a trade or

---

[1] American Bankruptcy Institute citing research by the Federal Reserve Board.

[2] 2001 Automobile Finance Study: An Analysis of the Year-End 2000 Survey of Practices, Consumer Bankers Association, 1000 Wilson Boulevard, Suite 2500, Arlington, VA 22209-3908.

[3] February 19, 2002 Press Release from the American Bankruptcy Institute citing data from the Administrative Office of the U.S. Courts.

[4] 2001 Used Car Market Report, Manheim Auctions, 1400 Lake Hearn Drive NE, Atlanta, GA 30319.

[5] 2001 NIADA Independent Used Car Market Report, National Independent Automobile Dealers Association, 2521 Brown Blvd., Arlington, TX 76006, and Leedom, and Associates, LLC, 40 Sarasota Center Blvd., Suite E, Sarasota, FL 34277.

[6] Analysis of the Buy Here-Pay Here Capitalization Market, December 2001, Leedom and Associates, LLC, 40 Sarasota Center Blvd., Suite E, Sarasota, FL 34277.

2

business engages in the lending of money and when that trade or business is significant. In general, the Proposed Regulations provide that the lending of money is a significant trade or business if money is lent on a regular and continuing basis. The Service has, however, included three safe harbors under which organizations will not be considered to have a significant trade or business of lending money. In addition, the Service has included a general exception to information reporting for entities whose principal trade or business is the sale of nonfinancial goods or the provision of nonfinancial services.

NIADA agrees with and supports the Service's conclusion that the legislative history pertaining to the amendment of Section 6050P indicates that Congress was concerned with credit card and finance companies and it did not mean to extend the Section 6050P reporting requirements to entities that extend credit in connection with the purchase by customers of goods and services. Motor vehicle dealers engage primarily in the business of selling motor vehicles and related products and services. They do not extend credit, lend money or provide loans to consumers other than the extension of credit in connection with the sale of a motor vehicle. Often times when a consumer cannot get financed themselves, a dealer has no choice but to finance the purchase itself. To accomplish this, a motor vehicle dealer enters into a retail installment sales contract with the customer and holds the contract for collection itself. A retail installment sale is a commercial arrangement whereby a retail seller sells goods and/or services to a retail buyer for a price that is payable in installments over time and is subject to a finance charge, the amount of which is limited by state law. By contrast, financial institutions loan a sum of money to individuals based upon a written agreement that the borrower will repay the debt, with or without interest.

Based upon the Service's Proposed Regulations and the Congressional intent surrounding the amendment to Section 6050P, motor vehicle dealers that enter into retail installment sales contracts with their customers for the purchase of motor vehicles and related goods and services are not deemed to be organizations a significant trade or business of which is the lending of money. Rather, retail sellers of motor vehicles that enter into retail installment sales contracts with purchasers fall within the general exception enumerated by the Service and are not subject to the information reporting requirements for discharges of indebtedness.

### SECTION C. Applicability of the Proposed Regulations to Entities that Acquire and Hold Loans: Related Finance Companies Distinguished.

While the Service has provided a general exception to the Section 6050P reporting requirements for motor vehicle dealers and other retailers whose principal trade or business is the sale of nonfinancial goods or the provision of nonfinancial services, this exception is not available to a separate financing subsidiary of such a retailer. Moreover, the Service has indicated in the Proposed Regulations that "lending money includes acquiring a loan, and gross income arising from that loan is gross income from lending money. Therefore, an organization that buys and holds loans will be treated as an organization that lends money." NIADA seeks clarification on whether the reporting obligations for the discharge of indebtedness would apply to related finance companies that purchase retail installment sales contracts from a commonly owned dealership.

When the Tax Reform Act of 1986 was passed, the ability to use the installment or "cash" method of accounting was eliminated for anyone who utilized an inventory in operating a

3

business. This change in the Tax Code had a severe impact on motor vehicle dealers that engaged in installment sales transactions because they were forced to pay taxes on income before it was received. Dealers can decrease this negative tax result by selling receivables generated from retail installment sales at a discount to their own (i.e. related) finance company.

In reality, the use of related finance companies has been a common practice in the motor vehicle industry for many years. There are many valid business reasons for forming a related finance company, as recognized by the Service in Chapter 8 of the MSSP Audit Technique Guide[7], some of which are as follows:

1.    Providing credit to enable a purchaser to buy a car.
2.    Improving the collection of accounts receivable.
3.    Avoiding the imposition of licensing and other regulatory requirements on the dealership entity.
4.    Preventing adverse publicity associated with repossessions and other collection actions.
5.    Insulating the dealership from the financial risk of default on the notes.
6.    Diversification of ownership.

Most related finance companies are small businesses that are commonly owned with a used motor vehicle dealership and they purchase and service receivables from only that dealership. Despite the fact that motor vehicle dealers that enter into retail installment sales contracts with purchasers of motor vehicles are not subject to the information reporting requirements for the discharge of an indebtedness, the Service's Proposed Regulation may be interpreted as treating a related finance company that acquires contracts from a related dealership as an organization a significant trade or business of which is the lending of money under Section 6050P(c)(2)(D).

NIADA respectfully requests that the Service clarify that a related finance company that is commonly owned with a used motor vehicle dealership, as explained herein, does not engage in the business of lending money on a regular and continuing basis and is not subject to the information reporting requirements under Section 6050P. In the case of related finance companies, they are not acquiring "loans," nor are they loaning a sum of money to individuals. The related finance company purchases retail installment contracts from a commonly owned dealership. Neither the substance nor the nature of the initial transaction between the dealer and the purchaser of the vehicle changes by the mere sale of the retail installment contract to a related finance company. That is, the retail installment contract is still a commercial arrangement whereby a retail seller sells goods and/or services to a retail buyer for a price that is payable in installments over time and is subject to a finance charge. The sale of the retail installment contract merely permits the related finance company to step into the shoes of the dealership in order to enforce the retail purchaser's obligations under the retail installment contract. The related finance company should not become an organization a significant trade or business of which is lending money. Just as the legislative history pertaining to the amendment of Section 6050P supports the conclusion that Congress did not intend for the reporting requirements to apply to retail sellers of goods and services that extend credit in connection with the purchase of such goods and services, the legislative history does not support a conclusion that Congress intends for related finance companies that purchase retail installment contracts from a related retail seller of goods to be subject to the reporting requirements.

---

[7] IRS Market Segment Specialization Program Audit Technique Guide for the Independent Used Car Dealer, Chapter 8, Related Finance Companies, pp 8-1 to 8-3.

4

If the Service takes the position that related finance companies must report discharges of indebtedness under 6050P, NIADA urges the Service to give additional consideration to the administrative burdens that the Proposed Regulations will have on these small business taxpayers and requests that the Service provide additional information and guidance to small businesses on how to comply with the Proposed Regulations. The reporting and record keeping requirements mandated by Section 6050P will have a significant impact on small business, many of which will not have systems in place to comply with the information reporting requirements. At a minimum, NIADA requests that the Service extend the time within which small businesses must comply with the Proposed Regulations beyond two months after final guidance is issued in order to provide them with sufficient time to become familiar with the newly imposed requirements and to put the appropriate systems in place to track discharges of indebtedness, file the appropriate reports and to establish proper record retention policies.

## SECTION D. Conclusion.

NIADA would like to thank the Internal Revenue Service for the opportunity to comment with respect to the Proposed Regulation. Any questions the Service has regarding NIADA's comments and the position taken herein may be directed to NIADA's Legal Counsel, Keith E. Whann or Deanna L. Stockamp, of the Law Firm of Whann & Associates at [Personal Privacy]

5

REGULATIONS UNIT
CC:ITA:RU

SEP 1 8 2002

ROOM 5226

Welch/Hall

From: postoffice@www.qai.irs.gov
Sent: Tuesday, September 17, 2002 4:49 PM
To: guy.r.traynor@irscounsel.treas.gov
Subject: Comment from Web Site
From: █████ Personal Privacy █████
reg=Guidance on Cancellation of Indebtedness
category=taxregs
email= █████ Personal Privacy █████

Begin Comment Text --------------------

September 17, 2002

sent via email: www.irs.gov/regs

CC:ITA:RU (REG-107524-00)
Room 5226
Internal Revenue Service
P.O. Box 7604, Ben Franklin Station
Washington, D.C. 20044

RE:    Guidance Under Section 6050P Regarding Cancellation of Indebtedness 26 CFR Part 1
Comment

To Whom It May Concern:

On behalf of the Texas Guaranteed Student Loan Corporation (TG) I am pleased to provide
comments regarding the Internal Revenue Service's (the IRS ) Notice of Proposed Amendment to
the Regulations and Request for Comment, published on June 13, 2002, at 67 Fed. Reg. 40629
(2002), relating to guidance under Section 6050P of the Internal Revenue Code regarding
cancellation of indebtedness.

We offer the following comments where we believe additional clarification of intent or further
consideration of related issues will strengthen the guidance.

1.    Definition of Applicable Entity

1.6050P-2(a):  This section was intended to clarify the meaning of Section 6050P(c)(2)(D).  It
appears from the plain language of this section that only lenders of money are subject to its terms.
TG is a public, non-profit corporation created by the Texas Legislature, in part to administer the
Federal Family Education Loan Program (FFELP), a federally insured student loan program, in
the state of Texas.  Although some FFELP guarantors are state agencies, TG is not a State of
Texas agency and receives no funding from the State.  TG guarantees payment to lenders who
make FFELP loans in the event of the borrower's default, death, or total and permanent disability,
and the U.S. Department of Education (ED) provides reinsurance to TG for all or part of the

2

amount paid to the lender. In addition, TG facilitates the forgiveness of portions of certain student loans under the Loan Forgiveness for Teachers Program authorized in Section 428J of the Higher Education Act of 1965 (HEA), as amended (20 USC 1078-10). The portion of any loan TG forgives under this program is fully reimbursed by ED.

Because TG does not originate student loans, and because we believe the activities undertaken by TG and other similarly-situated public, non-profit guarantors do not constitute the lending of money, TG requests clarification in the final guidance on these regulations that TG and other public, non-profit guarantors who do not originate loans are not applicable entities as defined in Section 6050P(c)(2)(D).

2.    Identifiable Events

Section 6050P-1(b)(2) of the Internal Revenue Code lists eight identifiable events for the reporting of indebtedness discharge. It is unclear from the language in that section whether the forgiveness of a portion of a student loan debt under the Loan Forgiveness for Teachers Program authorized in Section 428J of the HEA (20 USC 1078-10) is an identifiable event under this section. Although Section 1C of the Explanation of Revisions and Summary of Comments portion of the final regulations released in January of 1996 indicates that [a] discharge of indebtedness occurring by operation of law not enumerated above is not required to be reported under the final regulations (emphasis added), and it would appear that the Loan Forgiveness for Teachers Program does not meet any of the four events enumerated in that Section, TG requests specific clarification of this issue.

TG raises this issue because, if such forgiveness is considered an identifiable event, TG's student loan borrowers (and those of other public, non-profit guarantors) may suffer an inequitable consequence under the provisions of 26 USC 108(f) simply due to TG s status as a public, non-profit corporation. Section 108(f)(1) provides that discharge of a student loan is not includable in an individual's income if such discharge was a provision of such loan under which all or part of the indebtedness of the individual would be discharged if the individual worked for a certain period of time in certain professions for any of a broad class of employers. However, TG, which is neither a federal or state agency, is not encompassed within the definition of a maker of a student loan under 108(f)(2). Thus, one could conclude that a loan forgiven under the Loan Forgiveness for Teachers Program that is guaranteed by TG, a public, non-profit guarantor, may have tax liabilities for the borrower that would not exist if the teacher/borrower had the same type of loan guaranteed by a state agency guarantor.

Due to what appears to be an unintended inconsistency in borrower treatment, TG requests clarification within the final guidance on these regulations stating that the discharge of a portion of a FFELP student loan under the Loan Forgiveness for Teachers Program is not an identifiable event under 6050P-1(b)(2).

3

We appreciate the opportunity to comment on the proposed guidance for reporting of cancellation of indebtedness under 26 USC 6050P. If you have any questions concerning these comments, please contact me at ████████████████

Sincerely,


Kathleen A. Holden
Vice President and Senior Counsel

cc:    Nina Hold



End Comment Text ---------------------



# COMMERCIAL FINANCE ASSOCIATION

**Chairman of the Board**
Stephen L. Bakke
Manchester Commercial Finance LLC

**President**
Peter E. Schwab
Foothill Capital Corp.

**First Vice President**
Richard P. Palmieri
Credit Suisse First Boston

**Vice President-Finance**
Michael D. Sharkey
LaSalle Business Credit, Inc.

**Vice President**
Jack R. Hoekstra
Transamerica Business Capital Corp.

**Vice President**
Theodore J. Kompa
Business Alliance Capital Corp.

**Vice President**
Joseph F. Nemia
GE Capital Commercial Finance, Inc.

**Co-General Counsel**
Jonathan N. Helfat
Otterbourg, Steindler, Houston
& Rosen PC

Richard M. Kohn
Goldberg, Kohn, Bell, Black,
Rosenbloom & Moritz, Ltd.

**Executive Director
and Secretary**
Leonard Machlis

REGULATIONS UNIT
CC:ITA:RU

SEP 2 0 2002

225 WEST 34TH STREET, SUITE 1815, NEW YORK, NY 10122



e-mail: postmaster@cfa.com    internet: http://www.cfa.com

Personal Privacy

Welch/Hall

September 17, 2002

Internal Revenue Service
1111 Constitution Avenue
Washington, DC 20224

### Re:    Proposed Regulations under Code Section 6050P

Ladies and Gentlemen:

We submit these comments on behalf of the Commercial Finance Association ("CFA"). CFA is a trade association for United States banks and other financial institutions that provide asset-based commercial financing and factoring to corporate borrowers. Among the 240 members of CFA are substantially all of the money center banks and regional banks, as well as other large and small commercial lenders in the United States. Based on our most recent figures, we estimate that secured financing provided by CFA members presently exceeds $300 billion in outstanding loans, and revolving credit and other advances made by CFA members under credit agreements exceed $2 trillion per year.

The CFA has reviewed the proposed regulations (the "Proposed Regulations") published on June 13, 2002, addressing certain reporting requirements under Section 6050P of the Internal Revenue Code of 1986, as amended (the "Code"). The Proposed Regulations revise the Treasury Regulations previously issued under Code Section 6050P to incorporate certain changes to the statute enacted as part of Public Law 106-170 and effective for discharges of indebtedness occurring after December 31, 1999. Generally, the Proposed Regulations would require any organization, of which a significant trade or business is the lending of money, to report, each year, every discharge of indebtedness (subject to the statutory de minimis $600 threshold) to both the discharged debtor and the Internal Revenue Service ("IRS") on Form 1099.

Although we understand the desire of the Department of the Treasury (the "Treasury") and the IRS to increase compliance in reporting cancellation of indebtedness income, we respectfully request that the IRS and the Treasury consider the comments below. Specifically, the CFA seeks clarification that certain organizations that engage in the business of factoring the accounts receivable of firms not affiliated with their client arising in the ordinary course of such client's business (hereinafter referred to as "Factors") are not required to report discharges of indebtedness related to such receivables. Specifically, we believe that the obligation to report discharges of indebtedness relating to factored receivables should fall upon the Factor's client

**Associate General Counsel**
+Richard Jay Goldstein, Buchalter Nemer Fields & Younger +James R. Looman, Sidley Austin Brown & Wood + Donald L. Schwartz, Lathem & Watkins

who originated the receivables. We believe this is the proper approach because the client has the direct relationship with the debtor whose debt is discharged and can, in the normal course of that business relationship, obtain the debtor's federal taxpayer identification number ("TIN") and other information required in order to properly discharge information reporting responsibilities. Moreover, for the reasons discussed below, it would be unduly burdensome for Factors to obtain and authenticate the information required to be reported to the IRS and the debtor.

Nevertheless, if the IRS and Treasury believe that factored sales are covered by the Proposed Regulations and that Factors should be required to report discharges of indebtedness relating to factored receivables, CFA would ask that the Proposed Regulations be revised to provide specific standards tailored to the situation where a third party writes off a receivable not originated by it. As described below, we would suggest that, as there is no debtor/creditor relationship between the Factor and its client or borrower (but rather with a third party), a Factor be subject to less onerous due diligence and information gathering requirements to better enable it to discharge, as best it may in the circumstances, the Section 6050P reporting requirements to which it is subject.

## I.    Whether the Reporting Requirements of Section 6050P are Applicable to Factors

The rationale for Section 6050P of the Code and its attendant regulations is the same as for most other forms of information reporting: to provide an incentive to persons who recognize income - in this case, cancellation of indebtedness income - to report such income on their tax returns, knowing that a separate entity is independently required to report such income to the IRS. We understand the desirability of information reporting in these circumstances, but submit that the obligation ought to be appropriately tailored to the type of business relationship resulting in the recognition of income.

Generally, debt is canceled (and cancellation of debt income triggered) either when (a) a creditor decides (due to a debtor's pleas, or on its own) to release the debtor from, or to reduce the outstanding amount of, indebtedness or (b) with the passage of time or the occurrence of some other event, the obligation to repay the indebtedness may no longer be enforced against the debtor. In a typical cancellation scenario, there is privity between the creditor and the debtor, and the creditor itself either makes the decision to stop collection efforts or forgive the indebtedness, or recognizes that the debt has become unenforceable. The facts in this typical scenario raise a logical inference that any information relevant to the transaction - and to the information reporting of such transaction - is possessed both by the debtor and the creditor.

In contrast to the foregoing example, in the typical Factor relationship, a Factor purchases (often in bulk transactions) large quantities of trade receivables generated by one of its clients or borrowers. Sometimes, the Factor undertakes such a transaction based upon the client's representations as to the creditworthiness of the underlying trade debtors and the client's covenants to take reasonable steps to cause such receivables to be collected. Occasionally, a

-2-

Factor will even extend credit to a good client by allowing the client to factor some amount of receivables with the Factor without the client providing the Factor any information about those receivables or the underlying trade debtors. The trade debtors are not advised that their receivables have been factored, and the Factor's client continues to perform collection activities with respect to the receivables.

If, in spite of the client's representations and covenants, the trade debtor defaults on paying the receivable or becomes insolvent, the Factor's client should be better positioned than the Factor to discharge an information-reporting obligation to the debtor and to the IRS. The client has or had a direct business relationship with the defaulting debtor, in the course of which the client would have been likely to obtain (or, at the least, could have obtained with little difficulty) the account debtor's full name, address, and TIN. Even if it is the Factor who makes the decision to forgo collecting the receivables, the Factor generally has insufficient information about the trade debtor to report the transaction properly. Moreover, the Factor does not have the kind of direct relationship with the trade debtor that might make it reasonable for the Factor obtain the information necessary to fulfill an information reporting obligation.

In these circumstances, we suggest that it would be inappropriate to consider the Factor to be the party "discharging" the indebtedness. Instead, we believe it is more appropriate for the Factor's client - the business that has or had a direct relationship with the account debtor - to be treated as the party charging off the receivable and required to file Form 1099 with respect thereto.

We believe that an analysis of the language of Section 6050P supports our position. Subsection (a) requires "[a]ny applicable entity which discharges...indebtedness" to file a return describing the discharge. The statutory language suggests that, if the Factor is not actually the party which "discharges" the indebtedness of the underlying debtor, the requirements of Section 6050P are applicable. Neither the statutory language of Section 6050P, nor the regulations originally promulgated thereunder, nor the Proposed Regulations, discusses debt discharges in the context of any relationship other than a direct creditor/debtor relationship. Although the silence in the existing guidance does not necessarily mean that Congress or the IRS understood that Section 6050P was inapplicable to factoring transactions or other debt discharges undertaken by assignees, middlemen or other subsequent holders of the debt obligation, it does raise the inference that a true indirect relationship was not contemplated as being within the ambit of the information reporting requirements.

When receivables for which a Factor has previously assumed the risk are either written off or written down, a connection still exists between the original creditor and the trade debtor. The Factor is not the person actually discharging the indebtedness; instead, it is absorbing the negative consequence of a credit risk that it assumed in the normal course of its business. In such an instance, the fair outcome would be for the original creditor to report the discharge of the debt or, in the alternative, for the payor of the receivable to be solely responsible for properly reporting such cancellation of indebtedness to the IRS and the Treasury. Burdening an indirect

-3-

third party, such as a Factor, with the information reporting obligation imposes costs and inconveniences on it that are entirely out of proportion to the additional income tax reporting accuracy hoped to be achieved thereby.

## II.    Suggestions for Reducing Hardship on Business if Factors are Subject to Section 6050P

If, in spite of the foregoing discussion, the IRS and the Treasury determine that factoring relationships are meant to be within the purview of Section 6050P, we would suggest that the Proposed Regulations be amended to provide specific rules for Factors (and perhaps other third parties who hold receivables) to ameliorate the burdens which the Proposed Regulations place on the operations of a factoring business.

*Raise the Reporting Threshold for Third-Party Debt Cancellations*.  For example, as previously mentioned, Section 6050P requires reporting for any applicable transaction over a $600 threshold.  While the intent of this limit is presumably to exempt de minimis transactions from reporting, the threshold is far too low for third-party commercial transactions, such as a discharge of factored receivables.  A factoring business would continually need to expend time and other resources in order to obtain and authenticate the background information on the underlying debtor.  Background information would have to be gathered for every debtor, even though in most cases it would never be used, because there would be no way to know in advance which debts would be discharged.  Then the Factor would incur additional cost to prepare and file Forms 1099.  The total costs of this exercise would outstrip the amount of the debt being discharged by the creditor in numerous transactions.  We submit that, if Factors are deemed to be subject to the Section 6050P requirements, Treasury should consider using its regulatory authority to raise the minimum threshold for information reporting by Factors (and perhaps other third parties discharging debt in a commercial setting) by a substantial amount.

*Reduce the Administrative Burdens of Information Gathering for Third-Party Cancellations of Debt.*  Similarly, subsection (a)(1) of Section 6050P demands that the creditor identify the debtor by its TIN.  However, it is not standard practice in factoring arrangements for a Factor to obtain the TIN of every underlying debtor of the receivables being factored, solely to prepare for the possibility that certain indebtedness may be written off.  Further, there is no central public register from which a Factor can readily obtain the TIN of a trade debtor.  Therefore, the statute and Proposed Regulations place a nontrivial administrative burden on a Factor to obtain and authenticate such information - on pain of penalty, under Code Sections 6721 through 6723, for failure to file timely and accurately.

This administrative burden and penalty risk are the more significant because of the lengths to which a Factor must go to discover TINs of underlying debtors in order to comply with Section 6050P.  Currently, the Regulations demand that a creditor make a "reasonable effort" to obtain the correct name and TIN of the party for whom the debt was discharged.  Reg. § 1.6050P-1(e)(6).  Reg. § 1.6050P-1(e)(6)(ii) states that a person satisfies the "reasonable effort"

-4-

requirement if it makes a solicitation that complies with Reg. § 301.6724-1(e)(1)(i) and (2). These regulations, in turn, indicate that the creditor should make an initial solicitation of the TIN from payees at the time an account is opened (a point at which the Factor is typically not involved), as well as making annual solicitations for such information. Again, it is easy to see that a Factor could end up spending more time and energy on these "reasonable efforts" than would be warranted by the incremental improvements in accuracy of the tax reporting of those few trade debtors whose debts are ultimately canceled.

Moreover, one can easily imagine that debtors might balk at providing their TINs to Factors with which they have had no direct dealings. Since the maximum penalty that can be imposed on a taxpayer for failing to provide a TIN is $50, it is likely that the potential monetary threat will prove inadequate to sway an unwilling debtor to supply its TIN upon a Factor's request.

One potential, straightforward solution to this problem would be to allow persons who do not have a direct relationship with the debtor to file Forms 1099 with the IRS without including the debtor's TIN. The drawback to this approach is that the IRS would have greater difficulty matching the Form 1099 with the appropriate taxpayer.

A second approach would be for the IRS to establish a database and protocol whereby a Factor (or other third party holding trade receivables or other debt instruments) could request and obtain, from the IRS, the TIN for a debtor whose debt was being written off. There would, of course, be taxpayer information privacy issues to consider. However, such a database would dramatically reduce the amount of time and effort required for Factors or others to comply with their information reporting responsibilities, because a TIN would only be requested for debtors whose debts had been canceled. Moreover, if such a database and protocol could be implemented, a side benefit might be that the IRS receives swifter intelligence than otherwise of a debtor-taxpayer's financial problems. This intelligence could lead to improved tax collection from failing businesses, through earlier commencement of audits, prompt lien filings, and timely foreclosures.

### III.    Summary

None of Section 6050P as amended, the existing regulations, and the Proposed Regulations directly addresses whether a Factor, who acquires receivables from its borrower or client and has no continuing relationship with the payors of such receivables, should be viewed as discharging indebtedness when such receivables are written off or otherwise become uncollectible. We suggest, and ask you to clarify, that the statutory and regulatory silence on this specific issue implies that Factors, in the ordinary course of their business, are not subject to Section 6050P information reporting requirements with respect to receivables they factor. An alternative justification for this clarification is that requiring Factors to comply with the Proposed Regulations would impose undue hardship on their business, because the costs of compliance would be substantial and the benefits (in the form of improved taxpayer reporting of cancellation of debt income) would be small.

-5-

In the event that the IRS and the Treasury decide that Factors nevertheless should be covered by the Section 6050P reporting regime, then we believe it would be appropriate for the Proposed Regulations to be revised to (a) incorporate a substantially increased dollar threshold for reporting debt discharges by third parties such as Factors, or (b) allow Factors to report debt discharges without the inclusion of a debtor's TIN. Alternatively, the IRS might consider establishing a protocol for Factors and other third parties to obtain TINs directly from the IRS.

Commercial Finance Association appreciates the opportunity to submit these comments, and will gladly assist the IRS and the Treasury in formulating changes to the Proposed Regulations to reflect the issues set forth above. Please be advised that we also wish to be placed on the building access list to attend and make oral comments at the public hearing scheduled for October 8, 2002, to discuss the Proposed Regulations and their potential application to factoring transactions.

In addition, if you have any questions regarding our comments, please feel free to contact either Jonathan Helfat at Personal Privacy or Richard Kohn at Personal Privacy  We look forward to discussing these comments further with you.

Respectfully submitted,

COMMERCIAL FINANCE ASSOCIATION

By:  Jonathan N. Helfat, Esq.

By:  Richard M. Kohn, Esq.

Co-General Counsel

13500.1

-6-

**Approximate Pages:** 20

**Code Section:** Section 6050P -- Debt Discharge Info. Returns
**Author:**
**Institutional Author:** Internal Revenue Service
**Citations:** (8 Oct 2002)
**Tax Analysts Reference:** 2002 TNT 200-42

---

**Unofficial Transcript of IRS Hearing on Proposed Regs on Reporting Cancellation of Customers' Debts**

**The unofficial transcript is available of an October 8 IRS hearing on proposed regs on an organization's obligation to report the cancellation of a customer's debt; at the hearing a witness explained commercial financing and factoring to corporations.**

=== SUMMARY ===



The unofficial transcript is available of an October 8 IRS hearing on proposed regs (REG-107524-00) on an organization's obligation to report the cancellation of a customer's debt. At the hearing Jonathan Helfat of the Commercial Finance Association explained banks' and other financial institutions' providing asset- based commercial financing and factoring to corporate borrowers.

Helfat said every major financial institution now has a factoring division to provide a cash-flow device to manufacturers and merchants who extend credit to Middle American customers, with the factor creating a cash flow for the merchant based on the money the merchant's customers owe in credit payments.

Michael Novey, Treasury associate tax legislative counsel, prodded Helfat about the sequence of who holds receivables so that Novey could determine if, for tax purposes, factors would be deemed to have purchased the receivables when reporting discharges of debt is required. When Novey asked whether factors securitize their interest in receivables once they get them, Helfat said there was an effort several years ago to do that, but they are not securitized.

When Helfat explained that factoring is industry-driven because merchants need an identifiable customer base to do a credit risk, Novey asked whether factors that have succeeded in getting insurance on the factored receivables might enter into credit swap on them. "That is conceivable," Helfat replied.

=== FULL TEXT ===

**INTERNAL REVENUE SERVICE**
**HEARING OF PROPOSED REGULATIONS**
*IRS Headquarters*
*1111 Constitution Avenue, N.W.*
*Room 4718*
*Washington, D.C. 20224*
*Tuesday, October 8, 2002*

PROCEEDINGS

[10:08 a.m.]

*[1] MR. WILSON:* Good morning. I'm Curt Wilson, the Assistant Chief Counsel for Administrative Provisions and Judicial Practice. This is the time and place set for the hearing on the proposed regulations under section 6050P.

[2] I have with me today panelists, starting from my right, Mike Novey, from the Department of Treasury, Assistant Secretary for Tax Policy Office --

[3] MR. NOVEY: Associate Tax Legislative Counsel.

[4] MR. WILSON: Okay, thank you.

[5] And, Donna Welch, who's a Senior Counsel in Administrative Provisions and Judicial Practice; and Joe Dewald, who's a Docket Attorney in Administrative Provisions and Judicial Practice.

[6] The proposed regulations under section 6050P pertain to -- the statute provides that "Any applicable entity that discharges indebtedness of $600 or more must file an information return reporting on that discharge." The statute also provides that the "applicable entity" includes any applicable financial entity, such as an organization, a significant trade or business of which is the lending of money.

[7] The IRS issued 6050P proposed regulations on June 13, 2002. Those regulations provide guidance on when a trade or business is the lending of money; and when that trade or business is significant. They provide that the lending of money is a significant trade or business, if it's lent on a regular and continuing basis; and they provide three safe harbors under which organizations which will not be considered to have a significant trade or business of lending money.

[8] We've attempted in these proposed regulations to balance the information reporting requirements set by the statute and the burden on the lenders of information reporting, and we've tried to balance it through the use of those three safe harbors.

[9] We have one speaker this morning. That speaker is Mr. Helfat, Jonathan Helfat, from the Commercial Finance Association. I'll ask you to provide your remarks. You'll have ten minutes to talk, and then we'll perhaps have some questions.

[10] MR. HELFAT: Where do I speak from? Right here?

[11] MS. WELCH: At the podium, please.

[12] MR. WILSON: The podium.

[13] MR. HELFAT: I'll try to keep my remarks less than ten minutes.

[14] MR. WILSON: We don't have a crowd behind you, so, there might be some flexibility.

[15] MR. HELFAT: Oh, thank you very much.

[Laughter.]

[16] MR. HELFAT: Well, first, let me start by introducing myself. I'm Jonathan Helfat, and I'm co-general counsel to the Commercial Finance Association.

6050P Regulation Public File Page 25 of 67

[17] By way of background, the Commercial Finance Association is a trade association for U.S. banks, factors and other financial institutions that provide asset-based commercial financing and factoring to corporate borrowers. We have about 240 members all across the country; and we sincerely appreciate the opportunity to speak today on the impact of the proposed regulation.

[18] By way of background, most of the borrowers who are serviced by CFA members, are companies that can't obtain financing by borrowing, and must borrow against their accounts receivable, against their inventory, or equipment. This is not unsecured lending. It is strictly asset-based lending.

[19] Just to give you an idea of the parameters of our membership, based upon the most recent figures, we estimate that CFA members presently exceed $300 billion in outstanding secured loans. We want to talk to you this morning about a certain segment of our membership. Because various CFA members engage in factoring. It's on their behalf that I appear today.

[20] Basically, and certainly whatever questions you have, a factor is a specific type of lender. A factor not only makes direct loans to its borrower, based on the asset value of the borrower's assets, but also takes by assignment from its borrower certain of its trade receivables in full or partial satisfaction of additional advances that are made specifically against the receivables.

[21] If and when the borrower's customer fails to pay, it's the factor who may in certain situations bear the risk of loss. Nevertheless, it's the borrower who is always the party with the greatest knowledge and contact with its customer -- who we call the "account debtor."

[22] Specifically, the CFA seeks clarification that certain organizations that engage in the business of factoring accounts receivable are firms not directly affiliated with their borrower, arising in the ordinary course of the borrower's business, are not required to report discharges of indebtedness related to each such account.

[23] We believe that the obligation to report discharge of indebtedness relating to factored receivables of our borrower should fall upon the borrower. The borrower originated the receivable.

[24] We believe this is the proper approach because the borrower has the direct relationship with the debtor whose debt is being discharged, and can in the normal course of business, have this relationship with its customer; and therefore, more easily obtain the customer's federal tax ID number and other information.

[25] It would be very burdensome for the factor to obtain and authenticate the information required. Let me give an example.

[26] An individual factor may have 200 plus or minus borrowers. Each borrower, in turn, may have 500 to a thousand customers. To obtain the tax identification number for each receivable, when assigned, would be time consuming and expensive; and the direct effect of making us do this would drive up the price of the money that we would advance to our borrower.

[27] This reporting requirement, however, would not be nearly as onerous for the borrower, and certainly less expensive. We understand the desirability of information reporting, but submit that the obligation ought to appropriately be tailored to the facts.

[28] We believe that an analysis of the language of 6050P supports our position. Subsection (a) requires "Any applicable entity which discharges indebtedness to file a return describing the discharge." The statutory language suggests that "If the factor is not actually the party, which discharges the indebtedness of the underlying debt, the requirements of 6050P are applicable."

[29] Neither the statutory language of 6050P nor the regulations originally promulgated thereunder, nor the proposed regulations, discuss debt discharges in the context of any relationship, other than a debtor/creditor relationship.

[30] Although the silence in the existing guidance does not necessarily mean that Congress or the IRS understood that 6050P was inapplicable to factoring transactions, or other debt discharges undertaken by assignments, it does raise the inference that a true, indirect relationship was not contemplated as being within the ambient of the informational reporting requirements.

[31] When receivables for which a factor has previously assumed the risk are written off or written down, a connection still exists between the original creditor and the trade debtor. The factor is not the person actually discharging the indebtedness. Instead, it is absorbing the negative consequences of a credit risk that it assumed in the normal course of its business.

[32] In such an instance, the fair outcome would be for the original creditor to report the discharge, or in the alternative, for the payer of the receivables to be solely responsible for properly reporting such cancellation of indebtedness.

[33] Burdening an indirect third party, such as a factor, with information reporting imposes cost and inconvenience on it that are entirely out of proportion to the additional income tax reporting accuracy hoped to be achieved.

[34] We suggest and ask you to clarify that the statutory and regulatory silence on this specific issue implies that factors in the ordinary course of business are not subject to section 6050P information reporting requirements with respect to the receivables they factor.

[35] An alternative justification for this clarification is that requiring factors to comply with the proposed regulations would impose undue hardship on their business because the costs associated with compliance and the benefits would be small and more costly.

[36] I appreciate the opportunity to make these comments and would gladly entertain any questions you might have.

[37] MR. WILSON: Thank you, Mr. Helfat. Any questions?

[No verbal response.]

[38] MR. WILSON: Mr. Helfat, I appreciate your coming today. I think it would be helpful if you would expand a little bit on how factors operate. In the typical situation, is the factor lending money against a pool of loans that are still retained by the borrower; or are they purchasing loans from the borrower? I guess it wouldn't be the borrower under those circumstances.

[39] MR. HELFAT: Right. Let me see if I can help. Because unfortunately, factoring like anything else doesn't have -- has many variations.

[40] MR. WILSON: Sure.

[41] MR. HELFAT: But let me give you what would be called a traditional view of factoring.

[42] A traditional view of factoring is that the factor -- that -- let me give you an example. A textile mill, for example, or - because that's where factoring originated. In this country, factoring originated with textile manufacturers, and then it expanded to many different industries.

6050P Regulation Public File Page 27 of 67

[43] A clear example is that the textile mill wants to sell to a manufacturer, and they have a cash-flow problem, they have insufficient liquidity, so in order to be able to operate their business, they would take their receivables that they have -- they're going to manufacture the garment or the piece of fabric, and they're going to sell it to a manufacturer.

[44] They would take their receivables, traditionally, to a factor who would examine the credit risk, and then decide how much they would advance against that receivable. So it would be the receivable that is owed, the textile mill is owed that receivable from the manufacturer, the factor examines the credit risk, and then makes an advance. That's how it traditionally started out.

[45] It then got expanded into many different areas because in some situations, the mill does not want the manufacturer to know that its receivables are being factored. Because some manufacturers feel that it is not a good policy. And so, actually the receivable -- the payer of the receivable in my example, the manufacturer who is buying goods from the textile mill, may not even know that its receivables are being factored.

[46] MR. NOVEY: So, you're saying the manufacturer -- they don't want the manufacturer to know that it's being factored?

[47] MR. HELFAT: Right. I'm sorry, Michael. I apologize.

[48] Yes, the person who owes the obligation, in some instances, will not even know that the party who was taking the receivables to the factor for discounting even knows; and that is called in the trade, "non-notification factoring." Fairly simple. It's called "non-notification factoring." And it happens -- that is a different variation of factoring, but still very common in the factoring industry.

[49] Then there are the situations where -- and this goes to part of the de minimis rule that you gentlemen and ladies have discussed in the regulation. The de minimis rule is that some factors will say, "Look, under $5,000, whatever credits you have, we will just check them in bulk."

[50] Instead of doing an analysis of each one of these receivables -- whether they're creditworthy or not, up to a certain amount, we will take all of your receivables in bulk and give you a - - if you've got 50 receivables all under $5,000, we'll make a credit decision that some of them will pay, and we will give you a bulk number on those receivables and not analyze each individual receivable to see what its value is.

[51] But when we get all back to this, the relationship that the factor has in each situation is with its borrower. That is the primary responsibility. It's a debtor/creditor relationship. The creditor is coming to us -- our borrower is coming to us and using its receivables as currency to get advances. But in most situations, it doesn't know anything about the ultimate customer, other than its credit history.

[52] MS. WELCH: Mr. Helfat, is the -- and I don't know which mike works -- is the textile mill in your example, who's the borrower?

[53] MR. HELFAT: Yes.

[54] MS. WELCH: And they're going to actually discharge the underlying debt or the account receivable of the manufacturer. Correct?

[55] MR. HELFAT: They are going to ultimately have the -- it's a little more complicated, so, let me try to be clear.

[56] While in the situation I gave you -- and I want to give you one more situation. In the situation I

6050P Regulation Public File Page 28 of 67

gave you, the factor will absorb the credit risk.

[57] MS. WELCH: Right.

[58] MR. HELFAT: It will still be on the books --

[59] MS. WELCH: Of the textile mill?

[60] MR. HELFAT: It will still be on the books of the creditor, the textile mill, but that loss will be cushioned by the fact that they will still be able to keep the advance that they received from the factor, but it still remains on the textile mill's books and records.

[61] MS. WELCH: I'm just thinking. In your -- one of your arguments is that the textile mill is actually the one that's discharging the indebtedness.

[62] MR. HELFAT: Uhm hum.

[63] MS. WELCH: I'm wondering, are they -- do you think they are an applicable entity within the meaning of 6050P? Or are you the only applicable entity within the meaning of 6050P?

[64] MR. HELFAT: I think they are the party who is, in the technical sense, discharging the indebtedness. We're taking a credit risk; and it would be one thing --

[65] MS. WELCH: You're lending money?

[66] MR. HELFAT: We're lending money.

[67] MS. WELCH: Right.

[68] MR. HELFAT: It would be one thing, Ms. Welch, if the borrower came to us and said, "Here are my accounts receivable, and here are the tax ID numbers, and here is some of the information. We would then -- we are taking thousands upon thousands of these receivables as collateral, every day of the week.

[69] MS. WELCH: Right.

[70] MR. HELFAT: It would be one thing if the -- if the -- our borrower came to us with this information, we could then report it. But we take it long before the occurrence -- before there is an occurrence, under your definition. Long before there is an occurrence, we are taking in these receivables.

[71] So, for us at the initial entry level to take in these receivables, and to absorb the credit risk -- as you would hope 99.99 percent of the receivables do pay. I mean, I don't want to mislead you. We don't take -- we try not to take bad receivables. We're in the business of trying to take receivables that, in fact, do pay.

[72] But it's one thing to get this information at the time that we book them, and that would be easy for our borrower to do -- at the time of the incurrence. You can only imagine that we're not getting paid, and it is very difficult to get this information. Yet the borrowers in many instances still have a relationship with the party that is being discharged. Because we traditionally buy receivable-by-receivable; and therefore, they may have a continuing relationship with the borrower -- with the ultimate customer, and they'd be able to get this information even though the receivable that we have is uncollectible.

[73] Because there's everything from merchandise disputes -- I just don't want to go on and burden you, but there are a lot of reasons that receivables don't pay; and it doesn't mean that the company is necessarily out of business. It just means that particular receivable that we bought isn't pay. But that customer could be out there and able to pay other receivables, and therefore, our borrower could get that information a lot more easily than we could.

[74] MR. WILSON: I'm interested in a little more on the -- who bears the risk of loss here, and how that operates?

[75] How does the money flow? You have the clothing manufacturer owing money on an account receivable to the textile mill, then the textile mill factors it to the factorer. The money that's paid on the account receivable, does it flow directly from the clothing manufacturer to the textile mill, who then pays the factor?

[76] MR. HELFAT: No, we work on an advance basis. We work on an advance basis, Mr. Wilson.

[77] The factor -- this is how the factor is able to work well, and let me give you an example. What happens -- I may not -- I hope I'm answering your question. So, let me give you the answer that I would -- that I think you're looking for.

[78] When that receivable is created, it usually has a term. It can be 30 days, 60 days, 90 days. But the ultimate customer has a period of time in which to pay the textile mill. They'll come to us at the time that the receivable is created -- at the creation of the receivable and say, "Look, you'll get your money in 60 or 90 days, Mr. Factor. We would like an advance, 80 percent, 60 percent, 90 percent" -- it's a negotiation -- an advance against this receivable.

[79] So, the factor gives an advance against the receivable and at the end of 60 or 90 days, hopefully the receivable is paid. If an occurrence happens in the interim -- the easiest one being, let's say, an insolvency occurs in the interim, and the customer -- and the textile mill in my example hasn't changed the term, hasn't taken back goods, hasn't done something to change the invoice that was presented to the factor, then they get to basically get the benefit of this advance.

[80] If they had done something in the interim to change the contract, and had not gotten the approval of the factor, the factor would actually come after its borrower for money in advance that was not in accordance with the contract. But the answer is, we give advances. We give advances anywhere from 50 percent to 85 percent on the receivable, as they are created.

[81] MR. NOVEY: Now, it would help me to understand what's going on to clarify some terminology.

[82] MR. HELFAT: Certainly.

[83] MR. NOVEY: Because, during the course of our discussion, the person with whom you have a direct relation has been referred to you as both, "our customer" and "our borrower."

[84] MR. HELFAT: Oh, okay --

[85] MR. NOVEY: No, and the person with whom you have only an indirect relation has been referred to as both "the customer" and the "original borrower." Both of those sort of have loaded terms in terms of the legal relationship. If we can start off with some terms that don't imply the answer, that might be useful.

[86] I guess the other -- the first question that I have, and let me ask you the ultimate question; and

then, if necessary, we'll look into the particulars that lead to it. There is clearly, as I understand your presentation to us, a debt instrument issued by the person with whom you have only an indirect relationship -- the receivable.

[87] MR. HELFAT: Uhm hum.

[88] MS. WELCH: The account receivable.

[89] MR. NOVEY: Pardon me?

[90] MS. WELCH: It's an account receivable.

[91] MR. NOVEY: Yeah.

[92] MS. WELCH: Right.

[93] MR. NOVEY: And, what isn't clear to me is whether or not - or, not knowing whether, but if so, when you become the owner of that piece of property?

[94] MR. WILSON: You never sense economic benefits and burdens.

[95] MR. NOVEY: Only for tax purposes. I mean, let's ask first the ultimate tax question: Who's the owner of the receivable at which point in time; and then if you need to say, "Well, it depends." Give us the facts on which it would depend.

[96] MR. HELFAT: The underlying answer, of course, is what the parties negotiate in their contract. But in the example that I gave you, okay, if the factor were to advance 50 percent on the receivable, okay? And the receivable, then, did not collect. Okay?

[97] Then, the factor would have two rights. The first would be to go to his borrower and say to the borrower, "You gave that receivable" -- "I took the credit risk on that receivable, and therefore, I have" --

[98] MR. NOVEY: You say, "His borrower."

[99] MR. HELFAT: Oh, I'm sorry. Let me be more specific.

[100] Once there is an assignment of the receivable by the borrower to the factor, and the factor absorbs the credit risk, that is the factor's responsibility.

[101] MR. NOVEY: So you're saying, at that point, that was a sale of the receivable to the factor for tax purposes?

[102] MS. WELCH: Or a loan.

[103] MR. NOVEY: No, no, well that's --

[104] MR. WILSON: Or a sale.

[105] MR. NOVEY: Well, I'm asking.

[106] You say -- you refer to the merchant, let's say, as being your borrower.

6050P Regulation Public File Page 31 of 67

*[107] MR. HELFAT: Uhm hum.*

[108] MR. NOVEY: But the question is, although it may be that historically merchants borrowed from factors putting up their receivables as collateral.

[109] MR. HELFAT: Right.

[110] MR. NOVEY: The question is -- in the world that these regs when they become final will apply to -- who is the owner of the receivable? Is the receivable sold from the merchant to the factor; or is the merchant borrowing from the factor?

[111] MR. HELFAT: In the classic sense -- in the classic sense, certainly -- while we don't term it -- it's termed an assignment, certainly the credit risk resides with the factor. If they in fact get an assignment of an account receivable, and it doesn't pay, and it's met all the terms, the factor will absorb that credit risk.

[112] MR. NOVEY: To the extent that the factor has purchased -- sorry. To the extent that the amount of money transferred from the factor to the merchant, in exchange for its rights with respect to the receivables --

[113] MR. HELFAT: Uhm hum.

[114] MR. NOVEY: And to the extent that the amount that it ultimately -- the amount that is ultimately paid on the receivables significantly exceeds the amount transferred from the factor, does that amount inure to the benefit of the factor or of the merchant? Everything pays off 100 percent.

[115] MR. HELFAT: Everything pays off 100 percent.

[116] MR. NOVEY: Okay.

[117] MR. HELFAT: If everything pays off 100 percent, since we've only advanced 75 cents on the dollar, and the ultimate receivable is paid at 100 cents on the dollar?

[118] MR. NOVEY: Who gets the nickel -- the quarter?

[119] MR. HELFAT: The quarter goes back to our borrower.

[120] MR. NOVEY: The quarter goes to the merchant?

[121] MR. HELFAT: To the merchant, right. I called it borrower, but you're right, the merchant.

[122] MR. NOVEY: Okay.

[123] MR. HELFAT: The merchant gets 25 cents back and we charge a commission of one percent.

[124] MR. WILSON: And if it pays zero, the merchant absorbs the 25 percent and you absorb the -- and the factor absorbs the 75 percent?

[125] MR. HELFAT: That is correct.

[126] MR. WILSON: So it's a shared risk?

6050P Regulation Public File Page 32 of 67

[127] MR. HELFAT: It's a shared risk.

[128] I'm sorry I wasn't clear. I apologize.

[129] MR. NOVEY: That's all right. That's the purpose of the hearing.

[130] So in other words, you're saying that the merchant retains 100 percent of the upside, and the factor has 100 percent of the downside, and you say there's one percent you call "commission?"

[131] MR. HELFAT: The way this is priced, the pricing goes something like this. Okay?

[132] On all receivables that are discounted, assigned to the factor, they charge a commission; and that commission can range from a half percent to a percent and a half. That is the commission that is charged.

[133] MR. NOVEY: And when you say -- just in terms of the person from Mars, who doesn't know anything about our legal relations, they can watch money move back and forth.

[134] MR. HELFAT: Right.

[135] MR. NOVEY: Just describe to us what money moves back and forth, under what terms? In other words, does this end up being one percent -- a one percent reduction in the amount of money that you give to the merchant? Is it -- I mean, how does that --

[136] MR. HELFAT: In the classic sense, the commission -- the commission rate would be charged against -- in a pure one invoice situation, in a pure one invoice situation -- it would be charged against that receivable.

[137] MR. NOVEY: When you say, "charged against that receivable," if you had a 75 cents on the dollar factor with a one percent commission, does that mean that on day one you give the merchant $74 for $100 receivable?

[138] MR. HELFAT: It does and it doesn't, because the borrower is responsible for the commission, regardless --

[139] MR. NOVEY: The merchant?

[140] MR. HELFAT: The merchant is responsible for the commission, even if the receivable doesn't pay, or does pay. It is a charge that goes against --

[141] MR. NOVEY: Okay, but what I'm saying is, I'm wondering whether the initial amount paid by you to the merchant is simply paid net of the commission? Or whether at some subsequent point the commission charges are supposed to come back to you?

[142] MR. HELFAT: The commission charges -- so you wanted the way -- the movement of the money. Let me help you with the movement of the money.

[143] MR. NOVEY: Okay.

[144] MR. HELFAT: Okay. Factoring is done on a monthly basis. Factors account -- do their accounts on a monthly basis.

[145] MR. NOVEY: Can we do the simple, even if unrealistic thing, of a single invoice?

[146] MR. HELFAT: Yes.

[147] MR. NOVEY: Okay.

[148] MR. HELFAT: On the first day of the month, the merchant shows up at the factor with a receivable. Okay?

[149] MR. NOVEY: Uhm hum.

[150] MR. HELFAT: Whatever that receivable is on the face amount of that receivable, there is a commission charge based upon the face amount of that receivable, before the factor even considers whether it is worthy of discounting.

[151] MR. NOVEY: Okay, so, let's assume the receivable is a hundred bucks.

[152] MR. HELFAT: Right. So that one percent charge is the charge for the processing.

[153] MR. NOVEY: So, the merchant on day one pays -- you say it can be between 0.5 and 1.5, let's say that it's one. The merchant pays a dollar.

[154] MR. HELFAT: Right.

[155] MR. NOVEY: Okay.

[156] MR. HELFAT: Now we have a receivable and the credit analyst at the factor will now analyze the credit risk of that receivable.

[157] MR. NOVEY: Uhm hum.

[158] MR. HELFAT: He analyzes the credit risk and says, "This isn't worth factoring. We're not going to advance penny one. This is K-Mart. We're not going to give them penny one." Okay? The charge for the factoring still exists. The commission still exists.

[159] MR. NOVEY: Okay.

[160] MR. HELFAT: Now the factor says, "Oh, this is Walmart. We'll give you 50 cents on the dollar on your Walmart receivables." So, in fact, the factor advances that money.

[161] Now Walmart pays 100 percent and the factor gives back the other 50 percent, because they only advanced 50 cents on the dollar.

[162] MR. NOVEY: So you're saying that the factor -- since 50 percent is going to get --

[163] MR. HELFAT: Oh, okay, I'm sorry. Let's say it's 75 percent. Let's assume we advanced 75 percent on the dollar.

[164] MR. NOVEY: Okay.

[165] MR. HELFAT: Now we give -- and on the first day of the month, that first day of the month, the receivable's 90 days out -- the first day of the month we will give the 75 cents on the dollar

6050P Regulation Public File Page 34 of 67

against the receivable.

[166] MR. NOVEY: Okay, so the moment that the analyst says, "I like this credit."

[167] MR. HELFAT: Uhm hum.

[168] MR. NOVEY: You guys cut a check to your merchant for $75.

[169] MR. HELFAT: Actually, wire it.

[170] MR. NOVEY: Okay, more efficient. Sorry.

[Laughter.]

[171] MR. HELFAT: We'll wire a check to our borrower.

[172] MR. NOVEY: Okay.

[173] MR. HELFAT: Which is the merchant.

[174] MR. NOVEY: Okay, to the merchant.

[175] MR. HELFAT: Okay?

[176] MR. NOVEY: I'm with you.

[177] MR. HELFAT: Now, there is an additional charge, depending how long that money is outstanding. Example, the ultimate customer doesn't pay promptly. There are changes in terms. There may be additional charges for those issues. However, if the receivable pays 100 cents on the dollar, under our example, 75 percent goes back to the factor, and 25 percent goes to the merchant.

[178] MR. NOVEY: Okay.

[179] MR. HELFAT: And we call that 25 percent in the parlance of factoring, a credit balance.

[180] MR. NOVEY: A credit balance?

[181] MR. HELFAT: A credit balance.

[182] MR. NOVEY: So, if it pays in full --

[183] MR. HELFAT: Because here's what happens.

[184] MR. NOVEY: Uhm hum.

[185] MR. HELFAT: In the real world, the factor -- the borrower doesn't ask for his 25 percent. They somewhat bank with us. So the 25 percent stays in our account, so they have the ability to re-borrow.

[186] MR. NOVEY: Yes.

[187] MR. HELFAT: So we don't actually send them the quarter, but they have an account with the factor, and their credit balance is held. Because they want it that way. It's not because we don't want to give it to them.

[188] MR. NOVEY: Sure.

[189] MR. HELFAT: Because, once we give it to them, we charge interest. So they say, "Hey, look, hold the 25 percent. Because if we borrow that back down, we will have to pay interest on it."

[190] MR. WILSON: So, in your example, the customer is paying the factor on the account receivable; or are they sending payment to the merchant?

[191] MR. HELFAT: Very interesting. Okay?

[192] MR. NOVEY: Who's servicing this?

[193] MR. HELFAT: Okay, okay.

[194] The factor works one of two ways with the merchant. The merchant can either keep its own account, and that's its own live checks -- for lack of a better term. The merchant can actually get the ultimate customer to pay it, and then it will take those live checks and basically assign them to the factor.

[195] MR. NOVEY: When you say, "assign" them, you just pay them over?

[196] MR. HELFAT: Right, endorse them over -- endorse them over.

[197] But what is more the practice in the industry is one of two hybrids. Either the ultimate customer is told to pay at PO box -- a blind PO box that they do not necessarily care what it says; and that PO box is under the control of the factor. Or they'll be told, and the invoices will be stamped to pay the factor, directly.

[198] The reason that it would go to a blind PO box is where the merchant is unwilling to disclose to the customer that they are a factor. The other is where it is not of importance to the merchant, and then we basically label the receivables which say, "Don't pay the merchant, pay us."

[199] But is all a risk in a financial situation, and we have thousands upon thousands of receivables. I mean, it's a huge business. And if you wanted more backup on factoring, I will be glad to send you a letter describing how much volume the factoring community itself is involved in.

[200] MR. NOVEY: We know it's big.

[201] MR. HELFAT: It's big.

[202] MR. NOVEY: But I mean, what we're trying to do is to -- I mean, to the extent that the obligation under 5060P are going to be - - we'll find at least relevant, if not determinative, the question of who owns the receivable, the reason that I was going to go through this agonizing detail - -

[203] MR. HELFAT: No, no, no, my fault. I should have been more explicit.

[204] MR. NOVEY: -- was just that, if you've got a situation where the -- if the factor were solely a lender to the merchant, and one was dealing with some sort of contingent debt obligation, which was paying according to its terms where some of these contingencies could result in your not getting back everything that you expected to get, then the question of discharge of the debt that you held would be whether you had discharged the merchant.

6050P Regulation Public File Page 36 of 67

[205] And the merchant might or might not have obligations with respect to the receivables that it was treated as continuing to hold, depending on whether it fits within the exception that we've created.

[206] MR. HELFAT: Correct.

[207] MR. NOVEY: Okay. On the other hand, if for tax purposes you have purchased the receivable, then the result might be very different. And, obviously to get to that possible conclusion on our part concerns you, and is why you're in here today.

[208] MR. HELFAT: Uhm hum.

[209] Now, there's another wrinkle --

[210] MR. NOVEY: No, no, if I'm missing a wrinkle, please tell me now.

[211] MR. HELFAT: Okay. One of the traditional attributes of factoring is that it helps and streamlines the merchant's need for bookkeeping. So it's normal that the merchant will come to the factor with all of its receivables. Some of which deserve no credit, whatsoever.

[212] And therefore, the merchant -- okay -- will not get any advance. There'll be no advance. These receivables are on -- while they remain on the merchant's books, they're the merchant's receivables, the question of helping with collection and administration is also a service that factors offer to their borrowers, which is basically trying to help them do their own collections and their own administration, and there is no risk whatsoever that the factor takes. All they do is charge a fee for basically what you might call a bookkeeping function, which is really a collection function, as the factors consider them. And therefore, that is another business that factors are in.

[213] What I guess I'm having trouble understanding -- if I might ask a question -- is, it would be one thing if the factor was presented by the borrower with -- the hardest component of reporting is the tax identification number. That is singly the reason that I came to see the people here today. That is the single hardest, reporting. Because obviously there's no such things as a register or any way to find these things out.

[214] So the question is, when the borrower comes to us, when the merchant comes to us with the receivable, if the merchant comes without the tax ID number, and that is something that is going to be put on the shoulders of the factor to do, they're just going to charge for it.

[215] MS. WELCH: When you --

[216] MR. HELFAT: And -- and it's going to be -- and unfortunately they'll have to set up an infrastructure to be able to monitor this when wouldn't it be easier and better reporting for you that I could -- we could have these numbers on day one.

[217] Because the factor -- because the borrower, the merchant would be required, before we would take in the receivables on any purpose, to come with the taxpayer ID number. Because at that time there are two parties who are incentivized to give the tax ID number -- the ultimate customer who wants to make a sale; and the merchant who wants to get some money.

[218] So there are two parties not in the debtor/creditor relationship who are interested in seeing this function go as smoothly as possible. They would be more than happy to show up with their tax ID number, because they're going to get something for it.

6050P Regulation Public File Page 37 of 67

[219] MR. NOVEY: Uhm hum.

[220] MR. HELFAT: At the time of the event, unfortunately, it's very difficult to perform the function.

[221] MR. NOVEY: I guess the one thing that I hear you saying there is that we should allow enough advance time, after we go final with these regulations and before they kick in, so that factors if they wish to could tell their merchants in time for the merchants to tell the merchants' customers, "If you want to do business in the traditional way, you'll have to pass along a taxpayer ID number at the beginning of the process."

[222] The other question I was wondering is -- and given the fact that you have suggested that on the whole a lot of these customers are not large and not sophisticated. I guess there would be no legal impediment to you guys making the merchant your agent for doing this reporting, if you trusted them to do it right.

[223] MR. HELFAT: Right, if we could -- right, if we trusted them to do it right. And that becomes the next question, is that when our borrowers -- the merchants -- show up with these tax identification numbers, we have no idea whether they're right or wrong.

[224] MR. NOVEY: Uh huh.

[225] MR. HELFAT: I mean, you know, it's -- these are undercapitalized companies --

[226] MS. WELCH: But they generally --

[227] MR. HELFAT: -- selling to, basically -- this is truly middle America. This is not -- these are not, you know, multi- million dollar sales and we basically trust our borrowers to come up with the right information. Sometimes they do, sometimes they don't.

[228] MR. NOVEY: I assume that this stuff is so short term that once the -- once you obtain your interest in the receivables -- I'm trying to be as --

[229] MR. HELFAT: Right.

[230] MR. NOVEY: -- as neutral as I can in my terminology.

[231] Once you obtain your interest in the receivables, you all do not then securitize it, say, out into the capital markets anyway?

[232] MR. HELFAT: No. It is unsecured debt in that term. It's 60 and 90-day debt.

[233] MR. NOVEY: No, no. I'm talking about whether it's collateralized. I'm saying, do you guys securitize it in terms of --

[234] MR. HELFAT: No.

[235] MR. NOVEY: -- pooling it and having investors obtain some -

[236] MR. HELFAT: There was some effort several years ago with a finance company in California called Fremont to try to do just what you were saying. It was called Fremont Capital. They tried.

6050P Regulation Public File Page 38 of 67

[237] And I'm sure if you check, it's easy enough to do. You'll find that Fremont, in fact, tried to do just what you're saying; and there was another company called Capital Factor some years ago who tried to do just what you're saying.

[238] But on the main, those are the rarities. That is not typical of the industry -- typical of the industry is that they are not secured funds.

[239] MR. NOVEY: Because you mean -- even short term, I mean, if there are at least some securitization of vehicles typically involving off-shore trusts or off-shore parties, so you could get the revolving stuff going; and even short-term receivables can be securitized.

[240] But you're saying that's not --

[241] MR. HELFAT: That's not our norm. What is more than norm is buying insurance. Many of these factors, while they can't get insurance back-to-back to the amount that they advance, some of them have tried and have been successful in getting insurance policies -- what we might call "re-insurance" - try to get insurance policies as a backup.

[242] But the insurance companies do not give nearly 100 percent coverage. It is a fraction of the coverage. But still there are some of the factors who do go out and try to purchase insurance.

[243] MR. NOVEY: But since the -- you're saying the ultimate credit risk is the retail customer -- the merchant, some of the newer, more sophisticated means of transferring credit risk, obviously, wouldn't apply to that?

[244] MR. HELFAT: I guess.

[Laughter.]

[245] MR. HELFAT: You know, the better credit relationships get very expanded, and we've found -- the reason we came today is because we thought that the regulations were sort of silent, and we didn't want to fall into the trap of being in the situation where maybe --

[246] MR. NOVEY: You thought you knew what we meant, and we meant something different.

[247] MR. HELFAT: Yeah, right. That's -- we don't want to be there.

[248] MR. NOVEY: Yeah.

[249] MR. HELFAT: Is this something that's going to happen quickly?

[250] MR. NOVEY: Well, it should have happened last year or the year before, so --

[Laughter.]

[251] MR. NOVEY: We're going to try.

[252] MS. WELCH: I have a question.

[253] MR. NOVEY: One, one -- just one thought.

[254] For tax reporting purposes, how do the members of your trade association report these? Do they

6050P Regulation Public File Page 39 of 67

report them as owning - do they report themselves as owning the receivables from the merchant's customers? Or, do they report themselves as owning contingent debt issued by the merchant?

[255] MR. HELFAT: I don't want to misspeak. If I could get back to you, I would rather get back to you.

[256] MR. NOVEY: Sure.

[257] MR. HELFAT: Because I don't know the answer to that question, and I will be glad to --

[258] MR. NOVEY: Thanks.

[259] MS. WELCH: Then, I have a question.

[260] When the merchant, or the manufacturer sends up his accounts receivable, does the merchant have the name and TIN then?

[261] MR. HELFAT: The merchant makes the sale to the ultimate customer.

[262] MS. WELCH: Right.

[263] MR. HELFAT: Do they have the tax identification number?

[264] MS. WELCH: Right.

[265] MR. HELFAT: I don't know the answer to that question. I would say to you that they only have access to. I do not know if they have -- I honestly don't know whether they do have it. All I know is that they have the relationship. I don't know if they would have the exact identification number. They only have the relationship.

[266] MS. WELCH: When evaluating the receivable, you don't have access, then, to name and TIN of underlying customer?

[267] MR. HELFAT: It is not something that the factor has at the time it makes its credit decision.

[268] MR. NOVEY: Am I right in speculating that the way this business works is that these are short-term receivables, you guys will loan 75 cents on the dollar only for receivables that you expect to pay off, let's say, at 90 or 95 cents on the dollar, and -- so that although you have borne some ultimate downside, there is a fair amount of cushion between the amount that you have exposure to and where everybody expects these receivables to actually perform at?

[269] MR. HELFAT: Except for the occasional loss leader. The answer is clearly that we are evaluating it as a cash flow device, not to try to necessarily -- yes. The answer to you question is, is the cash flow device for our merchant -- for the borrower in the example and the -- no matter how gold plated a receivable may be, it doesn't get a hundred cents.

[270] MR. NOVEY: Sure.

[271] MR. HELFAT: So, it could be the best receivable in North America. No receivable gets a hundred percent.

[272] MR. NOVEY: No, what I'm saying is, if somebody said, "We really" -- "This merchant had a history of all their stuff paying off 95 cents on the dollar," let's say.

6050P Regulation Public File Page 40 of 67

[273] MR. HELFAT: Uhm hum.

[274] MR. NOVEY: And, you know, there's a little bit of variation above that, a little variation below that, but all in the whole, year-after-year, they're 95 cents on the dollar. You guys would not advance the 95 on the dollar, or even 90, you'd be somewhere way south of that so that you've got a big cushion. Is that a correct presumption on my part or incorrect?

[275] MR. HELFAT: That's how it used to be when factoring was in the more formative stage. The way it has developed in today's world is that we either take it or we don't take it, and it usually is at a percentage.

[276] So, many times what will happen is that the factor will evaluate the borrower's portfolio, and it will go into the borrower and look at its entire portfolio of receivables and say, "There're some good ones, there're some bad ones. Tell you what we'll do. As a business basis, we'll advance 75 percent on all the ones we're willing to take. Now, there're some we're not willing to take. You get zero for those. But if we take it, we'll give you 75 cents on the dollar."

[277] That is how the business has sort of moved from the traditional, one invoice example that we gave a while ago. It has moved to analyzing portfolios.

[278] MR. NOVEY: And, when you analyze the portfolio, the amount that you're giving is -- since you've got virtually no upside, it's got to be way south of where you think the thing is actually going to perform?

[279] MR. HELFAT: A typical advance -- the highest advance rate you would ever see would be 85 percent, 75 percent is typical. Yes, there is a cushion in the receivables.

[280] And the biggest -- interestingly enough, just as an aside for you -- the biggest issue, of course, in collecting the receivables is not so much as bad debts as merchandise disputes.

[Pause.]

[281] MR. NOVEY: And, in a situation where you have provided cash with respect to a particular receivable, and the customer then objects to the quality of the merchandise, say, returns it because it was junk, do you take the hit or does the merchant take the hit?

[282] MR. HELFAT: That's called a charge back, and all that the factor is doing is a financial transaction. If there is a merchandise dispute, then, we ask our merchant -- our borrower -- back for the money. We charge their account. We take it back because we are only in the finance business. We're not in the merchandise business.

[283] MR. NOVEY: So the merchandise disputes produce hassle and headache for you, but they don't produce actual, non- administrative cash out of pocket?

[284] MR. HELFAT: Yes. I will tell you, though, that while it is not written in the Bible, merchandise disputes lead to insolvencies.

[Laughter.]

[285] MR. HELFAT: I think the first step in not paying your bills is disputing the goods. "They're not the right quality. I didn't get them timely," that is very, very often the first step on to not paying the receivables.

[286] *But, as far as the factor is concerned, if the ultimate customer says to the factor when they try to collect, or to the mill -- the merchant when he tries to collect, that the garments are inferior or whatever, that becomes a charge back and it's charged back against the merchant.*

[287] MR. NOVEY: And you say, "Becomes a charge back," that means the merchant gives you back the --

[288] MR. HELFAT: Advance.

[289] MR. NOVEY: The 75 percent?

[290] MR. HELFAT: Correct.

[291] MR. NOVEY: And you nevertheless keep the one percent that was charged up front?

[292] MR. HELFAT: That's correct.

[Pause.]

[293] MR. DEWALD: In the contract between the factor and the merchant, is the merchant left with much control over the accounts receivable? For example, can they change the payment, like the length of the account receivable?

[294] MR. HELFAT: Mr. Dewald, they would have to get our approval. They would have to get the factor's approval to do that, because the way the contracts are written, if they walk in with a receivable that says 30 days, we may think that customer A is fine for 30 days. They can pay their bills.

[295] But if the merchant goes ahead and unilaterally changes it to 90 days, we may think that that merchant -- that customer at the end of 90 days may be at the wrong time of year and we don't really want paper from that customer at 90 days, but 30 days is fine.

[296] So, yes. They would have to stick to the contract, or that's another reason to charge back the receivable. We would charge that back to our merchant in the example.

[297] MR. DEWALD: So, ultimately, the factor has control of nearly every aspect of the account receivable?

[298] MR. HELFAT: Well, in your example -- or in the example I just gave, if the merchant thinks that that's a good receivable, even though we have taken it in and now given it back, the merchant will go ahead and try to -- that will be on its -- that will be a merchant who will not get an advance, but that's very much the merchant's receivable. I mean, if it pays it pays. But it's the merchant who is taking the credit risk.

[299] Now we may have it on our books. I don't want to get too complicated. It may still be on the factor's books. It's just the factor is not taking the credit risk on this receivable. It just may now perform only a bookkeeping service. We'll perform bookkeeping service. We'll make sure there's some collection efforts. But in the end, if it doesn't pay, that credit risk is not the factor's.

[300] MR. NOVEY: The situation where you were using the phrase, "On the factor's books" --

[301] MR. HELFAT: Right.

6050P Regulation Public File Page 42 of 67

[302] MR. NOVEY: *This is not synonymous with the factor doing the servicing? In other words,* you've got a situation where somehow the merchant is still doing the servicing of the loan, the factor is not on the hook or any downside, but you refer to it as being, "On the factor's books?"

[303] MR. HELFAT: Well --

[304] MR. NOVEY: Or is, "On the factor's books," synonymous with servicing it?

[305] MR. HELFAT: If we are going to do the servicing, whether we advance or don't advance, take a risk, don't take a risk, if the merchant comes to us and says, "Look, I was really interested in the bookkeeping services, as well," the collection service -- it's really the collection services.

[306] If I'm interested in the collection services, well I've got to give you the information so you can collect. So, we take it in and set up a ledger for it.

[307] MR. NOVEY: Okay, but the situation in which you have paid money to a merchant with respect to a bunch of receivables, but the merchant is continuing to do the collection activity on this -- other than the fact that you guys may be the ones with the post office box --

[308] MR. HELFAT: Right.

[309] MR. NOVEY: I guess if you've got the post office box, how does the merchant know how to do the collection activity?

[310] MR. HELFAT: Well, you raise another hybrid of factoring. Many factors are faced with this situation: The merchant comes and says, "You know, I sell to Federated Department Stores. I sell Walmart. I don't want to give you those receivables. Those receivables are as good as gold.

[311] "I'm not really -- I don't need your services for those receivables. I only need it for the ten accounts that I have that aren't the world's best accounts. Because I don't want to pay a commission. What do I need to pay a commission for Federated, for Walmart. I don't need to pay that one percent." And it is very much a negotiation.

[312] What happens is, in some of those situations, the merchant will in fact divorce -- sort of split its portfolio. Sort of divorce itself from some accounts. But in all situations -- but in all of those situations, while it is negotiated, okay, and there is no hard and fast rule, there may be some receivables that the merchant will not even ask for bookkeeping assistance with.

[313] But the more practical, or the more business relationship is, there's a second set of negotiations. Yes, we'll take the gold-plated ones, but that commission rate will be a fraction of the commission rate that is for another part of the merchant's portfolio.

[314] MR. NOVEY: Just very roughly, the examples you keep offering relate to the historic factoring of, you know -- textile mill and clothing manufacturer.

[315] MR. HELFAT: Right.

[316] MR. NOVEY: And then on these you've referred to presumably product manufacturer and retail outlet. What fraction of the business you're talking about falls into that category and what fraction are we talking about ultimate retail customers being the issuers of the receivables?

[317] MR. HELFAT: Standing here today, I don't know. But I have given you a textile example. But

6050P Regulation Public File Page 43 of 67

factoring is very prevalent in the trucking industry, there are lots of industries that have -- that have factoring as a component. It's just that I'm sort of giving you an historical.

[318] But the trucking industry, for example, is a major industry. Service receivables are becoming very much a factoring type of situation. And trucking receivables are, in fact, one of those that has -- some of our members, we have a decent number of members, CFA, who are in the trucking receivable business -- trucking factoring business.

[319] If you want me to get some more statistics, I will be glad to do so.

[320] MR. NOVEY: I was only -- I'm trying to get a feeling for, you know, are we talking about sort of -- you know -- ultimate -- you know -- natural people, purchasers of third-rate furniture; or are we talking about businesses who are the issuers of the receivables. I'm trying to get a sense of just the -- not that it's necessarily going to be tax relevant, just on -- on -- I'm trying to get a feeling for the businesses.

[321] MR. HELFAT: It's very interesting, because factoring is basically industry driven. The trucking industry has factoring. The furniture industry has factoring. The apparel industry has factor.

[322] MR. NOVEY: And you're talking -- when you say, furniture, apparel, et cetera, you're talking about the manufacturers of these things?

[323] MR. HELFAT: Manufacturers.

[324] MR. NOVEY: Not the retailers?

[325] MR. HELFAT: Not the -- right. The manufacturers in those industries have taken to factoring.

[326] There are other industries that do not have factoring as a component. And I believe the reason that is, is because you need an identifiable customer base in order to do credit examination.

[327] Since this involves discounting receivables, I think that what makes these industries more interested or less interested in factoring, is if you can identify the customers, get credit information on customers. That I think is one of the things that drives what industries -- what manufacturers wind up factoring.

[328] MR. NOVEY: But, if we're now talking about identifiable customer base, some of whom may have publicly traded debt and credit ratings and things like that, at this point when you said you get insurance, you may not be getting only insurance, you may be getting credit swaps on some of these underlying merchant customers -- customers of the merchants.

[329] MR. HELFAT: It's conceivable. That is conceivable, that is correct.

[330] And factoring -- the outgrowth of factoring was that people went to more asset-based lending. When the factors -- the factors, historically, were actually bought by the banks. Fifty years ago, factors were single entrepreneurial businesses.

[331] Starting in the early '60s, these entrepreneurial businesses were, to some extent, bought and became divisions of financial institutions, other than -- there were several large, like CIT, which is still an independent organization. But many of these are divisions, now, of banks.

[332] And clearly, you know, in all of the regs you propose, none of these companies fall outside of any -- they're all financial lending institutions. Factoring is one of the services that now has become a division, a subsidiary of large financial institutions.

[333] So, HSBC has a factoring division. Foothill, Wells Fargo has a factoring division. *These are all divisions*, now -- or are in the main divisions of large financial institutions. It is a type of business that they offer.

[334] So -- but one of the things that I've gotten away from, and I should make sure you understand before I leave, is that the factor performs actually two functions. We have talked now about discounting, or assigning, of receivables. The factor also makes direct loans to its borrowers, as well.

[335] So, the factor not only will be in the business of assignment of receivables, but the factor will advance against -- will also lend money to its borrower on the faith inventory. We'll give it an inventory loan, or do something that has nothing to do with the collection of receivables.

[336] Certainly, if that loan goes bad, we obviously know our own borrower's tax ID number. It is only these third-party receivables that we have the issue with.

[Pause.]

[337] MR. WILSON: Thank you, Mr. Helfat. This has been very helpful.

[338] MR. HELFAT: Thank you. I appreciate it.

[339] Should I follow-up with a letter with you on some information that you were --

[340] MR. NOVEY: That would be useful. Do we need to go through the formality of reopening the comment period? Or just let it come in.

[341] MR. WILSON: I think -- yeah --

[342] MS. WELCH: Just let it come in.

[343] MR. NOVEY: Thanks.

[344] MR. HELFAT: Thank you.

[Whereupon, at 11:10 a.m., the proceedings were
adjourned.]

---

**Date Published:** 10-08-2002
**Date Added to File:** 10/15/2002 09:39 PM EDT
**Microfiche Number:** Doc 2002-23270 (47 original pages)
**Index Terms:**
**Cross Reference:**