# KATZ, SAPPER & MILLER

KSM Business Services, Inc.
An Affiliate of
Katz, Sapper & Miller, LLP
Certified Public Accountants

800 East 96th Street
Suite 500
Indianapolis, IN 46240

March 31, 2004

**Personal Privacy**

## _VIA FASCIMILE_

Internal Revenue Service
1111 Constitution Avenue, N.W., Room 5327
Washington, DC  20224

Attn:   Donna Welch, Esq.
        Special Counsel
        CC:PA:APJP

Re:     Proposed § 6050P Regulations
        Published in the Federal Register June 13, 2002 (the "Proposed Regs.")

Dear Ms. Welch:

Although the deadline for public comment has expired, you have encouraged me to send my comments on the Proposed Regs. promptly, suggesting that my comments, though untimely, may yet be considered. I will be brief.

### The Problem

We represent a large number of "buy here, pay here" used car dealers ("BHPH dealers"). BHPH dealers sell cars on credit to people with extremely poor credit ratings. In our experience, less than 50% of the buyers fully pay their contracts; in other words more than 50% of them default and experience debt discharges. This default rate results in bad debts (discharges) averaging from around 15% to as high as 55% of all contract principal generated. Some of the defaulters file bankruptcy but most do not, probably because of the lack of funds for legal fees or trepidation concerning the process or its consequences. Whether they file bankruptcy or not, all defaulters are insolvent before and after the discharge of their auto installment contracts. Consequently, the defaulters have no gross income as a result of their discharge, either (1) because it occurs in bankruptcy (Code § 108(a)(1)(A)) or (2) because it leaves the debtor insolvent (Code § 108(a)(1)(B)).

There are, we understand, around 40,000 BHPH dealers, in the nation, all small businesses, some very small, and all selling to unsophisticated customers who do not "have a clue," if you will, about Code § 108, who would never intuit that discharges of their contracts might conceivably be taxable, and who do not have the financial means to seek tax counsel in the event of a discharge of their contracts. We would also venture a guess that most of the BHPH dealers in the country are too unsophisticated to be familiar with either Code § 6050P or Code § 108.

Internal Revenue Service
March 31, 2004
Page Two

For compelling business and federal income tax reasons many BHPH dealers (perhaps 8,000) operate their business, not through a single entity, but rather through two corporations (or other non-corporate entities which have elected corporation treatment under the "check-the-box regulations"). These two corporations can be either "C" or "S" as the owners prefer. One corporation sells the cars and takes back the contracts ("dealer") but then immediately sells the contracts without recourse at a fair market discount (reflective of anticipated bad debts, cost of collection and so on) to the second corporation which holds and collects the contracts ("factor").

In our experience the dealer and factor are brother-sister "controlled corporations" (as defined under Code § 1563), which have elected S status. However, they could as easily be brother-sister or parent-subsidiary "controlled corporations" in C status.

Into this "buy here, pay here" world, like the proverbial "bull in a china shop," come the Proposed Regs. whose primary purpose is to interpret the amendment to Code § 6050P made by P.L. 106-170, the Ticket to Work and Work Incentives Improvement Act of 1999. If the Proposed Regs. are issued in final form without change, all 8,000 BHPH dealers operating through two corporations (dealer and factor) will be required to issue 1099s to their defaulting customers, unless their discharges occur in bankruptcy. We estimate a resulting total of between 2 and 4 million worthless 1099s per year. The resulting "broken china" can be described as follows:

1.     Customer Harm:

       a.     Confusion and frustration over 1099s they do not understand;

       b.     Potential erroneous payment of tax with return or as a result of IRS "matching program;"

       c.     Cost of tax counsel (for the few who might afford it) regarding Code § 108 either at return filing time, or in response to IRS "matching program" notices.


2.     Dealer Harm:

       a.     Cost of compliance;

       b.     Potential $50/1099 failure to file penalty (limited to $50,000 annually) for every unintentional, but negligent, failure to file;

       c.     Cost of defending against IRS failure-to-file penalties;

O:\Workgroups\Tax\Burns\2004\Proposed 6050P Regs.doc

Internal Revenue Service
March 31, 2004
Page Three

      d.    Loss of goodwill in the marketplace because they will be perceived as the "bad guy" punishing defaulters by trying to create tax problems for them.

3.    IRS Harm:

      a.    Cost of administration (including the opportunity cost);

      b.    Insoluble problem of what to do with the BHPH dealer 1099s: Reason suggests they not be run through the IRS matching program, but there is no information on the 1099s that would allow IRS to cull the BHPH dealer 1099s from the general deluge. If they could somehow be culled they would need to be destroyed or stored (perhaps in that warehouse where the government stored the "Ark of the Covenant" in the old "Indiana Jones" movie).

      c.    The loss of goodwill among BHPH dealers and customers toward our tax system (Congress and IRS) generated by a regulation that virtually begs for civil disobedience because the whole exercise is meaningless and valueless.

Against all of the harm described above, there is not a single benefit achieved by imposing the 1099 reporting obligation on two-entity BHPH dealers respecting debt discharges. Furthermore, harm and benefit aside, there is an inherent unfairness in treating similarly situated taxpayers differently, as the Proposed Regs. do, in that single-entity operators are exempt from 1099 filing whereas two-entity operators are not. To do so is bad policy which should be avoided if at all possible, and if not avoided, further erodes public respect for our tax system.

If you agree with us so far, then you ought to use all your skills to find the authority to modify the Proposed Regs. to avoid the application of Code § 6050P to two-entity BHPH dealers and any similarly situated taxpayers. We believe Treasury and IRS have that authority.

## The Legislative Background

Code § 6050P, enacted as a part of the Omnibus Budget Reconciliation Act of 1993 (P.L. 103-66), imposed a new requirement that certain financial institutions (banks, mutual savings banks, building and loan associations, and similar institutions chartered and supervised under federal or state law) report on Form 1099 the discharge of any debt in excess of $600 owed the institution. In 1999, concerned that Code § 6050P as originally enacted did not cast a wide enough net, Congress (as part of the Ticket to Work and Work Incentives Improvement Act of 1999, P.L. 106-170) amended § 6050P by adding to it subsection (c)(2)(D) the effect of which is to extend the reach of § 6050P to "any organization a significant trade or business of which is the lending of money." However, neither the statutory amendment nor its legislative history defines the latter phrase. The only relevant passage of the committee reports accompanying the amendment is to the effect that Congress intended it to reach "credit card and finance companies." S. Rpt. No. 201, 106th Cong., 1st Sess. 28 (1999).

O:\Works\output\Task\Dravis\2004\P\improved 6050P Reg.doc

Internal Revenue Service
March 31, 2004
Page Four

## The Purpose of the Proposed Regs.

Regulations under Code § 6050P as in effect prior to its amendment by P.L. 106-170 were already on the books when P.L. 106-170 was enacted. The Proposed Regs. were issued in 2002 primarily in order to interpret and to implement the amendment of Code § 6050P made by P.L. 106-170 which, as stated erlier, extended the reach of the section's 1099-filing obligation to "any organization a significant trade or business of which is the lending of money" (Code § 6050P (c)(2)(D)).

## Solution Option #1

Given their usual and common meaning, we submit that the words used by Congress, "the lending of money," do not apply to a factor who simply purchases on a nonrecourse basis the loans made by others. Further, nothing in the committee reports suggests that Congress was after factors. On the contrary, as acknowledged in the preamble to the Proposed Regs. the Senate Report discloses only a Congressional interest in "credit card and finance companies." Nevertheless the Proposed Regs. go out of their way to explicitly apply new Code § 6050P (c)(2)(D) to factors. Proposed Regs. § 1.6050P-2(e) provides that "lending money includes acquiring an indebtedness...without regard to whether the indebtedness was originated by either an applicable entity or a related party." The preamble to the Proposed Regs. gives no rationale or justification for this interpretation.[1]

So, one way to fix the BHPH industry problem is to delete subsection (e) of the Proposed Regs. which defines "the lending of money" to include the purchase of a loan originated by another. The grounds for doing so would be that such definition is inconsistent with the plain meaning of the statutory words, "lending of money," and inconsistent, as well, with the legislative history of the statute it purports to interpret, which suggests that Congress was concerned only with "credit card and finance companies."

---

[1] The preamble merely notes that the regulatory interpretation in Proposed Reg. § 1.6050P-2(e) of the statutory phrase, "lending of money," found in Code § 6050P(c)(2)(D) is consistent with the regulatory interpretation in Temporary Reg. § 1.6050J-1T, Q&A-22 of the statutory phrase, "lends money," found in Code § 6050J(a). This is hardly compelling. First, the two statutes have differing purposes and impacts which could justify differing regulatory definitions of similar statutory phrases. Second, and alternatively, we offer the trite moral admonition, "Two wrongs don't make a right." Frankly, we find no more foundation in legislative history or statutory language for Q&A-22 of Temporary Reg. § 1.6050-J-1T than we do for subsection (e) of Proposed Regs. § 1.6050P-2.

Internal Revenue Service
March 31, 2004
Page Five

### Solution Option #2

Subsection (c) of the Proposed Regs. excepts from the definition of "the lending of money" the extension of purchase-money credit by a seller of goods or services to its customers. Another alternative way to fix the BHPH industry problem is to expand this "seller financing" exception to apply not only to originators of seller-financing loans, but also to related-party (appropriately defined) acquirers of such loans.

According to the preamble, the seller financing exception was written into the Proposed Regs. (notwithstanding its inconsistency with the flush language of the statute) because Treasury and IRS found in the Senate Report a clear expression of Congressional intent to extend the reporting requirement only to "credit card and finance companies," from which they concluded that Congress wished not to extend it to entities whose principal trade or business is the sale of goods or services, but who extend credit to their customers for their purchases of such goods or services. It is unimaginable to us that Congress would exclude from the reach of Code § 6050P(c)(2)(D) a retailer which holds its own paper, but would deny such exclusion to a unitary business operated through two commonly-controlled entities consisting of a retailer which sells on credit and a sister factor which buys the former's customer paper.

In light of the foregoing we ask you, indeed beseech you, to exercise your regulatory authority to the greatest extent possible to solve the problem caused by the Proposed Regs. If the solutions we have proposed do not suit, perhaps you can think of others. Many thought that Treasury exceeded its authority with the "check-the-box" regulations, but they were issued and we are all glad. With that precedent set, the solution to this problem via the exercise of regulatory authority should not be troubling.

Thank you for your consideration.

Sincerely,

Patrick J. Burns

Patrick J. Burns

PJB:pa

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### 1440 NEW YORK AVENUE, N.W.
### WASHINGTON, D.C. 20005-2111
### TEL: (202) 371-7000

Personal Privacy

http://www.skadden.com

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
NEW YORK
PALO ALTO
RESTON
SAN FRANCISCO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO

May 27, 2003

Eric Solomon
Deputy Assistant Secretary for Regulatory Affairs
Office of Tax Policy, Department of Treasury
1500 Pennsylvania Ave., NW
Washington, DC 20220

Gary Wilcox
Deputy Chief Counsel (Technical)
Internal Revenue Service
Room 3034
1111 Constitution Ave., NW
Washington, DC 20224

*comments*

Re: Clarify

Dear Messrs. Solomon and Wilcox

We respectfully rec
and the Internal Revenue Service (                                                        on
6050P reporting requirements (if a
transactions in general and to cons
preliminary matter, we believe that Congress did not intend to apply section 6050P to
nonlending transactions, and we anticipate that, on reflection, you will reach the
same conclusion. If, however, you have a contrary view, then we respectfully
request clarification that an uncollected amount in a nonlending transaction becomes
an "amount owed" – and therefore "indebtedness" within the meaning of Treas. Reg.
§ 1.6050P-1(c) – only at such time as the claim is reduced to a money judgement by
way of a judicial or other proceeding.

Messrs. Solomon and Wilcox
May 27, 2003
Page 2


    Since its enactment in 1983, section 6050P of the Internal Revenue
Code has required reporting of certain cancellations of indebtedness to the IRS and to
the borrower whose debt is discharged. The provision is intended to improve tax
compliance by providing individual taxpayers with usable information allowing them
to report cancellation of indebtedness income and by providing the IRS with usable
information allowing it to monitor taxpayer compliance as part of its information
returns matching program.

    As originally enacted, section 6050P applied only to certain govern-
mental agencies, banks, and savings institutions. Section 6050P(c)(2)(D), added in
1999, expanded the statute to apply to "any organization a significant trade or
business of which is the lending of money." *See* Ticket to Work and Work Incentives
Improvement Act of 1999, P.L. No. 106-170, § 533, 113 Stat. 1860, 1931 (1999).
We think it is clear from Congress' use of the words "lending of money" in section
6050P(c)(2)(D) that Congress intended the new provision to apply to discharges of
amounts that arise in lending transactions. Indeed, the legislative history indicates
that, in amending section 6050P, Congress was concerned with lending transactions
of credit card and finance companies. Notice of Proposed Rulemaking, 67 Fed. Reg.
40629, 40630 (June 13, 2002) (citing S. Rpt. No. 106-201, at 28 (1999)). There is no
indication in the statute or legislative history that Congress intended section 6050P to
apply to uncollected amounts in nonlending transactions; to the contrary, we believe
that Congress specifically intended that section 6050P not apply to such amounts.

    Treas. Reg. § 1.6050P-1(c) defines indebtedness as "*any amount owed*
to an applicable financial entity, including stated principal, fees, stated interest,
penalties, administrative costs and fines.*" (Emphasis added.) Given the legislative
history, the purpose for enacting section 6050P, and the explicit references in the
regulations to "stated principal" and "stated interest," we believe that the better
reading of the phrase "any amount owed" is that it applies to an amount owed that
arises in a lending transaction. Unfortunately, however, there is language in the
preamble to the regulations that creates uncertainly. Before the regulations were
finalized, Treasury and the IRS received comments suggesting that section 6050P
does not apply in the context of nonlending transactions. According to the preamble
to the final regulations, Treasury and the IRS chose not to adopt this suggestion. *See*
T.D. 8654, 61 Fed. Reg. 262, 267 (Jan. 4, 1996). The preamble notes that there is no
indication from the statute or legislative history that Congress intended that section
6050P not apply to amounts arising in nonlending transactions.

Messrs. Solomon and Wilcox
May 27, 2003
Page 3

The statements made in the preamble arguably are inconsistent with the definition of indebtedness in the regulations. In the case of an inconsistency between regulations and their preamble, the regulations should govern. If the regulations are to be interpreted consistently with the preamble, however, it is unclear as to what "amount owed" means in the context of nonlending transactions for purposes of giving rise to the section 6050P reporting requirements.

Applying the section 6050P reporting requirements to uncollected amounts in nonlending transactions – especially before such amounts have been reduced to money judgment – would run contrary to Congress' purpose in enacting section 6050P for the following reasons:

- Claims arising in nonlending transactions are not indebtedness. Thus, while discharges of such amounts may, under certain circumstances, give rise to income (*e.g.*, under a tax benefit theory), such discharges do not give rise to discharge of indebtedness income for purposes of section 61(a)(12). As such, we do not believe that Congress intended them to be covered by section 6050P. For example, the legislative history to section 6050P expressly states that "[t]he Conferees do not intend that this provision alter the present law determination of when a discharge of indebtedness occurs under section 61(a)(12)." H.R. Conf. Rep. No. 103-213, at 672 (1993), *reprinted in* 1993 U.S.C.C.A.N. 663, 1361.[1] This statement makes sense only in the context of Congress' belief that section 6050P was intended to operate in tandem with section 61(a)(12).

---

[1]    The temporary regulations under section 6050P defined indebtedness as "any amount owed to an applicable financial entity including principal, interest, penalties, administrative costs, and fines, *to the extent the amount constitutes an indebtedness for purposes of section 61(a)(12)*." Temp. Treas. Reg. § 1.6050P-1T(c) (1993) (emphasis added). The reference to section 61(a)(12) was not included in the final regulations, and no explanation was given for this change.

Messrs. Solomon and Wilcox
May 27, 2003
Page 4

- Applying section 6050P to discharges of all amounts that arise
in nonlending transactions would be inconsistent with the core
premise for all information reporting programs – *i.e.*, provid-
ing useful information to taxpayers in filing their returns and
useful information to the IRS in monitoring compliance.
Given uncertainties regarding the taxability of uncollected
amounts that arise in nonlending transactions (relating princi-
pally to proper determination of the amount and timing of any
liabilities and the taxability of those amounts to the extent not
collected), numerous taxpayers would likely over-report their
taxable income through fear of audit or ignorance of the law.
Meanwhile, the IRS would find itself in the difficult posture of
needlessly contacting thousands of taxpayers who properly
excluded discharged, nonlending transaction amounts reported
on Forms 1099-C.

- Applying the section 6050P regulations, as currently written,
to uncollected amounts in nonlending transactions would
produce the anomalous and wholly unwarranted result of
requiring reporting of nonprincipal amounts that are not col-
lected in a nonlending transaction (*e.g.*, penalties, fees, etc.)
while not requiring reporting of nonprincipal amounts in a
lending transaction. The stated reason for exempting such
nonprincipal amounts from the section 6050P reporting re-
quirement in the case of lending transactions – *i.e.*, the oner-
ous administrative burden on reporting parties, taxpayers and
the IRS, especially when compared to the benefit to be cap-
tured by the requirement[2] – is even more true in the case of
uncollected amounts in nonlending transactions.[3]

---

[2]    *See* T.D. 8654, 61 Fed. Reg. 262, 265 (Jan. 4, 1996) ("*With respect to lending
transactions*, Treasury and the Service have concluded that the benefits that
would be derived from requiring the reporting of penalties, fees, administra-
tive costs, and fines are outweighed by the burden associated with the re-
quirement [emphasis added].").

[3]    If Treasury and the IRS do decide to subject nonlending transactions to
section 6050P, then applying the reporting requirements to amounts reduced
(continued...)

Messrs. Solomon and Wilcox
May 27, 2003
Page 5

- Applying section 6050P to all uncollected amounts arising in nonlending transactions would produce the arbitrary result of requiring reporting by some entities, but not others, of amounts that are not collected in identical transactions. There is simply no way that Congress could have intended to discriminate in that fashion among similarly situated taxpayers.

- Finally, reporting entities (unlike their direct competitors that are not reporting entities) would be subjected to the high administrative burden of determining what uncollected amounts in nonlending transactions must be reported, creating new and costly accounting systems for capturing information and processing Forms 1099-C, and devising systems to deal with the numerous customers confused by the receipt of Form 1099-C (and by erroneous contacts by the IRS). It is difficult to imagine what benefit the IRS would achieve by requiring the reporting of such amounts, because they are not indebtedness and result in income in limited circumstances (*e.g.*, under a tax benefit theory). On the other hand, the burdens associated with such a requirement are real. They would impose substantial costs on reporting entities and put those entities at a competitive disadvantage.

We continue to believe that, as a matter of congressional intent and tax administration, section 6050P does not apply to amounts arising in nonlending transactions. If, however, as those drafting the preamble apparently intended, at least some amounts arising in nonlending transactions are subject to the reporting requirements of section 6050P, Treasury and the IRS need to issue guidance clarifying when amounts arising in nonlending transactions rise to the level of indebtedness the discharge of which must be reported. There are many questions that must be answered. For example, at the most basic level, what is the "amount owed" and when does the reportable discharge occur? Questions can arise in circumstances involving rights of mitigation, offset, or counterclaims. Questions can also arise

---

[3]    (...continued)
to money judgements would help address these administrative issues. Alternatively, it would be imperative to exclude interest, fees, penalties, etc. from reporting for nonlending transactions.

Messrs. Solomon and Wilcox
May 27, 2003
Page 6

regarding uncollected fees, administrative costs, or penalties. We believe that
potential claims arising in a nonlending transaction should not be considered
indebtedness (or an "amount owed") for purposes of section 6050P and the section
6050P regulations, unless and until that claim is reduced to a money judgment. Only
then is there the necessary certainty as to what amount is owed.

In conclusion, given the statutory language, the legislative history,
and the purpose for enacting section 6050P, we believe that Treasury and the IRS
should issue guidance clarifying that the term "indebtedness," the discharge of which
is subject to the reporting requirements of section 6050P, does not include amounts
that are not collected in nonlending transactions. Notwithstanding, however, if
Treasury and the IRS believe and intend that section 6050P apply to uncollected
amounts in nonlending transactions, we request published guidance clarifying that an
"amount owed" arising in a nonlending transaction is not indebtedness for purposes
of section 6050P unless and until any claim for the amount owed has been reduced to
money judgment.

We would welcome the opportunity to meet with you or other
representatives from Treasury and the IRS to discuss these matters. Should you have
questions regarding these comments, please contact Fred Goldberg at Personal Privacy
or Jody Brewster at Personal Privacy

Respectfully submitted,

Fred T. Goldberg, Jr.

Jody J. Brewster

cc:    Helen Hubbard
       Michael S. Novey
       Deborah Butler
       Curtis G. Wilson

Copyright (c) 2000 Tax Analysts

Tax Notes Today

NOVEMBER 2, 2000 THURSDAY

DEPARTMENT: Official Announcements, Notices, and News Releases; Treasury Tax Correspondence

CITE: 2000 TNT 213-29

LENGTH: 5584 words

HEADLINE: 2000 TNT 213-29 ATTORNEY SEEKS GUIDANCE ON DEBT DISCHARGE INFORMATION RETURNS. (Section 6050P -- Debt Discharge Info. Returns) (Release Date: SEPTEMBER 21, 2000) (Doc 2000-28159 (12 original pages))

CODE: Section 6050P -- Debt Discharge Info. Returns

ABSTRACT: Pamela F. Olson of Skadden, Arps, Slate, Meagher & Flom LLP has urged the IRS to issue guidance under section 6050P on the revised definition of "applicable financial entity."

SUMMARY:

  Pamela F. Olson of Skadden, Arps, Slate, Meagher & Flom LLP, Washington, has urged the IRS to issue guidance under section 6050P on the revised definition of "applicable financial entity." Olson also requests clarification of the definition of "indebtedness" already contained in the regs.

AUTHOR: Olson, Pamela F.
Skadden, Arps, Slate, Meagher & Flom LLP

GEOGRAPHIC: United States

INDEX: discharge of indebtedness, returns

REFERENCES:
Subject Area:
  Bankruptcy and insolvency;
  Information reporting

TEXT:

Release Date: SEPTEMBER 21, 2000

                    September 21, 2000

The Honorable Charles O. Rossotti
Commissioner of Internal Revenue
Room 3000
1111 Constitution Avenue, NW
Washington, DC 20224

        Re: REGULATORY GUIDANCE UNDER SECTION 6050P

Dear Commissioner:

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

[1] We respectfully submit the following comments concerning section 6050P of the Internal Revenue Code on behalf of * * * /1/. Our comments address regulatory issues raised by the 1999 amendment to section 6050P for which guidance is urgently needed. Specifically, we seek guidance on the revised definition of "applicable financial entity," and we request clarification of the definition of "indebtedness" already contained in the regulations under section 6050P.

BACKGROUND.

[2] Section 6050P was enacted as part of the Omnibus Budget Reconciliation Act of 1993, P.L. No. 103-66, section 13252, 107 St. 312, 531-32 (1993), in an effort to "increase the likelihood that a debtor will comply with the tax laws relating to discharge of indebtedness by requiring the reporting of that event to the IRS." T.D. 8654, 61 Fed. Reg. 262, 266. To accomplish this goal, section 6050P imposes information reporting responsibilities on certain entities if they discharge indebtedness in whole or in part. As originally enacted, the reporting obligation was limited to certain governmental agencies, banks, savings institutions such as savings and loan associations, and credit unions and their affiliates.

[3] The Ticket to Work and Work Incentives Improvement Act of 1999, P.L. No. 106-170, section 533, 113 Stat. 1860, 1931 (1999), amended section 6050P to extend its application to "any organization a significant trade or business of which is the lending of money." The effective date of the amendment was January 1, 2000, but in Notice 2000-22, 2000-16 I.R.B. 902, the Service, recognizing the near impossibility of affected entities complying with this provision with little lead time for implementation, announced it would not impose penalties on discharges of indebtedness prior to January 1, 2001. There remains a need for guidance on the scope and operation of the 1999 amendment to permit full compliance by affected entities, however, and that need grows more urgent by the day. Consequently, we urge you to address the issues described below promptly.

ISSUES REQUIRING GUIDANCE.

[4] Definition of "applicable financial entity." The first question on which we need guidance is what type of entities are required to report under amended section 6050P; in other words, as an initial matter, guidance is needed on what constitutes an "applicable financial entity" under section 6050P. In light of the obligations imposed by section 6050P, it is imperative the rules provide certainty regarding the entities required to comply with it. As originally enacted in 1993, the legislation limited the scope of those private institutions subjected to the reporting requirements of section 6050P to banks, savings institutions, and credit unions. The statutory definition of "applicable financial entity" in section 6050P(c)(2) was amended in 1999 to add a new subparagraph (D), which includes "any organization a significant trade or business of which is the lending of money" to the list of private institutions required to report discharges of indebtedness in excess of $600. Both "organization" and "significant trade or business" require regulatory explanation in order for many businesses to determine, as an initial matter, whether they in fact fall within the statute's purview. In addressing these questions, we believe Congress' stated intent in amending section 6050P should be taken into account, and section 6050P's application should be limited to "organizations," however that term is defined, in the financial services industry.

[5] Definition of "organization" Specifically, the statute looks to the "organization" to ascertain whether the lending of money is a significant trade or business, but "organization" is a term without an identifiable meaning in the context of the statute. Neither to our knowledge is it otherwise defined in the Code. Consequently, it is not clear whether it refers to an individual legal entity, such as a corporation or partnership, to multiple affiliated legal entities, or to another alternative. Congress' repeated use in section 6050P(c) of a separate entity approach, see, e.g., section 6050P(c)(2)(C), suggests a separate entity approach should be applied in giving meaning to the term "organization" in new subparagraph (D). We recommend the Service interpret "organization" as an individual legal entity and that the determination of whether the rules apply be made on an entity-by-entity basis as is the case in section 6050P(c).

[6] Under this approach, for example, only the individual corporations within an affiliated group that have as a significant trade or business the lending of money would be required to report discharges of indebtedness in excess of $600, and other corporations within the group that do not have the lending of money as a significant trade or business (and are therefore particularly ill-equipped to administer compliance with the statute), but that may from time to time extend credit, would not have a reporting obligation under section 6050P. The legislative history states that Congress' objective in amending section 6050P was to treat "similar entities in a similar manner." Id. By adopting a single entity

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

definition of "organization" and including only the entities whose trade or business is money-lending, the regulations would accomplish this congressional goal.

[7] Definition of "significant trade or business. "The Service should provide guidance establishing concrete guidelines on what the threshold for "significant" is in the context of the statute. From the text of the legislation enacted, it is impossible to discern what constitutes a "significant trade or business" under section 6050P(c)(2)(D), and clarification is offered nowhere in the statute or the legislative history. Again, given the need for an entity to be able to determine with certainty whether it is covered by section 6050P, we believe the Service should promulgate rules using objective criteria to determine whether an entity's money-lending activities constitute a "significant trade or business." We suggest the Service use readily ascertainable criteria, for example, percentage of revenues on average over a given period of prior years, to determine whether a trade or business is "significant." In light of the purpose of the recent legislation, it would seem appropriate to use a relatively high percentage so entities that are not in fact "similar" to those previously subject to the reporting requirements are excluded from reporting under section 6050P. A high percentage is also suggested by the fact that it is just plain sensible to impose the cost that complying with section 6050P entails only if the entity is likely to have a sufficient volume of discharged indebtedness to report to justify the cost of compliance.

[8] Limiting reporting to entities in the financial services industry. In describing the extension of section 6050P, the legislative history refers to "finance companies and credit card companies whether or not affiliated with financial institutions." H.R. Conf. Rep. No. 106-478, at 159 (1999). Because Congress' goal in amending section 6050P was to treat "similar entities in a similar manner," S. Rep. No. 106-201, at 28 (1999), in reporting discharges of indebtedness, it is apparent Congress did not intend the statute to apply to every organization that may, in the ordinary course of business, extend credit. Rather, it appears Congress intended the reporting obligation to extend only to other businesses in the financial services industry for which the lending of money is a significant part of their activities. With that in mind, we recommend the Service issue regulations clarifying that the requirements of the amended statute extend only to entities in the financial services industry lending money as a significant portion of their trades or businesses.

[9] Tax policy considerations. We believe these proposals make sense from a policy perspective for two reasons. First, entities in the financial services industry are more likely to be lending money in sufficiently large sums so that, from the Service's perspective, the discharge merits the time and expense of matching the reports and pursuing amounts not reported. /2/ The benefits of establishing a reporting mechanism to enable the Service to track and pursue insignificant amounts of discharged indebtedness simply cannot be balanced with the burden imposed on the financial entity to put in place a system to permit reporting. /3/ Second, as the comments on the regulations under section 6050P when they were first proposed make clear, the burden imposed by section 6050P is significant even for entities with sophisticated information technology systems such as the banks and savings institutions initially covered by section 6050P. /4/ Entities outside the financial services industry are unlikely to have sufficiently sophisticated information technology systems to be able to readily comply, and the burden of complying, if imposed on entities without sophisticated information technology systems, cannot be justified. /5/ In sum, we believe the Service should amend the regulations to specify that section 6050P applies only to individual legal entities operating in the financial services industry and to define "significant trade or business" using an objective, readily-ascertainable standard.

[10] Definition of indebtedness. The term "indebtedness" is defined in the regulations as "any amount owed to an applicable financial entity, including stated principal, fees, stated interest, penalties, administrative costs and fines." Treas. Reg. section 1.6050P-1(c). This definition is significantly broader than the meaning of "debt" and "indebtedness" employed elsewhere in the Internal Revenue Code, including the statutory provision that includes in income discharges from indebtedness. The broad definition is also curious inasmuch as the regulations, after including interest within the definition of indebtedness, then go on to exclude it from amounts required to be reported under section 6050P. Treas. Reg. section 1.6050P-1(d)(2). In addition, the regulations exclude from reporting the discharge of amounts "other than stated principal" but only the case of "lending transactions" a term defined as "any transaction in which a lender loans money to, or makes advances on behalf of, a borrower (including revolving credits and lines of credit)." Treas. Reg. section 1.6050P-1(d)(3). The interpretation of these provisions raises a number of questions, particularly after the statute's broadening to cover additional financial entities, that are addressed below.

[11] Need for administrative claim. As a preliminary matter, it should be noted that the standard for rules governing administrative responsibilities such as information reporting and withholding is that they be clear and certain. The definition of "indebtedness" in Treas. Reg. section 1.6050P-1(c) does not meet that standard because it uses inclusive

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

rather than exclusive language. Although it begins with exclusive language -- "indebtedness means" -- it then goes on to use inclusive language -- "ANY amount owed" and "INCLUDING stated principal, fees. . . ."(Emphasis added.) As an administrative provision requiring certainty for implementation, this section should be revised to explicitly state what it is the Service expects financial entities to report.

[12] What constitutes indebtedness generally. The Service and the courts -- often at the Service's behest -- have traditionally taken a narrow view of what constitutes indebtedness. Indebtedness has been defined by the Tax Court as "an existing, unconditional, and legally enforceable obligation for the payment of a PRINCIPAL sum." Howlett v. Commissioner, 56 T.C. 951, 960 (1971) (emphasis added). In other words, although more than repayment of principal may be an "amount owed," for example, interest on indebtedness, it is only the PRINCIPAL amount that constitutes the indebtedness. In addition, the Supreme Court has made it clear that although an indebtedness is always an obligation, an obligation is not always an "indebtedness" for tax purposes. See Deputy v. du Pont, 308 U.S. 488, 497 (1940); Knetsch v. United States, 364 U.S. 361, 365 (1960).

[13] Relevance of section 61(a)(12). Section 6050P does not refer to section 61(a)(12), but since the intent of the section is to ensure the reporting of amounts includible in income under section 61(a)(12), it is apparent that section 61(a)(12) is the relevant provision for purposes of determining whether an amount should be treated as indebtedness under section 6050P. The legislative history to section 6050P expressly states that "[t]he Conferees do not intend that this provision alter the present law determination of when a discharge of indebtedness occurs under section 61(a)(12)." H.R. Conf. Rep. No. 103-213, at 1361 (1993). That being the case, indebtedness should be defined so that it captures only amounts the discharge of which would give rise to income under section 61(a)(12). The inclusive definition of indebtedness in Treas. Reg. section 1.6050P- 1(c) fails to do that. Instead, by referring to "any amount owed" and including "fees, stated interest, penalties, administrative costs and fines" it sweeps into "indebtedness" a variety of items that, though they may be an "amount owed," are not indebtedness as that term is otherwise used and if discharged would not result in income under section 61(a)(12).

[14] Scope of section 61(a)(12). Nothing in section 61(a)(12) or in Treas. Reg. section 1.61-12, which interprets section 61(a)(12), suggests that a broader definition of indebtedness is intended for purposes of the discharge of indebtedness rules than would apply for other purposes of the Internal Revenue Code. Indeed, like the case law definitions of indebtedness, these regulatory provisions focus on debt and debt instruments and do not suggest that they cover "any amount owed." Consequently, unless the definition of "indebtedness" in Treas. Reg. section 1.6050P-1(c)(3) is read within the confines of the case law's definition of indebtedness, it would appear to exceed its statutory scope.

[15] Both the courts and the Service have consistently identified one factor as dispositive in ascertaining whether a taxpayer has income from discharge of indebtedness: whether the discharged party had previously received MONEY that was not included in income because the discharged party had incurred an obligation to repay that was later excused, thereby removing the rationale for excluding the receipt of funds from income. For the most part, there is little authority addressing whether "any amount owed" other than principal is debt in the context of ascertaining income attributable to the discharge of indebtedness; accordingly, authority on the subject is scant. When the obligation to pay such amounts is forgiven and income results, however, it is because the obligor has enjoyed a tax benefit from accruing such obligation; the rationale for inclusion in income is not that there has been a discharge of indebtedness but that there has been a tax benefit received. See, e.g., Rev. Rul. 76-316, 1976-2 C.B. 22, in which the Service ruled that accrued interest on a forgiven loan from a shareholder to a corporation should be included in income under the tax benefit rule, despite the fact that the exception to the discharge of indebtedness rule of Treas. Reg. section 1.61-12(a) for forgiven shareholder loans, which specifically treats forgiven indebtedness as a contribution to capital, extends only to the principal amount owed.

[16] Statutory limitation. That the regulatory language should be limited to money-lending transactions is supported by the 1999 amendment to section 6050P, which expanded the scope of section 6050P only for organizations engaged in the "lending of money." In other words, nothing suggests Congress intended the reporting of discharges of amounts owed that did not arise from transactions involving the lending of money. Indeed, had Congress intended the reporting of discharges of other amounts owed, it would not have made sense for it to limit the extension of the statute to organizations with a trade or business of lending money.

[17] Application to non-lending transactions. The Service's expectation with respect to items treated as indebtedness under Treas. Reg. section 1.6050P-1(c) is confused by the exclusion of amounts other than stated principal from the

Page 8

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

reporting requirements for "lending transactions." See Treas. Reg. section 1.6050P-1(d)(3). The inclusion of such items in the definition of "indebtedness" in Treas. Reg. section 1.6050P-1(c) and the subsequent exclusion of such items with respect to "lending transactions" suggests a category of "non-lending transactions" to which the reporting obligation applies. That is, while the regulations never EXPLICITLY state that they apply to non-lending transactions" -- nor do we see a basis in the statute or legislative history for them to do so -- the inclusion of "fees, stated interest, penalties, administrative costs and fines" in the definition of "indebtedness" in Treas. Reg. section 1.6050P-1(c), coupled with the exclusion in Treas. Reg. section 1.6050P1(d)(3) of "non-principal amounts" from the meaning of "indebtedness" as it applies in "lending transactions," suggests the regulations might apply to "non-lending transactions." In addition, the preamble to the final regulations, T.D. 8654, refers to "non-lending transactions" and states that "the amount owed, such as a fee, fine, or penalty, is reportable if discharged" 61 Fed. Reg. 262, 265 (1996).

[18] Leasing transactions. We are particularly concerned by whether the Service intends transactions such as leases to be covered by the term "indebtedness" in Treas. Reg. section 1.6050P-1(c). Rents and other amounts that may be charged a lessee pursuant to a lease /6/ are "amounts owed" to the lessor and thus could be considered to fall within the language of the regulations, but they are not indebtedness and their discharge should not be subject to reporting under section 6050P. Nothing else in the statute or existing regulations would compel the conclusion that leasing transactions are intended to be covered. Given the amount of litigation over whether a transaction is a lease or a loan, it would indeed be ironic if the Service were to treat leases and loans alike for purposes of reporting under section 6050P. /7/

[19] Rental payments. We also note that as a matter of tax policy it would make little sense to attempt to treat amounts owed on a lease as indebtedness. With respect to rental payments, a lessee who has had the benefit of the use of a vehicle without paying for it may be said to be enriched to the extent of the value of the use. Accordingly, there may be some logic in taxing the lessee on that sum. But that value is not necessarily equal to the amount of the rent that has gone unpaid so there would be either subjectivity or arbitrariness in determining what should be included in income. Of greater significance, however, is that the number of rental payments that will go unpaid before a lessor repossesses the vehicle will be few. /8/ As a consequence, the unpaid balance will never be large and cannot justify the burden of establishing a system to capture the information so the amounts can be reported in the event they exceed $?00.

[20] Default or termination payments. Tax policy considerations dictate the same result with respect to default or termination payments on a lease. If the lessee defaults on the lease and the lessor repossesses the vehicle, the lease may provide for a payment to the lessor for the difference between the market value of the vehicle at the time of the default and its expected value stated in the lease. This default or termination payment is intended to make the lessor whole and is akin to liquidated damages. It does not reflect in any way the amount by which the lessee has been enriched. Consequently, if the lessor fails to collect the default or termination payment from the lessee, there is no enrichment of the lessee on which the lessee should be taxed. The lessee is relieved of a liability to the lessor, but unless the lessee has deducted that amount, there is no tax policy justification for taxing that amount when it goes unpaid. Moreover, there are often disputes with regard to the lessee's liability for the default or termination payment. If a disputed amount is compromised or waived, there is obviously a question as to the existence of the liability. If there is doubt as to the liability, there certainly cannot be income attributable to its nonpayment.

[21] Other amounts owed on a lease. We also request prompt clarification of the treatment of amounts such as fees, administrative costs, and penalties that may be imposed with respect to leasing transactions. In the case of a lease, many fines, penalties, and late fees are imposed to create an incentive for payment of rent and voluntarily waived when payment is resumed. Because such a waiver could be treated as an "identifiable event" under Treas. Reg. section 1.6050P-1(b)(2), the current regulatory definition of "indebtedness" could create a reporting obligation when there has been such a waiver even when the obligor has resumed payment and there has been no cancellation of any other amount due under the lease.

[22] As noted above, the current regulations do not require the reporting of discharges of non-principal amounts, such as fees, administrative costs, and penalties, but the relief from reporting is limited to only lending transactions, thus IMPLICITLY creating within the regulations inconsistent treatment of items that may be indistinguishable. "Any amount owed" in a non-lending transaction, especially items such as fees, administrative costs, and penalties asserted, has not put money in the hands of the discharged party. It is puzzling, therefore, why the Service would, albeit only by implication, suggest that discharges of non-principal amounts asserted in a non-lending transaction, in which no money has ever changed hands, should be subject to the reporting requirements of section 6050P. Assuming amounts

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

discharged in non-lending transactions should be subject to reporting under section 6050P at all, it is difficult to understand how the apparent inconsistency in treatment of such amounts between lending and non-lending transactions furthers the stated goals of the statute. There is no rationale stated for the dissimilar treatment and we do not understand what policy reason might justify with the statutory amendment broadening the sweep of the statute, the inconsistency takes on greater significance.

[23] The stated reason for exempting such non-principal amounts from the section 6050P reporting requirement in the case of a lending transaction was the onerous administrative burden such an accounting would impose, especially when compared to the benefit to be captured by the requirement. In the case of non-lending transactions such as leases, the administrative burden of identifying these situations and collecting the required information would be beyond the capacity of those obligated to report. For example, fees, administrative costs, and penalties that are waived in leasing transactions are frequently considered by the lessor essentially as "rebates" to the lessee to encourage continued payment or future business. These amounts are no longer tracked by the lessor and there is no business reason for them to do so. Of equal importance is the fact that the precise amounts owing in the form of fees, administrative costs, and penalties are frequently disputed in good faith and not readily ascertainable for tracking purposes. A reporting requirement as to these amounts would, as recognized by the Service in the case of lending transactions, impose an unacceptably high administrative burden. It is not apparent why such an accounting would be any less onerous, and the collection benefit increased, where the non-principal amounts originate in a non-lending, as opposed to a lending, transaction. In addition, the amounts owed are often very small amounts, though they may aggregate to more than $600, and cannot justify the cost that would be incurred to track them. /9/

[24] Because of the lack of authority for treating leasing transactions and related fees and charges as indebtedness, i.e., the absence of any statutory definition of "indebtedness" that includes such charges and the fact that it is not at all clear that discharges of such amounts constitute discharges of indebtedness under section 61(a)(12), we have assumed that, without further guidance, the service does not intend for financial entities to report such amounts. In light of the ambigous language defining "indebtedness" and the suggested intention of the Service to treat fees and charges in non-lending transactions differently from those in lending transactions, however, we request that the Service clarify this point. We think the best approach is to amend the definition of indebtedness to clarify that, with respect to financial entities, it only applies to lending transactions and that forgiveness of non- principal amounts is not required to be reported whether imposed in a "lending transaction" or a "non-lending transaction."

[25] In conclusion, we note that the regulations take a broad approach to legislation intended to be narrow in terms of scope, application, and impact. As noted in the preamble to the current regulations, "the legislative history does not preclude an exception for [reporting] certain discharges in appropriate circumstances." T.D. 8654, 61 Fed. Reg. 262, 263 (1996). This is especially true where a high administrative burden has little impact on compliance.

[26] We would be pleased to meet with the Internal Revenue Service to discuss these matters further. Should you have questions regarding these comments, please feel free to contact me or Maureen Nelson.

Respectfully submitted,

Pamela F. Olson
Skadden, Arps, Slate, Meagher &
   Flom LLP
Washington, D.C.

cc: Stuart L. Brown
    Heather C. Maloy
    Jonathan Talisman
    Joseph Mikrut
    Robert P. Hanson
    Stephen J. Toomey
    Mindy Toback-Seiden

FOOTNOTES

Page 10

(c) 2000, Tax Analysts, Tax Notes Today, NOVEMBER 2, 2000

/1/ * * * is a member of an affiliated group of companies engaged in the distribution of automobiles and light-duty trucks and the provision of related services * * * acquires retail installment sales contracts and leased vehicles from automobile dealers.

/2/ While we are aware the reporting floor in section 6050P is $600, nothing in the legislative history suggests the $600 figure constitutes a considered policy judgment. Rather it appears the dollar threshold for section 6050P was chosen to match the dollar threshold used in other information reporting sections of the Code. Compare sections 6041, 6041A, 6050H, and 6050R.

/3/ * * * is well-acquainted with the administrative difficulties and costs of complying with reporting requirements on account of its experience in adapting its systems and procedures to comply with section 6050J.

/4/ From the financial entity's perspective, the threshold in section 6050P does little to minimize administrative burden because a system must still be created to capture the required information and the amounts must be tracked even if below the threshold because the amounts may eventually aggregate to an amount in excess of the threshold. It is the creation of the system to capture the information and its retention that makes the reporting requirement costly, not the actual transmission of the information to the Service. It is important to keep that fact in mind when determining how "financial entity" or "significant trade or business" should be defined.

/5/ These statements are based on our own experience, not on a study of the costs.

/6/ These amounts would cover a wide variety of items including charges for excess wear and tear, excess mileage, property taxes, sales taxes, late charges, early termination fees, appraisal fees, lease assumption fees, dishonored check charges, repossession fees, collection fees, and other administrative charges, fees, and penalties.

/7/ See, e.g., Frank Lyon Co. v. U.S., 435 U.S. 561 (1978).

/8/ * * * practice is to charge-off leases when they are 120 days past due, which gives you some indication of the swiftness with which it acts with respect to a default on a lease. The fact that it charges-off the past due amounts after 120 days also means that, as is the case with interest for the banks, it will not be possible to track rental payments for more than four months after a default, even if the term of the lease extends well beyond that date.

/9/ * * * estimates that most of the various fees that may be waived total an average of less than $350 in each case. The exceptions are extreme cases such as bankruptcy, death of the lessee, fraud, settlements in collection efforts, and warranty costs.

END OF FOOTNOTES

***************** End of Document *****************

```
                    ********************
                    ***   RX REPORT   ***
                    ********************


        RECEPTION OK

        TX/RX NO              5097
        CONNECTION TEL                    [Personal Privacy]
        SUBADDRESS
        CONNECTION ID
        ST. TIME             11/19 21:28
        USAGE T              03'57
        PGS.                 8
        RESULT               OK
```

# USAFunds®

United Student Aid Funds, Inc.
*Mailing Address:*
P.O. Box 6028, Indianapolis, IN 46206-6028
*Corporate Address:*
10475 Crosspoint Blvd, Suite 230, Indianapolis, IN 46256-3323
*www.usafunds.org*
*Supporting access to education*

*REG-107524-00*
REGULATIONS UNIT
CC:ITA:RU

SEP 1 8 2002

September 17, 2002

ROOM 5226
*Welch/Hall*

Ms. Treena Garrett
CC:ITA:RU (REG-107524-00)
Room 5226
Internal Revenue Service
POB 7604
Ben Franklin Station
Washington, DC 20044

Dear Ms. Garrett:

USA Funds, as the nation's largest Federal Family Education Loan Program (FFELP) private guarantor, appreciates the opportunity to comment on the proposed regulations relating to information reporting requirements under section 6050P of the Internal Revenue code for cancellation of indebtedness. We have identified two substantive concerns and have provided examples to illustrate our concerns.

- While FFELP participants do not encourage the discontinuation of collection activities or the write-off of portions of a debt, situations occur that result in the guarantor's ceasing collection activities or accepting a reduced payment in full. FFELP rules provide flexibility for guarantors to work with student and parent borrowers ensure the most efficient, effective collection of outstanding, federally reinsured debt. We believe the imposition of additional parameters on these collections efforts would result in lost flexibility and would add detrimental costs (via servicing revisions and procedural changes) to a program that is already closely regulated by the U.S. Department of Education. These added rules and requirements would not efficiently serve the federal fiscal interest. USA Funds recommends that the Internal Revenue Service clearly state that the proposed regulations are not applicable to any student loans made under Title IV, including those under the Federal Family Education Loan Program.

We provide the following examples to illustrate:

<u>Example 1</u>
The guarantor may discover it cannot locate a borrower for whom it holds a defaulted student loan. The guarantor attempts to locate such borrowers through exceptional skip tracing activities, such as contacting the individuals listed on the loan application as 'references,' prior schools attended, and national credit bureaus. On rare occasions, these efforts are unsuccessful and the guarantor has no recourse for collection activities. Instead of continuing to contact the same two or three references and schools in pursuit of the address, the guarantor may cease collection activities. However, since there is no statute of limitations on the collection of FFELP loans, this cessation may not be permanent. If the borrower applies for additional student loans, the default information is shared with the school and is available to lenders and guarantors through the Department of Education's National Student Loan Data System (NSLDS). When this occurs, the guarantor often obtains the borrower's current address and pursues the outstanding debt. Thus the cessation of collection activities does not mean the loan will never be collected. If the proposed rule were applicable to FFELP guarantors, accurate reporting would require establishing more

stringent collections rules, perhaps deeming a loan "permanently uncollectable" at an arbitrary point, and certainly requiring the development of additional statuses and reporting mechanisms to comply with the new rule.

## Example 2

Guarantors may 'compromise' or write off a portion of the debt due to the obvious inability of the borrower to repay the debt in full. While these types of compromises are not common, FFELP guarantors do enjoy the flexibility of being able to consider the borrower's overall financial situation when working with a defaulted borrower to establish repayment terms. An example of a compromise due to a borrower's inability to repay the debt would be parents who obtain a Parent Loan for Students (PLUS), a FFELP program designed to allow parents to borrow funds to pay post-secondary education costs for dependent children. Infrequently, the parent may suffer dramatic changes in his or her financial situation during the 10- to 30-year repayment period of the loan(s). Such financial downturns may be attributed to numerous causes (corporate downsizing, forced retirement, loss of financial assets). Because these parents may be well into their 60's – and we have even seen parents in the 70's trying to repay debts for their children's education – it is sometimes apparent that the parents' financial situation is unlikely to improve. While the parent is willing to repay the loan to the extent his assets permit, attempting to collect beyond the parent's ability to repay is inefficient. Another example would be a parent who is totally and permanently disabled (unable to work and earn money) when the loan is made. Federal regulations and statute prohibit this inability to repay the debt from being considered at the time the loan is requested and also prohibit the later discharge of the loan due to that same disability. Still, as the loan enters repayment, the parent's ability to repay is limited and the guarantor may attempt to compromise/write-off some of the outstanding sum in order to collect the remaining balance. These write-off transactions are performed to protect the federal fiscal interest by encouraging the borrower to repay the majority of the outstanding sum. However, the number of instances of such write-offs and their overall financial implications are negligible. We do not believe that the costs associated with developing the mechanisms necessary to report the transactions would be offset by any gains in the collection of data or tax revenues.

## Example 3

The guarantor may compromise a portion of the debt (mainly outstanding collection cost and/or accrued interest) to demonstrate a good faith effort to correct substantive servicing errors made by prior loan holders or collection contractors. While this may appear to be a 'discharge' of a portion of the debt, in most cases it is primarily an attempt to correct an error. Reporting this as a 'discharge' may penalize the borrower in error. However, to develop the sophisticated mechanisms to distinguish compromise "types," would require costly servicing system protocols and procedures.

- Our second concern focuses on the taxability of the amount discharged. To determine the taxable status of the funds, we first refer to 26 U.S.C. § 61(a)(12), IRS statute. This cite provides that a cancellation of $600.00 or more is generally considered to be income includable in the taxpayer's gross income unless specifically excluded; 26 U.S.C. § 108(f) specifically excludes canceled amounts of "student loans" from inclusion as gross income. However, the term "student loan" is narrowly defined for the purposes of exclusion of cancellation, and not all FFELP loans are considered as "student loans" for this purpose. For example, the definition of student loan does not appear to exclude from gross income for tax purposes FFELP loan amounts forgiven or canceled under HEA sections 428J (teacher loan forgiveness) and 428K (childcare forgiveness) unless such forgiveness is completed by a state guarantor or the U.S. Department of Education. This implies that loan amounts forgiven for teachers or childcare providers by a national, non-profit guarantor such as USA Funds may be taxable, if the non-profit guarantor is forgiving the loan amount while the loan is held by the

lender. Further, the definition appears not to exclude other loan amounts forgiven or canceled by non-profit guarantors for other reasons in this same situation. This creates a discriminatory situation in which some borrowers may be considered responsible for taxable income while others are not, even though their student loans are forgiven/canceled for identical reasons based on the same statutory provisions. This would appear to establish a pattern of discrimination against certain borrowers based solely on the entity that holds the loan at the time of forgiveness/cancellation. In order to provide equitable borrower benefits, USA Funds supports expanding the definition of "student loan" to include all FFELP student loans, regardless of the entity performing the cancellation.

We sincerely appreciate the opportunity to review the proposed regulatory changes and to provide comments. We hope that you will call if you have any questions regarding our comments or the examples we provide.

Sincerely,

Gregory A. Ayers
Vice President
Policy and Compliance

GA/sk
F:\BRENDA\IRS_report disch-NPRM response.doc

<u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that the foregoing Notice of Filing the Public Portions

of the Internal Revenue Service's Background File for 26 C.F.R. §1.6050P-2 was served

upon counsel for the plaintiffs this 23d day of January 2006, by sending copies First

Class mail, postage prepaid, addressed to:


Deborah J. Israel
Louis J. Rouleau
Womble Carlyle Sandridge & Rice
1401 Eye Street, N.W., 7th Floor
Washington, D.C. 20005


    /s/ Jennifer L. Vozne