# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DEBT BUYERS' ASSOCIATION,

     Plaintiff,

     v.

JOHN W. SNOW, Secretary of the Treasury,
*et al.*,

     Defendants.

Civil Action No. 06–101 (CKK)

## MEMORANDUM OPINION
(January 30, 2006)

On January 19, 2006, Plaintiff, Debt Buyers' Association, filed with this Court both a Complaint and [3] Plaintiff Debt Buyers' Association's Motion for Temporary Restraining Order and/or Preliminary Injunction and Request for Expedited Hearing ("Plaintiff's Motion for Preliminary Injunction"). In Plaintiff's Motion, Plaintiff asks the Court to enjoin Defendants, John W. Snow in his official capacity as Secretary of the Treasury, and Mark W. Everson in his official capacity as Commissioner of Internal Revenue, from enforcing Treasury Regulation § 1.6050P-2(e), which subjects certain entities to specific information reporting requirements related to the discharge of debt, with respect to Debt Buyers' Association's members. The Court held a conference call with the Parties on January 20, 2006, setting forth an expedited briefing schedule related to Plaintiff's motion. During the conference call, the Parties agreed that the Court should consider Plaintiff's requests for a temporary restraining order and preliminary injunction as one action. On January 23, 2006, Defendants filed [6, 8] Memorandum in Support of Motion to Dismiss and Opposing Motion for Temporary Restraining Order and Preliminary Injunction ("Defendants' Motion to Dismiss"), in which Defendants argue that the Court does

not have subject matter jurisdiction over Plaintiff's claims because both the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), and the Anti-Injunction Act, 26 U.S.C. § 7421, apply to this

case.  Per the Court's request, on January 23, 2006, Plaintiff also filed [5] Plaintiff's

Supplemental Brief in Support of Motion for Preliminary Injunction ("Plaintiff's Supplement"),

which re-framed certain portions of Plaintiff's request for expedited injunctive relief.  On

January 24, 2006, Plaintiff filed [11, 12] Plaintiff's Reply to Defendants' Motion to Dismiss and

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction ("Plaintiff's

Response").  After considering the aforementioned motions and Complaint as well as the

relevant case law, the Court shall DENY Plaintiff's Motion for Preliminary Injunction because

the Court does not have jurisdiction over Plaintiff's claims.  As the Court lacks subject matter

jurisdiction, it shall also GRANT Defendants' Motion to Dismiss.

## I: BACKGROUND

Debt Buyers' Association, henceforth "DBA," is a tax-exempt trade organization

incorporated in California with approximately 550 members.  Plaintiff Debt Buyers'

Association's Memorandum of Points and Authorities in Support of Motion for Temporary

Restraining Order and/or Preliminary Injunction ("Pl.'s Mem.") at 3.[1]  DBA brings this suit on

behalf of its members,[2] referred to as Debt Buyers, which are in the business of purchasing and

collecting delinquent consumer loans and receivables.  *Id.*  Rather than originating loans

themselves, Debt Buyers generally purchase portfolios of consumer loans and receivables that

---

[1] To avoid confusion, the Court will cite to page numbers in Plaintiff's Memorandum rather than paragraph numbers, which are only used in the Statement of Facts located on pages 3–8 of the Memorandum.

[2] Defendants do not challenge DBA's standing to bring this suit on behalf of its members.  *See* Pl.'s Mem. at 14 n.2 (not contested by Defendants).

have been in default for a significant period of time at a discount from lending institutions.  *Id.*

> **A.**      **Debt Buyers' Role in the Lending Process**

A brief summary of Debt Buyers' role in the lending process is necessary to understand Plaintiff's substantive claims.  An originating lender (such as a bank, credit card company, or finance company) will typically evaluate the creditworthiness of a potential consumer borrower, analyze any collateral pledged as security for the loan, establish terms for the loan, and provide the underlying documentation for the lending or credit arrangement.  If the originating lender chooses to make a loan and the loan becomes delinquent, the originating lender may under the terms of the loan charge interest, late fees, attorneys' fees, and other costs and expenses related to enforcing and collecting the loan.  Pl.'s Mem. at 4.  Customarily, if a consumer loan has been delinquent for more than 180 days, the originating lender charges off the loan (including interest and any other charges) in its books.  *Id.* at 4–5.  Ordinarily (which the Court interprets to mean not always), the originating lender transfers the loan to a book account that records the aggregate amount of the charge-off without recording separately the principal, interest, and other fees associated with the charge-off.  *Id.* at 5.

To recoup a portion of its lost investment, an originating lender may sell a charged-off consumer loan to a Debt Buyer, usually as part of a portfolio of delinquent consumer loans, for a fraction of the total amount owed to the originating lender.  Pl.'s Mem. at 5.  Once a Debt Buyer has purchased a portfolio of defaulted consumer loans, it may engage in collection efforts (or hire a third-party to do so), which may include locating borrowers, determining whether borrowers are in bankruptcy, commencing legal proceedings, or "otherwise encouraging" payment of all or a portion of the delinquency.  *Id.* at 6.

Relevant to the present case is that, as a matter of practice, Debt Buyers *generally* have received only the aggregate amount of the charge-off from the originating lender for a particular debtor and consequently do not know the component amounts of stated principal, unpaid accrued interest, late fees, and other charges.  Pl.'s Mem. at 6–7.  Plaintiff cites to no legal impediment to the transfer of this information from originating lenders to Debt Buyers in its Complaint, Motion for Preliminary Injunction, Supplement, or Response.  *See* Def.s' Mot. Dismiss at 25.

### B.      *Statutes and Regulations Related to Reporting Discharged Debt*

Pursuant to the Internal Revenue Code, 26 U.S.C. § 6050P(a), "[a]ny applicable entity which discharges (in whole or in part) the indebtedness of any person during any calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe) . . . ."  This information reporting requirement allows the IRS to compare the amount of discharged debt reported by various institutions with the amount of discharged debt reported by individuals, since under 26 U.S.C. § 61(a)(12), gross income to be reported by individuals and under certain circumstances taxed by the IRS includes "[i]ncome from discharge of indebtedness."  Included in the statute's definition of "applicable entity" is an "applicable financial entity," more specifically defined as "any organization a significant trade or business of which is the lending of money."  26 U.S.C. § 6050P(c)(1)(B), (c)(2)(D).  Applicable entities are also required to furnish to each person with respect to whom a return has been made a written statement showing the name and address of the entity required to make the return, as well as the information required to be shown on the return with respect to that person.  26 U.S.C. § 6050P(d).  For the calendar year 2005, the required written statement must be provided to said person on or before January 31, 2006.  *See id.*

Treasury Regulation 1§ 6050P-1 clarifies the form in which applicable entities must fulfill the reporting requirement mandated by 26 U.S.C. § 6050P(a).  26 C.F.R. § 1.6050P-1. Pursuant to Treas. Reg. 1§ 6050P-1(a), an applicable entity that discharges a debt of at least $600 of any person must file a Form 1099-C with the IRS.  The trigger for the reporting requirement is described as follows:

> Solely for purposes of the reporting requirements of section 6050P and this section, a discharge of indebtedness is deemed to have occurred . . . if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred.

Treas. Reg. 1§ 6050P-1(a).  The 1099-C Form must be filed with the IRS on or before February 28 (March 31, if filed electronically) of the year following the calendar year in which the identifiable event occurs, and it must include the following information relevant to this case:  the name, address, and taxpayer identification number of the person; the date on which the identifiable event occurred; the amount of indebtedness discharged; and any other information required by Form 1099-C or its instructions and current revenue procedures.  *Id.*  Form 1099-C requires, among other things, that the filer be able to distinguish between the total amount of reported discharged debt and the interest included as a portion thereof.  *See* Pl.'s Mem. at Exh. 4 (Form and Instructions p.3).  One "identifiable event" as defined by Treas. Reg. 1§ 6050P-1(b)(2)(H)(iv) is the expiration of a non-payment testing period:

> There is a rebuttable presumption that an identifiable event under paragraph (b)(2)(i)(H) of this section has occurred during a calendar year if a creditor has not received a payment on an indebtedness at any time during a testing period (as defined in this paragraph (b)(2)(iv)) ending at the close of the year.  The testing period is a 36-month period increased by the number of calendar months during all or part of which the creditor was precluded from engaging in collection activity by a stay in bankruptcy or similar bar under state or local law.  The presumption that an identifiable event has occurred may be rebutted by the creditor if the creditor (or a third-party collection agency

on behalf of the creditor) has engaged in significant, bona fide collection activity at any time during the 12-month period ending at the close of the calendar year, or if facts and circumstances existing as of January 31 of the calendar year following expiration of the 36-month period indicate that the indebtedness has not been discharged.

*Id.* Therefore, the regulation stipulates that a Form 1099-C must be filed under certain conditions regardless of whether or not the debt in question has actually been discharged.

Treas. Reg. 1§ 6050P-2, the regulation at issue in the instant case, was passed on October 25, 2004, effective for discharges occurring on or after January 1, 2005. 26 C.F.R. § 1.6050P-2. The regulation further clarifies what is "an organization a significant trade or business of which is the lending of money" under 26 U.S.C. § 6050P(c)(2)(D). Pursuant to Treas. Reg. 1§ 6050P-2(e), "lending money includes acquiring an indebtedness not only from the debtor at origination but also from a prior holder of the indebtedness." Debt Buyers are encompassed by this definition and hence required to submit 1099-C Forms to the IRS by February 28, 2006 (or March 31, 2006, if filed electronically) as well as informational reports to debtors by January 31, 2006, for identifiable events that occurred in the year 2005.

### C. *Fair Debt Collection Practices Act (FDCPA)*

Debt Buyers are also required to comply with the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692. Pursuant to 15 U.S.C. § 1692e, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." One application of the foregoing is "[t]he false representation of–the character, amount, or legal status of any debt." 15 U.S.C.§ 1692e(2)(A). The FDCPA creates liability for damages for any violation thereof. 15 U.S.C.§ 1692k. However, in determining the amount of the debt collector's liability, a court may consider factors such as the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to

which such noncompliance was intentional.  15 U.S.C.§ 1692k(b)(1).  Also, under the intent

provision of the statute, "[a] debt collector may not be held liable in any action brought under

this subchapter if the debt collector shows by a preponderance of evidence that the violation was

not intentional and resulted from a bona fide error notwithstanding the maintenance of

procedures reasonably adapted to avoid any such error."  15 U.S.C.§ 1692k(c).

> ### D.    *Plaintiff's Claims*

In its Complaint, Plaintiff seeks an order from the Court declaring Treas. Reg. § 1.6050P-

2(e) to be contrary to law, unenforceable, and invalid.  Compl. ¶¶ 5, 54–58.  Plaintiff also seeks a

permanent injunction from the Court enjoining Defendants from enforcing Treas. Reg. §

1.6050P-2(e) generally and with respect to Plaintiff's members.  Compl. ¶¶ 5, 59–62.  In its

Motion for Preliminary Injunction, Plaintiff asks the Court to enjoin Defendants from enforcing

Treas. Reg. § 1.6050P-2(e) with respect to Plaintiff's members in advance of January 31, 2006,

the date by which Debt Buyers would be required under the treasury regulation in dispute to

furnish delinquent borrowers with statements with respect to the 1099-C Forms to be submitted

to the IRS.  Pl.'s Mot. Prelim. Inj. at 1, 2.

In its Motion, Plaintiff first claims that Defendants have issued an interpretive regulation

in the form of Treas. Reg. § 1.6050P-2(e) that surpasses the statutory authority under which it

was enacted in expanding the definition of "any organization a significant trade or business of

which is the lending of money" as set forth in 26 U.S.C. § 6050P(c)(2)(d) to include Debt

Buyers.  Pl.'s Mem. at 2.

Second, Plaintiff claims that Treas. Reg. § 1.6050P-2(e) "invades" the FDCPA, which

was purportedly "expressly created by Congress to be the primarily regulatory force governing

the debt buying industry." Pl.'s Mem. at 2.  Plaintiff alleges that Debt Buyers lack sufficient information to distinguish between the stated principal and interest of the loans they purchase from originating lenders and therefore will be forced to make misrepresentations on 1099-C Forms and the corresponding statements issued to debtors.  As a result, Plaintiff contends that Debt Buyers will violate the FDCPA, because inaccurately completed 1099-C Forms would effectively constitute misrepresentations to debtors for which liability can be imposed, in addition to violating Treas. Reg. § 1.6050P-2(e) itself.  Pl.'s Mem. at 6–7.  Plaintiff further alleges that it faces the "promised" threat of class action lawsuits under the FDCPA based upon inaccurate Forms 1099-C.  Pl.'s Mem. at 7.

Third, Plaintiff claims that Treas. Reg. § 1.6050P-2(e) displaces state common and statutory laws "that have traditionally bestowed certain entitlements upon the members of the debt buying industry."  Pl.'s Mem. at 2.  Plaintiff alleges that because an "identifiable event" prompting the mandatory filing of a Form 1099-C with the IRS and the corresponding issuance of statements to debtors includes the 36-month "non-payment" rule delineated above in Treas. Reg. 1§ 6050P-1(b)(2)(H)(iv), Debt Buyers will be denied the opportunity to collect debt after this three-year period–an opportunity which is permitted under some applicable state statutes of limitations.  Pl.'s Mem. at 7–8.  Citing only one case, *In re Crosby*, 261 B.R. 470 (Bankr. Ct. D. Ka. 2001), Plaintiff states that "case law suggests that courts are willing to find debt, including judgment debts, unenforceable if the creditor (here, a Debt Buyer), has issued to the debtor a Form 1099-C reporting discharge of indebtedness income."  *Id*.

Finally, presumably for the same reason alleged in its third claim, Plaintiff claims that Treas. Reg. § 1.6050P-2(e) "results in the forcible deprivation of Debt Buyers' legal and

economic rights in desecration of the Fifth Amendment Due Process Clause."  Pl.'s Mem. at 2.

   In both its Complaint and its Motion for Preliminary Injunction, Plaintiff requests injunctive and/or declaratory relief from the Court.  Defendants, in their Motion to Dismiss, argue that this Court does not have jurisdiction over Plaintiff's claims under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and the Anti-Injunction Act, 26 U.S.C. § 7421.[3]  Def.s' Mot. Dismiss at 1, 4.

## II: LEGAL STANDARD

   A federal court must have jurisdiction over the subject matter of an action before it may hear a case.  *See Wachovia Bank v. Schmidt*, 126 S. Ct. 941, 950 (2006) ("Subject-matter jurisdiction, on the other hand, concerns a court's competence to adjudicate a particular category of cases. . . . It poses a 'whether,' not a 'where' question:  Has the Legislature empowered the court to hear cases of a certain genre?") (citations omitted)*; Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) ("Federal courts . . . have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.").  Thus, the initial issue that the Court must address is whether the Declaratory Judgment Act and the Anti-Injunction Act preclude the Court's jurisdiction over Plaintiff's claims.

   To eliminate any possible confusion regarding the respective burdens of the Parties considering the present posture of the case (in which both a motion for imminent injunctive relief and a motion to dismiss are before the Court), the Court notes that a motion to dismiss for lack of

---

[3]  While Defendants also argue that unfair delay by Plaintiff in commencing this action on January 19, 2006, and requesting immediate injunctive relief regarding a regulation that was passed on October 25, 2004, has prejudiced Defendants such that an injunction should not issue, Def.s' Mot. Dismiss at 27, the Court need not address this argument since the Court, as noted by Defendants, must have jurisdiction to consider the injunctive relief requested.

subject matter jurisdiction places on the plaintiff the "burden of establishing that jurisdiction is proper," unlike a motion to dismiss for failure to state a claim, in which the Court must construe all reasonable inferences in the plaintiff's favor. *District of Columbia Ret. Bd. v. United States*, 657 F. Supp. 428, 431 (D.D.C. 1987). *See also KVOS, Inc. v. Associated Press*, 299 U.S. 269 (1936); *McNutt v. Gen. Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 188-89 (1936) ("If [a party's] allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof"). Hence, Plaintiff in this case clearly bears the burden of demonstrating that this Court has jurisdiction to hear its claims, both in the context of its own Motion for Preliminary Injunction and to survive Defendants' Motion to Dismiss.

### III:  DISCUSSION

The Anti-Injunction Act ("AIA"), 26 U.S.C. § 7421, provides in relevant part that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). Various statutory exceptions are provided, none of which have been invoked by Plaintiff. The Declaratory Judgment Act, 28 U.S.C. § 2201, states that declaratory relief is allowed "except with respect to Federal taxes." 28 U.S.C. § 2201(a). The Declaratory Judgment Act, while considered by the D.C. Circuit coterminously with the Anti-Injunction Act, has been held by some courts to provide an even more exacting jurisdictional standard than the AIA. *See Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1435 (D.C. Cir. 1995) (citing *Inv. Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4 (D.C. Cir. 1979), *cert. denied*, 446 U.S. 981 (1980)) (considering the two statutes coterminously); *see also Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.6 (1974) ("There is no dispute, however, that the federal tax

10

exception to the Declaratory Judgment Act is at least as broad as the Anti-Injunction Act.").

Although the Supreme Court has commented that the language of the AIA "could scarcely be more explicit," *Bob Jones*, 416 U.S. at 736 (quoting § 7421(a)), two judicially created exceptions have been recognized, *see Nat'l Taxpayers*, 68 F.3d at 1436. First, under *South Carolina v. Regan*, 465 U.S. 367 (1984), a suit otherwise prohibited by the AIA may be brought if the plaintiff has no recourse to alternative legal remedies. *See Nat'l Taxpayers*, 68 F.3d at 1436. Second, under *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1 (1962), a suit may be brought notwithstanding the AIA if it is clear that under no circumstances could the government prevail and equity jurisdiction otherwise exists. *See Nat'l Taxpayers*, 68 F.3d at 1436.

### A.     *The AIA is applicable to Plaintiff's claims.*

Plaintiff first argues that the AIA is not applicable to the instant suit because Plaintiff does not bring its claims "for the purpose" of restraining the assessment or collection of taxes. Plaintiff states that "the heart of Plaintiff's suit is not to restrain the Defendants from assessing and collecting taxes, but to restrain the Defendants from unconstitutionally forcing members of the debt buying industry to (1) violate the FDCPA, and/or (2) forego their legal and economic rights." Pl.'s Mem. at 16–17.

Plaintiff construes the "for the purpose" language of the AIA as creating an express intent requirement. However, as read by the D.C. Circuit, the AIA should not be construed so narrowly. In *Foodservice and Lodging Institute v. Regan*, the D.C. Circuit considered whether the contested regulations "plainly *concern[ed]* the assessment or collection of federal taxes" in determining whether the Anti-Injunction Act and the Declaratory Judgment Act should bar

appellant's challenges.  *Foodservice & Lodging Inst. v. Regan*, 809 F.2d 842, 844 (D.C. Cir. 1987) (emphasis added).  *See also Bob Jones*, 416 U.S. at 740 ("[W]e cannot say that [the IRS's] position has no legal basis or is *unrelated* to the protection of the revenues.  The [AIA] is therefore applicable.") (emphasis added); *Jericho Painting & Special Coating, Inc. v. Richardson*, 838 F. Supp. 626, 629 (D.D.C. 1993) ("A court must look to the *effect* the requested relief would have on the assessment or collection of taxes.").  Even Plaintiff admits that the AIA "has been interpreted to apply also to 'activities which are intended to or may culminate in the assessment or collection of taxes.' " Pl.'s Mem. at 17 n.5 (citing *Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d 1315, 1320 (5th Cir. 1981) (quoting *United States v. Dema*, 544 F.2d 1373, 1376 (7th Cir. 1976), *cert. denied*, 429 U.S. 1093 (1977))).

Here, Plaintiff seeks to enjoin Defendants from enforcing Treas. Reg. § 1.6050P-2(e), which requires Debt Buyers to file 1099-C Forms with the IRS.  The information reporting requirement imposed by this treasury regulation will be used to enable the IRS to compare the amount of discharged debt as defined by the regulation reported by lending institutions to the amount of discharged debt reported as income by individuals, since under 26 U.S.C. § 61(a)(12), gross income to be reported by individuals to the IRS includes "[i]ncome from discharge of indebtedness."  Since such gross reported income is in fact taxed by the IRS, any action that hinders the IRS in determining the accuracy of such income will in fact hinder the assessment and collection of taxes from debtors and thus fall within the auspices of the AIA.

Furthermore, in asking the Court to enjoin Defendants from enforcing Treas. Reg. § 1.6050P-2(e), Plaintiff is effectively asking the Court to enjoin Defendants from assessing any penalties related to Plaintiff's non-compliance with the regulation.  Since the IRS enforces

penalty provisions as a means of ensuring compliance with regulations intended to aid the agency in the collection and assessment of taxes, asking the Court to prevent the IRS from assessing penalties would clearly contravene the purpose of the collection and assessment of taxes. *See also* 26 U.S.C. § 6724(b) ("Any penalty imposed by this part shall be paid on notice and demand by the Secretary and in the same manner as tax.").

Finally, momentarily putting aside whether or not Plaintiff can actually provide support for the existence of a constitutional violation (which it cannot, as will be addressed below), Plaintiff's allegation of a constitutional violation does not place its claims outside of the reach of the AIA. *See Alexander v. 'Americans United' Inc.*, 416 U.S. 752, 759 (1974) ("[D]ecisions of this Court make it unmistakably clear that the constitutional nature of a taxpayer's claim, as distinct from its probability of success, is of no consequence under the Anti-Injunction Act.").

Thus, the AIA clearly applies to Plaintiff's claims.  In order to determine if this Court has jurisdiction, the Court must analyze whether Plaintiff's claims fall within one of the two judicially created exceptions to the AIA's jurisdictional bar.  In doing so, the Court finds that neither of the exceptions applies, as explained via the following analysis.

### B.     The South Carolina *exception to the AIA does not apply in this case.*

Plaintiff argues that even if the AIA is deemed applicable to this case, Plaintiff's claims fall within the *South Carolina* exception such that this Court has jurisdiction to issue injunctive relief.  This second judicial exception to the jurisdictional bar created by the AIA was articulated in *South Carolina v. Regan*, 465 U.S. 367 (1984).  In *South Carolina*, the Court acknowledged that the Court in *Bob Jones* had left open the question of whether the AIA would apply in the event that "the aggrieved party had no access to judicial review."  *South Carolina*, 465 U.S. at

13

375 (citing *Bob Jones*, 416 U.S. at 738-39).   The Court in *South Carolina* concluded that

"Congress did not intend the [AIA] to apply to actions brought by aggrieved parties for whom it

has not provided an alternate remedy."   *Id*. at 378.   This exception is "an extremely narrow []

exception to the Anti-Injunction Act for situations in which the taxpayer has no means of

challenging a tax statute other than through an injunctive action."   *Spencer v. Brady*, 700 F.

Supp. 601, 604 (D.D.C. 1988).

        In this case, an alternate legal remedy exists such that the *South Carolina* exception does

not apply.   Debt Buyers who have not yet obtained separate principal and interest information

from originating lenders, as well as Debt Buyers who retain concerns (despite the lack of

supporting legal evidence) that submitting 1099-C Forms will disinvest them of the "right" to

continue to pursue collection activities (*see infra* 20-21), can simply choose not to fill out and

submit 1099-C Forms to the IRS.   If Debt Buyers choose not to submit 1099-C Forms, they

would not face the alleged risks of violating the FDCPA or allegedly undermine their ability to

collect and enforce debts after thirty-six (36) months of no collection activity.   If the IRS

consequently chooses not to assess penalties for such non-compliance with Treas. Reg. §

1.6050P-2(e), Debt Buyers will have suffered no harm, irreparable or otherwise, and thus would

have no basis for injunctive relief.   If the IRS actually pursues penalty assessment for such non-

compliance with Treas. Reg. § 1.6050P-2(e), Debt Buyers will have a legal forum in the form of

penalty-refund litigation to raise the arguments it brings to the Court today and petition for relief

from the actual harm of the penalty imposed.   Similarly, in *Foodservice*, the D.C. Circuit

considered an alternate remedy to be available such that the "narrow exception" created in *South*

*Carolina* could not be invoked where the plaintiff could refuse to comply with a tip reporting

requirement, pay the statutory fine, and sue for a refund of the fine.  *See Foodservice*, 809 F.2d at

844–45.  This Court takes note of the Supreme Court's assessment in *Bob Jones* that an alternate

avenue of review need not be "the best that can be devised" and may include various

inconveniences (such as delay) to the party petitioning for relief.  *See Bob Jones*, 416 U.S. at 747.

>     **C.**      **The Williams Packing *exception to the AIA does not apply in this case*.**

Plaintiff also argues that if the AIA is deemed applicable to this case, Plaintiff's claims

fall within the *Williams Packing* exception such that this Court has jurisdiction to issue

injunctive relief.  This judicial exception to the jurisdictional bar created by the AIA was first

articulated in *Enochs v. Williams Packing & Navigation Co., Inc.*, 370 U.S. 1 (1962).  There are

two prongs which must be met by the Plaintiff in order for this exception to the AIA to apply.

First, in order for the suit to go forward in federal court, it must be clear that "under no

circumstances could the Government ultimately prevail."  *Id.* at 7.  The question of whether

under any circumstances the government can prevail is to be determined by the Court "under the

most liberal view of the law and the facts."  *Id.* ("[T]he question of whether the Government has

a chance of ultimately prevailing is to be determined on the basis of the information available to

it at the time of suit."); *Commissioner of Internal Revenue v. Shapiro*, 424 U.S. 614, 627 (1976).

Second, equity jurisdiction must otherwise exist.  *Williams Packing*, 370 U.S. at 7.  In order for

equity jurisdiction to exist to meet the second prong of *Williams Packing*, Plaintiff must show

that it will suffer irreparable harm because there is no adequate alternative forum in which to

litigate its claims.  *See id.* at 6–7.

>     1.      *Plaintiff cannot show on the merits that "under no circumstances" would*
>             *the government prevail.*

Plaintiff raises three arguments as to why Plaintiff would prevail on the merits, which

15

will be addressed in turn.  Plaintiff first argues that Defendants exceeded their statutory authority in issuing Treas. Reg. § 1.6050P-2(e).  Pl.'s Mem. at 20–26.  Plaintiff next argues that Treas. Reg. § 1.6050P-2(e), an interpretive rule promulgated by Defendants, transgresses another federal statute, namely the FDCPA.  Pl.'s Mem. at 26–31.  Plaintiff finally argues that Treas. Reg. § 1.6050P-2(e) preempts state law rights and violates principles of federalism and comity. Pl.'s Mem. at 31–33.

> a.   *Plaintiff cannot definitely show that Defendants exceeded their statutory authority in promulgating Treas. Reg. § 1.6050P-2(e).*

Plaintiff argues that Defendants exceeded their statutory authority in promulgating Treas. Reg. § 1.6050P-2(e) based on Plaintiff's reading of the legislative history of 26 U.S.C. § 6050P, its interpretation of the statute itself, and "the IRS' own historical interpretation" of the statute. Pl.'s Mem. at 20.  However, Plaintiff misses two key points in its analysis.  First, nothing in the legislative history points to any explicit intention to exclude non-originating lenders such as Debt Buyers from the definition of lenders.  In fact, Congress's amendment to 26 U.S.C. § 6050P as part of the Ticket to Work and Work Incentives Improvement Act of 1999, Pub. L. No. 106-170, § 533(a), 113 Stat. 1860, which expanded the applicability of Section 6050P to "any organization a significant trade or business of which is the lending of money," suggests an intention by Congress to explicitly broaden the types of institutions subject to the information reporting requirements pertaining to discharged indebtedness.

Secondly, the face of the statute itself does not evince evidence of a desire to exclude institutions such as Debt Buyers from its scope.  While the Court agrees that interpretive rules that overreach their statutory authority may be invalidated, such overreaching is not exhibited in this case.  The cases relied upon by Plaintiff either demonstrate examples of an agency *not*

16

"overreaching" in its issuance of an interpretive rule, *see Nat'l Rest. Ass'n v. Simon*, 411 F. Supp.

993, 999 (D.D.C. 1976), or are otherwise distinguishable.  *See United States v. Calamaro*, 354

U.S. 351, 358–59 (1957) (holding that a pick-up man who literally "picked-up" wagers for a

salary of $40 a week but had no interest in the numbers enterprise was not meant to pay a special

tax for receiving wagers, despite a treasury regulation stating otherwise); *Beneficial Corp. &*

*Subsidiaries v. United States*, 814 F.2d 1570 (Fed. Cir. 1987) (statute upon which "overreaching"

interpretation rested was repealed prior to issuance of judgment).  In this case, interpreting "any

organization a significant trade or business of which is the lending of money," to include entities

which acquire debt from originating lenders is a reasonable interpretation of the statutory

provision.  Because this phrase is general enough to require definition by an interpretive

regulation, a reasonable interpretation necessary to implement congressional mandate should be

deferred to by the Court.  *See Nat'l Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476-77

(1979).  This deference is given because " 'Congress has delegated to the [Secretary of the

Treasury and his delegate, the] Commissioner [of Internal Revenue], not to the courts, the task of

prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code.

26 U.S.C. § 7805(a)' " *Id.* at 477 (quoting *United States v. Correll*, 389 U.S. 299, 307 (1967)).

Including Debt Buyers within the definition of "any organization a significant trade or business

of which is the lending of money" is logically reasonable, particularly when reviewed under "the

most liberal view of the law and the facts" standard required when applying the *Williams*

*Packing* exception, because "the *business* of lending money necessarily includes collecting what

has been lent plus interest and fees and, if the circumstances arise, determining when the debt is

uncollectible."  Def.s' Mot. Dismiss at 18.  Plaintiff clearly cannot show that the government

would not prevail under any circumstances in demonstrating that it operated within its statutory

authority in interpreting 26 U.S.C. 6050P(c)(2)(D), "any organization a significant trade or

business of which is the lending of money," as applicable to entities which purchase loans from

originating lenders and acquire indebtedness, thus assuming the position of lenders themselves.

> b.      *Treas. Reg. § 1.6050P-2(e) does not conflict with the FDCPA.*

Plaintiff alleges that Treas. Reg. § 1.6050P-2(e) conflicts with the FDCPA and

consequently must be invalidated.  Plaintiff cites to the accepted premise that agency action must

be invalidated if it either " 'conflicts with an agency's own statute, [or] if it conflicts with another

federal law.' "  Pl.'s Mem. at 26–27 (quoting *NextWave Pers. Comm'n Inc. v. FCC*, 254 F.3d

130, 149 (D.C. Cir. 2001).  Plaintiff specifically argues that § 1.6050P-2(e) (1) asserts a

definition of lender that is inconsistent with the distinction between "debt collector" and

"creditor" set forth by Congress in the FDCPA; (2) contributes to abusive debt practices by Debt

Buyers; and (3) punishes Debt Buyers who do not engage in abusive debt collection practices.

Pl.'s Mem. at 28.

However, Plaintiff's second and third arguments are based on an inaccurate factual

premise–that Debt Buyers are somehow prohibited from obtaining the component principal and

interest information from lenders upon acquiring defaulted loans and will be required to falsely

report information.  While Plaintiff consistently alleges that Debt Buyers "generally," "often,"

"usually," "typically," or "customarily" do not receive such component information, Plaintiff

points to no evidence of any legal impediment preventing Debt Buyers from insisting on

receiving such information upon acquiring portfolios of defaulted loans.  *See* Pl.'s Mem. at 2, 6,

7.  Plaintiff's use of such non-definitive terms also indicates the likelihood that some Debt

18

Buyers presently receive such component information.

Furthermore, even if some Debt Buyers were completely unable to obtain a breakdown of the principal and interest components of debt already acquired from lenders (presumably of loans acquired before 2005, as the Court assumes that Debt Buyers would have insisted on receiving component information from lenders once § 1.6050P-2(e) was implemented),[4] Debt Buyers are not forced to provide false information of any kind to debtors that would potentially subject Debt Buyers to liability under the FDCPA and thus face "punishment" under the Act.  Nor does Debt Buyers' furnishing of even an accurate copy of a 1099-C to a debtor have to create a false presumption that the Debt Buyer agrees not to pursue further collection activities or be subject to liability under the FDCPA.  Notably, Plaintiff does not in its Response contest Defendants' assertion that Debt Buyers are free to include in their statement to a debtor text noting "(1) that they are issuing a 1099 because one or more of the circumstances in Treasury Regulation § 1.6050P-1 have been met, (2) that the business intends to, or may, continue collecting the debt until barred by state or federal law governing debt collection, and (3) that the recipient should consult with a tax advisor if he or she does not know whether income arises under 26 U.S.C. §§ 61(a)(12) and 108 in his or her particular circumstances."  Def.s' Mot. Dismiss at 20.  As explained by Defendants, issuance of a 1099 is not a declaration by the issuer that the recipient debtor actually has received taxable income, since under 26 C.F.R. § 1.6050P-1, "discharged indebtedness must be reported *regardless* of whether the debtor is subject to tax on the

---

[4] The Court also notes that while the regulation at issue was passed on October 25, 2004, Debt Buyers have been on notice regarding the promulgation of Treas. Reg. § 1.6050P-2(e) and its corresponding principal and interest reporting requirements since the regulation was published for comment in June 2002.  *See* Def.s' Mot. Dismiss at 27.  The Court fails to understand, perhaps because Plaintiff has failed to make clear, why Debt Buyers have not as a matter of practice insisted upon receiving component information from originating lenders since mid-2002.

discharged debt under sections 61 and 108." *See* Def.s' Mot. Dismiss at 21.

Finally, the goal of the FDCPA is to eliminate abusive debt collection practices, while the goal of 26 U.S.C. § 6050P is to provide information to the IRS regarding discharged debt, which the IRS then uses to match to individual tax forms for the purposes of verifying reported income. The differing aims of these statutes suggests that differing definitions as to what entities these statutes regulate would be expected. Furthermore, Plaintiff does not point to any evidence that Congress does or should consistently frame how parties governed by statutes are defined across the breadth of legislation that is promulgated year after year on a variety of topics created to address different ends.

> c.   *Plaintiff cannot show that Treas. Reg. § 1.6050P-2(e) either preempts state law "rights" or violates principles of federalism and comity.*

Plaintiff insists that issuance of 1099-C Forms will prohibit Debt Buyers from pursuing debt collection and enforcement activities after such forms are issued, which may be before a state's statute of limitations for the collection of such debt has expired. However, as stated above, there is no reason that a Debt Buyer cannot include with its statement to an affected debtor an instructional guideline explaining the reasons for the issuance of the 1099-C (for example, because 36 months have transpired without debt collection activity), a disclaimer that a 1099-C must be issued as a result of an identifiable event regardless of whether an actual discharge of indebtedness has occurred on or before the date of such event, and a notice to the debtor that a Debt Buyer plans to continue debt collection activities. Such full disclosure would not falsely represent the status of the debt recorded on a 1099-C Form. More importantly, even absent such a disclaimer, Plaintiff can only cite to one case, notably from a bankruptcy court in

Kansas, in which the prior issuance (without any disclaimer) of a Form 1099-C rendered a debt

effectively discharged and unenforceable.  *See In re: Crosby*, 261 B.R. 470 (Bankr. Ct., D. Ka.

2001).  Considering that the Court must analyze whether under any circumstances the

government can prevail "under the most liberal view of the law and the facts,"[5] this Court does

not find persuasive the evidence presented by Plaintiff regarding the limitations Treas. Reg. §

1.6050P-2(e) would place on Debt Buyers' ability to collect debts in accord with state statutes of

limitations.

> 2.      *Equity jurisdiction does not exist.*

As stated above, Plaintiff must show both that under no circumstances will the

government succeed on the merits *and* that equity jurisdiction otherwise exists in order to invoke

this Court's jurisdiction under the *Williams Packing* exception to the AIA.  Because Plaintiff is

unable to demonstrate that "under no circumstances" will the government succeed on the merits,

Plaintiff cannot invoke the *Williams Packing* exception.  However, even if Plaintiff could

demonstrate that the government could not under any circumstances succeed on the merits

(which Plaintiff cannot do), equity jurisdiction does not exist for the Court to exercise

jurisdiction over Plaintiff's claims regardless.

In order for equity jurisdiction to exist, Plaintiff must demonstrate that it will suffer

irreparable harm because no alternate forum exists in which it can effectively vindicate its

claims.  Relying on its analysis under *South Carolina* in Section III(B) of this Memorandum

Opinion, the Court maintains that an alternate forum exists in which Plaintiff can effectively

vindicate its claims.  Moreover, Plaintiff has not established that it will suffer irreparable harm in

---

[5] *Williams Packing*, 370 U.S. at 7.

the absence of the issuance of injunctive relief by this Court.  As stated above, Plaintiff has not

provided persuasive evidence that submitting 1099-C Forms to the IRS and corresponding

informational statements to affected debtors will deprive Debt Buyers of their ability to collect

debt in states with longer statute of limitations periods after such an issuance.  Nor has Plaintiff

provided any evidence that meeting the requirements set forth in Treas. Reg. § 1.6050P-2(e) will

subject Debt Buyers to liability under the FDCPA so long as Debt Buyers do not make any false

representations on said forms (leaving blank the interest portion of the form if it is unknown),

and, as an extra precaution, include information statements in their submission to debtors that the

issuance of 1099-C Forms correlates with the occurrence of an identifiable event and does not

necessarily indicate that actual debt has been discharged.  Despite protestations to the contrary,

Plaintiff has not demonstrated proof of any "promised" threat of litigation,[6] nor would the Court

consider such speculative harm.  Finally, the only real threat of irreparable harm faced by Debt

Buyers is the possible assessment of penalties by the IRS, for which an alternate and exclusive

forum has been shown to exist to contest such harm.  Furthermore, there already exists an

indication in the form of a public letter to a trade group that the IRS may be sympathetic to

certain Debt Buyers who have been unable to obtain component information to report on 1099-C

Forms who then report using the best available information and henceforth can contest penalty

assessments under the "reasonable cause" exception.  *See* BNA Daily Tax Reporter, INFO 2005-

---

[6]  During the conference call held on January 20, 2006, Plaintiff represented to the Court and to Defendants that a suit had been filed in the Northern District of Illinois demonstrating the realized threat of litigation regarding violations of the FDCPA by debt buying entities based on the issuance of 1099-C Forms and corresponding statements to debtors.  Plaintiff volunteered to include the referenced complaint to the Court and Defendants, which Plaintiff included in its Supplement.  *See* Pl.'s Suppl. at Exh. 1.  Upon examination of the attached "Amended Complaint–Class Action" in *Johnston v. Arrow Fin. Services, LLC*, No. 06cv13 (N.D. Ill.), the referenced case on its face does not appear to implicate the reporting requirements as applied by Treas. Reg. § 1.6050P-2(e).

0208 at Q&A 3 (January 10, 2006).  The "reasonable cause" exception in 26 U.S.C. § 6724(a)

states that "[n]o penalty shall be imposed under this part with respect to any failure if it is shown

that such failure is due to reasonable cause and not to willful neglect."  *Id.*

   Plaintiff clearly has not met the prerequisites for equity jurisdiction required for this

Court to exercise jurisdiction over its claims in the event that Plaintiff had actually shown

definitive success on the merits.  Thus, Plaintiff has not shown either that the government cannot

prevail on the merits under any circumstances, nor that equity jurisdiction may be invoked, and

as such this Court does not have jurisdiction over Plaintiff's claims under the *Williams Packing*

exception to the AIA.

   **D.     Plaintiff's request for declaratory relief in its Complaint should likewise be
            dismissed.**

   In its Complaint, Plaintiff requests that the Court declare Treas. Reg. § 1.6050P-2(e)

"contrary to law, unenforceable, and invalid."  Pl.'s Compl. ¶ 1.  Plaintiff further invokes the

Administrative Procedure Act ["APA"], 5 U.S.C. § 702, as a basis for the Court's jurisdiction to

review agency action in this case.  Pl.'s Compl. ¶ 10.  However, the APA does not provide an

independent basis for jurisdiction over Plaintiff's claims if the Court is precluded from exercising

jurisdiction by the AIA.  *See Walker v. Washington*, 627 F.2d 541, 545 (D.C. Cir. 1980) ("At one

time, this circuit had concluded that section 702 provided an independent source of jurisdiction

that empowered the district courts to review agency action.  Now, however, the Supreme Court

has made it clear that section 702 is not an independent jurisdictional provision." (citations

omitted)); *Yamaha Motor Corp., U.S.A. v. United States*, 779 F. Supp. 610, 612 (D.D.C. 1991)

("If the Anti-Injunction or Declaratory Judgment Acts apply to the instant case, the Plaintiffs

cannot assert a claim under the Administrative Procedure Act.  *See* 5 U.S.C. § 701(a)(1) (APA

does not apply 'to the extent that . . . statutes preclude judicial review'); 5 U.S.C. § 702(1) (APA

does not affect 'other limitations on judicial review or the power or duty of the court to dismiss

any action or deny relief on any appropriate legal or equitable ground').").  Consequently, as this

Court lacks any basis for jurisdiction to hear Plaintiff's claims under the Anti-Injunction Act and

the Declaratory Judgment Act as analyzed in the previous sections of this Memorandum Opinion,

Plaintiff's case before this Court in its entirety must be dismissed.[7]

## IV:  CONCLUSION

For the reasons set forth above, the Court shall DENY Plaintiff's Motion for Temporary

Restraining Order and/or Preliminary Injunction and Request for Expedited Hearing; and the

Court shall GRANT Defendants' Motion to Dismiss.  An Order accompanies this Memorandum

Opinion.


Date:   January 30, 2006


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge


[7] Additionally, since the Court does not have jurisdiction to review the regulation at issue under the APA, the complete record pertaining to Treas. Reg. § 1.6050P-2(e) shall not be reviewed by the Court.